1  PATRICK D. ROBBINS (CABN 152288)
   Acting United States Attorney
2
   MARTHA BOERSCH (CABN 126569)
3  Chief, Criminal Division

4  CASEY BOOME (NYBN 5101845)
   MOLLY K. PRIEDEMAN (CABN 302096)
5  Assistant United States Attorneys

6       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
7       Telephone: (415) 436-6627
        casey.boome@usdoj.gov
8       molly.priedeman@usdoj.gov

9  STEPHEN MARZEN (NYBN 2007094)
   YIFEI ZHENG (NYBN 5424957)
10 Trial Attorneys, National Security Division

11      950 Pennsylvania Avenue, N.W.
        Washington, DC 20530
12      Telephone: (202) 616-1051
        stephen.marzen@usdoj.gov
13      yifei.zheng@usdoj.gov

14 Attorneys for United States of America

15                UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17                 SAN FRANCISCO DIVISION

18
   UNITED STATES OF AMERICA,            )  CASE NO. 3:24-cr-00141-VC
19                                       )
        Plaintiff,                       )  **UNITED STATES' OPPOSITION TO
20                                       )  DEFENDANT'S MOTION TO MODIFY
     v.                                  )  PROTECTIVE ORDER**
21                                       )
   LINWEI DING,                          )  The Honorable Vince Chhabria
22                                       )  Courtroom 4, 17th Floor
        Defendant.                       )
23 _____ )  Hearing: 1:00 pm on March 19, 2025

24

25

26

27

28

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY PROTECTIVE ORDER

3:24-cr-00141-VC

TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................................1

FACTS .............................................................................................................................................3

The Protective Order, the Government's Confidentiality Designations and Productions, and
the Parties' Negotiations to Adjust ................................................................................................3

    A    The Protective Order and Prompt Productions of GOOG Bates-Numbered
              Confidential Material ......................................................................................................3

    B.   The Government's De-Designations and (Re)production of Confidential
              Material and Discovery Material ....................................................................................4

    C.   The Government's Proposal to Reduce Defense Costs But Protect
              Confidential Material ......................................................................................................5

    D.   The Documentary Evidence of Linwei Ding's Non-Compliance with
              Confidentiality and Non-Disclosure Obligations..........................................................6

LEGAL STANDARD.......................................................................................................................9

Good Cause Must Be Demonstrated to Modify the Protective Order ...........................................9

ARGUMENT .................................................................................................................................10

    I.    Ostensible Overdesignation Provides No Good Cause to Modify the
             Protective Order Because the Government Has Reviewed the Productions –
             Twice – and Will Correct any Misdesignations..............................................................12

    II.   The Court Should Not Add Another Confidentiality Tier Because Ding
             Should Not Review Confidential Material at Home..........................................................12

CONCLUSION...............................................................................................................................14

1

**TABLE OF AUTHORITIES**

2                                                                                         Page(s)

3  Cases

4  *Mohawk Industries, Inc. v. Carpenter*,
5     558 U.S. 100, 130 S. Ct. 599 (2009)............................................................... 10

6  *United States v. Jinhua*,
7     No. 3:18-cr-00465-MMC (N.D. Cal.).…………………………………………10

8  *United States v. Wang*,
   No. 21-CR-6108-FPG …………………………………………………………...11

9

10 Other Authorities

11 5 WAYNE R. LAFAVE, JEROLD H. ISRAEL, NANCY J. KING & ORIN S. KERR, CRIMINAL PROCEDURE
12    § 20.3(l), at 515 (4th ed. 2015).…………………………………………………1

13

14 Statutes

15 18 U.S.C. § 1831(a)(1)-(3)............................................................................... 6
   18 U.S.C. § 1832(a)(1)-(3).......................................................................... 4, 6
16 18 U.S.C. § 1835(b) ...................................................................................... 10
   Pub. L. No. 114-153...................................................................................... 10

17 Rules

18 FED. R. CRIM. P. 16(d)(1) ................................................................................ 9

19
20
21
22
23
24
25
26
27
28

1

**PRELIMINARY STATEMENT**

2       Protective orders generally and in trade-secret cases particularly require courts to strike a balance

3   between the burden of denying or restricting disclosure to the defense, on the one hand, and the risk of

4   unrestricted disclosure, on the other hand. *See* 5 WAYNE R. LAFAVE, JEROLD H. ISRAEL, NANCY J. KING

5   & ORIN S. KERR, CRIMINAL PROCEDURE § 20.3(l), at 515 (4th ed. 2015) ("In the end, as the Arizona

6   Rule notes, the court must determine that the disclosure would result in a risk or harm outweighing any

7   usefulness of the disclosure.'") (footnote omitted).

