PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

CASEY BOOME (NYBN 5101845)
MOLLY K. PRIEDEMAN (CABN 302096)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6627
    casey.boome@usdoj.gov
    molly.priedeman@usdoj.gov

STEPHEN MARZEN (NYBN 2007094)
YIFEI ZHENG (NYBN 5424957)
Trial Attorneys, National Security Division

    950 Pennsylvania Avenue, N.W.
    Washington, DC 20530
    Telephone: (202) 616-1051
    stephen.marzen@usdoj.gov
    yifei.zheng@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>LINWEI DING,<br><br>    Defendant. | CASE NO. 3:24-cr-00141-VC<br><br>**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS AND FOR MORE PARTICULARS ON ECONOMIC ESPIONAGE**<br><br>The Honorable Vince Chhabria<br>Courtroom 4, 17th Floor<br><br>Hearing: 1:00 pm on April 1, 2025 |

1

**TABLE OF CONTENTS**

2  PRELIMINARY STATEMENT…………………………………………………………………1

3  ALLEGED FACTS FOR PURPOSES OF DING'S PRETRIAL MOTIONS TO DISMISS AND FOR
   MORE PARTICULARS ON ECONOMIC ESPIONAGE………………………………………….3
4

5  A.    The Superseding Indictment Tracks the Statutory Intent Requirement, Provides
         Factual Detail, and Identifies Source Documents.........................**Error! Bookmark not defined.**

6  B.    The Government Provided the Source Documents in Discovery and a Reverse Proffer
         which Called Out the PRC Government and Instrumentalities .....**Error! Bookmark not defined.**
7

8  C.    Ding Will Receive an Expert Report Stating Opinions on How Ding's Offense Would
         Have Benefitted the PRC and Its Instrumentalities and the Bases and Reasons therefor...... **Error!**
         **Bookmark not defined.**
9

10 LEGAL STANDARD……………………………………………………………………11

11 THE INDICTMENT MUST STATE AN OFFENSE WITH SUFFICIENT SPECIFICITY
         FOR THE DEFENDANT TO MEET THE CHARGES AGAINST HIM .. **Error! Bookmark not**
12       **defined.**

13 I.    The Superseding Indictment States Economic Espionage Offenses Because It Tracks
         the Statutory Text and Alleges Sufficient Facts; the Economic Espionage Act Does
14       Not Require Foreign-Government Tasking ...................................**Error! Bookmark not defined.**

15       A.    Counts 8-14 State Economic Espionage Offenses Because Paragraph 46 of the
               Superseding Indictment Tracks the Economic Espionage Act and Paragraphs
16             24-2 Allege Historical Facts and Identify Source Documents......... **Error! Bookmark not**
               **defined.**

17       B.    The Economic-Espionage Offense in Section 1831 Is Not Limited to Foreign-
               Government Tasking and Volunteer Spies Like Ding Are Liable for Economic
18             Espionage and Not Merely Trade-Secret Theft .................**Error! Bookmark not defined.**

19             1.    The Second Circuit's Decision in Zheng Is Persuasive Authority that
                     Economic Espionage Does Not Require Foreign-Government Tasking ....... **Error!**
20                   **Bookmark not defined.**

21             2.    The Economic-Espionage Decisions on which Ding Relies Are
                     Generally Consistent with Zheng and in any Event Provide No
22                   Binding Authority to Limit the Statutory Text Because of a Floor
                     Statement................................................................**Error! Bookmark not defined.**
23

24 II.   The Superseding Indictment Provides Sufficient Particularity to Provide Fair Notice
         without Making Evidentiary Allegations........................................**Error! Bookmark not defined.**

25 CONCLUSION………………………………………………………………………………24

26

27

28

1

**TABLE OF AUTHORITIES**

2

Cases

3

*Commissioner of Internal Revenue v. Lundy*,
   516 U.S. 235 (1996).................................................................................................. 15

4

*Conroy v. Aniskoff*,
   507 U.S. 511 (1993).................................................................................................. 23

5

*Demore v. Hyung Joon Kim*,
   538 U.S. 510 (2003).................................................................................................. 15

6

*Estate of Cowart v. Nicklos Drilling Co.*,
   505 U.S. 469 (1992).................................................................................................. 15

7

*Hagner* v. *United States*,
   285 U. S. 427 (1932).................................................................................................. 11

8

*INS v.] St. Cyr*,
   [533 U.S. 289 (2001) ................................................................................................. 15

9

*Pennsylvania Dept. of Corrections* v. *Yeskey*,
   524 U. S. 206 (1998).................................................................................................. 15

10

*Ratzlaf v. United States*,
   510 U.S. 135 (1994).................................................................................................. 15

11

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993)............................................................................................. 15, 16

12

*Sorenson v. Secretary of Treasury*,
   475 U.S. 851 ............................................................................................................. 15

13

*Sullivan v. Stroop*,
   496 U.S. 478 (1990).................................................................................................. 15

14

*Trainmen* v. *Baltimore & Ohio R. Co.*,
   331 U. S. 519 (1947).................................................................................................. 15

15

*United States v. Articles of Drug Consisting of 203 Paper Bags*,
   818 F.2d 569 (7th Cir. 1987) ..................................................................................... 22

16

*United States* v. *Carll*,
   105 U. S. 611 (1882).................................................................................................. 11

17

*United States v. Chung*,
   659 F.3d 815 (9th Cir. 2011) ..................................................................................... 18

18

*United States* v. *Debrow*,
   346 U. S. 374 (1953)............................................................................................. 11, 16

19

*United States v. Hamling*,
   418 U.S. 87 (1974).................................................................................................... 11

20

*United States v. Harkonen*,
   No. C 08-00164 MHP, 2009 WL 1578712 ................................................................ 11

21

*United States* v. *Hess*,
   124 U. S. 483 (1888).................................................................................................. 11

22

*United States v. Krasovich*,
   819 F.2d 253 (9th Cir. 1987) ..................................................................................... 11

23

*United States v. Kwok Cheung Chow*,
   No. CR 14-00196 CRB, 2015 WL 4480425 (N.D. Cal. July 21, 2015) ...................... 11

24

*United States v. Lan Lee*,
   No. CR 06-0424 JW, 2010 WL 8696087 (N.D. Cal. May 21, 2010) ................ 14, 22, 23

*United States v. Liew*,
856 F.3d 585 (9th Cir. 2017) ............................................................ 2, 3, 20, 21
*United States v. Liew*,
Nos. CR 11-00573-1 JSW, 2013 WL 2605126 (N.D. Cal. June 11, 2013) ................................. 20, 21
*United States v. Long*,
706 F.2d 1044 (9th Cir. 1983) ............................................................ 11, 12
*United States v. Resendiz-Ponce*,
549 U.S. 102, 127 S. Ct. 782 (2007)...................................................... 11
*United States v. Robertson*,
15 F.3d 862 (9th Cir. 1994) ............................................................ 11
*United States v. Zheng*,
113 F.4th 280 (2d Cir. 2024) .......................................................... passim
*Wong Tai v. United States*,
273 U.S. 77 (1927).................................................................. 11

Statutes
18 U.S.C. 1831(a) ..................................................................... 1, 2, 13
18 U.S.C. § 1831 .................................................................... 1, 14, 21, 23
18 U.S.C. § 1831(a)(5) ................................................................ 17
18 U.S.C. § 1832 ..................................................................... 14
18 U.S.C. § 1832(1)-(3) .............................................................. 1
18 U.S.C. § 1839(1) .................................................................. 10

Rules
Fed. R. Crim. P. 7(c)................................................................ 16
Fed. R. Crim. P. 7(c)(1) ............................................................ 11
Fed. R. Crim. P. 16(a)(1)(G)(ii)..................................................... 10

1   This government brief opposes Defendant Linwei Ding's ("Ding's") motions to, on the one

2   hand, dismiss the economic-espionage counts (counts 8-14) (Dkt. 63) for failure to state an offense and,

3   on the other hand, for a bill of particulars (Dkt. 54) to obtain "specific facts regarding the government's

4   allegation that Mr. Ding satisfied the intent element of 18 U.S.C. § 1831 (Charge Nos. 7-14)" [*sic* counts

5   8-14) (Dkt. 54 i). (Ding's motion for a bill of particulars regarding the trade-secrets-in-suit (*see* Dkt. 54

6   i) is withdrawn without prejudice to refiling (Dkt. 71, at 3-4).)

