PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

CASEY BOOME (NYBN 5101845)
MOLLY K. PRIEDEMAN (CABN 302096)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6627
    casey.boome@usdoj.gov
    molly.priedeman@usdoj.gov

STEPHEN MARZEN (NYBN 2007094)
YIFEI ZHENG (NYBN 5424957)
Trial Attorneys, National Security Division

    950 Pennsylvania Avenue, N.W.
    Washington, DC 20530
    Telephone: (202) 616-1051
    stephen.marzen@usdoj.gov
    yifei.zheng@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:24-cr-00141-VC |
| Plaintiff, | **DECLARATION OF GREGORY TOOLE IN SUPPORT OF THE UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS** |
| v. | |
| LINWEI DING, | The Honorable Vince Chhabria |
| Defendant. | Courtroom 4, 17th Floor |
| | Hearing: 1:00 pm on April 30, 2025 |

**DECLARATION OF GREGORY TOOLE**

I, Gregory Toole, being duly sworn, depose and say as follows:

1.    I am a Special Agent of the Federal Bureau of Investigation ("FBI") currently assigned to the San Francisco Division. I have been employed as a Special Agent by the FBI since September 2022.

While employed by the FBI, I have investigated economic espionage and trade-secret theft in violation of the Economic Espionage Act of 1996. I am one of the agents assigned to the investigation of the above-referenced criminal proceeding.

2. On the morning of January 6, 2024, I was part of a team that executed a search warrant at the residence of Linwei Ding. At approximately 6:00 a.m., I was near the front door to Ding's residence when we knocked and announced our presence. After time passed with no response, we breached the door with a ram and entered Ding's residence, a three-story townhouse. Several agents had their weapons drawn as we conducted a safety sweep of the residence. When we encountered Ding coming down the stairs, agents' weapons were briefly pointed at Ding until it became clear that he was not a threat. Ding was then escorted outside the residence.

3. Another agent escorted Ding outside the residence while agents completed a safety sweep. On April 18, 2025, I spoke via telephone with former FBI Task Force Officer Kevin Weeks, of the Santa Clara County Sherriff's Office. Deputy Weeks informed me that he encountered Ding outside the residence sometime after Ding had been escorted out. Deputy Weeks informed me that he conducted a pat search of Ding, placed Ding in handcuffs, and placed Ding in a marked police vehicle. Deputy Weeks stated that he did not press Ding's face or body into the police car.

4. At approximately 6:16 a.m., FBI Special Agent Samuel Chen and I removed our FBI flack jackets (bullet proof vests) and we each concealed our firearms under the outer layer of our clothing. I started my recording device and approached Ding, who was seated in the back of marked police vehicle. I immediately removed the handcuffs and began speaking with Ding. The conversation that SA Chen and I had with Ding was audio recorded and took place in an unmarked FBI sedan. SA Chen sat in the driver's seat, I sat in the rear driver-side seat, and Ding sat in the rear passenger-side seat.

5. Approximately two hours into the interview, we all exited the vehicle so that Ding could use the restroom. Before we went into Ding's residence, I showed Ding a copy of the search warrant, including Attachment B. Ding had asked to see the portion of the warrant that authorized agents to seize his electronic devices. This interaction took place near the trunk of the unmarked FBI vehicle where the interview took place. My recording device remained inside the vehicle and thus did not capture my

interaction with Ding regarding the search warrant.

6. Neither SA Chen nor I locked the doors to the vehicle at any time during the interview. I recall that we were all able to open the doors without unlocking them when we paused the interview for the restroom break. On the way back to the vehicle from the restroom break, Ding asked if we could drive down the block so that his neighbors would not see him. SA Chen drove the car to a location at Ding's direction. The FBI vehicle we were using had a feature that automatically locks the passenger doors when the vehicle reaches a certain speed. The auto-lock feature likely activated while SA Chen drove down the block to the location specified by Ding. Neither SA Chen nor I were aware that the doors had locked after relocating. Ding never suggested that he was aware that the doors had locked. Each door to the vehicle can be easily unlocked from the inside by the driver or any passenger. When we concluded the interview, the doors had to be unlocked to exit.

7. I have examined photos of Item 2 (Apple iPhone 12), Item 7 (ThinkPad Laptop) and item 16 (MacBook Pro), and observed that all three devices have physical features that can facilitate biometric unlocking. Specifically, all three devices have a camera facing the user, and both laptops have fingerprint recognition pads.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: April 18, 2025                                    Respectfully submitted,

/s/ *Gregory Toole*
Gregory Toole
Special Agent,
Federal Bureau of Investigation