1  GRANT P. FONDO (SBN 181530)
   *GFondo@goodwinlaw.com*
2  FARZAD FEYZI (SBN 343538)
   *FFeyzi@goodwinlaw.com*
3  NIRAV BHARDWAJ (SBN 350829)
   *NBhardwaj@goodwinlaw.com*
4  **GOODWIN PROCTER** LLP
   601 Marshall Street
5  Redwood City, CA 94063
   Tel: +1 650 752 3100
6  Fax: +1 650 853 1038

7  DARRYL M. WOO (SBN 100513)
   *DWoo@goodwinlaw.com*
8  JESSICA HUANG FUZELLIER (SBN 315208)
   *JHFuzellier@goodwinlaw.com*
9  DAVID RAPP-KIRSHNER (SBN 344494)
   *DRappKirshner@goodwinlaw.com*
10 **GOODWIN PROCTER** LLP
   525 Market Street, Floor 32
11 San Francisco, CA 94105
   Tel.: +1 415 733 6000
12 Fax: +1 415 677 9041

13 Attorneys for Defendant
   LINWEI DING

14

15                UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17                 SAN FRANCISCO DIVISION

18  UNITED STATES OF AMERICA,          | Case No.  3:24-CR-00141-VC

19                    Plaintiff,       | **DEFENDANT LINWEI DING'S REPLY IN
                                       | SUPPORT OF MOTION TO SUPPRESS
20         v.                          | STATEMENTS AND REQUEST FOR
                                       | EVIDENTIARY HEARING**
21  LINWEI DING,
                                       | Date:       April 30, 2025
22                    Defendant.       | Time:       1:00 p.m.
                                       | Courtroom:  4 (17th Floor)
23                                     | Judge:      Hon. Vince Chhabria
                                       |             450 Golden Gate Avenue
24                                     |             San Francisco, CA 94102

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND ............................................................................... 2

    A.      The Government's Factual Admissions Are Clear Indicia Of A Custodial
       Interrogation ............................................................................................. 2

III.    LEGAL STANDARD ......................................................................................... 4

IV.     ARGUMENT ....................................................................................................... 6

    A.      The Objective Totality Of The Circumstances Clearly Show Mr. Ding Was In
       Custody. ..................................................................................................... 6

        1.      The Government's Reliance On The Court's Conclusion In *Dyer v.
            Hornbeck* Is Unavailing To It ........................................................ 6

        2.      The Government Relies Exclusively On Out Of Circuit And Out Of
            State Squad-Car Interview Cases That Are Factually Inapposite ............... 8

        3.      The Government Asks This Court To Overturn Ninth Circuit
            Precedent To Arrive At Its Conclusion ............................................ 9

        4.      The *Kim* Factors Necessitate A Finding Of Custody ................................. 10

        5.      The *Craighead* Factors Also Necessitate A Finding Of Custody ............. 12

    B.      Mr. Ding's Statements Regarding Seeking A Lawyer Sufficiently Warrant
       Suppression. ............................................................................................. 14

        1.      The "Clarification Rule" Survives *Berghuis* According To The
            Precedent Of This Court. ................................................................. 14

    C.      The Passwords Mr. Ding Provided Should Be Suppressed, As Well As
       Any Fruits Obtained Therefrom. .............................................................. 14

V.      CONCLUSION .................................................................................................. 16

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Berghuis v. Thompkins*,
5     560 U.S. 370 (2010)..........................................................................................14

6

*Berkemer v. McCarty*,
     468 U.S. 420 (1984)............................................................................................4
7

*California v. Beheler*,
8     463 U.S. 1121 (1983)..........................................................................................4

9

*Dyer v. Hornbeck*,
10     706 F.3d 1134 (9th Cir. 2013).....................................................................*passim*

11

*J.D.B. v. North Carolina*,
     564 U.S. 261 (2011)............................................................................................4
12

*Lee. U.S. v. Krystic*,
13     708 F.Supp.2d 1134 (D. Ore. 2010)....................................................................9

14

*Mickey v. Ayers*,
15     606 F.3d 1223 (9th Cir. 2010).........................................................................15

16

*Oregon v. Mathiason*,
     429 U.S. 492 (1977)............................................................................................4
17

*Stansbury v. California*,
18     511 U.S. 318 (1994)............................................................................................4

19

*Thatsaphone v. Weber*,
20     137 F.3d 1041 (8th Cir. 1998)..........................................................................12

21

*Thompson v. Keohane*,
     516 U.S. 99 (1995)..............................................................................................4
22

*U.S. v. Bassignani*,
23     575 F.3d 879 (9th Cir. 2009).........................................................................5, 11

24

*U.S. v. Carroll*,
     No. CR-13-0566 EMC, 2015 WL 1967019 (N.D. Cal. May 1, 2015)....................9
25

*U.S. v. Copeland*,
26     291 F. App'x 94 (9th Cir. 2008) .........................................................................9

27

*U.S. v. Craighead*,
28     539 F.3d 1073 (9th Cir. 2008)....................................................................*passim*

*U.S. v. Crawford*,
    372 F.3d 1048 (9th Cir. 2004)...................................................................................4

*U.S. v. Diaz*,
    No. CR 05-0167 WHA, 2006 WL 3086732 (N.D. Cal. Oct. 30, 2006)....................................9

*U.S. v. Ehrman*,
    No. 21-CR-00204-VC-1, 2022 WL 390716 (N.D. Cal. Feb. 9, 2022) ....................................6

*U.S. v. Eller*,
    No. CR16820701PCTDGC, 2020 WL 58589 (D. Ariz. Jan. 6, 2020) ....................................9

*U.S. v. Fox*,
    216 F.Supp.3d 1225 (W.D. Wa. 2016) ................................................................11

*U.S. v. Hargrove*,
    625 F.3d 170 (4th Cir. 2010)..........................................................................13

*U.S. v. Hudgens*,
    798 F.2d 1234 (9th Cir. 1986)..........................................................................4

