UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA,<br><br>                    Plaintiff,<br><br>        v.<br><br>LINWEI DING,<br><br>                    Defendant. | Case No.  24-cr-00141-VC-1<br><br>**ORDER GRANTING IN PART<br>MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 81 |

The motion to suppress is granted in part. Ding's statements were obtained as a result of a *Miranda* violation, so they must be suppressed. But the evidence discovered on Ding's devices need not be suppressed, because his decision to give the officers his passwords was voluntary and nontestimonial. Nor did the officers violate Ding's right to counsel.

I.

At approximately 6:00 a.m. on a Saturday, 18 police officers and FBI agents knocked on Ding's door to execute a search warrant related to allegations that Ding committed trade secret theft and economic espionage. Dkt. No. 82-3, Ex. B to Fondo Decl., at 1–2 (hereinafter FBI 302). After receiving no answer, they used a battering ram to break down the door. *Id.* The officers encountered Ding, who was coming down the stairs at the time they entered, and multiple guns were drawn, with at least one officer pointing a gun at Ding. Dkt. No. 88, Toole Decl. at ¶ 2. Ding was then handcuffed and put in the back of a marked local police car. *Id.* at ¶ 3. His wife and five-year-old son were also found and brought outside, but were not handcuffed. FBI 302 at 2.

The officers took 15 minutes to clear the house. *Id.* After roughly 15 minutes more, Ding's wife and child were permitted back in the house, where they stayed in a third-floor room

for the duration of the search, with Ding's wife occasionally permitted downstairs under escort to get food and drinks. *Id.* Ding remained in the squad car.

Shortly after being placed in the car, Ding was approached by FBI Special Agents Gregory Toole and Sam Chen. Toole Decl. at ¶ 4. Ding asked for his glasses; while he remained in the car, an officer entered the house and retrieved them. Dkt. No. 87-2, Interview Trans. at 1–2. The agents then removed his handcuffs, asserted that he was not under arrest or in custody, and said that they "simply needed to detain [Ding] while [they] initiated the search there for everyone's safety." *Id.* at 2. And they explained that his wife and child were going to "stay inside now to stay warm." *Id.* After Toole said that he didn't want Ding's neighbors to think he was under arrest, Toole asked "is it alright if we go to just a normal one of our cars." *Id.* The agents then both said that talking to them was completely voluntary, that Ding was not under arrest, and the Ding was "free." *Id.* at 3.

In response, Ding asked if they could instead go to the police station, "where it's safe." *Id.* at 4. Chen explained that the station was "a bit of a drive, so that's why, we don't want . . ." to drive there. *Id.* Toole then said "so if this is alright with you, we could we could just have a talk here," to which Ding responded, "okay." *Id.* Ding then noted that he needed to use the bathroom, to which the agents responded that the search was ongoing but that they could go inside to use the restroom. Ding asked if they could then stay inside the house. The agents initially agreed, but then implied that the plan to stay in the house wouldn't work because the search was ongoing and it "would take a little time to process the house." Dkt. No. 82-2, Manually Filed Audio Exhibit 00.02.50–00.10.00 at 6:30–7:01.[1] In response, Ding responded that he "can hold for maybe 5–10 minutes," the agents let him know that if it's urgent, they could "take a little break," and then the agents began questioning Ding. Trans. at 5.

---

[1] The written transcript appears to say that Ding said "we can stay here," implying that Ding was retracting his ask to go to the house and instead said it was fine to stay in the car. Listening to the audio file, it seems like Ding is instead saying "we can stay there," as in, Ding wished to remain in the house. While the analysis below does not turn on the resolution to this question, the Court finds that Ding said "there."

Ding remained in the car until around 9:30 a.m., for a total detention period of more than three hours. He was given an eight-minute bathroom break approximately two hours into his time in the car. Toole Decl. at ¶ 5. During that bathroom break, police officers escorted him to and from his home. FBI 302 at 2–3.

Shortly before the bathroom break, both inside and outside of the car, the agents asked Ding for the passwords to his devices. *See* Trans. at 75–79. He asked to see the search warrant, which authorized a search of his devices, and, after some back-and-forth, provided the passwords to the agents. *Id.*; *see also* Toole Decl. at ¶ 5. At this point, Ding also renewed his request to go to the police station, noting that the questioning was taking a long time. Trans. at 77. After the bathroom break, Ding noticed that the neighbors were coming out and asked if the agents could drive a little farther from the houses. *Id.* at 79.