8       Defendant Linwei Ding's ("Ding's") motion to modify the stipulated protective order (Dkt. 13)

9   presents narrow issues – namely, whether Ding himself should be permitted to review the trade-secrets-

10  in-suit[1] and other Google LLC ("Google") trade secrets in his defense counsel's law offices without

11  supervision and with his electronic devices and other means of taking notes; and whether Ding should be

12  permitted to review confidential information other than trade secrets at home.

13      The government's productions to defendant are up to date and were reviewed document-by-

14  document for proper protective-order designation. The document *corpus* in this economic-espionage

15  case is fewer than 2,000 documents. Approximately 1,370 of those documents are technical documents

16  that contain information that Ding copied from Google's network and secretly transferred to his personal

17  Google cloud account.[2] Most importantly, the protective order has two tiers rather than three and thus no

18  documents are limited to attorney's eyes only. Not only has Ding's counsel had access to the

19  government's productions, but Ding himself has access as well. The only "burden" imposed on Ding's

20  access by the protective order – to borrow his counsel's words – is "the need to drive to his counsel's

21  office." Ding's Motion to Modify Protective Order, Dkt. 53, at 11.

22      Balanced against Ding's desire to reduce his commute is the risk that, if Ding is allowed

23  unsupervised access in his counsel's offices to review trade secrets with his electronic devices and

24

25      [1] As in a patent case concerning infringement of the patents-in-suit, as opposed to other patents the plaintiff owns, by "trade-secrets-in-suit" we refer to the trade secrets in the indictment and which the

26  government will prosecute at trial, as opposed to other trade secrets owned by the victim company and obtained or retained by the defendant from the victim company and others without authorization.

27

28      [2] Defendant's motion repeatedly refers to a universe of 4,400 confidential documents without acknowledging that the vast majority of those 4,400 files are duplicates or derivative (*e.g.*, thumbnail artifacts or metadata files) of the core 1,370 confidential documents.

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY PROTECTIVE ORDER          1
3:24-cr-00141-VC

1 ability to take written notes, he will revictimize Google by taking photographs or handwritten notes,

2 which could be transferred to the Ding's business associates in the People's Republic of China ("PRC").

3 Home access to Google's business proprietary documents other than trade secrets provides even greater

4 opportunities for Ding to exfiltrate Google's confidential information.

5          Not only would defense counsel's protective-order modifications give Ding the means to

6 exfiltrate Google confidential materials, but Ding has the motive. When Google caught Ding

7 downloading Google documents the first time, Ding signed a self-deletion affidavit in which he falsely

8 promised that he would delete all Google proprietary information in his possession. Ding's attestations

9 in the affidavit were lies. Contrary to his sworn affidavit, Ding retained without authorization a treasure

10 trove of Google trade secrets and confidential files that might never have been recovered but for law-

11 enforcement intervention. To circumvent Google's sophisticated network controls, Ding copied and

12 pasted Google trade secrets from Google's internal network into Apple Notes, saved the Notes in

13 portable document format (.pdf), and uploaded the files to his personal cloud storage account. In a

14 voluntary interview during execution of a premises warrant, Ding repeatedly lied about how many

15 Google files he downloaded, why he downloaded them, whether he accessed them in the PRC, and

16 whether he had another Google employee "badge in" for him in the United States to conceal the fact that

17 he was in the PRC.

18          The current protective order (Dkt. 13), together with proposed modifications, strike a fair balance

19 by (on the one hand) giving Ding and his counsel access to the entire defense production with the

20 modest burden that Ding commute to his counsel's law offices, but (on the other hand) denying Ding the

21 means to copy and exfiltrate Google's trade secrets and proprietary business information, which he has

22 demonstrated a propensity to do.

23          In an (unsuccessful) effort to avoid this motion practice, or at least narrow the issues before the

24 Court, the government offered (before Ding filed his motion) to permit Ding access to Confidential

25 Material (*i.e.*, the trade-secrets-in-suit, trade secrets not in suit, and other Google proprietary business

26 information) in his counsel's office on a secure laptop *without supervision*; provided, however, that Ding

27 leave all electronic devices (phones, cameras etc.) with counsel before reviewing Confidential Materials

28 (to prevent photographs of computer monitors), and that any notes taken by Mr. Ding remain on the

1    secure review laptop or otherwise in his attorneys' custody and control. Ding's counsel did not respond

2    to the government's offer and instead filed this motion. In his motion, Ding seems to accept the

3    government's offer to adjust the protective order, but Ding drops the critical *proviso* that he not have

4    electronic devices or the ability to take written notes. The government does not agree, and the victim

5    company does not agree, to give Ding unsupervised access to Google's trade secrets and business

6    proprietary information with his electronic devices and ability to take and remove notes. Ding's motion

7    essentially asks that the Court trust Ding. Ding's lies and concealment demonstrate that trust in him is

8    misplaced.