7   Although Ding's economic-espionage motions seek relief that is arguably in tension with each

8   other, the constant is that both defense motions should be denied. The superseding indictment (Dkt. 44)

9   states economic-espionage offenses as required by Criminal Rule 12(b)(3)(B)(v) and it does so with

10   sufficient particularity to provide fair notice without making evidentiary allegations as required by

11   Criminal Rule 12(b)(3)(B)(iii).

12   ## PRELIMINARY STATEMENT

13   The Economic Espionage Act of 1996 punishes as economic espionage (18 U.S.C. § 1831 (1)-

14   (3)), and not merely trade-secret theft (18 U.S.C. § 1832(1)-(3)), the taking without authorization of

15   trade secrets if the defendant "intend[ed] or kn[e]w[] that the offense will benefit any foreign

16   government, foreign instrumentality, or foreign agent." 18 U.S.C. 1831(a). The superseding indictment

17   tracks the statutory text (*see* Dkt. 44 ¶ 46) and alleges that Ding intended and knew that his theft of

18   Google, LLC's ("Google's") artificial-intelligence ("AI") trade secrets would benefit the People's

19   Republic of China ("PRC"), for three reasons (*see* Dkt. 44 ¶¶ 24-26). *First*, Ding intended that his PRC

20   startup company would fill a strategic gap in the PRC's domestic AI industry (Dkt. 44 ¶ 24) and that the

21   PRC government would provide Talent Plan money so that Ding's company could "help China to have

22   computing power infrastructure capabilities that are on par with the international level" (Dkt. 44 ¶ 25

23   (quoting Ding)). *Second*, because Ding sought PRC government investors for his PRC startup company,

24   Ding intended and knew that his company's success would benefit, financially and technologically,

25   instrumentalities of the PRC government. *See* Dkt. 44 ¶ 26 (Ding's startup company "intended to market

26   itself to . . . to multiple PRC-controlled entities"). And *third*, because Ding and his associates marketed

27   his company's services to government-controlled entities, Ding intended and knew that his company

28

1    would "provide services to multiple PRC-controlled entities, including government agencies and

2    universities." Dkt. 44 ¶ 26.

3        In his motion to dismiss (Dkt. 63), Ding contends (among other things) that the facially broad

4    intent to benefit foreign-government entities that is required for economic espionage is limited to

5    foreign-government tasking. *See* Dkt. 63, at 9. Ding seeks to imply a limitation in the facially broad text

6    because of the section heading and a statement made on the floor of Congress. *See id.*

7        The only circuit squarely to address whether economic espionage is limited to the tasking

8    characteristic of traditional espionage is the United States Court of Appeals for the Second Circuit in

9    *United States v. Zheng*, 113 F.4th 280 (2d Cir. 2024). In *Zheng*, a unanimous panel "h[e]ld" that

10   economic espionage "does not require proof of foreign government sponsored or coordinated

11   intelligence activity, and Zheng's guilt depended on the facts as he believed them to be." *Id*. at 300; *see*

12   *id*. at 292-95 (analyzing text and legislative history). With respect to the floor statement on which Ding

13   relies, the Second Circuit explained that while an economic spy receiving tasking from a foreign

14   government commits economic espionage, so too does a "volunteer spy" who receives no tasking but

15   intends or knows that his offense will benefit a foreign government or foreign instrumentality (*id*. at

16   295:

> 17    [E]ven assuming that the "princip[al] purpose" of § 1831 is to prosecute economic espionage
> 18    done on behalf of a foreign government, that does not mean it is the only circumstance in which
>       § 1831 may be utilized. 142 Cong. Rec.S12212. The legislative history to which Zheng draws
> 19    our attention does no more than exhort "[e]nforcement agencies [to]administer" § 1831 with that
>       purpose in mind—in other words, the statement is nothing more than a suggestion regarding the
> 20    proper exercise of prosecutorial discretion, and should not be read as purporting to delineate the
>       scope of the statute. *Id.* Perhaps prosecutors will prioritize the use of § 1831 for cases that
> 21    involve foreign government spying. Or perhaps they will place greater importance on different
>       factors, depending on the circumstances. But such questions about the allocation of prosecutorial
> 22    resources are reserved for the executive branch, not for the judiciary. All that matters for
>       purposes of this appeal is that an individual may intend to benefit a foreign government by
> 23    misappropriating trade secrets without the foreign government directing or coordinating his
>       activity. Under § 1831, a volunteer spy is just as guilty as one recruited and handled by a foreign
>       government.

24

25       Perhaps understanding that *Zheng* forecloses his motion to dismiss, Ding breezily dismisses

26   *Zheng* as an "out of circuit case that conflicts with binding Ninth Circuit case law," citing *United States*

27   *v. Liew*, 856 F.3d 585, 597 (9th Cir. 2017). Contrary to Ding's contention, the Ninth Circuit in *Liew*

28   cited the floor statement (through a Third Circuit case) in a historical "EEA Background" section, not as

part of its holding or *ratio decidendi*. *Liew*, 856 F.3d at 596-97. The Ninth Circuit in *Liew* did not hold that the Economic Espionage Act requires tasking. What's more, the jury instructions that the district court in *Liew* gave (*see* 856 F.3d at 599) tracked the statutory text: "What is required is proof beyond a reasonable doubt that the defendant and at least one other member of the conspiracy knowingly converted information that they reasonably believed was a trade secret and was being taken for the benefit of a foreign government or foreign instrumentality." *United States v. Liew*, Case 4:11-cr-00573-JSW, Dkt. 792, at 27 (Feb. 24, 2014) (jury instruction for conspiracy); *see id.* at 32 (jury instruction for attempt). Neither the Ninth Circuit nor any other Circuit holds contrary to *Zheng*. Tellingly, the Second Circuit in *Zheng* cited the Ninth Circuit's decision in *Liew* favorably. *See Zheng*, 113 F.4th at 298-99.

At Ding's trial, the government will show that Ding misappropriated Google's trade secrets for the purpose of allowing his PRC-based company to succeed. Ding's statements and conduct show that he intended and knew that the success of his startup company would "help China to have computing power infrastructure capabilities that are on par with the international level" (Dkt. 44 ¶¶ 24-26, quoting Ding). As in *Zheng*, so too here, "[t]he jury therefore could have found that Zheng misappropriated GE's trade secrets for the purpose of allowing his Chinese companies to achieve their objectives, and consequently, those of the PRC. And the jury could therefore have found that Zheng acted with the intent to confer a benefit on the PRC – whether economic, strategic, tactical, or reputational – or at least with the knowledge that such a benefit would be conferred on the PRC if his conspiracy succeeded." *Id.* at 296.

Because neither the Ninth Circuit nor any other Circuit requires tasking by a foreign government, Ding's motion to dismiss (Dkt. 63) the Economic Espionage charges should be denied. Moreover, because the superseding indictment sufficiently alleges Ding's intent to benefit the PRC and PRC instrumentalities, Ding's motion for a bill of particulars concerning economic espionage (*see* Dkt. 54 i, 4-5, 15-16) should also be denied.