*U.S. v. Hurtado*,
    21 F.Supp.3d 1036 (N.D. Cal. 2014) ................................................................14

*U.S. v. Johnson*,
    39 F.4th 1047 (8th Cir. 2022) ..........................................................................8

*U.S. v. Jones*,
    523 F.3d 1235 (10th Cir. 2008)..........................................................................8

*U.S. v. Kim*,
    292 F.3d 969 (9th Cir. 2002).......................................................................4, 6, 10

*U.S. v. Lee*,
    699 F.2d 466 (9th Cir. 1982) ........................................................................9, 10

*U.S. v. Manning*,
    312 F. App'x 34 (9th Cir. 2009) .........................................................................9

*U.S. v. Panousopoulos*,
    No. CR-22-00820-002-TUC-JCH (LCK), 2025 WL 1144564 (D. Ariz. Apr.
    18, 2025) ..........................................................................................9

*U.S. v. Plumman*,
    409 F.3d 919 (8th Cir. 2005)..........................................................................8

**Other State Cases**

*State v. Bryant*,
    97 A.3d 595 (Me. 2014)............................................................................ 9

*State v. Cote*,
    2017 Me. 73, 159 A.3d 831 (2017)........................................................... 8

*State v. Deal*,
    2015 S.D. 51 (2015)................................................................................... 8

*State v. Morato*,
    619 N.W.2d 655 (S.D. 2000) .................................................................... 9

*State v. Uhre*,
    2019 S.D. 8, 922 N.W.2d 789 (2019) ....................................................... 8

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3
4
5
6
7
8
9
10
11

    In its opposition, the government is requesting this Court extend and expand the boundaries of what it means to be a non-custodial interview in the Ninth Circuit. The government admits that its law enforcement agents broke down Mr. Ding's door with guns pointed at him, handcuffed him for a time, isolated him from his family for more than three hours, put him in a car (locked at times) with two agents, never let him leave the presence of the agents including to go the bathroom, did not grant his request for permission to go inside his home to be with his wife and young child or to a police stations rather than be in the car, and so thoroughly traumatized him that after the three hour interrogation concluded that he requested *mental health services* and requested five minutes to compose himself before he went back to his family.

12
13
14
15

    The government further asks this Court to extrapolate what the agents told Mr. Ding, that he was "free," to find that any objective person in Mr. Ding's position, in those circumstances, of course understood that this meant "free to terminate the questioning and free to go." Opp. to Mot. to Suppress (Dkt. 87) at 1.

16
17
18
19
20
21
22
23

    The government also relies on case law that ultimately supports Mr. Ding's motion and should cause this Court to pause before extending the law beyond those cases, as it must, in order to deny this motion. Perhaps most illustrative is *Dyer v. Hornbeck*, 706 F.3d 1134, 1138 (9th Cir. 2013), where, in a case with less troubling facts than the current one, the Ninth Circuit expressed significant concern about law enforcement's interrogation-like tactics, clearly disagreed with the state court finding that no interrogation took place and felt significantly constrained by the exacting standards for habeas review. *This is the case the government most relies and spends three pages discussing*. This Court is not so constrained, and the facts here are more troubling, not less.

24
25
26
27

    The government's admissions are telling, further evidencing  that the agents conducted a custodial interrogation of Mr. Ding, and failed to provide him the constitutionally required *Miranda* warning. This Court should grant Mr. Ding's motion and suppress all his statements, as well as the information obtained from his illegally obtained passwords.

28

1

## II.    FACTUAL BACKGROUND

### A.    The Government's Factual Admissions Are Clear Indicia Of A Custodial Interrogation

The government admits that 18 law enforcement officers were preset at Mr. Ding's townhome when Federal Bureau of Investigation ("FBI") agents broke Mr. Ding's front door down around 6:00 a.m. PST on a Saturday morning. Dkt. 87 at 22. "Several agents had their weapons drawn" and pointed their guns at Mr. Ding as he came to answer the door "until it became clear he was not a threat." Dkt. 87 at 3; Toole Decl. (Dkt. 88) ¶ 2; Nguyen Decl. (Dkt. 88-1) ¶ 2; *see* Dkt. 87 at 3. In fact, FBI Special Agent ("SA") Le Nguyen pointed a gun with a laser pointer at him, demonstrating to Mr. Ding that he was "covered by a firearm." *See* Dkt. 88-1 ¶ 2; Dkt. 87 at 3 n.2.

The government further admits that agents escorted Mr. Ding outside his home *without placing him in handcuffs*. *See* Dkt. 88 ¶ 3; Dkt. 87 at 3. Later, Deputy Kevin Weeks of the FBI Task Force *placed Mr. Ding in handcuffs* while he was outside his home, and  then placed Mr. Ding in the back of a marked police car. *See* Dkt. 88 ¶ 3.  Moments after Mr. Ding was handcuffed in the back of a police car, the agents told him "the house is still being processed now, so we are not going back in the house."  Dkt. 87-2 at 2; Dkt. 82 at 3, 10.

### B.    There Was No Risk To Law Enforcement By 6:16 a.m., Yet Mr. Ding Was Never "Free."

The government admits that agents cleared Mr. Ding's home **within 15 minutes**, by 6:16 a.m. *See* Dkt. 87 at 3, 7; Dkt. 88 ¶¶ 4-6.  Certainly at this point Mr. Ding was no longer a threat, and could have been allowed back in his home and placed in the same room with his family (who were quickly allowed to go back into the house) – *as he requested*.  *See* Dkt. 87 at 4; Boome Decl. Ex. B (Dkt. 87-2) ("Tr.") at 2, 3-4. Agents allowing him back into the house with his family would have been indicia of being "free" – but the agents sent the clear message that he was not free, instead isolating him and requiring that he stay with them. *Id.* This continued for three hours. *See* Dkt. 87 at 3, 7; Dkt. 88 ¶¶ 4-6.