II.

Ding's detention and questioning resulted in a *Miranda* violation. Ding's statements must be suppressed as a result. But the contents on the devices do not need to be suppressed because Ding's provision of the passcodes was nontestimonial and voluntary.

A.

*Miranda* warnings are designed to protect against the potentially coercive nature of custodial interrogation, i.e., when a suspect is interrogated "in custody." *Miranda v. Arizona*, 384 U.S. 436, 467–70 (1966). Whether a suspect is "in custody" is an objective inquiry consisting of two discrete questions: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). The ultimate question is whether "there [was] a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Id.* (quoting *Thompson*, 516 U.S. at 112). Courts must "examine all of the circumstances surrounding the interrogation, including any circumstance that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to

3

leave." *Id.* at 270–71 (cleaned up) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

The Ninth Circuit has supplied a non-exhaustive list of factors that courts can use as a framework to conduct this inquiry. In *United States v. Kim*, the Ninth Circuit described the inquiry as involving "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." 292 F.3d 969, 974 (9th Cir. 2002) (quoting *United States v. Hayden,* 260 F.3d 1062, 1066 (9th Cir. 2001)). And in *United States v. Craighead*, the Ninth Circuit considered "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." 539 F.3d 1073, 1084 (9th Cir. 2008).

### B.

Both sides agree that Ding was subject to questioning and did not receive *Miranda* warnings. The sole remaining issue, then, is whether Ding was "in custody" during his interview, such that a reasonable person in his position would not have felt free to end the questioning and leave.

The government begins with two big-picture arguments. First, it contends that the inquiry into whether a *Miranda* violation occurred should be confined to the events that took place after Ding was asked whether he wanted to move to the unmarked car. The government asserts that this "choice" should serve as a functional break between the incident in the house and the rest of the interrogation for purposes of determining whether Ding was in custody while he was in the unmarked car for questioning. But in reality, any reasonable person would have understood that the only choice was staying in a marked car or moving to an unmarked car, not moving to an unmarked car or leaving, such that they would have been consenting to custody by choosing to move to the unmarked car. This was not a situation where Ding chose to speak with the officers

over another viable option that did not involve speaking with them.

Second, the government argues that the most important fact is that Ding was told he was not under arrest and was "free." This certainly plays an important role in the analysis. But it's not dispositive. "The mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation non-custodial *per se*." *Craighead*, 539 F.3d at 1088. It depends on the circumstances. And in many cases, it almost seems as if officers believe that they need only utter the magic words "not under arrest" or "free to leave" to inoculate themselves from a claim that their otherwise-highly-coercive detention and interrogation triggered the *Miranda* obligation. *See, e.g.*, *United States v. Howard*, 156 F. Supp. 3d 1045, 1051–52 (N.D. Cal. 2016); *Smith v. Clark*, 612 F. App'x 418, 424 (9th Cir. 2015) (Watford, J., concurring). And here, the officers did not even tell Ding he was "free to leave." They said he was "free." Free to do what? The question is whether Ding, considering the circumstances in their totality (including the officers' statements that he was "free" and not under arrest) could have reasonably believed he was free to walk away from the officers when they were holding him in the car. Applying the factors set out by the Ninth Circuit, the answer is no.

Accounting for overlap between the factors considered by the Ninth Circuit in *Kim* and *Craighead*, the factors most useful to consider in this case are: (1) the language used to summon Ding; (2) the extent to which Ding was confronted with evidence of guilt; (3) the physical surrounding of the interrogation, including whether Ding was isolated from others and the number of law enforcement personnel and whether they were armed; (4) the duration of Ding's detention; and (5) the degree of pressure applied to detain Ding, including whether Ding was at any point restrained and whether Ding was informed that he was free to leave and the context in which those statements were made.

First, the language used to summon Ding supports a finding of a *Miranda* violation. At the initiation of the government's interaction with Ding, he had firearms pointed at him and was ordered into a marked car. Even taking the government's suggested starting point for the inquiry—when he was asked whether he wanted to move into a marked car—that interaction had

the hallmarks of "an order," as opposed to his voluntarily "accompan[ying] law officers understanding that questioning would ensue," given that there was clearly no alternative in which Ding was left alone. *See Kim*, 292 F.3d at 974 (emphasis omitted) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1982)).