9                                                    **FACTS**

10       **THE PROTECTIVE ORDER, THE GOVERNMENT'S CONFIDENTIALITY DESIGNATIONS AND
         PRODUCTIONS, AND THE PARTIES' NEGOTIATIONS TO ADJUST**
11

12           The designated document population in this criminal proceeding is little more than four thousand

13   documents. Most of those files are duplicates or derivative copies of a core set of 1,370 confidential

14   documents. *See* Declaration of Casey Boome ¶¶ 2-3 ("Boome Decl."). Those 1,370 files represent the

15   cache of Google confidential information and trade secrets that Ding secretly exfiltrated from Google's

16   network and stored in his personal cloud storage account. *See id*.

17           Although defense counsel did not respond to the government's pre-motion offer to avoid "baby

18   sitting" its client while at the same time preventing Ding from copying and exfiltrating Confidential

19   Material, that offer remains on the table and the government suggests that the Court adopt it and deny

20   any further modification of the protective order beyond permitting unsupervised document review in

21   defense counsel's offices without electronic devices or personal notes.

22           Later in this proceeding, as we get closer to the October 14, 2025 trial date, the Court may want

23   to make rulings to protect the confidentiality of trade secrets at trial, because the protective order does

24   not speak to confidentiality at trial.

25       A.       **The Protective Order and Prompt Productions of GOOG Bates-Numbered
                  Confidential Material**

26           On January 6, 2024, FBI Special Agents executed a premises warrant at the residence of Linwei

27   (a/k/a/ Leon) Ding and interviewed Mr. Ding outside his home. *See* Declaration of FBI Special Agent

28

1  Gregory Toole ("Toole Decl."), Ex. 3.[3] On March 5, a grand jury in the Northern District of California

2  indicted Ding for four counts of trade-secret theft in violation of 18 U.S.C. § 1832(a)(1)-(3). On March

3  6, 2024, Ding was arrested.

4      Before the month of March 2024 was finished, the parties stipulated to a protective order (Dkt.

5  13) and the government produced the core 1,370 files with the bates prefix "GOOG," all designated as

6  Confidential Material under the protective order. *See* Boome Decl. ¶ 3. The protective order has two

7  categories – Confidential Material and Discovery Material. *See* Dkt. 13 ¶ 1. Confidential Material is

8  information that is (a) "to be kept secret" (*i.e.*, business proprietary information) or (b) "is a trade

9  secret." Dkt. 13 ¶1(a). Discovery Material consists of "all materials disclosed by the United States

10  during discovery in this case." Dkt. 13 ¶1(b).

11      **B.    The Government's De-Designations and (Re)production of Confidential Material
        and Discovery Material**

12
13  On September 18, 2024, the government produced the 1,370 GOOG files again with a "US" Bates

14  prefix as part of a larger production that included the content of Ding's Google cloud accounts.[4] While

15  the original GOOG production numbered 1,370 files, the US production numbered 3,005 files because it

16  included not only the original 1,370 files, but also additional files containing associated metadata and

17  other artifacts of the 1,370 files. *See* Boome Decl. ¶¶ 4-5 To be specific, the 3,005 designated files in the

18  government's fifth production (produced on September 18, 2024) included duplicate copies of the 1,370

19  designated GOOG files, 1,285 single-page thumbnail (.png) files (duplicating again the first page of

20  most of the 1,370 GOOG files), and 91 metadata files. *Id*. ¶¶ 6-7. As such, 2,746 of the 3,005 designated

21  files were either metadata files or duplicate copies of GOOG designated documents that the government

22  produced to defense counsel in March 2024. The government's cover letter accompanying its September

23  18 production advised defense counsel that the designated US files included "substantial[] overlap with

24  the previously produced GOOG files." *Id.* ¶ 4. Ding's motion elides the substantial duplication of

25
26      [3] Exhibits in the government's declarations are numbered sequentially across declarations to
    provide unique exhibit numbers and to avoid overlap with Ding's exhibits, which use letters.