### ALLEGED FACTS FOR PURPOSES OF DING'S PRETRIAL MOTIONS TO DISMISS AND FOR MORE PARTICULARS ON ECONOMIC ESPIONAGE

Ding's motions to dismiss for failure to state an offense and for particulars attack the superseding indictment (Dkt. 44). For purposes of those motions, this Court must assume that the government will be

able to prove the facts alleged in the superseding indictment beyond a reasonable doubt. The alleged facts relevant to economic espionage, in the government's view, demonstrate three things. (A) The superseding indictment tracks the statutory intent requirement, provides factual detail, and identifies source documents. (B) The government provided the source documents in discovery and a reverse proffer which called out the PRC government and instrumentalities. (C) Ding will receive an expert report with the opinions on how his offense would have benefitted the PRC and its instrumentalities and the bases and reasons therefor.

### A.    The Superseding Indictment Tracks the Statutory Intent Requirement, Provides Factual Detail, and Identifies Source Documents

Paragraph 46 of the superseding indictment (Dkt. 44) tracks the statutory text and alleges that Ding "intend[ed] or kn[e]w[] that the offense would benefit any foreign government, foreign instrumentality, or foreign agent." Dkt. ¶ 46. In support of that allegation, the superseding indictment alleges that Ding intended and knew that (1) his startup company, Shanghai Zhisuan Technology Co. Ltd. ("Zhisuan"), would fill a gap in the domestic AI infrastructure identified by PRC strategic plans and that Ding applied to a PRC government–sponsored Talent Plan for support; (2) Ding intended Zhisuan to market itself to "PRC-controlled entities" and obtain government investors so that the stolen Google trade secrets would benefit not only Zhisuan, but also the PRC government investors; and (3) Zhisuan would provide services to "government agencies and universities." The superseding indictment alleges in pertinent part as follows (Dkt. 44 ¶¶ 24-26):

*DING Intended to Benefit the PRC Government and Instrumentalities*

24. On or about November 17, 2023, Ding circulated a PowerPoint presentation to other Zhisuan employees citing PRC national policies encouraging the development of the domestic AI industry. The presentation, which was circulated to potential Zhisuan investors, pointed to the State Council's 2017 "Notice on the Development of the New Generation of Artificial Intelligence," which called for the development of high-performance computing infrastructure. The PRC State Council is the chief administrative authority in the PRC, and it functions as the executive branch of the central government. The presentation also cited a policy document titled "Interim Measures for the Management of Generative AI Services," which was published and sponsored by seven PRC government agencies, including the Cyberspace Administration of China (CAC). The CAC, also known as the State Internet Information Office, is a PRC government agency responsible for regulating and managing the PRC's internet and cyberspace. The presentation quoted Article 6 of the Interim Measures document, which seeks to "Encourage independent innovation in basic technologies such as generative ratification intelligence algorithms, chips, and supporting software platforms . . . ."

25. In or about December 2023, Ding created a PowerPoint presentation containing an

application to a PRC talent program based in Shanghai. Talent programs are sponsored by the PRC to incentivize individuals engaged in research and development outside of the PRC to transmit that knowledge and research to the PRC in exchange for salaries, research funds, lab space, or other incentives. Ding's application stated that his product "will help China to have computing power infrastructure capabilities that are on par with the international level."

26. An internal Zhisuan memo dated December 14, 2023, indicates that Zhisuan intended to market itself to and provide services to multiple PRC-controlled entities, including government agencies and universities.

The superseding indictment not only tracks the statutory intent requirement (Dkt. 44 ¶ 46) and alleges historical facts (Dkt. 44 ¶¶ 24-26), but it also identifies the source documents (the PowerPoint presentations and internal memorandum) that contain those historical facts (Dkt. 44 ¶¶ 24-26).

### B. The Government Provided the Source Documents in Discovery and a Reverse Proffer which Called Out the PRC Government and Instrumentalities

The government produced in criminal discovery the source documents identified in the superseding indictment and gave Ding and his counsel a reverse proffer at which it pointed out those documents and the PRC government and instrumentalities that Ding intended and knew his trade-secret theft would benefit. The particulars provided by those documents were no surprise to Ding. They came from his devices and accounts.

The November 17, 2023 Zhisuan PowerPoint presentation (US-0002114) described in paragraph 24 of the superseding indictment (Dkt. 44) showed that Ding knew and intended that Zhisuan would serve China's economic development goals in the AI space. An Excel spreadsheet found on Ding's personal MacBook indicates that the Zhisuan presentation citing national policies was sent to dozens of potential Zhisuan investors. WeChat messages recovered from Ding's phone show that Ding was personally involved in editing the Zhisuan presentation along with his PRC-based Zhisuan colleagues. At trial, the government will argue that Ding's message to investors was that Zhisuan would serve China's government-sponsored development goals. The relevant machine-translated page from the Zhisuan/Lyceum presentation is here:



US-0002114

The December 27, 2023 PowerPoint presentation (US-0072950) described in paragraph 25 of the superseding indictment (Dkt. 44) came from Ding's personal laptop and is his application for a Shanghai Talent Plan. The slide from Ding's application with the quotation in paragraph 25 appears on the next page.



Elsewhere in his Talent Plan application, Ding describes China's "domestic technical difficulties" of insufficient supercomputing infrastructure were preventing China from achieving its AI-related national development objectives. Ding positioned his product, which he said was based on "replicating and upgrading Google's experience," as a solution to China's computing power problem that could reduce the time required to train large-language models ("LLMs"). Ding's Talent Plan application links the Google trade secrets that Ding stole to his intent to benefit the PRC.



未来工作设想

成立上海至算科技有限公司
致力于打造基于异构算力资源的互联互通的
全新高效的单任务万卡级算力基础架构平台

• 国内技术困境
  国内的算力是基于单一GPU或者1台机器上多个GPU的
  运算方式；国外可支持集群扩展到2500个节点，2万
  块GPU并行运算。国内外差距是非常明显的。

• 技术亮点和稀缺性
  搭建过且能搭建万卡级算力平台的，全世界不足十人；
  丁林葳先生是其中之一；
  至算科技的产品支持的算力规模可达单任务万卡，支持
  大规模训练时长从月级可降至小时级。

• 基于国情的创新能力
  丁林葳 先生在谷歌带领团队做出的 6万卡TPU、2.6万
  GPU万卡级算力平台，正被Google Research,
  Anthropic, Deepmind, OpenAI使用；
  所以完全有能力复制和升级谷歌的万卡级算力平台经验，
  再打造适合中国国情的算力平台。



US-0072950

The final translated paragraph of Ding's Talen Plan application (above) states that his company is "fully capable of replicating and upgrading Google's experience in the 10,000-class computing power platform, and then creating a computing power platform suitable for China's national conditions." The government's evidence at trial will show that, at the time Ding made this claim, he had already stolen Google's AI trade secrets. Ding's statement, therefore, encapsulates the government's theory of economic espionage: Ding stole Google's trade secrets intending to use them to help the PRC meet its AI-related economic development goals.

The December 14, 2023 Zhisuan internal memorandum (US-0072950) described in paragraph 26 of the superseding indictment (Dkt. 44) lists potential government and university (which in the PRC are also government) customers.

Potential customers of Zhisuan Technology

Customer classification: corporate customers, government operations/computing centers, universities/research institutes

-- Confidential Confidential
author: Guo Shasha & Li Luqian
update: Dec 14, 2023

2. Government operations
1. Mingyue Lake International Intelligent Science and Technology Innovation Base
Progress: Synchronous communication on funds, investment promotion, and government AI projects
Pain points: Currently, many cards cannot be interconnected and used; they are relatively weak on the AI application side.
Demand: It is hoped that the computing power of Huawei, Nvidia, JD Cloud and other cards can be interconnected and used; it is hoped that complete AI can be provided
Solutions, including standardized AI applications and heterogeneous computing power interoperability platforms

3. Universities/research institutes
1. Sichuan Tianfu New Area Innovation Research Institute of Southwest University of Science and Technology (customer interviews can be arranged later)
Progress: A strategic cooperation agreement has been signed
Pain point: Weak in the field of AI, we also shoulder the national task of establishing computing power centers in universities.
Demand: We hope that we will fully assist in the establishment of the computing center, including the application for some scientific research projects.