Specifically, after the determining there was not safety risk to officers, SA Gregory Toole and SA Sam Chen turned on their recording devices at 6:16 a.m. and approached Mr. Ding to begin

1  their interrogation. *See* Dkt. 87 at 3; Dkt. 88 ¶ 4. *Mr. Ding was still handcuffed in the back of a*

2  *police car when the agents approached him and began their questioning. Id.*

3       The government then spent **over three hours** in the back of an FBI car interrogating him

4  until 9:31 a.m., with two agents in the car, the doors closed and locked for at least a significant

5  portion of the three hours. *See* Dkt. 87 at 3, 7; Dkt. 88 ¶¶ 4-6. The government does not dispute

6  that FBI agents never provided a *Miranda* warning to Mr. Ding. *See* ECF 87 at 9, 26.

7       Mr. Ding was at all times kept in the presence of law enforcement officers and isolated from

8  his family – from the moment they broke his door down through the next three and a half hours.

9  *See* Dkt. 87-2 at 1-2; ECF 87-2 at 77-78; Dkt. 88 ¶¶ 5-6; Dkt. 87 at 7. Mr. Ding was not "free" and

10  the agents made that clear in their actions. *See* ECF 87-2 at 3; ECF 87 at 1, 4, 5, 9-11, 18, 20-23.

11  If Mr. Ding was "free" as the government asserts, then why was his wife and son permitted to

12  remain in their home but Mr. Ding was not? *See* Fondo Decl. Ex. B (Dkt. 82-3) at 2. Instead Mr.

13  Ding's movement was restricted throughout the interrogation. He was not permitted to retrieve his

14  eyeglasses from his home. *See* Dkt. 87-2 at 1-2. Mr. Ding asked to go back into the house to be

15  with his family – each time this request was denied. Two hours into the interrogation, Mr. Ding

16  asked permission to leave the FBI car to the bathroom. The FBI did not say sure, we will be here

17  when you get back. Instead they escorted him into his home, to and from the bathroom within his

18  home by armed agents, and *then escorted back to the car*. *See* ECF 87-2 at 77-78; Dkt. 88 ¶¶ 5-6;

19  Dkt. 87 at 7. There is no evidence, for example, that Mr. Ding asked to be escorted back to the car.

20  Further, if Mr. Ding was "free" or believed he was "free" he would have sat down with his family,

21  not be escorted back to a car in spite of his requests to go into the house, or go to any law

22  enforcement office instead of being in the car. *Id.*

23       Importantly, despite the government's suggestions, Mr. Ding never stated he was

24  "comfortable" or that he wanted to go to or stay in the back of the FBI car with two agents. *See*

25  Dkt. 87-2. In fact, Mr. Ding suggested alternatives, including asking to go "to the police office"

26  and again to "go to the office and and **where it's safe** yeah." Dkt. 87-2 at 4 (emphasis added).

27       Further, the government's opposition ignores Mr. Ding's limited English proficiency, which

28  is readily apparent from the audio recording. *See generally* Fondo Decl. Ex. A (Dkt. 82-2). In fact,

3

the agents sought clarification from Mr. Ding for several statements he made during the interview. *See* Dkt. 87-2 at 13, 25, 41, 89 (agents attempt to clarify M. Ding's statements by stating, "What do you mean…?"); Dkt. 82 at 7. But they did not seek clarification regarding Mr. Ding's run-on sentence about going to the police office, having "watched a movie," and getting "a lawyer."[1] *See generally* Dkt. 82-2.

At the end of the interrogation, Mr. Ding asked for mental health resources. Dkt. 87-2 at 106. He then asked to be able to stay in the patrol car for an extra five minutes before facing his wife and child. *Id.* at 107. That is not indicia of a person enjoying their time in the back of a law enforcement vehicle for three hours – it shows the agents broke him, and he needed time to recover.

## III.    LEGAL STANDARD

There can be no dispute that the U.S. Supreme Court and the Ninth Circuit have consistently framed the "ultimate question" in determining whether an individual is in "custody" for purposes of *Miranda* as "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011); *see also, e.g.*, *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Berkemer v. McCarty*, 468 U.S. 420, 442, 442 n.35 (1984); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *U.S. v. Craighead*, 539 F.3d 1073 (9th Cir. 2008); U.*S. v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004); *U.S. v. Kim*, 292 F.3d 969, 973–974 (9th Cir. 2002); *U.S. v. Hudgens*, 798 F.2d 1234, 1236 (9th Cir. 1986).   The analysis is disjunctive: 1) whether there was a formal arrest, or, 2) whether there was a restraint on freedom of movement of the degree associated with a formal arrest.

As detailed in Mr. Ding's opening brief (Section III), the Ninth Circuit has explained that the question of whether there was a "restraint on freedom of movement" is "glossed as whether a reasonable innocent person in such circumstances ***would understand that she could refuse to answer officers' questions and leave***." *Dyer*, 706 F.3d at 1138 (internal quotation marks omitted,

---

[1] The government's transcript of the audio recording renders as "unintelligible" Mr. Ding's statement regarding having "watched a movie."  Mr. Ding points the court to the audio recording attached as Exhibit A to Mr. Ding's Motion to Suppress and the transcript attached as Exhibit A to the Declaration of Grant Fondo filed herewith. *See* Dkt. 82-2 at 004.

1    emphasis added).  In its Opposition, the government incorrectly seeks to transform this question

2    into a different one entirely.  They are trying to beef-up the custody inquiry by reframing the

3    reasonable person inquiry as:  "the question is not whether a reasonable person would believe he

4    was not free to leave, [which was the question the Lee court asked,] but rather whether a reasonable

5    person in Mr. Ding's position would believe he was "***in police custody of the degree associated***

6    ***with formal arrest***."[2]  In doing so, the government attempts to set a dangerous precedent, which

7    this Court should reject, for several important reasons.