Second, the agents confronted Ding with evidence of his guilt. Several times over the course of questioning, the agents contrasted Ding's answers with evidence they had previously collected about his alleged crimes. While the government asserts that *all* interrogations with suspects will involve some amount of confrontation, the *Kim* court contrasted "a full-fledged interrogation" with "a brief inquiry," noting that questions covering, in detail, the activities that were the subject of a criminal investigation would auger more towards a finding that a suspect was in custody. *Id.* at 977. So too here.

Third, the physical surroundings support a finding of a *Miranda* violation. Ding was isolated from his family, who he knew had been returned into the house. And he was in a "police-dominated" atmosphere in the car where the questioning took place. *See id.* ("[T]he police in this case temporarily took over complete control of Kim's store, creating 'a police-dominated atmosphere,' in which the police kept Kim physically isolated from two family members who could have provided both moral support and, given her limited English, a more complete understanding of the overall situation.").

The government cites a number of cases holding that a suspect might not be "in custody" even when questioned in a squad car. But those cases are distinguishable when the totality of the circumstances is considered, especially because in all of them, the suspect was asked to talk with agents while in an environment in which the suspect plausibly (and reasonably) could have chosen to remain or leave, as opposed to going with and speaking to the agents. *See United States v. Johnson*, 39 F.4th 1047, 1051-52 (8th Cir. 2022) (agents approached suspect at his house and asked if he would come out with them and talk); *United States v. Jones*, 523 F.3d 1235, 1237 (10th Cir. 2008) (agents asked to speak with suspect as she exited a convenience store while her car was at gas pump, and agents did not block in her car); *United States v. Jones*,

523 F.3d 1235, 1237 (10th Cir. 2008) (after agents showed up at suspect's house, he agreed to speak with them, took some time to get dressed, walked outside, and entered the front passenger seat).

Fourth, the duration of this interrogation, around three hours and fifteen minutes, was beyond the outer bounds of the higher end identified by the Ninth Circuit and goes in favor of finding a *Miranda* violation. *See United States v. Bassignani*, 575 F.3d 879, 886 (9th Cir. 2009) ("Our precedents suggest that a two-and-a-half-hour interrogation is at the high end." (cleaned up)). The government argues that the Court should rely on *Dyer v. Hornbeck*, a habeas case in which the Ninth Circuit considered an interrogation that lasted four hours and determined that the state court's decision that no *Miranda* violation had occurred was not contrary to clearly established law. 706 F.3d 1134, 1137 (9th Cir. 2013). But not only was that case decided under the deferential standard of review required by the Antiterrorism and Effective Death Penalty Act of 1996, but the majority stated that the length of the interview would likely go in favor of finding a *Miranda* violation had occurred during Dyer's interrogation. *See id.* at 1139.

Fifth, the degree of pressure used to detain Ding was high: not only were there 18 officers involved in ramming down Ding's door with guns drawn, but he also knew that there were guns pointed at him because he had lasers on his body. And although he was not the victim of physical force or threats, he was restrained through the use of handcuffs prior to being put into the unmarked car, leaving him very aware that he was at the mercy of the agents around him. And even once Ding was in the car, he was not permitted to leave, despite his requests to move to different locations.

As to the agents' statements about Ding's status, while Ding was informed he was "free," he was not informed that he was free to terminate the interview or leave. Certainly after being placed in a police car, it would be difficult for any reasonable person to believe and act on the *implication* that he was free to leave. In these circumstances, a reasonable person would not have felt at liberty to terminate questioning and leave. Where would he have gone? It was 6:15 in the morning, and Ding had already been told that he could not go back into the house. As for the

comment that he was "not under arrest," this is not nearly as understandable to the reasonable layperson as "free to leave"—a layperson is likely to understand "you're not under arrest" as "we're not taking you down to the station and booking you." This is evidenced by Ding's reaction to an exchange with the officers about his travel plans. After he let the officers know that he had a trip to China planned, the officers told him that he was "not under arrest" and that he was "free to travel," while at the same time letting him know that they were taking his passport. *See* Trans. at 80 ("[W]e can't restrict you from leaving, you can . . . still go, the only issue for you though is that we're taking your passport."); *see also id.* at 81 (after telling Ding he should probably change his flight because he won't get his passport back in time, Toole tells Ding, "Yeah but legally like you're . . . free"). In this context, a reasonable person would not assume that, in the presence of two police officers and answering questions in a car isolated from his family, being informed he was not under arrest and was "free" meant that he was free to leave.