27      [4] The 1,370 GOOG files were produced immediately after the initial indictment to give Ding
    prompt access to the core technical files. The government re-produced the GOOG files under the US
28  Bates scheme when the government produced the content of the cloud storage account where the GOOG
    files were stored. *See* Boome Decl. ¶¶ 2-5.

1  designated documents in the government's productions.

2          In the fall of 2024, the parties exchanged correspondence about protective-order designations

3  and the government reviewed each of the 1,370 GOOG files, document by document. The review

4  identified 83 files to produce without designation. The resulting de-designated re-production, which the

5  government provided to defense counsel on November 26, 2024, included 278 files because of each file

6  had a GOOG version, a US version, and associated derivative files. *See* Boome Decl. ¶¶ 8-11. Among

7  the files the government de-designated on November 26, 2024 were all documents referenced in

8  Exhibits C, D, and F to the Declaration of Grant Fondo.

9          Ding's protective-order motion identifies a single document – US-0012528 – that remains

10  improperly designated as Confidential Material. If Ding's counsel had identified that erroneous

11  designation before filing his motion, the government would have de-designated that document. *See*

12  Boome Decl. ¶ 12.

13          In response to that inadvertent designation, the government reviewed again all 3,005 documents

14  from the US production. As a result of that review, the government will de-designate an additional 109

15  files. *See* Boome Decl. ¶¶ 12-14. Approximately 60% of the documents are metadata files.

16  Approximately 40% of the files are personal documents that are relevant for attribution to Ding but do

17  not contain trade secrets or other Google confidential information. The mis-designation of those 109

18  documents thus could not have delayed or otherwise impeded the preparation of the defense.

| Second Re-Production (De-Designation) | |
|---|---|
| **Number of Files** | **Nature of Files** |
| 64 | Metadata (.json or .json.txt) files |
| 18 | HR-related documents pertaining to Ding's employment at Cadence (one of Ding's former employers) |
| 11 | Non-technical Google documents, such as job descriptions, interview outlines, and other notes |
| 16 | Non-Google-related personal documents, including two copies of the resume-like document attached as Exhibit A to the Fondo Decl. |
| 109 | TOTAL |

**C.    The Government's Proposal to Reduce Defense Costs But Protect Confidential Material**

On February 4, 2025, a grand jury in the Northern District of California returned a superseding

1    indictment that further specified the trade-secrets-in-suit (to seven categories in the superseding

2    indictment from four categories in the original indictment) and charged Ding with seven counts of

3    economic espionage in violation of 18 U.S.C. § 1831(a)(1)-(3) and seven counts of trade-secret theft in

4    violation of 18 U.S.C. § 1832(a)(1)-(3).

5        On February 5, 2025, the government sent an e-mail message to defense counsel proposing a call

6    to meet and confer about Ding's motion to modify the protective order. On a call later that day, the

7    government suggested that Ding be allowed to review Confidential Material without supervision as long

8    as Ding gave all electronic devices to counsel before reviewing Confidential Material and that any notes

9    taken by him remained in the possession, custody, and control of the defense team at all times. Defense

10   counsel did not respond to the government's offer. *See* Molly K. Priedeman Declaration ¶¶ 2-5.

11   **D.    The Documentary Evidence of Linwei Ding's Non-Compliance with Confidentiality and Non-Disclosure Obligations**

12

13       The evidence at trial will show that, between May 21, 2022 and December 2, 2023, Ding secretly

14   uploaded a substantial cache of Google corporate files to his personal Google drive. *See* Superseding

15   Indictment, Dkt. 44 ¶ 17. Ding was on notice of Google's security measures and data confidentiality

16   policies, which he acknowledged by signing his Employment Agreement and Google's Code of Conduct

17   and by completing required trainings focused on the importance of protecting Google's intellectual

18   property. *See id*. ¶¶ 12-14. Ding attempted to circumvent Google's security measures by copying and

19   pasting sensitive, internal Google content into Apple Notes on his Google-issued MacBook Pro laptop,

20   converting the content into portable document format, and uploading the .pdfs to a personal Google

21   Drive. *See id*. ¶ 17. In December 2023, while Ding was in the PRC raising funds for his startup

22   company, another Google employee, at Ding's direction, badged in for Ding at Google's California

23   offices to make it appear as though Ding was working from his normal workstation. *See id*. ¶¶ 22, 31.