US-0072950

The machine-translated memorandum states that Zhisuan had engaged in "synchronous communication on funding, investment promotion, and government AI projects" with representatives of Mingyue Lake International Intelligent Science and Technology Innovation Base ("Mingyue Lake"). Mingyue Lake appears to be a government-sponsored technology and innovation center. The memo also states that Zhisuan signed a strategic cooperation agreement with Sichuan Tianfu Area Innovation Research Institute of Southwest University of Science and Technology ("Southwest University"). According to the memorandum, Southwest University "shoulders the national task of establishing computing power centers in universities" but remains "weak in the field of AI." Zhisuan intends to "assist in the establishment of a computing center" that can apply AI to research projects.

The source documents referenced in the superseding indictment (Dkt. 44), which the government not only produced to Ding but also explained in a reverse proffer (the slides depicted above were shown to Ding and his defense team during the October 8, 2024 reverse proffer), and other documents produced to Ding identify the PRC and PRC instrumentalities that Ding intended and knew his trade-secret theft would benefit, specifically:

- Zhisuan customers:
    - Mingyue Lake – technology base established by Chongqing Liangjiang New Area Administrative (a government entity)
    - SWUST-TIRI – research institute created jointly with Sichuan Tianfu New Area (part of the municipal government)
    - BaishanCloud – investors include ZGC Group (funded by local Beijing government), an SOE affiliated with the Ministry of Finance and China Investment System, and the Guizhou provincial government fund
- Zhisuan investor: MiraclePlus (Qiji) fund has limited partners to include ZGC Science City and Zhongguancun Science City (both government entities)
- Zhisuan potential investor: Lingang Group, is a state-owned company under the Shanghai Government.

### C.    Ding Will Receive an Expert Report Stating Opinions on How Ding's Offense Would Have Benefitted the PRC and Its Instrumentalities and the Bases and Reasons therefor

As is typical in economic-espionage trials, the government currently intends to retain a PRC computer industry expert who will explain the PRC's strategic plans and Talent Plan programs and testify which of Ding's investors, suppliers, and customers are owned, controlled, or sponsored by the PRC. *See* 18 U.S.C. § 1839(1) (Economic Espionage Act definition of "foreign instrumentality"). Based on the relatively recent revisions to Criminal Rule 16(a)(1)(G), Ding will receive a signed expert disclosure with the government's expert's opinions and the "bases and reasons for them" "sufficiently before trial to provide a fair opportunity for the defendant to meet the government's evidence." FED. R. CRIM. P. 16(a)(1)(G)(ii), (iii), (v).

### LEGAL STANDARD

### THE INDICTMENT MUST STATE AN OFFENSE WITH SUFFICIENT SPECIFICITY FOR THE DEFENDANT TO MEET THE CHARGES AGAINST HIM

The government agrees with Ding (Dkt. 63, at 2) that the U.S. Supreme Court's decision in *United States v. Hamling*, 418 U.S. 87, 117 (1974), governs the motion to dismiss – *i.e.*, the superseding indictment is sufficient if it tracks the statutory text and includes sufficient facts to inform Ding of the

1    offenses against him:

2           Our prior cases indicate that an indictment is sufficient if it, first, contains the elements of
      the offense charged and fairly informs a defendant of the charge against which he must defend,
3     and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the
      same offense. *Hagner* v. *United States,* 285 U. S. 427 (1932); *United States* v. *Debrow,* 346 U. S.
4     374 (1953). It is generally sufficient that an indictment set forth the offense in the words of the
      statute itself, as long as "those words of themselves fully, directly, and expressly, without any
5     uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to
      be punished." *United States* v. *Carll,* 105 U. S. 611, 612 (1882)."Undoubtedly the language of
6     the statute may be used in the general description of an offence, but it must be accompanied with
      such a statement of the facts and circumstances as will inform the accused *118 of the specific
7     offence, coming under the general description, with which he is charged." *United States* v. *Hess,*
      124 U. S. 483, 487 (1888).

8
9     418 U.S. at 117-18; *see United States v. Resendiz-Ponce*, 549 U.S. 102, 127 S. Ct. 782, 789 (2007) ("an

10    indictment parroting the language of a federal criminal statute is often sufficient"); *see also* FED. R.

11    CRIM. P. 7(c)(1) ("The indictment or information must be a plain, concise, and definite written statement

12    of the essential facts constituting the offense charged . . . ."). Ding admits, as he must, that in ruling on

13    his motion, the Court "must presume the truth of the allegations in the charging instrument." Dkt. 63, at

14    2 (quoting *United States v. Harkonen*, No. C 08-00164 MHP, 2009 WL 1578712,a t *3 (N.D. Cal. June

      4, 2009)).
15
16          A bill of particulars is not warranted if "the defendant has been advised adequately of the charges

17    through the indictment and all other disclosures made by the government." *United States v. Long*, 706

18    F.2d 1044, 1054 (9th Cir. 1983) (citations omitted). When the language of the indictment itself provides

19    the "specific charges" against the defendant, a bill of particulars is not required. *United States v.*

20    *Robertson*, 15 F.3d 862, 873–74 (9th Cir. 1994), *rev'd on other grounds*, 514 U.S. 669 (1995); *see Wong*

21    *Tai v. United States*, 273 U.S. 77, 82 (1927) ("sufficiently advised"); *United States v. Krasovich*, 819

22    F.2d 253, 254–55 (9th Cir. 1987) ("sufficient detail"); *see also United States v. Kwok Cheung Chow*,

23    No. CR 14-00196 CRB, 2015 WL 4480425, at *2 (N.D. Cal. July 21, 2015) (Charles R. Breyer, J.)

24    ("The purpose of a bill of particulars is not to provide defendants with every detail of the Government's

25    case, as [defendant] seems to request.") (citation omitted). Moreover, "[f]ull discovery will obviate the

26    need for a bill of particulars." *Long*, 706 F.2d at 1054.

27

28

## ARGUMENT

The superseding indictment (Dkt. 44) states an offense against Ding because it tracks the language of the Economic Espionage Act in paragraph 46 and alleges facts that fairly inform Ding of the offense against which he must defend in paragraphs 24-26.

The superseding indictment, supplemented by the government's discovery and reverse proffer, identify the foreign government and foreign instrumentalities that Ding intended and knew his offense would benefit. No further specification of the PRC instrumentalities is required before the government's expert disclosure is due.

## I.    The Superseding Indictment States Economic Espionage Offenses Because It Tracks the Statutory Text and Alleges Sufficient Facts; the Economic Espionage Act Does Not Require Foreign-Government Tasking

The superseding indictment (Dkt. 44) in paragraph 46 tracks the Economic Espionage Act and alleges that Ding intended his trade-secret theft to benefit the PRC and PRC instrumentalities. The Act's *mens rea* – the intent to benefit a foreign-government entity – is not impliedly limited to foreign-government taskings.

### A.    Counts 8-14 State Economic Espionage Offenses Because Paragraph 46 of the Superseding Indictment Tracks the Economic Espionage Act and Paragraphs 24-2 Allege Historical Facts and Identify Source Documents

Counts Eight through Fourteen of the superseding indictment include two paragraphs: paragraph 45 incorporates the factual allegations of paragraphs 1-42 and paragraph 46 tracks the language of Section 1831 of the Economic Espionage Act, including that Ding committed the offense in subsections (a)(1) – (3) "intending or knowing that the offense would benefit any foreign government, foreign instrumentality or foreign agent." Dkt. 44 ¶ 46. The incorporated factual allegations include the three paragraphs (24-26) under the heading "*Ding Intended to Benefit the PRC Government and Instrumentalities*." Dkt. 44 ¶ 24 (the government's double emphasis is in the superseding indictment).