8         *First*, the government's framing of "custody" as meaning "a reasonable person in the

9    suspect's position, under the totality of circumstances, must be 'in police custody of the degree

10   associated with formal arrest'" relies not on any case law, but a treatise (*see* Dkt. 87 at 10 (emphasis

11   added)), and is not a standard cited in any U.S. Supreme Court or Ninth Circuit authority.  *Second*,

12   the government's framing is effectively an unanswerable question.  The meaning of "in police

13   custody of the degree associated with formal arrest" is ambiguous, and moreover uses the term

14   "police ***custody***," which necessarily brings the inquiry full-circle back to what "custody" even

15   means.  *And third*, to the extent a reasonable person *could* form a belief about whether he was in

16   "police custody of the degree associated with formal arrest," that belief necessarily must be based

17   on some form of restraint on that individual's ability to terminate the interrogation and leave – the

18   very same question asked by the Ninth Circuit in determining whether there was a "restraint on

19   freedom of movement."  *See, e.g.*, *Dyer*, 706 F.3d at 1138, citing *U.S. v. Booth*, 669 F.2d 1231,

20   1235 (9th Cir. 1981); *see also U.S. v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009) (stating "[a]

21   defendant is in custody if a reasonable innocent person in such circumstances would conclude that

22   after brief questioning he or she would not be free to leave").

23        As such, the Court can and should evaluate whether Mr. Ding was in "custody" such that

24   there was a "restraint on freedom of movement of the degree associated with formal arrest" by

25   examining the totality of the circumstances surrounding the interrogation, and whether a reasonable

26   person in Mr. Ding's situation would believe that he was not free to refuse to answer questions and

27

28

---

[2] *See* Dkt. 87 at 1 ("[T]he question is not whether a reasonable person would believe he was not free to leave, but rather whether such a person would believe he was ***in police custody of the degree associated with formal arrest***." (emphasis revised); *id.* at 2.

1  leave.  That is the standard articulated in both *Kim* and *Craighead*, which both also set forth factors

2  relevant to deciding the question of whether an individual was in custody.  *See Kim*, 292 F.3d at

3  973–974 ("[W]e must determine whether 'the officers established a setting from which a reasonable

4  person would believe that he or she was not free to leave.'" (citations omitted)); *Craighead*, 539

5  F.3d at 1082 ("[W]e must decide whether a reasonable person in [defendant's] position would have

6  felt deprived of his freedom of action in any significant way, such that he would not have felt free

7  to terminate the interrogation.").

8  **IV.    ARGUMENT**

9      **A.    The Objective Totality Of The Circumstances Clearly Show Mr. Ding Was In
              Custody.**

10
          **1.    The Government's Reliance On The Court's Conclusion In *Dyer v.*
11              ***Hornbeck* Is Unavailing To It**

12      The government extensively relies on *Dyer* as "the closest Ninth Circuit case on the facts

13  to Ding's case."  Dkt. 87 at 12.  But not only are the facts in *Dyer* significantly less troubling than

14  those presented here, *Dyer* is also inapposite because it is a habeas appeal in which the court was

15  bound by a heightened standard of review.  *See Dyer*, 706 F.3d at 1134.  And, even under this

16  heightened standard of review, which does not apply here, the Ninth Circuit expressed "doubts"

17  that the district court had reached the right conclusion in denying Dyer's motion to suppress.  The

18  *Dyer* court emphasized it was required to affirm denial of Dyer's petition "unless the state court's

19  decision in the matter was **so lacking in justification that there was an error well understood**

20  **and comprehended in existing law beyond any possibility for fairminded disagreement.**" *Id.*

21  at 1139 (emphasis added).  Due to  this heightened standard, the court affirmed the decision." *Id.*

22  In doing so,  the Ninth Circuit was in no way is providing the guidance asserted by the government.

23      This is not the only reason the government's reliance on this case is odd. Unquestionably

24  the facts in *Dyer* differ significantly from what is presented here, which is even more problematic

25  as that is what caused the Ninth Circuit so much concern. First, unlike Mr. Ding, "Dyer was never

26  handcuffed." *Id.* at 1136. This court has held that "[h]andcuffs are, after all, a hallmark of a formal

27  arrest." *U.S. v. Ehrman*, No. 21-CR-00204-VC-1, 2022 WL 390716, at *1 (N.D. Cal. Feb. 9, 2022).

28      Second, Dyer was interviewed in a relatively large 15 feet by 15 feet room at the sheriff's

6

office where she was able to get up and leave on her own. *Dyer*, 706 F.3d at 1136. Mr. Ding was interrogated in the back of a FBI car with two agents inside where the doors were locked for a significant portion of the time. *See* Dkt. 87 at 3, 7.

Third, at the outset of the interview, the officers clearly asked Dyer to clarify her understanding that she was indeed free to leave and not in trouble: "[a]nd you understand that you're not in any trouble, you're not under arrest, and that you're free to leave at any time?" *Id.* at 1142. Here, Mr. Ding was told he was "not under arrest," speaking to the agents was "voluntary," and that he was "free." Tr. at 3. However, he was never specifically told that he was free to leave, free to go, or free to terminate the interrogation at any time. Instead, the government is asking the Court to find that the abbreviated statement of being "free" is akin to "meaning free to terminate the questioning and free to go." Dkt. 87 at 1. But the government cites no authority indicating suspects, the reasonable person, and this court are expected to correctly guess an agent's intent when using abbreviated and ambiguous language.

Fourth, Dyer took "two *unaccompanied* breaks to the restroom during the interrogation." *Dyer*, 706 F.3d at 1138. During one break Dyer "got up, left the room, walked to the restroom (approximately 30 yards away), used the restroom, and returned to the interview room." *Id*. at 1140. One of the law enforcement officers testified that Dyer "could have exited the station from there." *Id*. Here, law enforcement never permitted Mr. Ding to leave their presence during the over three-hour interrogation. And during the one break granted to Mr. Ding after he *requested permission* to use the restroom, FBI agents escorted him to his home and back to their vehicle.

Fifth, "nothing in the record suggests that the detectives did anything to heighten [Dyer's] sense of seclusion." *Dyer*, 706 F.3d at 1138. In stark contrast, the FBI agents secluded Mr. Ding from his wife and child for over three hours, keeping Mr. Ding in the back of an FBI car.