Considering the totality of the circumstances, then, a reasonable person in Ding's shoes would have understood his situation to be equivalent to the restriction of movement associated with a formal arrest.

## C.

Ding argues that the Court should remedy the *Miranda* violation by suppressing both the statements he made during the interrogation and the fruits of the passwords that he gave the agents. The testimonial evidence from the interrogation—Ding's statements—must be suppressed. *See Missouri v. Seibert*, 542 U.S. 600, 608 (2004). But the nontestimonial fruits of a *Miranda* violation are not usually suppressed because *Miranda* is designed to protect the right against self-incrimination, and nontestimonial evidence does not implicate the right against self-incrimination. *United States v. Patane*, 542 U.S. 630, 637 (2004).

Ding argues that the passwords in this case would be considered testimonial. But in the cases where a password has been considered testimonial, the knowledge of the password itself revealed something about the suspect's guilt and so was essentially testimony by the suspect. For

example, in *United States v. Doe*, the suspect's ability to unencrypt the flash drives would "be tantamount to testimony" by the suspect of knowledge about the encrypted—and incriminating—files and the suspect's possession, control, and access of the files, all of which would have been key evidence in the case against him. 670 F.3d 1335, 1346 (11th Cir. 2012); *see also United States v. Kirschner*, 823 F.Supp.2d 665, 669 (E.D. Mich. 2010). Here, there is nothing inherently incriminating about the fact that Ding has the passwords for his own personal cellphone and personal computers. In this case, then, Ding's possession of the passwords is not tantamount to admitting control over everything on the devices such that it would be equivalent to testimony that he was the person who stole any trade secrets that might be found on the devices.

Ding makes a last-ditch argument for exclusion by contending that his choice to give the password was involuntary because he was coerced by the conditions of his interrogation, such that the passwords and fruits must be excluded. A statement "is involuntary if coerced either by physical intimidation or psychological pressure." *United States v. Shi*, 525 F.3d 709, 730 (9th Cir. 2008) (quoting *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003)). Ding argues that the two-and-a-half hourlong wait to use the bathroom and the fact that the agents did not have water to give him means that he was under duress, and his statements, made while he was trying to get into the house to use the bathroom, were involuntary. But these conditions, over the time period here, do not rise to the level of physical coercion that would indicate that Ding's "will was overborne by the circumstances surrounding the giving" of his passwords. *Mickey v. Ayers*, 606 F.3d 1223, 1233 (9th Cir. 2010) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)); *cf. Mincey v. Arizona*, 437 U.S. 385, 398–99 (1978) (finding that a confession obtained from a defendant who was in the hospital, experiencing severe pain, and nearly comatose was involuntary); *Haynes v. Washington*, 373 U.S. 503, 510–12 (1963) (invalidating a confession where the authorities held the suspect for more than five days and never advised him of his rights); *United States v. Jenkins*, 938 F.2d 934, 939 (9th Cir. 1991) (holding that a suspect who confessed after being beaten and told of a plan to kill him had confessed involuntarily).

III.

Ding also claims that his right to counsel was violated because questioning continued after he expressed interest in getting a lawyer. He points to his statement in the car: "That's okay – let's talk over there. And then if necessary, if you have any questions, I watch the movies – if I am uncomfortable I can get a lawyer – at anytime." Trans. at 4.

Ding does not contend that this statement was an unambiguous invocation of his right to counsel. Instead, he argues that while his statement was ambiguous as to his invocation of his right to counsel, the agents had a duty to clarify whether Ding was seeking to assert his right to counsel. As a preliminary matter, Ding's statement doesn't seem ambiguous—he seemed to be saying that although he might ask for a lawyer later, he wasn't asking for one now. But anyway, the Supreme Court has held that "[i]n the context of invoking the *Miranda* right to counsel," if a suspect "makes a statement concerning the right to counsel 'that is ambiguous or equivocal,'" the police are not required to "ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (quoting *Davis v. United States*, 512 U.S. 452, 461–62 (1994)). So the agents were under no obligation to cease questioning or clarify his alleged invocation. *See also Garcia v. Long*, 808 F.3d 771, 778 (9th Cir. 2015) ("An ambiguous or equivocal *Miranda* invocation does not require the cessation of questioning." (cleaned up) (quoting *Davis*, 512 U.S. at 459)).

**IT IS SO ORDERED.**

Dated: June 24, 2025

VINCE CHHABRIA
United States District Judge