24       On December 8, 2023, Google Global Investigations interviewed Ding and Ding signed a self-

25   deletion affidavit ("SDA"), falsely promising that he had "searched [his] personal possessions, including

26   all devices, accounts, and documents in [his] custody or control for any non-public information

27   originating from [his] job at Google . . . [He] ha[d] permanently deleted and/or destroyed all copies of

28   such information . . . As a result, [he] no longer ha[d] access to such information outside the scope of

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY PROTECTIVE ORDER          6
3:24-cr-00141-VC

1   [his] employment. Dkt. 44 ¶ 27.

2       On January 6, 2024, while FBI Special Agents executed a warrant to search Ding's residence,

3   other agents asked Ding if they could interview him. *See* Gary Toole Declaration, Exhibit 3, at 1. Ding

4   agreed. *See id.* The agents told Ding that he was not in custody or under arrest and that the interview was

5   voluntary. *See id.* The interview was recorded. *See id.* Ding acknowledged that Google did not allow

6   him to transfer files outside of Google or share information outside of Google about Google projects.

7   *See id.* at 2. When asked if he ever let anyone else use his badge, Ding initially insisted that he never let

8   anyone else use his badge. *See id.* at 4. Later in the interview, however, Ding admitted that he had a co-

9   worker badge in for him, which meant that his initial representation to the agents was a lie. *See id.* at 6.

10  Ding also acknowledged that he signed the SDA on December 8, 2023. Contrary to Ding's sworn

11  promise to delete all Google non-public information, on January 6, 2024, when Ding spoke to the

12  agents, Ding admitted that he still had Google files in his possession, which meant that Ding lied again.

13  *See* Greg Toole Declaration, Exhibit 3, at 4.

14      The evidence at trial will also show that, shortly after Ding began secretly exfiltrating Google's

15  trade secrets, he began discussing employment with Beijing Rongshu Lianzhi Technology Co., Ltd.

16  ("Rongshu"), an early-stage technology company based in the PRC. *See* Dkt. 44 ¶¶ 18-20. Rongshu's

17  business objectives included the development of acceleration software for machine learning on graphics

18  processing unit ("GPU") chips (*see id.*) – technology that overlapped with the trade secrets that Ding

19  stole (*see id* ¶¶ 2-7). Ding became Rongshu's Chief Technology Officer, but eventually left the

20  company to found his own artificial intelligence ("AI")-focused startup company called Shanghai

21  Zhisuan Technology Co. Ltd. ("Zhisuan"), all the while concealing his separate business ventures from

22  Google, even as he continued to collect his full-time Google paycheck. *See id.* ¶¶ 18-23. On November

23  24, 2023, at an investor conference in Beijing, Ding explained to potential investors that the foundation

24  of his company Zhisuan (and its product Lyceum) was its ability to "directly copy and upgrade"

25  "Google's experience and technology." The image below shows Ding at the November 2024 Beijing

26

27

28

1    investor conference together with the machine translated text appearing above Ding's head.



2
3
4
5
6
7
8
9
10
11
12
13

14    Following the January 6, 2024 premises search at Ding's residence, FBI reviewed WeChat

15    messages found on the Ding's phone of a group entitled "Zhisuan Technology-Chuxin Capital," a

16    collection of Ding's Zhisuan colleagues. Their discussion, which took place between November 30,

17    2023 and December 4, 2023 included the following machine translated colloquy between Ding

18    (dingyong198608) and a colleague:

19
20    dingyong198608: "Thank you for your attention. We will communicate again
      later. [Joyful][Joyful][Joyful]"

21    wxid_sb2kzwve0r1j21: "Do we have more specific chip-specific performance
22    test reports and speed-up training cases?"

23    dingyong198608: "Yes, but it is confidential and cannot be shared directly
      with everyone"

24    wxid_sb2kzwve0r1j21: "Let's sign an NDA? We'll use it for internal
      evaluation."

25
26    dingyong198608: "@Yi Yixin This is a case study I did at Google before, not
      information about our current project, so it's hard to share [Facepalm] I
27    signed a confidentiality agreement so you can watch it on the spot, but you
      can't keep it."

28    wxid_sb2kzwve0r1j21: "Got it, I'll come over to see it later [happy]"

1 | Toole Decl., Exhibit 5, at 1.

2 | **LEGAL STANDARD**

3 | **GOOD CAUSE MUST BE DEMONSTRATED TO MODIFY THE PROTECTIVE ORDER**

4 | The parties agree that the Court may modify the protective order (Dkt. 13) for "good cause."

5 | Criminal Rule 16 authorizes courts "at any time" to enter or modify protective orders for good cause.