Ding's motion to dismiss largely ignores paragraph 46's allegation of Ding's intent (*see* Dkt. 63, at 3-4) and on that incomplete factual foundation Ding insists in the first three of his four arguments that the superseding indictment fails to allege that Ding intended to benefit a foreign government or instrumentality. The table below captures Ding's first three arguments and the government's responses.

| Ding's First Three Arguments | Dkt. 63 Page Reference | Government's Responses | Superseding Indictment Paragraph |
|---|---|---|---|
| "[T]he Superseding Indictment fails to allege (1) that any "benefit" to a foreign governmental entity was intended, or that Mr. Ding ever handed over or otherwise conveyed any of the allegedly stolen trade secrets to a foreign governmental entity" | Page 1; *see* p. 4 | ● Paragraph 46 and the heading preceding paragraph 24 track the statutory text and allege that "Ding Intended to Benefit the PRC Government and Instrumentalities" <br> ● The economic-espionage offense is complete when the defendant commits one of the 26 verbs in Section 1832(a)(1)-(3) with the required intent – no passage of the trade secret to a foreign government is required | Dkt. 44 ¶ 46; *see id.* ¶¶ 24-26 |
| "(2) that Mr. Ding had the requisite *mens rea* of intending or knowing that his actions would benefit any foreign government or instrumentality" | | Paragraph 46 and the heading preceding paragraph 24 allege the *mens rea* required by 18 U.S.C. § 1831(a) *in haec verba* | |
| "(3) that any of the entities referenced in the Superseding Indictment qualify as a foreign government, agent, or instrumentality as defined by the EEA" | | Paragraph 46 alleges that the entities identified in incorporated paragraphs 24-26 include a "foreign government" and "foreign instrumentalit[ies]" and the heading preceding paragraph 24 specifies that they are the "PRC Government" and PRC "Instrumentalities" respectively | |

Contrary to Ding's contention (Dkt. 63, at 4-6), the intent to "benefit" a foreign-government entity does not require that the superseding indictment allege that Ding stole Google's trade secrets intending to "'turn[ them] over' to the PRC or its instrumentalities" (Dkt. 63, at 5; *see id.* at 6-7). As Ding admits (Dkt. 63, at 4), *Black's Law Dictionary* defines "benefit" to include "useful effect." Bringing cutting-edge U.S. AI trade secrets to the PRC intending and knowing that the exfiltration will fill a PRC government-identified strategic gap in Chinese computing infrastructure, as the superseding indictment alleges (Dkt. 44 ¶ 24) has a "useful effect."

To be sure, stealing trade secrets to start a business in a foreign country thinking only of one's own personal pecuniary benefit would not constitute economic espionage. *See United States v. Lan Lee*, No. CR 06-0424 JW, 2010 WL 8696087, at *6 (N.D. Cal. May 21, 2010) ("Section 1831 does not

penalize a defendant's intent to personally benefit"). But the Economic Espionage Act already assigns trade-secret thefts between "Economic espionage" (18 U.S.C. § 1831), which requires the intent or knowledge that the offense will benefit a foreign government, instrumentality or agent, on the one hand, and "Theft of trade secrets" (18 U.S.C. § 1832), which requires the intent or knowledge that the offense will injure the trade-secret owner and benefit someone else, on the other hand. The statute does not require a dead drop of the trade secrets to foreign-government intelligence officers to charge a case of economic espionage – only an intention or knowledge that the trade-secret theft will benefit foreign-government entities.

Ding notes that "[t]he title of Section 1831 is 'economic *espionage*'" (Dkt. 63, at 4), and from the term "espionage" infers foreign-government tasking and spies passing economic secrets. But the Economic Espionage Act of 1996 uses "economic espionage" to mean "industrial espionage."[1] The offense of economic espionage is simply the offense described in Section 1831. The use of the term "espionage" in the heading does not limit the otherwise broad *mens rea* that captures any intention or knowledge that the offense conduct will benefit "any foreign government, foreign instrumentality, or foreign agent." *See, e.g., Demore v. Hyung Joon Kim*, 538 U.S. 510, 535 (2003) (Justice O'CONNOR, with whom Justice SCALIA and Justice THOMAS join, concurring in part and concurring in the judgment) ("As the Court stated in [*INS v.*] *St. Cyr,* [533 U.S. 289 (2001)], 'a title alone is not controlling,' *id.,* at 308, because the title of a statute has no power to give what the text of the statute

---

[1] House Committee Report No. 788, 104th Cong., 2d Sess. 5 (Sept. 16, 1996), uses "economic espionage" and "industrial espionage" interchangeably (at 5):

> The term economic or industrial espionage is appropriate in these circumstances. Espionage is typically an organized effort by one country's government to obtain the vital national security secrets of another country. Typically, espionage has focused on military secrets. But as the cold war has drawn to a close, this classic form of espionage has evolved. Economic superiority is increasingly as important as military superiority. And the espionage industry is being retooled with this in mind.

> It is important, however, to remember that the nature and purpose of industrial espionage are sharply different from those of classic political or military espionage. The phrase industrial espionage includes a variety of behavior—from the foreign government that uses its classic espionage apparatus to spy on a company, to the two American companies that are attempting to uncover each other's bid proposals, or to the disgruntled former employee who walks out of his former company with a computer diskette full of engineering schematics. All of these forms of industrial espionage are problems. Each will be punished under this bill.

takes away. Where as here the statutory text is clear, "'the title of a statute . . . cannot limit the plain meaning of the text.'" *Pennsylvania Dept. of Corrections* v. *Yeskey,* 524 U. S. 206, 212 (1998) (quoting *Trainmen* v. *Baltimore & Ohio R. Co.,* 331 U. S. 519, 528-529 (1947)).").

The notion that economic "espionage" in Section 1831 incorporates the tradecraft of taskings and passing secrets cannot be indulged because "espionage" is not only the heading of Section 1831, but it is also the short title of the Economic Espionage Act of 1996. The Act includes both economic espionage in Section 1831 and trade-secret theft in Section 1832. Trade-secret theft requires no foreign-government tasking. If the "economic espionage" in the short title of the Act does not incorporate foreign-government taskings, it follows that the "economic espionage" which serves as the heading for Section 1831 cannot incorporate taskings either. "Espionage" must have a consistent meaning throughout the Economic Espionage Act of 1996. *See, e.g., Commissioner of Internal Revenue v. Lundy*, 516 U.S. 235, 250 (1996) ("The interrelationship and close proximity of these provisions of the statute 'presents a classic case for application of the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning."' *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (quoting *Sorenson v. Secretary of Treasury*, 475 U.S. 851, 860, (internal quotation marks omitted)."); *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears. See *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992)."); *Reves v. Ernst & Young*, 507 U.S. 170, 177 (1993) ("The word 'conduct' is used twice, and it seems reasonable to give each use a similar construction.").[2]

Ding contends that the superseding indictment's allegations that Ding intended to benefit the PRC and its instrumentalities are "conclusory statements" (Dkt. 63, at 8) and that the superseding indictment needs to "make the required connection between the entities and the PRC government" (*id.*) and allege that "the entities in the Superseding Indictment are alleged to be subject to substantial

---

[2] In the almost 30 years since Congress passed the Economic Espionage Act, the vast majority of cases have charged industrial espionage and the bulk of those cases have not involved foreign-government tasking. One case this year charged an economic spy tasked by foreign government. *See United States v. John Rogers*, Case No. 25-cf-033 (DLF) (indicted Jan. 31, 2025) (senior Federal Reserve officer charged stealing Federal Reserve Board and Federal Open Market Committee trade secrets intending to benefit the PRC).

ownership, control, sponsorship, or the like by the PRC government" (*id.*). Contrary to Ding's

contention, an indictment adequately charges an offense if it tracks the statutory text and alleges

sufficient facts from which the defendant can prepare his defense. *See supra* pp. 10-11. The superseding

indictment (Dkt. 44) tracks the text of Section 1831 and describes the historical facts with dates and

identifies source documents. Ding needs nothing more to prepare for trial. In *United States v. Debrow*,

346 U.S. 374 (1953), the defendant facing a perjury indictment insisted that the indictment "allege the

name of the person who administered the oath [and] his authority to do so." *Id*. at 375-76. The U.S.