In sum, Dyer voluntarily joined the officers to the sheriff's station where she was interviewed in a large room in a setting where she was able to (and did) take breaks by walking out of the room on her own accord, without asking for permission and without the escort of law enforcement despite it being "the dead of night." *Dyer*, 706 F.3d at 1143. Even then, the court was reluctant to believe Dyer's circumstances did not warrant a *Miranda* warning, yet they were

7

1  hamstrung by the heightened standard of a habeas petition. One judge on the panel concurred in

2  the judgment yet bluntly concluded: "Dyer was 'in custody' and was entitled to receive *Miranda*

3  warnings." *Id.* at 1145.

4  Indeed, not only are circumstances in Mr. Ding's case far more indicative of a custodial

5  interrogation than the situation presented in *Dyer*, but the heightened standard applied also renders

6  the court's conclusion inapplicable to Mr. Ding. And, further, the conduct in Dyer can only be

7  interpreted as beyond the outer limits of what the Ninth Circuit would sanction. For these reasons,

8  the government's reliance on *Dyer* is odd, inapposite, and supports the finding that Mr. Ding's

9  statements must be excluded.

10  ### 2.    The Government Relies Exclusively On Out Of Circuit And Out Of State Squad-Car Interview Cases That Are Factually Inapposite

11

12  The government argues "a substantial number of courts in squad-car interview cases have

13  denied motions to suppress statements made by suspect (*sic*)." Dkt. 87 at 13. Yet in support of this

14  claim, the government cites not one case within the Ninth Circuit, and none of the cases relied upon

15  are as egregious factually as the current case. *See U.S. v. Johnson*, 39 F.4th 1047 (8th Cir. 2022)

16  (the defendant was interviewed after only two agents knocked on his door, asked to talk in their

17  squad car, never placed him handcuffs or otherwise physically restrained, and allowed him to sit in

18  the front seat of the police car on his own); *U.S. v. Jones*, 523 F.3d 1235 (10th Cir. 2008) (defendant

19  not in custody where she was approached by a single agent at a gas station, answered questions in

20  the back of the agent's car for 45-60 minutes, was never handcuffed, and she never asked to leave);

21  *U.S. v. Plumman*, 409 F.3d 919 (8th Cir. 2005) (one agent knocked on defendant's door, invited

22  him to talk in his unmarked car where defendant sat in the front seat, was never handcuffed or

23  otherwise physically restrained, and was told "he did not have to talk if he did not want to, and if

24  he decided to talk with the agents, he could stop talking at anytime and exit the truck").[3]

---

25

26  [3] In addition to the out of circuit federal cases, the government relies on five non-California state court cases. *See, e.g., State v. Cote*, 2017 Me. 73, 159 A.3d 831, 834 (2017) (defendant was called

27  on the phone outside of the residence he was in and asked to come outside to speak with one detective, who then invited him into the back of his cruiser, to which defendant agreed); *State v.*

28  *Uhre*, 2019 S.D. 8, 922 N.W.2d 789, 800 (2019) (questioning of defendant was conducted in law enforcement vehicle at defendant's specific request, and defendant was repeatedly advised that he could get out of the vehicle and end the interview at any time); *State v. Deal*, 2015 S.D. 51 (2015)

### 3.    The Government Asks This Court To Overturn Ninth Circuit Precedent To Arrive At Its Conclusion

The government spends nearly four pages of its opposition criticizing Mr. Ding's citation to the Ninth Circuit case *U.S. v. Lee*, 699 F.2d 466 (9th Cir. 1982). *See* Dkt. 87 at 15-18. However, the government presents just a *single* in-circuit case to rebut *Lee*. *U.S. v. Krystic*, 708 F.Supp.2d 1134, 1145 (D. Ore. 2010)). And, the government misstates that court's treatment of *Lee*, alleging it "dismissed" *Lee* as "provid[ing] only scant analysis." Dkt. 87 at 17 (citing *Krystic*, 708 F.Supp.2d at 1145). The government's characterization of *Krystic* is misleading. *Krystic* distinguished its vastly different facts from those presented in *Lee* – it did not dismiss the holding or analysis in *Lee*. *Krystic*, 708 F.Supp.2d at 1145 (contrasting the record between *Lee* and *Krystic* where the *Lee* defendant "was questioned in a closed FBI car with two officers for well over an hour while police investigators were in and around his house" and the *Krystic* defendant "was interviewed in his home in the presence of three adult relatives with whom he conversed freely in Serbo–Croatian, was presented with evidence of his guilt, and quickly admitted he lied on his immigration application. Accordingly, *Lee* is of limited relevance **to the circumstances of this case**") (emphasis added).

In fact, both the Ninth Circuit and several district courts within the Circuit continue to cite *Lee* with approval. *See, e.g.*, *U.S. v. Manning*, 312 F. App'x 34, 37 (9th Cir. 2009); *U.S. v. Copeland*, 291 F. App'x 94, 96 (9th Cir. 2008); *U.S. v. Carroll*, No. CR-13-0566 EMC, 2015 WL 1967019, at *3-*4 (N.D. Cal. May 1, 2015); *U.S. v. Diaz*, No. CR 05-0167 WHA, 2006 WL 3086732, at *4 (N.D. Cal. Oct. 30, 2006) (quoting *Lee*: "an officer cannot negate a custodial situation simply by telling a suspect that he is not under arrest"); *U.S. v. Panousopoulos,* No. CR-22-00820-002-TUC-JCH (LCK), 2025 WL 1144564, at *5 (D. Ariz. Apr. 18, 2025); *U.S. v. Eller*, No. CR16820701PCTDGC, 2020 WL 58589, at *2 (D. Ariz. Jan. 6, 2020), aff'd, No. 20-10425,

---

(questioning of defendant began on defendant's front porch, where there was snow on the ground and he was 'cold and shivering' and only moved to a patrol car after defendant was asked if he would like to continue the conversation there); *State v. Bryant*, 97 A.3d 595, 597 (Me. 2014) (defendant was questioned in an unmarked police cruiser after expressing a desire to leave the apartment he was in because a shooting fatality had just occurred there, and was told numerous times throughout the interview that he was free to leave); *State v. Morato*, 619 N.W.2d 655, 661 (S.D. 2000) (defendant accompanied officer to patrol car at his request where the conversation remained conversational and defendant never suggested he wished to leave the car).