6 | FED. R. CRIM. P. 16(d)(1). Ding's civil cases put the burden on the movant to demonstrate good cause.

7 | *See* Dkt. 53, at 8 (citing cases). After relying on civil cases, Ding reverses field and asserts that in

8 | criminal cases the movant need not bear the risk of non-persuasion because the court need only "act for

9 | good cause." Dkt. 53, at 9. How a risk of non-persuasion functions if neither party bears it is not

10 | explained in Ding's brief. In any event, the parties agree that the Court may modify the protective order

11 | for good cause and the arguments on either side of this motion are not evenly balanced so that risk of

12 | non-persuasion should not do any work here.

13 | Although the government agrees with the applicable legal standard, Ding's analysis is

14 | incomplete to the point of irrelevance because he asserts that the "primar[]y" function of a protective

15 | order is to protect witnesses and prevent perjury. Dkt. 53, at 9 (quoting 1966 advisory committee's

16 | notes); *see id*. at 11 ("Mr. Ding's proposed modification poses no meaningful risk to witness safety – the

17 | primary concern of Rule 16(d)(1).").

18 | Contrary to Ding's contention, the primary function of protective orders in economic espionage

19 | and trade-secret cases is to protect trade secrets. To that end, protective orders in cases under the

20 | Economic Espionage Act of 1996 – such as this case – are governed not only by Criminal Rule 16, but

21 | also by statute. Ding's motion does not even cite the statute requiring protective orders in cases under

22 | the Economic Espionage Act.

23 | In Section 1835, the Economic Espionage Act of 1996 requires courts to enter protective orders

24 | to safeguard trade secrets and provides an immediate interlocutory appeal by the United States (not the

25 | defendant) if an alleged trade secret is ordered to be disclosed:

26 | In any prosecution or other proceeding under this chapter, the court shall enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality
27 | of trade secrets, consistent with the requirements of the Federal Rules of Criminal and Civil Procedure, the Federal Rules of Evidence, and all other applicable laws. An interlocutory appeal
28 | by the United States shall lie from a decision or order of a district court authorizing or directing the disclosure of any trade secret.

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY PROTECTIVE ORDER        9
3:24-cr-00141-VC

1  *Compare Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 130 S. Ct. 599, 604-609 (2009)

2  (disclosure orders adverse to the attorney-client privilege do not qualify for immediate appeal under the

3  collateral order doctrine).

4       Twenty years later, in 2016, Congress amended the Economic Espionage Act of 1996 by passing

5  the Defend Trade Secrets Act, Pub. L. No. 114-153 (May 11, 2016). Among other provisions, DTSA

6  redesignated the prior paragraph as subsection (a) and added a new subsection (b) providing additional

7  protective-order rights to trade secret owners (and not merely the government):

8       **(b) Rights of Trade Secret Owners.—**

9       The court may not authorize or direct the disclosure of any information the owner asserts to be
a trade secret unless the court allows the owner the opportunity to file a submission under seal

10      that describes the interest of the owner in keeping the information confidential. No submission
under seal made under this subsection may be used in a prosecution under this chapter for any

11      purpose other than those set forth in this section, or otherwise required by law. The provision of
information relating to a trade secret to the United States or the court in connection with a

12      prosecution under this chapter shall not constitute a waiver of trade secret protection, and the
disclosure of information relating to a trade secret in connection with a prosecution under this

13      chapter shall not constitute a waiver of trade secret protection unless the trade
secret owner expressly consents to such waiver.

14 DTSA § 3(a)(2)(B), *codified at* 18 U.S.C. § 1835(b).[5]

15                              **ARGUMENT**

16      This District is the epicenter of trade-secret litigation and many cases present genuine and

17 serious problems of how to produce and designate large collections of documents while at the same time

18 preparing for trial and not letting document discovery become the main event. This case does not present

19 those problems.

20      Compared to the more than six million documents produced to the PRC state-owned entity in

21 *United States v. Jinhua*, No. 3:18-cr-00465-MMC (N.D. Cal.), the vast majority of which were

22

23

24      [5] The House Committee Report on DTSA's expansion of the protective-order requirements
suggests that trade-secret defendants are not necessarily entitled to access the trade-secrets-in-suit in

25 conspiracy cases under the Economic Espionage Act. *See* H.R. Rep. No. 529, 114th Cong., 2d Sess. 14-
15 (Apr. 26, 2016) ("The provision is also intended to ensure that in a prosecution for conspiracy related

26 to the alleged theft of a trade secret, the actual trade secret itself is not subject to disclosure to the
defense, because the actual secrecy of the information that is the object of the conspiracy is not relevant

27 to the prosecution of a conspiracy charge."), *reprinted in* 3 U.S. Code Cong. & Admin. News 209
(2016). Although this case alleges substantive violations and no conspiracy, that Congress saw no need

28 for the defendant to have access to the trade-secrets-in-suit bears on the weight to be given to Ding's
access request, especially his request to access Confidential Material at home to reduce his commute.