Supreme Court quoted Criminal Rule 7(c), which then and now requires a "plain, concise and definite

written statement of the essential facts constituting the offense charged." *Id*. at 376 (quoting Fed. R.

Crim. P. 7(c)). A unanimous Court (with one Justice not participating) rejected defendant's demand that

the indictment identify the oath-giver and his authority (346 U.S. at 377-78):

> The charges of the indictments followed substantially the wording of the statute, which embodies all the elements of the crime, and such charges clearly informed the *378 defendants of that with which they were accused, so as to enable them to prepare their defense and to plead the judgment in bar of any further prosecutions for the same offense. It is inconceivable to us how the defendants could possibly be misled as to the offense with which they stood charged. The sufficiency of the indictment is not a question of whether it could have been more definite and certain. If the defendants wanted more definite information as to the name of the person who administered the oath to them, they could have obtained it by requesting a bill of particulars.

So, too, here, the superseding indictment tracks the text of Section 1831 and informs Ding of the

economic-espionage offenses of which he is accused. Criminal Rule 7 requires nothing more.

**B.    The Economic-Espionage Offense in Section 1831 Is Not Limited to Foreign-Government Tasking and Volunteer Spies Like Ding Are Liable for Economic Espionage and Not Merely Trade-Secret Theft**

The Second Circuit's decision in *United States v. Zheng*, 113 F.4th 280, 292-97 (2d Cir. 2024), is

persuasive authority that the facially broad intent to benefit a foreign-government entity is not impliedly

limited to foreign-government taskings. No binding authority requires this Court to contradict the

statutory text.

> 1.    *The Second Circuit's Decision in* Zheng *Is Persuasive Authority that Economic Espionage Does Not Require Foreign-Government Tasking*

The United States Court of Appeals for the Second Circuit in *Zheng* is the only circuit court of

appeals to address the question whether Section 1831 of the Economic Espionage Act requires proof of

foreign-government sponsored or coordinated intelligence activity. Zheng was a General Electric ("GE") Power engineer who stole GE turbine trade secrets and sent those trade secrets to his personal e-mail address and a co-conspirator in China for use in his two PRC turbine businesses. *See* 113 F.4th at 283. The indictment charged Zheng and his co-conspirator with conspiracy to commit economic espionage in violation of 18 U.S.C. § 1831(a)(5), among other offenses. *See* 113 F.4th at 284. The evidence at trial on intent showed, in the light most favorable to the verdict, that Zheng was aware of the PRC's Thirteenth Five-Year Plan and Made in China 2025 policy to improve domestic turbine manufacturing; Zheng sought PRC local government funding for his two PRC companies; and "Zheng's writings . . . reiterated his desire to help the PRC meet its economic goals." *Id*. at 296. In addition to intending to benefit the PRC, Zheng's PRC businesses "themselves were foreign instrumentalities" because "Zheng sought government funding." *Id*. at 297. The stolen GE trade secrets would therefore have benefitted a PRC state-owned entity ("SOE"). Lastly, Zheng sought to provide services to PRC public universities, which are "basically . . . owned by the Chinese government," and another PRC SOE and therefore intended or knew that his offense would benefit those PRC instrumentalities. *Id*. at 297. The jury convicted Zheng of conspiracy (113 F.4th at 289) and the Second Circuit affirmed.

On appeal, the Second Circuit panel unanimously rejected Zheng's contention – which Ding makes again here (Dkt. 63, at 9-10) – that Section 1831 requires proof of foreign government sponsored or coordinated intelligence activity. *See* 114 F.4th at 292-95. The Second Circuit started with the facially broad statutory text and, quoting a Ninth Circuit decision, found no requirement of any foreign-government action, let alone tasking (113 F.4th at 292):

> Contrary to Zheng's claim, there is nothing in § 1831(a) that requires proof of a foreign government's involvement in the defendant's conduct. To the extent the statute makes any mention of foreign governments, it does so only in terms of the defendant's mental state: the defendant must intend or know that his misappropriation of a trade secret will benefit a foreign government or instrumentality. Far from requiring any action or involvement by another sovereign, under § 1831(a), "criminal liability ... may be established on the basis of [the] [d]efendant's intent alone." *United States v. Chung,* 659 F.3d 815, 828 (9th Cir. 2011).

Because the text of Section 1831 is not ambiguous, the Second Circuit said it "need not consider [Zheng's] arguments that go beyond the statutory text." 113 F.4th at 293 (citing cases). But the Second Circuit considered and rejected Zheng's arguments, which Ding repeats here (Dkt. 63, at 9-10), that the

1   section title "espionage" and the floor statement limit the broad statutory text to foreign-government

2   tasking. *See id*. at 293-94.

3        The Second Circuit explained that "espionage" is "used broadly here" because "the EEA

4   codified § 1832, 'Theft of trade secrets,'" in the Economic Espionage Act in addition to § 1831. 113

5   F.4th at 293. "[I]n contrast to § 1831(a), § 1832(a) does not even mention foreign governments,

6   instrumentalities, or agents, but it was still codified as part of the Economic *Espionage* Act of 1996. It is

7   therefore clear that the EEA proscribes more than classic spy craft involving foreign government

8   interference." *Id*. (emphasis Second Circuit's).

9        The Second Circuit also explained that the House Committee Report used "espionage" in the

10  sense of "industrial espionage" rather than the "limited – and outdated – conception of 'espionage' that

11  only involves foreign government or coordinated intelligence activity" (113 F.4th at 294):

12        Contemporary references to "espionage" in the legislative history are consistent with this
     broader understanding of the term. The House of Representatives explained that the EEA was
13   needed because of the growing threat of "economic or industrial espionage." H.R. Rep. No. 104-
     788, 294*294 at 5 (1996). Although "[e]spionage is typically an organized effort by one
14   country's government to obtain the vital national security secrets of another country," they
     explained, "as the cold war has drawn to a close, this classic form of espionage has evolved." *Id.*
15   From the traditional style of espionage, which was "[t]ypically ...focused on military secrets,"
     had evolved "industrial espionage," which
16
17        includes a variety of behavior—from the foreign government that uses its classic
          espionage apparatus to spy on a company, to the two American companies that are
18        attempting to uncover each other's bid proposals, or to the disgruntled former employee
          who walks out of his former company with a computer diskette full of engineering
          schematics.
19
20        *Id.* The legislators recognized that "[a]ll of these forms of industrial espionage are
     problems" and that "[e]ach will be punished under [the EEA]." *Id.* Accordingly, the title of
21   § 1831 does not support Zheng's assertion that there must be proof of government sponsored or
     coordinated intelligence activity, because Congress understood "economic espionage" to
22   encompass much more conduct than Zheng's limited—and outdated—conception of "espionage"
     that only involves foreign government or coordinated intelligence activity.