1    2023 WL 395938 (9th Cir. Jan. 25, 2023).

2          The government's attempt to distinguish *Lee* on its facts is similarly unpersuasive.  In *Lee*,

3    the defendant "was questioned in a closed FBI car with two officers for well over an hour while

4    police investigators were in and around his house." *Lee,* 699 F.2d at 468.  In finding the defendant

5    to be in custody, the *Lee* court emphasized agents confronting the defendant with evidence of guilt

6    after allowing him to repeat his exculpatory story.  *Id*.  So too here.  The agents twice told Mr. Ding

7    they "just want to ask you some questions, kinda get your side of the story uh of what happened"

8    and "yeah we're just wanna hear yeah your side of things."  Tr. at 3, 39.  The agents then presented

9    Mr. Ding with multiple pieces of alleged evidence against him. Dkt. 87-2 at 64-71, 88-91.

10         In sum, the government has not identified a single case within this Circuit rejecting *Lee*, but

11   nevertheless invites this Court to break with established precedent and be the first to do so.  Further,

12   even if the government were correct regarding the status of *Lee*, it does not change the outcome of

13   this case under consideration of the totality of the circumstances and the *Kim* and *Craighead* factors.

14            **4.       The *Kim* Factors Necessitate A Finding Of Custody**

15         *First Kim factor: Language used to summon Mr. Ding*.  The government argues that because

16   the agents "politely" asked Mr. Ding if they could talk in their car as "they could not go into the

17   townhouse while the search warrant was being executed," the first *Kim* factor "strongly points to a

18   voluntary interview." Dkt. 87 at 19.  But it is simply not true that the agents and Mr. Ding could

19   not go into the townhouse while the search warrant was being executed.  In fact, within minutes of

20   luring Mr. Ding to their car, the agents told Mr. Ding his wife and son were inside where it was

21   warm. Dkt. 87-2 at 4.  Mr. Ding's wife and son remained inside their home for the duration of the

22   search and three hour interrogation, together, but the agents told Mr. Ding he could not go home at

23   the outset of the interrogation because the home was "still being process." Tr. at 2.  The agents did

24   not mention any security reason for preventing Mr. Ding to return home – in fact they admitted to

25   him that they knew he was not dangerous –  rather, they did so to keep Mr. Ding isolated from his

26   family and in general.  *See* Dkt. 82-3 at 2.

27         The  government  also  fails  to  consider  the  circumstances  surrounding  the  agent's

28   (subjectively characterized) "polite[]" invitation, which objectively demonstrates that anyone in

                                            10

1  Mr. Ding's position would have reasonably felt he was compelled to go with the agents, regardless

2  of the tone.  The government ignores the fact that eighteen law enforcement agents from three

3  agencies were on the premises, agents had just broken down Mr. Ding's door with a ram, Mr. Ding

4  was detained at gunpoint with a laser shining on him, and Mr. Ding was subsequently handcuffed

5  outside of his home and placed in the back of a police car. Of course, this was done "politely."

6      *Second Kim factor: Extent to which Mr. Ding was confronted with evidence of guilt.*  The

7  government rests on its position that "virtually every voluntary interview involves law enforcement

8  asking the suspect whether he was involved in the crime under investigation." Dkt. 87 at 19.  By

9  doing so, the government is again asking this Court to create a new standard such that any time law

10 enforcement is interviewing a suspect, they are permitted to interrogate, argue with, and challenge

11 the suspect to any extent without it weighing towards a finding of the suspect being in custody.

12 This is contrary to well-established precedent.  *See U.S. v. Fox*, 216 F.Supp.3d 1225, 1232 (W.D.

13 Wa. 2016) (finding interview tactics to weigh in favor of custody where officer "challenged

14 whether defendant was lying by presenting him with evidence of his guilt").

15     *Third Kim factor: Physical surroundings of the interrogation*.  The government claims that

16 Mr. Ding was "comfortable" during the interrogation process, even pointing to the end of the three

17 hour interrogation where Mr. Ding asks to remain seated in the car for a couple minutes. Dkt. 87 at

18 7; *see also* Dkt. 87-2 at 106-107. Far from it.  Just prior to asking to "sit for five minutes" Mr. Ding

19 asked the agents if they "have some mental help you know something you know after all going

20 through all this kinda all of… okay just wondering if you have any mental assistant I think even

21 [IA] should have some, okay." Dkt. 87-2 at 106.  These are statements indicative of someone who

22 was suffering and traumatized, not some who was enjoying their three hours in the car with FBI

23 agents so much that he wanted to stay an extra five minutes.

24     *Fourth Kim factor: Duration of the detention*.  Again, the government asks this Court to

25 establish yet another precedent by expanding the "high end" of the threshold for when an

26 interrogation weighs towards a finding of custody. *Bassignani*, 575 F.3d at 886.  The government

27 wants this Court to add "an extra 30 minutes" to the established "high end" as it asserts here that

28 "an extra 30 minutes did not transform an otherwise non-custodial interview into a custodial

11

1    interview that required a *Miranda* warning." Dkt. 87 at 20. The Court should reject this.