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY PROTECTIVE ORDER        10
3:24-cr-00141-VC

1    designated as confidential by the producing (Taiwanese) corporate defendant, and the more than half

2    million documents produced to the individual defendant in *United States v. Wang*, No. 21-CR-6108-FPG

3    (W.D.N.Y.) (to be tried in Rochester beginning on May 19, 2025), which also included voluminous

4    designated documents, Ding by his own admission bases his motion on about 4,400 documents. *See* Dkt.

5    53, at 3, 4, 6, 8, 9, 12 (Ding's motion refers to the 4,400 documents 14 times).

6        As explained above, however, even 4,400 documents vastly overstates the population in this

7    criminal proceeding. As the government's production letters make pellucidly clear, the government

8    produced the same core documents twice: once in March 2024 immediately after obtaining them (to give

9    defense counsel immediate access) and again with metadata and artifacts as part of a production that

10   included the content of the cloud account where the core documents were found. As a result, the 4,400

11   documents are overstated by more than double.

12       According to Ding's counsel, the two thousand-ish documents present two issues, which Ding

13   conflates but the government will separate – those purported issues are (I) overdesignation and

14   (II) burdensome access under the protective order.

15       With respect to ostensible overdesignation, the government is aware of its obligations under the

16   protective order. The government reviewed the designations last fall, long before Ding filed his motion.

17   Ding identified one additional document in his motion. In response, the government re-reviewed the

18   entire collection. (At a standard document review rate of 50 documents an hour, the entire collection can

19   be reviewed for proper designations by a single associate unfamiliar with the documents in less than a

20   week.) Both of the government's reviews resulted in de-designations. None of the de-designated

21   documents affect preparation of this case for trial. The misdesignated documents were almost entirely

22   system files or personal documents. If the government mistakenly designates documents, we will correct

23   the designation. But misdesignation supports a motion to comply with the protective order, not good

24   cause to modify it.

25       With respect to Ding's request to add another tier to the protective order in order to separate

26   trade secrets (a new "Highly Confidential Material" category) from non-trade-secret business

27   proprietary information ( "Confidential Material"), that request presupposes that Ding should be

28   permitted to review Google's business proprietary information at home. The conduct that got Ding

1   indicted makes it risible to think he should be allowed to review Google trade secrets with his electronic

2   devices or ability to take notes, even in his defense counsel's offices, and should surely not be allowed

3   to take Google proprietary information home.

4   **I.    Ostensible Overdesignation Provides No Good Cause to Modify the Protective Order
        Because the Government Has Reviewed the Productions – Twice – and Will Correct any
5       Misdesignations**

6           If true, defense counsel's overdesignation accusations would support an order that the

7   government review its designations and correct them if necessary. Contrary to those accusations,

8   however, *supra* pp. 4-5, the government reviewed the confidentiality designation of its documents last

9   fall and de-designated 278 documents (not the 44 claimed by the defendant, *see* Dkt. 53, at 1). At no

10  time did the government "tr[y] to shift the burden to Mr. Ding" (*id.* at 6, 7) to designate documents. The

11  government did its work and simply asked Ding to let it know if it thought the government made a

12  mistake so that the government could correct it. Rather than identify any other mistakes, the defendant

13  found a misdesignated resume (*see* Dkt. 53, at 2) and made it the basis for this motion. In response, the

14  government has now re-reviewed the entire production and will de-designate 109 more documents.

15  None of the de-designations are technical documents affecting preparation of this case for trial. About

16  60% of the de-designations are system files and 40% are personal documents that are relevant for

17  attribution but not offense conduct.

18          No document production is perfect. Mistakes will be made. The government is entirely confident

19  that it will make mistakes in the future. But it will correct them. And mistaken designations are

20  inadvertent departures from a protective order, not good cause to modify it.