23        Lastly, the Second Circuit considered and qualified the floor statement on which Zheng (and

24  Ding) principally rely for the notion that it limits Section 1831 to foreign-government tasking. *See* 113

25  F.4th at 294-95. Because this floor statement is Ding's primary authority (Dkt. 63, at 9-10), the Second

26  Circuit's rejection of Zheng's and Ding's over-reading of the floor statement is worth quoting in full (*id*.

27  at 294-95) (emphasis Second Circuit's):

28        Zheng notes certain instances in the EEA's legislative history where legislators referred

to § 1831 as applying to defendants acting on behalf of foreign governments. He points to the Senate Managers' Statement, which explained "the difference between Sections 1831 and 1832":

> This legislation includes a provision penalizing the theft [of] trade secrets (Sec. 1832) and a second provision penalizing that theft when it is done to benefit a foreign government, instrumentality, or agent (Sec. 1831).The principle [sic] purpose of this second (foreign government) provision is not to punish conventional commercial theft and misappropriation of trade secrets (which is covered by the first provision). Thus, to make out an offense under the economic espionage section, the prosecution must show in each instance that the perpetrator intended to or knew that his or her actions would aid a foreign government, instrumentality, or agent. *Enforcement agencies should administer this section with its principle [sic] purpose in mind and therefore should not apply section 1831 to foreign corporations when there is no evidence of foreign government sponsored or coordinated intelligence activity.*

142 Cong. Rec. S12212 (daily ed. Oct. 2, 1996) (emphasis added). According to Zheng, this last quoted sentence establishes that § 1831 may be applied only when there is "evidence of foreign government sponsored or coordinated intelligence activity." Appellant's Br. at 11 (citation omitted).

Zheng's argument fails for two reasons. First, the context of the Managers' Statement clarifies that legislators were concerned about § 1831 being enforced against someone who misappropriates a trade secret intending to benefit a foreign corporation that has no nexus to a foreign government, that is, a foreign corporation that is not a foreign instrumentality. Indeed, the very next paragraph explains that the legislators' "particular concern" was addressed through "the definition of 'foreign instrumentality[,]' which indicates that a foreign organization must be `substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government or subdivision thereof.'" *Id.* In other words, the Managers' Statement's reference to "foreign government sponsored or coordinated intelligence 295*295 activity" was an explanation of the limit to which § 1831 may be utilized when a defendant intended to benefit "foreign corporations," that is, only when the foreign corporation is considered a foreign instrumentality, as defined in § 1839(1). If the foreign corporation does not have the requisite level of connection with the foreign government to make it a foreign instrumentality, then the Managers' Statement expressed the view that § 1832, not § 1831, is the appropriate vehicle to prosecute someone who misappropriates a trade secret with the intent to benefit that foreign corporation.

Second, even assuming that the "princip[al] purpose" of § 1831 is to prosecute economic espionage done on behalf of a foreign government, that does not mean it is the only circumstance in which § 1831 may be utilized. 142 Cong. Rec.S12212. The legislative history to which Zheng draws our attention does no more than exhort "[e]nforcement agencies [to] administer" § 1831 with that purpose in mind—in other words, the statement is nothing more than a suggestion regarding the proper exercise of prosecutorial discretion, and should not be read as purporting to delineate the scope of the statute. *Id.* Perhaps prosecutors will prioritize the use of § 1831 for cases that involve foreign government spying. Or perhaps they will place greater importance on different factors, depending on the circumstances. But such questions about the allocation of prosecutorial resources are reserved for the executive branch, not for the judiciary. All that matters for purposes of this appeal is that an individual may intend to benefit a foreign government by misappropriating trade secrets without the foreign government directing or coordinating his activity. Under § 1831, a volunteer spy is just as guilty as one recruited and handled by a foreign government.

The Second Circuit affirmed Zheng's economic-espionage conviction on the same three intent theories that the superseding indictment alleges against Ding: (1) intending to benefit the PRC by filling

1    a strategic gap in PRC industry with the stolen trade secrets in exchange for compensation in cash and in

2    kind; (2) intending to benefit PRC government investors in his company who will earn profits from

3    stolen trade secrets; and (3) intending to benefit PRC government agencies and universities by providing

4    services using the stolen trade secrets. *See* 113 F.4thh at 295-97. If this Court follows *Zheng* as

5    persuasive authority, Ding's motion must be denied.

6           2.      *The Economic-Espionage Decisions on which Ding Relies Are Generally
                    Consistent with* Zheng *and in any Event Provide No Binding Authority to Limit
7                   the Statutory Text Because of a Floor Statement*

8           All but one of Ding's cases for the proposition that economic espionage requires foreign-

9    government tasking are *dicta*. None of them are binding authority on this Court. And all of them trace

10   ultimately back to the two arguments based on the use of "espionage" in the title of Section 1831 and the

11   floor statement.

12          Three of the four decisions on which Ding relies (Dkt. 63, at 9-10) are *dicta* that trace ultimately

13   back to the floor statement analyzed in *Zheng*. The three decisions on which Ding relies are the Ninth

14   Circuit and district court decisions in *Liew* and the Third Circuit's decision in *Hsu*. *See United States v.*

15   *Liew*, 856 F.3d 585 (9th Cir. 2017); *United States v. Hsu*, 155F.3d 189 (3d Cir. 1998); *United States v.*

16   *Liew*, Nos. CR 11-00573-1 JSW, 2013 WL 2605126 (N.D. Cal. June 11, 2013) (not for publication).

17   Both *Liew* and *Liew* rely on *Hsu*. *See Liew*, 856 F.3d at 597 ("§ 1831 "is designed to apply only when

18   there is evidence of foreign government sponsored or coordinated intelligence activity" and may involve

19   "any manner" of benefit. *Hsu,* 155 F.3d at 195-96 (internal quotation marks omitted)."); *Liew*, 2013 WL

20   2605126, at 2 & n.2 ("This reading is further supported by the legislative history of the EEA. *See Hsu,*

21   155 F.3d at 195 (noting that Section "1831 is deigned to apply only when there is 'evidence of foreign

22   government sponsored or coordinated intelligence activity') (quoting 142 Cong. Rec. S12,212 (daily ed.

23   Oct. 2, 1996) (Managers' Statement for H.R. 3723))."). Both *Liew* decisions directly cite *Hsu* and

24   therefore indirectly the floor statement as part of "background" sections on the Economic Espionage

25   Act. *See Liew*, 856 F.3d at 596-97 ("DISCUSSION [¶] A. EEA Background"); *Liew*, 2013 WL

26   2605126, at 1 ("BACKGROUND . . . 1. THE EEA"). Similarly, *Hsu* quotes the floor statement as part

27   of a background discussion of the Economic Espionage Act (*see Hsu*, 155 F.3d at 195) before

28

1  addressing the questions presented on appeal – namely, "the relationship between the confidentiality

2  provisions of the newly-enacted Economic Espionage Act of 1996, 18 U.S.C. § 1831, *et seq.,* and

3  principles of criminal law regarding discovery and disclosure of material evidence" and "the defense of

4  legal impossibility" as it "pertains to the attempt and conspiracy crimes with which the defendants are

5  charged" (*Hsu*, 155 F.3d at 191). Because the historical background sections were not necessary for the

6  decisions in *Liew*, *Liew*, or *Hsu*, the quotations of the floor statement were *dicta* and none of those

7  decisions can fairly be read to hold that economic espionage in Section 1831 requires proof of the

8  foreign-government tasking.