2        *Fifth Kim factor: Degree of pressure applied to detain Mr. Ding.* The government argues

3    that Mr. Ding was not pressured because he was told he was "free," which the government expects

4    Mr. Ding, the reasonable person, and this Court to interpret as equating to "free to terminate

5    questioning and leave." Dkt. 87 at 20. The government cites no authority for the proposition that

6    abbreviated, incomplete statements can take on the meaning of elaborate sentences providing

7    fundamental constitutional protections. Indeed, the government concedes the FBI agents never told

8    Mr. Ding that he was "free *to leave*," "free *to go*," "free *to terminate the interrogation*," or free *to*

9    *do anything else*. To arrive at its conclusion, the government once again requests this Court to

10   expand the current legal precedent: according to the government, if an agent tells a suspect "you

11   are free," the only reasonable interpretation of that vague statement is that the agent is actually

12   saying "you are free to terminate the questioning and free to go." Dkt. 87 at 1, 20. However, none

13   of the cases the government cites in support of its position involve the statement "you are free" –

14   they each include additional language after the word "free" – "free to leave," "free to go," "free to

15   terminate the interview." *See, e.g.*, *Dyer*, 706 F.3d at 1136 ("At the outset of the interview, Dyer

16   was told she was not in custody and she was free to leave").

17       Further, the government fails to consider Mr. Ding's limited English proficiency. Indeed,

18   "a suspect's language skills may be relevant to the 'in custody' issue," despite the fact the inquiry

19   is objective. *Thatsaphone v. Weber*, 137 F.3d 1041, 1045 (8th Cir. 1998). The question is whether

20   a reasonable police officer should have "realized the questioning would be perceived by [defendant]

21   as custodial due to his limited English language skills." *Id*. Here, the agents clearly knew, or

22   should have known, that Mr. Ding's English proficiency is limited – indeed, the agents asked Mr.

23   Ding to clarify his statements on several occasions. *See* Dkt. 87-2 at 13, 25, 41, 89 (agents attempt

24   to clarify Mr. Ding's statements by stating, "What do you mean…?"); *see also* Dkt. 82 at 7. This

25   fact weighs towards increased pressure, and finding Mr. Ding was in custody.

26       **5.    The *Craighead* Factors Also Necessitate A Finding Of Custody**

27       The *Craighead* factors are also relevant to totality of the circumstances analysis of whether

28   Mr. Ding was in custody for the purposes of *Miranda*. *See also* Dkt. 87 at 8 n. 3. *First*, regarding

12

the number of law-enforcement personnel present, the government relies on a Fourth Circuit case pertaining to an in-home interrogation where the defendant was "freely moving around" during the interview. *U.S. v. Hargrove*, 625 F.3d 170, 174 (4th Cir. 2010). Despite there being between ten and fifteen law enforcement officers present to execute a search of the suspect's home at 6:00 a.m., the officers in *Hargrove* did not break the suspects' door down, did not handcuff him, interviewed him in his home where he was permitted to smoke cigarettes, move around, and even get up to "deal[] with the cat, going back and forth from the door or something." *Id*. These facts do not apply here, and are in sharp contrast to the facts before this Court. Here, Mr. Ding was not even allowed into his home, never mind allowed to "freely move[] around" anywhere. *See Craighead,* 539 F.3d at 1084-85 (holding that eight law enforcement officers would have made "[a] reasonable person… feel that his home was dominated by law enforcement agents and… prepared for a confrontation").

*Second*, as to law enforcement restraining Mr. Ding by placing him in handcuffs, the government argues any effect of that was "removed" when the agents told Mr. Ding he was not under arrest and he was "free." Dkt. 87 at 22. As an initial matter, the word "free" is not sufficient to entail "free to leave." Moreover, "the mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation non-custodial per se." *Craighead*, 539 F.3d at 1088. Because Mr. Ding was just handcuffed in the back of a police car, his house filled with agents, and surrounded by law enforcement officers and vehicles, Mr. Ding was certainly restrained to the point it weighs towards finding of custody.

*Third*, the government attempts to construe Mr. Ding's request to go to the police office as a desire to be further isolated. Dkt. 87 at 23. But in fact, Mr. Ding stated he wanted to go to the office "where it's safe," presumably because he did not feel safe in the back of an FBI vehicle with two agents. Dkt. 87-2 at 4.

*Finally*, as addressed above, the government seeks to create a new precedent in which an officer need only say the truncated statement "you are free" to convey the meaning "you are free to terminate questioning and free to go." Dkt. 87 at 23. The court should reject such an unfounded position. In fact, Mr. Ding was never told he was free to leave, free to go, free to get out of the car, free to go the bathroom unescorted, or free to go home, at any time.

**B.    Mr. Ding's Statements Regarding Seeking A Lawyer Sufficiently Warrant Suppression.**

**1.    The "Clarification Rule" Survives *Berghuis* According To The Precedent Of This Court.**

Contrary to the government's position, the "clarification rule" requiring law enforcement to clarify ambiguous statements regarding invocation of counsel made by suspects who have not waived their *Miranda* rights, has not been overturned and survives *Berghuis* within the Ninth Circuit. *See Berghuis v. Thompkins*, 560 U.S. 370 (2010). Four years after *Berghuis*, in *U.S. v. Hurtado*, 21 F. Supp. 3d 1036, 1041 (N.D. Cal. 2014) this court stated: "Although some language in Berghuis could be read very broadly to abrogate the 'clarification rule,' this Court concludes that the clarification rule survives *Berghuis*." Notably, *Berghuis* did not involve a defendant's ambiguous or equivocal response, but rather, an implied waiver by the defendant's silence after being advised of Miranda warnings. *Berghuis*, 506 U.S. at 379.

In assessing Mr. Ding's statements regarding counsel, the government's transcription misses a key part of the rambling, somewhat confusing, run-on sentence Mr. Ding stated which concluded with the words "I can get a lawyer." The full transcription is: "Can they stay here? My wife and my son stays here, stay at home. Can you just…if you want to watch her, that's okay, you can get someone to watch her at home, and then I can go with you to the police office, if that's okay, let's talk over there. And then if necessary, if you have any questions. **I watched a movie**, if I feel uncomfortable, I can get a lawyer." Dkt. 82-2 at 4. The reason "I watched a movie" is important is because it adds color to why someone in Mr. Ding's position (a foreign national who has difficulties with English) would want to go the more formal setting of a police office where, as seen in the movies, a suspect can actually summon a lawyer, versus in the back seat of a police car. The combination of the difficulty to understand Mr. Ding, the somewhat broken nature of his fragmented run-on sentence, and his confusing invocation to "get a lawyer," was sufficiently ambiguous to warrant the agents to seek clarification.