21  **II.   The Court Should Not Add Another Confidentiality Tier Because Ding Should Not Review
        Confidential Material at Home**
22
            Although Ding's proposed order lists four changes to the protective order, all four changes are
23
    motivated by one consideration – namely, to allow Ding to review documents other than the trade-
24
    secrets-in-suit at home. To enable Ding to review those documents at home, his counsel proposes (1) to
25
    split the definition to Confidential Material into Highly Confidential Material (which includes the trade-
26
    secrets-in-suit as well as other trade secrets) and Confidential Material (which includes documents that
27
    are not trade secrets such as business proprietary information). After splitting Confidential Material into
28

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY PROTECTIVE ORDER        12
3:24-cr-00141-VC

1    two categories, Ding (2) requires the government to re-designate all documents produced to date as well

2    as all future productions into Highly Confidential, Confidential, and Discovery Material (the latter

3    constituting documents that are not Highly Confidential or Confidential). (As an extra task, Ding's

4    proposed order requires the government to identify the trade-secrets-in-suit for its trial exhibit list by

5    May 15: "The government shall identify the Highly Confidential materials that it intends to use at trial

6    on or before May 15, 2025.") Lastly, Ding asks (3) to review Confidential Material at home and (4) to

7    review Highly Confidential Material in defense counsel's offices without supervision and with all of his

8    electronic devices and free to take pictures or make written notes to take out the door.

9            If Ding should *not* be allowed to review Google confidential information at home, then no good

10   cause exists to add an additional tier to the protective order. For if Ding should not take Google

11   confidential information home, then he needs to review that information in his counsel's law offices. If

12   all confidential information should be reviewed in defense counsel's offices – the trade-secrets-in-suit,

13   other trade secrets, and business proprietary information – then the Court need not distinguish among

14   those different categories of information: Ding can review all of them after a short commute to the firm.

15           Ding's counsel complains, on Ding's behalf, that "Mr. Ding should have access without the need

16   to drive to his counsel's office or be under constant supervision." Dkt. 53, at 11. The basis for avoiding a

17   short commute is Ding's counsel's blithe assertion that "[t]he government has not alleged, nor produced

18   any evidence, that Mr. Ding ever actually used or disclosed the alleged trade secrets." Dkt. 53, at 11.

19   Contrary to Ding's assertion, the government asserts and expects the evidence at trial to prove that Ding

20   intended to use Google trade secrets for his own benefit and that of his PRC-based companies and the

21   PRC government -- and would have done so if the government had not intervened. *See supra* pp. 6-8.

22   Ding announced at a PRC investor conference that his PRC startup company would "directly copy"

23   Google's "technology" to develop a computer acceleration platform for artificial intelligence suitable to

24   China's national conditions. *Supra* pp. 7-8. Ding offered in an encrypted WeChat message to show his

25   PRC colleagues Google confidential information notwithstanding that the information was protected by

26   a "confidentiality agreement" with Google. *Supra* p. 8. Despite knowing the confidentiality rules and

27   promising to comply with them, Ding repeatedly violated them and lied about it. His offense conduct

28   provides good cause to tighten restrictions on his access to confidential information, not relax them.

1   Even if good cause existed to create a new confidentiality tier – which it does not – the Court

2   would need to add not one confidentiality tier but two, for a total of three confidentiality tiers. The

3   Confidential Material produced by the government includes three categories: (1) the trade-secrets-in-

4   suit, (2) other trade secrets (which the government will not prosecute at trial to streamline the

5   presentation of its case-in-chief), and (3) business proprietary information. The protective order should

6   not permit Ding to review any Confidential Material at home. But if it did, he certainly should not be

7   allowed to review trade secrets that are not in suit, because they remain trade secrets entitled to statutory

8   protection under Section 1835.

9                                           * * * * *

10   Rather than engage in extensive satellite proceedings to implement a reticulated scheme of

11   confidentiality designations, Ding should review all Confidential Material in his counsel's offices,

12   without supervision by an attorney or even paralegal, but also without his electronic devices or other

13   means to copy and exfiltrate Google's trade secrets and business proprietary information.

14                                        **CONCLUSION**

15   For the foregoing reasons, Defendant Linwei Ding's motion to modify the protective order (Dkt.

16   13) should be denied.

17

18

19   DATED: March 5, 2025                        Respectfully submitted,

20                                               PATRICK D. ROBBINS
                                                 Acting United States Attorney
21

22

23                                               /s/_____
                                                 CASEY BOOME
24                                               MOLLY K. PRIEDEMAN
                                                 Assistant United States Attorneys
25

26                                               STEPHEN MARZEN
                                                 YIFEI ZHENG
27                                               Trial Attorneys, National Security Division

28