9        At the same time, neither the Second Circuit panel in *Zheng* nor Zheng's counsel thought that the

10 Second Circuit's decision conflicted with the Ninth Circuit's decision in *Liew*. The Second Circuit in

11 *Zheng* cited *Liew* and noted no conflict. *See Zheng*, 113 F.4th at 299 & n.6 (citing *Liew* four times and

12 discussing it favorably). What is more, Zheng petitioned for review in the U.S. Supreme Court and

13 identified no conflict among the circuit courts of appeals on whether economic espionage requires

14 foreign-government tasking, even though he advanced that argument in the court of appeals. *See* Petition

15 for a Writ of Certiorari, *Zheng v. United States*, No. 24-604 (filed Nov. 26, 2024). Instead, Zheng

16 petitioned for review of the question whether actual loss includes intended loss, because the comments

17 in the Sentencing Guidelines should no longer receive deference. *See id*. i ("The Question Presented is:

18 Whether the limits on agency deference articulated in *Kisor* limit the deference owed to the United

19 States Sentencing Commission's commentary on intended loss under 2B1.1 Application Note 3 of the

20 Sentencing Guidelines."). The U.S. Supreme Court docket reflects the petition filed in November of last

21 year and the government's opposition filed earlier this month. *See* U.S. Brief in Opposition, *Zheng v.*

22 *United States*, No. 24-604 (filed Mar. 4, 2025). As of the filing date of this brief, the U.S. Supreme

23 Court's docket does not list the conference at which the Court may consider the petition (if it is on the

24 discuss list).

25        The district court *United States v. Lan Lee*, No. CR 06-0424 JW, 2010 WL 8696087 (N.D. Cal.

26 May 21, 2010) (Ware, J.), dismissed two economic-espionage conspiracy counts following a jury trial

27 because

28        [T]he "benefit any foreign government" element must be interpreted to refer to the benefits

1
2
ordinarily associated with "espionage." Although the term "industrial espionage" has been adopted in reference to commercial theft of trade secrets, traditionally, the word "espionage" is associated with activity sponsored or solicited by a foreign government.

3    2010 WL 8696087, *5. In support of its conclusion, the district court relied on the heading of Section

4    1831 and the "inherent feature of espionage . . . that the information is turned over to the foreign

5    government or to an agent of the foreign government." *Id*. *5, *6. The district court also relied on the

6    floor statement. *See id*. *6.

7        *Lan Lee* is not binding on this Court, it is inconsistent with *Zheng*, and it was wrongly decided.

8    *See United States v. Articles of Drug Consisting of 203 Paper Bags*, 818 F.2d 569, 572 (7th Cir. 1987)

9    (Posner, J.) ("A single district court decision . . . is not binding on the circuit, or even on other district

10   judges in the same district."). *Lan Lee* acknowledged that "[d]uring the legislative process leading up to

11   the passage of the 1996 Act, the term 'espionage' was used to refer to both commercial theft of trade

12   secrets and foreign government sponsored theft." 2010 WL 8696087, *5 n.12. *Lan Lee* understood that

13   the use of espionage to refer to both economic espionage in Section 1831 and trade-secret theft in

14   Section 1832 meant that espionage could not carry with it a requirement of foreign-government tasking.

15   2010 WL 8696087, *5 n.12. Indeed, the bill that Congress enacted into law had a short title that

16   described both Section 1831 and Section 1832 as "Economic Espionage": "SECTION 1. SHORT TITLE

17   [¶] This Act may be cited as the 'Economic Espionage Act of 1996'." Public Law 294, 110 Stat. 3488,

18   3488 (Oct. 11, 1996).

19       *Lan Lee* correctly observes that "when the 1996 Act was added to the United States Code, only

20   Section 1831, which penalizes 'intending or knowing benefits to any foreign government,' was given the

21   title 'Economic Espionage.'" 2010 WL 8696087, *5 n.12. But Congress passed the public law and the

22   public law used the term "espionage" to describe the offenses in both Section 1831 and Section 1832.

23   Because "espionage" must mean the same concept in the short title as well as Section 101(a), which

24   included the nine sections codified as Sections 1831-1839, it follows that "the term 'espionage'" must

25   "refer to both commercial theft of trade secrets and foreign government sponsored theft." 2010 WL

26   8696087, *5 n.12.

27       Although *Lan Lee* also quotes the floor statement with its admonition to how "enforcement

28

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS AND FOR MORE PARTICULARS ON ECONOMIC ESPIONAGE          22
3:24-CR-00141-VC

1    agencies should administer [Section 1831]" (2010 WL 8696087, *6 (brackets in original), the precatory

2    prosecutorial advice does not limit the statutory text. More generally, floor statements, which can be

3    added after the fact, provide no authority to limit the statutory text. *See, e.g., Conroy v. Aniskoff*, 507

4    U.S. 511, 519 (1993) (Scalia, J., concurring in the judgment) ("We are governed by laws, not by the

5    intentions of legislators. . . . Judge Harold Leventhal used to describe the use of legislative history as the

6    equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's

7    friends.").

8            It should be obvious that neither a section heading using the label "espionage" nor a floor

9    statement provide authority to limit the ordinary meaning of statutory text. *Lan Lee* stretched to impose

10   a limit on the statutory text, however, because it searched for a principle to limit the offense of economic

11   espionage so as not to reach purely private conduct: "Evidence that Defendants solely intended to

12   benefit themselves in the PRC, or benefit a private corporation in the PRC is insufficient for the charge

13   of Economic Espionage." 2010 WL 8696087, *7. Like Dorothy, *Lan Lee* did not need to search for

14   labels or legislative history. The answer was at home in Section 1831. That Section requires an intention

15   or knowledge to benefit a foreign-government entity, whether the entity is the foreign government itself

16   or one of its instrumentalities or agents. The *mens rea* required by Section 1831 does not reach purely

17   private conduct, even if that conduct constitutes the federal crime of trade-secret theft in Section 1832.

18   The harsher penalties of economic espionage are reserved for defendants like Ding, who stole Google's

19   trade secrets based on a business plan intending to upgrade the PRC's AI infrastructure using

20   government cash and land, obtain and enrich PRC government investors using stolen Google trade

21   secrets, and serve the needs of PRC government agencies and universities for large language models

22   with stolen Google technology. Ding's business plan is a classic case of economic espionage and should

23   be prosecuted as such.

24   **II.    The Superseding Indictment Provides Sufficient Particularity to Provide Fair Notice
            without Making Evidentiary Allegations**

25

26           The superseding indictment, supplemented by the government's substantial discovery and

27   reverse proffer, and the forthcoming PRC computer-industry expert disclosure, more than adequately

28   advise Ding of the economic espionage charges in Counts 8-14 of the indictment. *See supra* p. 11

1  (sufficient specificity is determined based on "the charges through the indictment and all other

2  disclosures made by the government," quoting the Ninth Circuit's decision in *Long*).

3       The superseding indictment describes the historical facts. It lists the underlying source

4  documents. The government produced the source documents to Ding in discovery. The government

5  pulled the relevant pages from the source documents and machine translated them from Mandarin

6  (which Ding reads) to English (for the convenience of Ding's counsel) for a reverse proffer. To explain

7  the foreign-government entities and the relationships to the jury, the government currently intends to

8  tender expert testimony which will be preceded by a disclosure with the expert's opinions and bases and

9  reasons therefore, as required by Criminal Rule 16.

10       The information that the government has provided to date and will provide seasonably in

11  advance of trial more than specifies the PRC government entities for Ding to prepare for trial. Ding's

12  request, among others, that the government "[i]dentify with particularity which specific 'foreign

13  government, . . .' Mr. Ding intended or knew his alleged offenses would benefit" underscores the

14  silliness of Ding's request for particularization. The foreign government that Ding intended and knew

15  his trade-secret theft would benefit was the People's Republic of China.

16                 **CONCLUSION**

17       For the foregoing reasons, Defendant Linwei Ding's motion to dismiss (Dkt. 63) should be

18  denied in its entirety and his motion for a bill of particulars (Dkt. 54) should be denied as to the

19  economic-espionage offenses (counts 8-14).

20  DATED: March 19, 2025              Respectfully submitted,

21                           PATRICK D. ROBBINS

22                           Acting United States Attorney

23                           /s/_____

24                           CASEY BOOME
                            MOLLY K. PRIEDEMAN

25                           Assistant United States Attorneys

26                           STEPHEN MARZEN
                            YIFEI ZHENG

27                           Trial Attorneys, National Security Division

28