**C.    The Passwords Mr. Ding Provided Should Be Suppressed, As Well As Any Fruits Obtained Therefrom.**

Contrary to the government's position, Mr. Ding did not voluntarily provide passcodes to

14

1  devices during the interrogation. Opp. at 27. The government argues the audio recording of the

2  interrogation "makes clear that the conditions surrounding it … do not demonstrate the kind of

3  duress needed to show involuntariness." *Id*. However, the government's assessment ignores the

4  totality of the circumstances Mr. Ding faced. *See Mickey v. Ayers,* 606 F.3d 1223, 1233 (9th Cir.

5  2010) (in assessing the voluntariness of a statement the court considers "the totality of all the

6  surrounding circumstances—both the characteristics of the accused and the details of the

7  interrogation"). Leading up to being asked to give the passwords to his devices, Mr. Ding had been

8  detained at gun point, handcuffed, placed in the back of a police car, and transferred to the back of

9  a FBI car where he was interrogated by two officers for approximately two hours. Considering the

10  totality of these circumstances, the officer's actions amounted to an effective coercion.

11  The government claims that because Mr. Ding "challenged" the agents to prove that they

12  had the right to make him give up his passwords, this somehow demonstrates voluntariness. Dkt.

13  87 at 27. To the contrary, Mr. Ding was attempting to invoke his rights, and he was making sure

14  he did not do anything that he was not *required* to do. Indeed Mr. Ding attempted to resist by

15  stating "I am not volunteering here to provide you all these kind of my personal information." Tr.

16  at 76. However, the agents exercised their authority over Mr. Ding and emphasized that they had

17  a warrant *to seize* Mr. Ding's devices.

18  In fact, in no way were Mr. Ding's subsequent statements providing passwords voluntary –

19  he even said so himself and reiterated a second time he was "*not volunteering*" to provide

20  information. *Id*. There are no clearer words Mr. Ding could have stated in an attempt to invoke

21  his constitutional rights. But, Mr. Ding was surrounded by the domineering presence of several

22  FBI agents while still sitting in the back seat of an FBI car where he had just endured nearly two

23  hours of interrogation by two agents.

24  Further, the full context of the request for Mr. Ding to provide the passwords was one of

25  duress. Mr. Ding had not been provided water to drink or an opportunity to use the restroom during

26  those two hours of interrogation. *See* Tr. at 58, 77. This is despite notifying the agents within the

27  first few minutes of the interrogation that he wanted to "use the restroom" but that he "can hold for

28  maybe five to ten minutes . . . otherwise I have to pee." Tr. at 5. Two hours later, the agents began

15

1  pressuring Mr. Ding to provide passwords for various devices while he was still sitting in the back

2  of the FBI car.  Tr. at 71-77.  In addition to trying to object by stating he was not volunteering any

3  information, Mr. Ding tried, once again, to leave the car: "I'm trying to understand do we have to

4  do it this morning or can we go to the office quickly?"  Tr. at 78.  An agent responded that the FBI

5  has a warrant to search Mr. Ding's home and "would love for [him] to unlock the devices [n]ow."

6  Tr. at 78.  Only after Mr. Ding said "okay" and again requested permission to go to the bathroom,

7  the agents finally permitted him to do so with an FBI escort.  Tr. at 78.

8       Indeed, throughout this time, Mr. Ding was kept in isolation from his family, and instead

9  faced the countless questions and requests of several agents while sitting in the back of an FBI car,

10  without access to a phone, without food, without drink, and without access to the outside world.

11       The government argues in the alternative that FBI agents would have inevitably discovered

12  the contends of Ding's passcode-protected devices through biometric unlocking.  But in support,

13  the government only articulates that the devices it seized allegedly contained the optionality for

14  biometric access – the government provides no indication that biometric unlocking was configured

15  working as to each of the relevant devices, and it would have been able to obtain the same

16  information from biometric tools as it may have through the passcodes provided by Mr. Ding.

17  **V.    CONCLUSION**

18       For the foregoing reasons, Mr. Ding respectfully requests the Court suppress all statements

19  made by Mr. Ding to law enforcement agents during and after the execution of the search warrant

20  at Mr. Ding's residence on January 6, 2024, and exclude all the evidence obtained as a result of the

21  passwords obtained during the interrogation.

22

Dated: April 24, 2025                    Respectfully submitted,

23                                       GOODWIN PROCTER LLP

24

25                                       By: /s/ *Grant Fondo*
                                         GRANT P. FONDO (SBN 181530)
26                                       *GFondo@goodwinlaw.com*
                                         DARRYL M. WOO (SBN 100513)
27                                       *DWoo@goodwinlaw.com*
                                         JESSICA HUANG FUZELLIER (SBN
28                                       315208)

1                                    *JHFuzellier@goodwinlaw.com*
                                    FARZAD FEYZI (SBN 343538)

2                                    *FFeyzi@goodwinlaw.com*
                                    DAVID RAPP-KIRSHNER (SBN 344494)

3                                    *DRappKirshner@goodwinlaw.com*
                                    NIRAV BHARDWAJ (SBN 350829)

4                                    *NBhardwaj@goodwinlaw.com*
                                    **GOODWIN PROCTER LLP**

5

6                                    Attorneys for Defendant
                                    LINWEI DING

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

1

## **CERTIFICATE OF SERVICE**

2        I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the

3    United States District Court for the Northern District of California by using the CM/ECF system

4    on **April 24, 2025**. I further certify that all participants in the case are registered CM/ ECF users

5    and that service will be accomplished by the CM/ECF system.

6        I certify under penalty of perjury that the foregoing is true and correct. Executed on **April**

7    **24, 2025**.

8

9                                        */s/ Grant P. Fondo*
                                         Grant P. Fondo

18