GRANT P. FONDO (SBN 181530)
*GFondo@goodwinlaw.com*
FARZAD FEYZI (SBN 343538)
*FFeyzi@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 Marshall Street
Redwood City, CA 94063
Tel.: +1 650 752 3100
Fax: +1 650 853 1038

DARRYL M. WOO (SBN 100513)
*DWoo@goodwinlaw.com*
RACHEL M. WALSH (SBN 250568)
*RWalsh@goodwinlaw.com*
JESSICA HUANG FUZELLIER (SBN 315208)
*JHFuzellier@goodwinlaw.com*
DAVID RAPP-KIRSHNER (SBN 344494)
*DRappKirshner@goodwinlaw.com*
COLETTE LOWRY (SBN 359889)
*CLowry@goodwinlaw.com*
**GOODWIN PROCTER LLP**
525 Market Street, Floor 32
San Francisco, CA 94105
Tel.: +1 415 733 6000
Fax: +1 415 677 9041

Attorneys for Defendant:
LINWEI DING

[*Additional Counsel Listed in Signature Block*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>LINWEI DING,<br><br>　　　　　　Defendant. | Case No. 3:24-CR-00141-VC<br><br>**DEFENDANT LINWEI DING'S NOTICE OF MOTION AND MOTION FOR A MISTRIAL AND NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE AND *BATSON V. KENTUCKY***<br><br>Date:　　　　April 16, 2026<br>Time:　　　　1:00 p.m.<br>Courtroom:　4 (17th Floor)<br>Judge:　　　Hon. Vince Chhabria<br>　　　　　　450 Golden Gate Avenue<br>　　　　　　San Francisco, CA 94102<br><br>Filed/lodged concurrently herewith:<br>1.　Declaration of Grant P. Fondo<br>2.　[Proposed] Order |

**NOTICE OF MOTION**

**TO THE COURT AND ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on April 16, 2026, at 1:00 p.m., or as soon thereafter as this matter may be heard at a time set by The Honorable Vince Chhabria in Courtroom 4 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Defendant Linwei Ding ("Mr. Ding"), will and hereby does move for declaration of a mistrial and new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure and *Batson v. Kentucky*, 476 U.S. 79 (1986).

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the attached Declaration of Grant P. Fondo ("Fondo Decl.") and accompanying exhibits, the pleadings and papers filed in this matter, and on other such arguments or evidence as the Court shall deem proper.

i

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................................... 1

II.   FACTUAL BACKGROUND .............................................................................. 2

      A.    Prospective Juror Questionnaires .............................................................. 3

      B.    Voir Dire .................................................................................................... 6

      C.    *Batson* Challenges, Hardship and Cause Excusals, and Other Procedural
            Background ................................................................................................ 7

      D.    Jury Pool and Jury Composition ............................................................... 10

III.  LEGAL STANDARD .......................................................................................... 11

IV.   ARGUMENT ........................................................................................................ 12

      A.    The Government Disproportionately Exercised Its Peremptory Strikes Against
            Prospective Jurors of Chinese Descent. .................................................... 12

      B.    The Government's Proffered Reasons for Exercising These Three Strikes Are
            Inadequate. ................................................................................................ 14

      C.    Comparative Juror Analysis Further Undermines the Government's Proffered
            Reasons for Exercising Its Peremptory Strikes. ........................................ 16

      D.    The Government's Efforts to Exclude Jurors of Chinese Descent for Cause and
            Hardship Further Demonstrates Purposeful Discrimination. ..................... 18

      E.    The Seating of Jurors 61 and 104 Does Not Undermine Evidence of
            Discrimination. .......................................................................................... 20

V.    CONCLUSION .................................................................................................... 21

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ali v. Hickman*,
584 F.3d 1174 (9th Cir. 2009).............................................................. 21

*Batson v. Kentucky*,
476 U.S. 79 (1986).............................................................. 1, 11

*Cooper v. State*,
134 Nev. 860 (2018) .............................................................. 15

*Ex parte Travis*,
776 So.2d 874 (Ala. 2000) .............................................................. 18

*Foster v. Chatman*,
578 U.S. 488 (2016).............................................................. 2, 11, 12

*Green v. LaMarque*,
532 F.3d 1028 (9th Cir. 2008).............................................................. 12, 18

*Johnson v. California*,
545 U.S. 162 (2005).............................................................. 12

*Kesser v. Cambra*,
465 F.3d 351 (9th Cir. 2006).............................................................. 15, 18, 20

*Miller-El v. Cockrell*,
537 U.S. 322 (2003).............................................................. 11

*Miller-El v. Dretke*,
545 U.S. 231 (2005).............................................................. *passim*

*Pao Lo v. Kane*,
584 F. App'x 885 (9th Cir. 2014) .............................................................. 15

*Shirley v. Yates*,
807 F.3d 1090 (2015).............................................................. 16, 17, 21

*Simmons v. Beyer*,
44 F.3d 1160 (3d Cir. 1995).............................................................. 13

*Snyder v. Louisiana*,
552 U.S. 472 (2008).............................................................. 12

*United States v. Collins*,
551 F.3d 914 (9th Cir. 2009).............................................................. 13

*United States v. Tory,*
    52 F.3d 207 (9th Cir. 1995)......................................................................................... 11

*Tolbert v. Page,*
    182 F.3d 677 (9th Cir. 1999)....................................................................................... 13

*Turner v. Marshall,*
    63 F.3d 807 (9th Cir. 1995).................................................................................... 13, 20

*Williams v. Runnels,*
    432 F.3d 1102 (9th Cir. 2006)............................................................................. 11, 12, 13

**Statutes**

18 U.S.C. § 1831 ........................................................................................................ 2

18 U.S.C. § 1832 ........................................................................................................ 2

## I. **<u>INTRODUCTION</u>**

In its prosecution of Defendant Linwei Ding ("Mr. Ding")—a Chinese national of Chinese descent—for stealing trade secrets to benefit the Chinese government or an instrumentality thereof, the prosecution exercised three of its first five (of six total) peremptory strikes against prospective jurors of Chinese descent: Jurors 43, 45, and 84. The defense promptly raised challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986), which were denied without prejudice to the filing of a written motion for an order declaring a mistrial.

The relevant circumstances demonstrate that the government engaged in purposeful discrimination against jurors of Chinese descent. **First**, as mentioned, the government used a disproportionate number of its strikes against prospective jurors of Chinese descent—60% of its first five strikes, and then sought to exclude a fourth (Juror 104) through an attempt to excuse her for hardship.

**Second**, the government's proffered reasons for exercising these strikes were unsupported by the record. The government pointed to the jurors' questionnaire answers and testimony relating to law enforcement, criminal justice, and Google as reasons for striking these jurors. But in response to further questioning all three prospective jurors testified that they could be fair and impartial. Additionally, in one instance, the government's cited reason to excuse a prospective juror was the juror's expressed concerns about discriminatory prosecutions against Chinese defendants. Far from being a race-neutral reason, that justification reveals a discriminatory purpose. Indeed, if concern about discrimination was a basis for excluding jurors, then *Batson* almost certainly would have no meaning. Any potential jurors who admitted being subject to discrimination or having concerns about discrimination against those similar to them could be excluded with impunity.

**Third**, the government's articulated reasons for exercising these strikes are entirely undermined by the fact that jurors not of Chinese descent expressed similar misgivings about law enforcement, criminal justice, and Google, but those jurors were not stricken and were seated as members of the jury or as alternates. In fact, as to one of those prospective jurors, the government

1

did not ask a single follow-up question, showing that the government's purported concern about anti-government or anti-Google bias was merely pretextual.

**Fourth**, the government's purposeful discrimination is further confirmed because the government attempted to excuse three jurors of Chinese descent—Jurors 45, 84, and 104—for hardship and/or for cause (and both cause and hardship as to Jurors 84 and 104) despite a lack of support for such excusals.

The "Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Foster v. Chatman*, 578 U.S. 488, 499 (2016). Here, the government struck not one, not two, but three prospective jurors for a discriminatory purpose, and likely would have struck a fourth if it thought it could get away with it. Instead, the government subsequently tried to get Juror 104 (of Chinese descent) excused for hardship. This unenviable record of seeking to exclude jurors in any manner possible due to their Chinese descent violates the U.S. Constitution and *Batson*. The Court should declare a mistrial and order a new trial so that Mr. Ding may be tried by a new jury whose composition is not affected by the government's discrimination.

## II.   FACTUAL BACKGROUND

The government initially charged Mr. Ding, a defendant of Chinese nationality and descent, with seven counts of Theft of Trade Secrets pursuant to 18 U.S.C. § 1832 on March 5, 2024. Dkt. 1. Later, on February 4, 2025, after the change in administration, the government sought and obtained a superseding indictment, adding seven counts of Economic Espionage pursuant to 18 U.S.C. § 1831. Dkt. 44. The superseding indictment and a second superseding indictment alleged that Mr. Ding intended to benefit the Chinese government or an instrumentality thereof by stealing trade secrets from Google relating to its AI supercomputer. Dkt. 44 & 140. In recent years, the Department of Justice has focused its Economic Espionage prosecutions on the Chinese government and a significant portion of such prosecutions have been brought against defendants who, like Mr. Ding, are of Chinese descent.[1]

---

[1] Under the Obama Administration, 66% of Economic Espionage Act defendants were Asian; under President Trump's "China Initiative," established in 2018, nearly 90% of individual defendants prosecuted through the Initiative were of Chinese descent; in 2022, the Biden administration formally did away with the "China Initiative" nomenclature, but combating China remained the

2

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR A NEW TRIAL
CASE NO. 3:24-CR-00141-VC

### A.      Prospective Juror Questionnaires

In advance of trial, the Jury Office asked a pool of 114 prospective jurors to complete questionnaires. Krsulich Decl. Ex. 1 (Juror Questionnaires); Krsulich Decl. Ex. 2 (Juror Questionnaire Spreadsheet). A number of questions sought information about the prospective jurors' attitudes about law enforcement, Google, AI, and China and Chinese nationals. Several prospective jurors of Chinese descent provided responses that would later become relevant to the defense's *Batson* challenges:

**Juror 43**: In response to a question that asked if he had "strong feelings (positive or negative) about Google," Juror 43 noted that he held "negative feelings to the extent that Google is a monopolist and that it[s] reach impinges on its consumers and employers." Juror 43 Questionnaire, Question 35. In response to a question that asked if he had "strong feelings (positive or negative) about Artificial Intelligence (AI) and/or Machine Learning (ML)," he explained that he is "not against the growth of technology so much as its unchecked proliferation. AI and ML need to be regulated." *Id.* at Question 37. And when asked, "Is there anything about the subject matter of this case, or the points covered in this questionnaire, or anything else, which creates a question in your mind as to whether you can be a fair, objective, and unbiased juror in this case?," Juror 43 responded, "No." *Id.* at Question 44.

**Juror 45**: In response to a question that asked, "If a law enforcement officer testifies, would their occupation make you more or less likely to believe their testimony?," Juror 45 replied that he would be less likely to believe their testimony, noting that "[t]he current administration uses the law to favor their friends, punish their enemies, and enrich themselves. The military and law enforcement are blindly following corrupt orders." Juror 45 Questionnaire, Question 27. In response to a question that asked, "Which of the following statements best describes your view regarding criminal law in the United States as it relates to people accused of crimes?," he replied

administration's top priority as part of its "Strategy for Countering Nation-State Threats." Leo Yu, *From Criminalizing China to Criminalizing the Chinese*, 55 Colum. Hum. Rts. L. Rev. 45 at pp. 76, 77, 85, 98-99 (2023); *see also* Matthew Olsen, Asst. Att'y Gen., Assistant Attorney General Matthew Olsen Delivers Remarks on Countering Nation-State Threats (Feb. 23, 2022), https://www.justice.gov/opa/speech/assistant-attorney-general-matthew-olsendelivers-remarks-countering-nation-state-threats [https://perma.cc/2PD2-3EWX].

3

that the law does not provide enough protection for people accused of crimes, again citing that "[t]he current administration uses the law to favor their friends, punish their enemies, and enrich themselves." *Id.* at Question 28. In response to a question that asked which statement best describes his view regarding criminal law in the United States as it relates to victims, he replied that the law does not provide enough protection for victims, once again citing the rationale that "[t]he current administration uses the law to favor their friends, punish their enemies, and enrich themselves." *Id.* at Question 29. And when asked if he had strong feelings about China or Chinese nationals working in the country, he explained that "[y]ou won't be competitive without Chinese (and Indian) talent, but you will always wonder about ip theft." *Id.* at Question 41.

**Juror 84**: When asked if he had strong feelings about Google, Juror 84 replied that he uses Google search daily and "enjoy[s] the service provided by Google. However, I also feel Google is way too powerful in influencing our lives." Juror 84 Questionnaire, Question 35. When asked if he has strong feelings about the protection or theft of intellectual property, he explained: "[w]ithout IP protection, we will have less innovation, the driver advancing the development and prosperity of humanity." *Id.* at Question 39. He also noted that "[m]ost cases of US IP theft against Chinese nationals were proven to be either witch-hunting or racial discrimination." *Id.* at Question 40. Asked about feelings toward China or Chinese nationals working in this country, he responded: "I am a Chinese from Taiwan and am proud to be a naturalized American. Chinese Americans have contributed greatly to the development of the global digital economy. Chinese Americans are hardworking and law-abiding citizens of this country. We have every right to live and work in this country without discrimination." *Id.* at Question 41.

**Juror 104**: In response to a question that asked if a law enforcement officer's occupation would make her more or less likely to believe their testimony, Juror 104 replied that she would be less likely to believe their testimony, explaining: "I feel like corruption runs deep in the law enforcement community, especially around where I live. This makes me not trust people from law enforcement." Juror 104 Questionnaire, Question 27. Juror 104 also expressed in her questionnaire that the law does not provide enough protection for people accused of crimes, saying, "Just look at

4

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR A NEW TRIAL
CASE NO. 3:24-CR-00141-VC

what is going on with ICE and the fact that people who are legitimate citizens can be detained for long periods of time just because they don't look like they are Americans when they really are." *Id.* at Question 28. Asked whether she had any concerns about the principle that the defendant is presumed innocent until proven guilty, she wrote: "It's a great principle, but I doubt it's being upheld." *Id.* at Question 31. She also noted that the parties' race, color, religious beliefs, national ancestry, sexual orientation, gender identity, or economic circumstances might influence her: "As an Asian, I feel like I am more cognizant of potential racism and would take that into account when assessing the behavior of whomever is testifying." *Id.* at Question 32. Finally, when asked if there was a question in her mind as to whether she could be a fair, objective, and unbiased juror in this case, she answered: "Given that I have been following this case through my daily readings, and that I'm also Chinese, I don't know that I can be completely impartial. I feel like society has been unfairly targeting Chinese people since Covid and continues to do so." *Id.* at Question 44.

In addition, jurors not of Chinese descent and who were later seated on the jury or as alternates provided similar responses as Jurors 43, 45, 84, and 104:

**Juror 71**: In her response to the question whether a law enforcement officer's occupation would make her more or less likely to believe their testimony, Juror 71 answered less likely, citing a "corrupt system." Juror 71 Questionnaire, Question 27. She further noted that the law "can be biased depending on the parties" and responded to another question indicating that she may have views that would make it difficult or inappropriate for her to serve as a juror in a criminal case. *Id.* at Questions 28, 29, 33.

**Juror 109**: In his juror questionnaire, Juror 109 expressed that he had strong feelings about Google, noting that he did not like their use of artificial intelligence. Juror 109 Questionnaire, Question 35. Juror 109 said he has strong negative feelings about artificial intelligence, noting "I really do not like the use of artificial intelligence, especially as unrestricted as it currently is in the US and how it is used as an alternative for studying and doing personal research. I also hate the use of AI images and videos," adding in response to another question that "Anything involving AI I will have a negative feeling towards, so I could be biased in that regard." *Id.* at Questions 37 & 44.

5

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR A NEW TRIAL
CASE NO. 3:24-CR-00141-VC

Juror 109 additionally expressed that he has views that may make it difficult for him to serve as a juror in a criminal case. *Id.* at Question 33.

### B.    Voir Dire

Voir dire commenced on January 7, 2026, beginning with excusals for hardship before both the government and the defense questioned the prospective jurors. During voir dire, the government questioned four jurors of Chinese descent about their ability to serve impartially.

**Juror 84**: The government first questioned Juror 84, asking him if he would be able to serve as an impartial juror and if his views on Google's power and impact would affect his ability to serve. Fondo Decl. Ex. 4 (Jan. 7, 2026 Tr.) 160:16-161:17. Juror 84 replied that he was "positive" he could serve as a fair and unbiased juror, adding that he did not think his views about Google would impact his ability to serve. *Id.*

**Juror 104**: When asked about her ability to be impartial, Juror 104 noted that she had been targeted recently due to her Chinese nationality, "having black hair and getting people looking at me." *Id.* at 162:25-163:21. Ultimately, when asked by the Court if she would commit to trying her best to follow the Court's instructions and to follow the law and do her duty under the law, she replied, "Yeah, I think so." *Id.* at 166:8-11.

**Juror 45**: Juror 104's discussion of her experience with discrimination prompted the government to question Juror 45, who the government represented was "nodding along as Juror 104 was talking." *Id.* at 166:18-20. Juror 45 explained that he could "logically weigh the evidence presented," and affirmed that he would be able to set aside his views to reach a verdict, remarking that "we can't let our outside biases influence the outcome in contradiction of what is presented to us." *Id.* at 167:15-169:1.

**Juror 43**: The government then asked Juror 43 if he would be able to follow the Court's instructions. *Id.* at 174:6-9. While Juror 43 acknowledged his own unconscious biases as a Chinese person, he noted that he would indeed be able to set these biases aside and follow protocol to fulfill his role as a juror. *Id.* at 174:25-175:10. When asked if his opinions about Google would influence his perspective in this case, Juror 43 answered: "I don't think so, no." *Id.*, 175:14-18.

6

Jurors 71 and 109, who were not of Chinese descent and later seated on the jury or as alternates, testified as follows:

**Juror 71**: The government followed up regarding Juror 71's questionnaire responses: "You also mentioned some concerns about . . . the criminal justice system, and I wanted to better understand those." *Id.*, 184:2-4. Juror 71 explained that she was skeptical of the justice system, noting that she did not think it was "always fair regarding the person, depending on the context." *Id.*, 184:14-16. The government then asked if she would be able to "listen to the evidence carefully and follow the instructions that the Court has provided," to which she replied: "Yes." *Id.*, 184:18-22.

**Juror 109**: Despite Juror 109's questionnaire responses, the government did not ask him any follow up questions during voir dire.

C.      ***Batson* Challenges, Hardship and Cause Excusals, and Other Procedural Background**

Both before and after voir dire, the government and the defense discussed juror excusals for hardship and cause. The government claimed that Juror 45's identical responses to Questions 27, 28, and 29 on the juror questionnaire warranted exclusion for cause. Fondo Decl. Ex. 3 (Jan. 6, 2026 Tr.) 42:12-21; *see also* Juror 45 Questionnaire. The Court denied this challenge. Jan. 6, 2026 Tr. 42:12-21. With respect to Juror 84, the government first sought exclusion on hardship grounds. *Id.* at 23:5-17. When the Court declined to excuse him for hardship, the government sought his exclusion for cause, noting Juror 84's hesitation to participate in the case because the defendant is a Chinese national. *Id.* at 24:7-22. The Court denied this attempt to strike, explaining, "[i]t is not inappropriate for this person to participate in this case because the defendant is a Chinese national . . . I don't think that these responses come close to a basis for excusing the person for cause on the papers alone." *Id.* at 24:23-25:4. Upon the conclusion of oral voir dire, the government again challenged Juror 45 for cause and newly challenged Juror 104 for cause. Jan, 7, 2026 Tr. 233:3-234:23. The Court denied both challenges and noted that any concerns relating to Juror 45 were "much, much less significant than 104's." *Id.* at 235:1-7, 240:18-22, 241:21-24.

7

When its for-cause efforts to remove Jurors 104 and 45 failed, the government exercised two of its first three peremptory strikes on Jurors 43 and 45, which the defense timely challenged on *Batson* grounds. *Id*. at 244:14, 246::11-247:16. The Court then provided the government opportunity to articulate race-neutral reasons for excluding these jurors. The government pointed to Juror 43's feelings toward Google as its reason for striking him:

> [O]n the questionnaire he stated that he holds negative feelings to the extent, quote [as read]: "I hold negative feelings to the extent that Google is a monopolist and that its reach impinges on its consumers and employers." And then during questioning today when asked about whether he would be able to follow the law in certain circumstances, he expressed some concerns about that, some skepticism . . . I would say he walked back . . . those responses a bit, but we have some concerns about that in addition to his very, very strong views on Google.

*Id*. at 247:25-248:22. The defense replied that Juror 43 "could not think of any law that he did not agree with and that he said he could follow the law, and he found no examples of any types of laws unreasonable." *Id*. at 249:15-24.

The government's stated concern with Juror 45 was that "[h]e has some very strong Administration views":

> This is the individual who wrote in his questionnaire three times, quote [as read]: "The current Administration uses the law to punish" -- "to favor their friends, punish their enemies, and enrich themselves. The military and law enforcement are blindly following corrupt orders," end quote. And then today when questioned . . . one of the issues he raised was wanting to know the motivation behind the prosecution's charging process, how the Government decided to bring the case. As the Court correctly ruled in *Mills* [sic]*,* that's off

8

limits in a criminal case. And so for those separate reasons, we

exercised our premptories.

*Id*. at 248:25-249:13. The Court denied the *Batson* challenges as to jurors 43 and 45. *Id*. at 249:25-250:11.

The government then exercised its fifth peremptory strike against Juror 84. Jan. 7, 2026 Tr. 251:5. The defense *again* timely raised a *Batson* challenge. *Id.* at 251:11-14. The Court once more provided the government opportunity to state race-neutral reasons for its strike. In seeking Juror 84's exclusion, the government asserted that it had raised questions about his ability to be fair and impartial based solely on the papers the prior day. *Id.* at 251:17-20. The Court asked what the government's concern was based on the papers, to which the government initially responded, "I don't recall." *Id.* at 251:22. The government then continued that "in general" it had some "very strong opinions about allegations of IP theft against Chinese nationals," the government had "concerns about his ability to be a hundred percent fair and impartial," and said the juror had "strong views about Google in terms of its influence on society." *Id*. at 251:22-252:24.

The Court denied the *Batson* challenge as to this juror without prejudice, but it disagreed with the government's descriptions of Juror 84's testimony, and said the juror's responses to questions "seemed very solid to me today. That was my takeaway from our discussion with him" and that, "I'm concerned about [the government's exercise of a strike as to] Juror Number 84." *Id*. at 252:13-16, 254:8-11, 254:25-255:6. The Court invited written briefing in the form of a motion for mistrial after the jury returned a verdict. *Id*. at 252:25-253:16, 254:25-255:6.

In total, the government exercised six peremptory strikes for the jury plus two additional peremptory strikes for alternates. Jurors 7, 24, 25, 37, 39, 51, 54, 61, 62, 70, 71, and 72 were seated on the jury. *Id.* at 256:2-23. Jurors 86, 104, 109, and 110 were seated as alternates. *Id.* at 258:1-5. Three jurors were later excused and replaced by alternates. Juror Number 24 was excused on January 15, 2026. Trial Tr. 660:20-22; *see also* Jan. 7, 2026 Tr. 256:13. Juror Number 71 was excused on January 22, 2026. Trial Tr. 660:20-22, 1423:6-18; *see also* Jan. 7, 2026 Tr. 256:22. Juror Number 70 was excused on January 27, 2026. Trial. Tr. 660:20-22, 2087:2-9; *see also* Jan. 7,

9

2026 Tr. 256:21. Due to these three excusals, alternate Jurors 86, 104, and 109 were seated on the jury. The 12 jurors who ultimately deliberated on the case were Jurors 7, 25, 37, 39, 51, 54, 61, 62, 72, 86, 104, and 109.

After she had been chosen as an alternate, Juror 104 submitted a letter from her employer requesting her excusal from jury service. Krsulich Decl. Ex. 7 (Request for Jury Duty Excusal). In the letter, Juror 104's employer explained that the company was comprised of approximately 200 employees and that the juror's absence "would result in an undue hardship to our company that we are not reasonably able to mitigate on such short notice." *Id.* During the final pre-trial hearing on January 9, 2026, the parties discussed Juror 104's hardship request. The government argued that she should be excused on hardship grounds: "As you may suspect . . . the Government believes the basis submitted is valid for a hardship excusal." Fondo Decl. Ex. 5 (Jan. 9, 2026 Tr.) 3:20-22. The Court disagreed with the government: "I know that you want her off for other reasons, but I would not expect you to say that that's a valid hardship excusal. . . . So I'm not going to excuse her. And I think that's that." *Id.* at 4:1-12.

Trial commenced on January 12, 2026. The government presented testimony providing that Mr. Ding is a Chinese national of Chinese descent. *See* Fondo Decl. Ex. 6 (Trial Tr.) 584:8-585:3. The government also presented an expert witness, Adam Segal, whose sole focus was the Chinese government. *See generally* Trial Tr. 899-962.

### D. Jury Pool and Jury Composition

The jury pool initially consisted of 114 prospective jurors. Based on statements made during voir dire and on juror questionnaires, approximately 13 of the 114 prospective jurors were of Chinese descent. Juror Questionnaires for Jurors 8, 12, 20, 41, 61, 84, 99, 103, 104, and 113; Jan. 7, 2026 Tr. 174:25-175:10 (Juror 43), 249:22-250:9 (Jurors 45 and 48). Seven prospective jurors of Chinese descent were excused for hardship or cause or failed to appear, leaving six prospective jurors of Chinese descent before the parties began exercising peremptory challenges. Dkt. 311; Jan. 6, 2026 Tr. 56:21-22; Jan. 7, 2026 Tr. 102:15, 57:16-58:16. In total, 78 prospective jurors were removed from the jury pool before the parties began exercising peremptory challenges, leaving 36

10

prospective jurors overall, 6 of whom were of Chinese descent. Dkt. 311; Fondo Decl. Ex. 8 (Juror 96 Hardship Excusal); Jan. 7, 2026 Tr. 45:24-25, 102:15, 129:15-17, 231:3, 241:21-24, 242:21-23.

On the jury, two of the jurors or alternates selected were of Chinese descent—Jurors 61 and 104.[2] *See id.* at 256:11-23, 258:1-6; *see also* Juror 61 Questionnaire, Question 7 ("Where were you born? [A:] Hong Kong"), Juror 104 Questionnaire, Question 44 ("I'm . . . Chinese").

### III.    LEGAL STANDARD

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." A new trial may be granted under Rule 33(a) for procedural issues like a *Batson* challenge. *See United States v. Tory*, 52 F.3d 207, 211 (9th Cir. 1995) (vacating and remanding for a new trial based upon evidentiary and procedural errors).

Under *Batson*, "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson v. Kentucky*, 476 U.S. 79, 86 (1986). The "Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Foster*, 578 U.S. at 499. A *Batson* challenge is evaluated using a three-step framework: First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race or ethnicity. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination. *Miller-El v. Cockrell*, 537 U.S. 322, 328–29 (2003).

The focus of the inquiry at the third step is whether the government's proffered reasons actually support the strike: "the question is not whether the prosecutor might have had good reasons, but what were the prosecutor's real reasons for the challenges." *Williams v. Runnels*, 432 F.3d 1102,

---

[2] Juror 61 was born in Hong Kong when it was ruled by the United Kingdom. Juror 61 Questionnaire, Questions 4 & 7. Juror 61 did not explicitly state his ethnicity in his questionnaire or during voir dire. The defense is including him in this count out of an abundance of caution, though the fact that he did not raise his Chinese ethnicity would lessen the government's incentive to strike him.

11

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR A NEW TRIAL
CASE NO. 3:24-CR-00141-VC

1109 (9th Cir. 2006) (citing *Johnson v. California*, 545 U.S. 162, 172 (2005)). "[C]ourts must be careful not to substitute their own speculation as to reasons why a juror might have been struck for the prosecutor's stated reasons." *Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008). "[I]n considering a *Batson* objection . . . all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (citing *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005)).

## IV.    ARGUMENT

Based on all of the relevant circumstances, the record demonstrates that the government exercised peremptory challenges on the basis of race or ethnicity and engaged in purposeful racial or ethnic discrimination against jurors of Chinese ethnicity.

### A.    The Government Disproportionately Exercised Its Peremptory Strikes Against Prospective Jurors of Chinese Descent.

The government received six peremptory strikes as to the jury and two as to the alternates. The government exercised its second, third, and fifth peremptory strikes against prospective jurors of Chinese descent. Though the Constitution prohibits even one juror from being stricken for a discriminatory purpose, *Foster*, 578 U.S. at 499, the government's exercise of peremptory strikes against multiple prospective jurors of the same race or ethnicity strengthens the inference of discrimination: "[A] court would be required to consider the strike of [one potential juror] for the bearing it might have upon the strike of [another potential juror]." *Snyder*, 552 U.S. at 478.

As noted above, there were six prospective jurors of Chinese descent and 36 prospective jurors overall before the parties began exercising peremptory challenges. *Supra* at 10-11. The government exercised three of its first five (and six total) peremptory challenges against jurors of Chinese descent.

The government accordingly used 60% of its peremptory strikes before the second *Batson* motion by the defense, and 50% in total, to 50% of the prospective jurors of Chinese descent where jurors of Chinese descent accounted for only 16.67% of the venire. The government's highly disproportionate exercise of peremptory strikes against prospective jurors of Chinese descent is

12

strong evidence of purposeful discrimination. The Ninth Circuit has "found an inference of discrimination where the prosecutor strikes a large number of panel members from the same racial group, or where the prosecutor uses a disproportionate number of strikes against members of a single racial group," as is the case here. *See United States v. Collins*, 551 F.3d 914, 921 (9th Cir. 2009). In *Turner v. Marshall*, for example, the court found an inference of discrimination where the prosecutor used peremptory challenges to exclude five out of nine African American venirepersons, explaining that other courts had found an inference of discrimination in similar circumstances in which the prosecution exhibited a "pattern of exclusion" of minority venirepersons, including in situations "in which the prosecution struck some, but not all, of the minority venirepersons." 63 F.3d 807, 812-13 (9th Cir. 1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999). The court continued on to consider "whether the percentage of prosecutorial challenges made against minorities was disproportionately higher than the percentage of the minority group within the venire," concluding that the fact that the prosecution used 56% of its peremptory challenges against African American venirepersons when they constituted only 30% of the pool appearing in front of the court was further support for an inference of discrimination. *Id.* at 813. Similarly, in *Williams v. Runnels*, the court found an inference of discrimination where the prosecutor used three of his first four peremptory challenges to remove African Americans from the jury, noting in addition that only four of the first 49 potential jurors were black. 432 F.3d 1102, 1107 (9th Cir. 2006).

The government's pattern of excusing jurors of Chinese descent is particularly significant given that Mr. Ding is a Chinese national of Chinese descent *and* the subject matter of this case focuses on the Chinese government and instrumentalities. *See Williams*, 432 F.3d at 1107 (emphasizing that defendant was African American, like the prospective jurors that the prosecution struck, in finding that the prosecution's disproportionate use of peremptory challenges against African American veniremen supported an inference of discrimination); *Simmons v. Beyer*, 44 F.3d 1160, 1168 (3d Cir. 1995) (explaining that the nature of the crime and its racial configurations are relevant to whether there is an inference of discrimination, and finding a *Batson* violation where,

13

among other things, the defendant was African American, the victim was white, and the government excluded at least one African American venireperson).

**B.      The Government's Proffered Reasons for Exercising These Three Strikes Are Inadequate.**

The government was provided opportunity to express non-discriminatory reasons for each challenged strike, but its proffered reasons are not supported by the record or are otherwise inadequate.

The government pointed to two reasons for its strike of Juror 43: his "very" negative feelings about Google and concerns he expressed about his ability to follow the law. *Id*. at 247:25-248:22. But the government conceded that Juror 43 had "walked back" those responses during questioning. *Id.* And as the defense pointed out, Juror 43 could not think of any law that he viewed as unreasonable, and he confirmed that he could follow the law. *Id.* at 174:25-175:10, 249:15-24. Juror 43 also said that his opinions about Google would not influence his perspective on the case. *Id.* at 175:14-18.

The government's primary concern with Juror 45 was his "very strong Administration views," and his resulting curiosity about how the government decided to bring the case. *Id*. at 248:25-249:13. The government, however, had asked Juror 45 follow-up questions about both of these issues, and both times Juror 45 explained that he would be able to set aside his views to reach a verdict and that he would be able to reach a verdict regardless of whether he understood the motivations of how the case was charged. *Id.* at 167:15-169:1.

Regarding Juror 84, the government pointed to the prospective juror's "very, very" strong opinions about allegations of IP theft against Chinese nationals and concerns about Google's influence. *Id*. at 251:22-252:24. But the government's reliance on Juror 84's concerns about discriminatory IP theft cases is both an invalid reason for the government to exercise its peremptory strike, and is affirmative evidence of the government's discriminatory purpose. Striking a juror because of the juror's concerns about racial discrimination is not a race-neutral reason because it is indicative of a discriminatory motive: jurors who are not white are more likely to experience or

14

recognize discrimination and the government's apparent assumption that such jurors are therefore biased is itself a forbidden assumption. *See Cooper v. State*, 134 Nev. 860, 865 (2018) (expressing concern that "questioning a veniremember's support for social justice movements with indisputable racial undertones" suggests that the prosecution "believes that a certain, cognizable racial group of jurors would be unable to be impartial," which is "an assumption forbidden by the Equal Protection Clause" (quotations omitted)). The government's discriminatory purpose is only emphasized by its initial failure to remember why it exercised the strike at all. The government cited its attempt to excuse Juror 84 for cause on the papers. But when the Court asked what the reason was for that initial challenge, the government responded that it did not recall. *Id.* at 251:22. In addition to all of this, Juror 84 had replied to follow-up questioning that he was "positive" he could serve as a fair and unbiased juror and that his views about Google would not influence him. *Id.* at 160:16-161:17.

In circumstances like these, where the government's rationale for exercising a peremptory strike is unsupported by the record, courts routinely find the exercise of the strike to be discriminatory. In *Pao Lo v. Kane*, for example, the prosecutor claimed he had struck an Asian member of the venire because she did not respond to the prosecution's questions and the prosecution did not feel that it knew her well enough. 584 F. App'x 885, *886 (9th Cir. 2014). The court found, however, that the record showed the venirewoman *had* answered the prosecution's questions. *Id.* This raised "serious questions about the legitimacy of [the] prosecutor's reasons for exercising peremptory challenges," and the court concluded that the defendant had established a *Batson* violation. *Id.* at *886-87. And in *Kesser v. Cambra*, the court similarly held that where the prosecution's stated reasons for striking a prospective juror, including acting self-important and being emotional, were not supported by the record, this "compel[ed] the conclusion that his actual and only reason for striking [her] was her race." 465 F.3d 351, 356, 359, 363-65 (9th Cir. 2006). Like the prosecution in *Pao Lo* and *Kesser*, here the government's offered reasons for exercising its peremptory challenges are not consistent with the record. The same result is warranted here.

In sum, the government's justifications as to each of these three jurors lack support in the record.

15

**C.    Comparative Juror Analysis Further Undermines the Government's Proffered Reasons for Exercising Its Peremptory Strikes.**

While the government's provided reasons for exercising its peremptory strikes are insufficient on their own, the government's failure to exercise strikes as to jurors that provided similar answers who were not of Chinese descent further demonstrates that the government engaged in purposeful discrimination.

The Supreme Court has explained that one of the "more powerful" ways to evaluate a *Batson* challenge is comparative juror analysis: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination[.]" *Miller-El*, 545 U.S. at 241. "The purpose of comparative juror analysis is largely to test for consistency." *Shirley v. Yates*, 807 F.3d 1090, 1112 (2015).

A comparative juror analysis shows that the government acted inconsistently, seating jurors who were not of Chinese descent even where they provided answers similar to the reasons the government cited for striking Jurors 43, 45, and 84.

Non-Chinese Juror 71 expressed concerns about law enforcement and the criminal justice system similar to those of Jurors 43, 45, and 84, but the government did not exercise a peremptory strike against her. In her response to being asked on the juror questionnaire if a law enforcement officer's occupation would make her more or less likely to believe their testimony, Juror 71 answered less likely, citing a "corrupt system." Juror 71 Questionnaire, Question 27. She further noted that the law "can be biased depending on the parties" and responded to another question indicating that she may have views that would make it difficult or inappropriate for her to serve as a juror in a criminal case. *Id.* at Questions 28, 29, 33. At voir dire, the government followed up on these responses: "You also mentioned some concerns about . . . the criminal justice system, and I wanted to better understand those." *Id.* at 184:2-4. Juror 71 expressed that she was skeptical of the justice system, noting that she did not think it was "always fair regarding the person, depending on the context" *Id.* at 184:14-16. The government followed up by asking if she would be able to "listen

16

to the evidence carefully and follow the instructions that the Court has provided," to which she replied: "Yes." *Id.* at 184:18-23. The government did not exercise a peremptory strike against Juror 71.

And Juror 109, also not of Chinese descent, expressed concerns about Google similar to those of Jurors 43 and 84, but the government did not exercise a peremptory strike against him. In his juror questionnaire, Juror 109 expressed that he had strong feelings about Google, noting that he did not like their use of artificial intelligence. Juror 109 Questionnaire, Question 35. Juror 109 emphasized his strong negative feelings about artificial intelligence in two additional responses: "I really do not like the use of artificial intelligence, especially as unrestricted as it currently is in the US and how it is used as an alternative for studying and doing personal research. I also hate the use of AI images and videos," and that "Anything involving AI I will have a negative feeling towards, so I could be biased in that regard." *Id.* at Questions 37 & 44. Juror 109 additionally expressed that he has views that may make it difficult for him to serve as a juror in a criminal case. *Id.* at Question 33. Despite Juror 109's questionnaire responses, the government did not ask him any follow up questions during voir dire and did not exercise a peremptory strike against him.

In sum, on the one hand, the government exercised peremptory strikes against Jurors 43 and 84, both of Chinese descent, for expressing concerns about Google, even where they ultimately testified that they could be impartial. At the same time, the government did not exercise a peremptory strike against Juror 109, who was not of Chinese descent, and who expressed similar concerns about Google and whom the government did not even bother to question. And on the one hand, the government exercised peremptory strikes against Jurors 43, 45, and 84, all of Chinese descent, for expressing concerns about bias in the law and law enforcement. But at the same time, the government did not strike Juror 71, who was not of Chinese descent, and who expressed similar concerns about law enforcement.

In similar circumstances in which the government has exercised its peremptory strikes inconsistently, courts routinely find that the government has engaged in purposeful discrimination. *See, e.g., Shirley*, 807 F.3d at 1112 (finding discrimination where the prosecution seated a white

17

juror with a similar level of "life experience" as a black juror that it struck for lack of life experience); *Green*, 532 F.3d at 1033 (finding discrimination where the prosecutor feared a black juror would be partial because she had a family member who had been convicted of a crime, but "had no such worries regarding numerous white prospective jurors who had similar experiences"); *Kesser*, 465 F.3d at 363-66 (finding discrimination where the prosecutor said he struck a Native American juror for being self-important, emotional, and having a dysfunctional home life where other jurors had comparable backgrounds and demeanors). The same result should follow here.

Moreover, the government's failure to ask Juror 109 any questions about his strong feelings about Google shows that the government's anti-Google bias justification relating to Jurors 43 and 84 is merely pretext: "[T]he [prosecution]'s failure to engage in any meaningful voir dire examination on a subject the [prosecution] alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Miller-El*, 545 U.S. at 246 (citing *Ex parte Travis*, 776 So.2d 874, 881 (Ala. 2000)).

**D.     The Government's Efforts to Exclude Jurors of Chinese Descent for Cause and Hardship Further Demonstrates Purposeful Discrimination.**

In addition to exercising its peremptory strikes to exclude jurors of Chinese descent from the jury, the government also sought to exclude the same jurors from the jury through hardship and cause excuses. Before and after the voir dire questioning, the government sought to excuse Juror 45 for cause because he had identical responses to three questions, but the Court denied this challenge. Jan. 6, 2026 Tr. 42:13-21; Jan. 7, 2026 Tr. 235:4-7. The government also sought to excuse Juror 84 on both hardship and cause grounds. Jan. 6, 2026 Tr. 23:14-17, 24:7-22. The Court declined to excuse Juror 84 for hardship. *Id.* The government argued that he should be excused for cause in light of the juror's hesitation to participate in the case because the defendant is a Chinese national. *Id.* The Court firmly disagreed, explaining, "[i]t is not inappropriate for this person to participate in this case because the defendant is a Chinese national . . . I don't think that these responses come close to a basis for excusing the person for cause on the papers alone." *Id.* at 24:23-25:4.

18

The government, after having two *Batson* challenges and the Court expressing concern about the government's third strike of a juror of Chinese descent, did not exercise a peremptory strike against Juror 104, a juror of Chinese descent who had been seated as the second alternate. But the government had previously sought her exclusion on cause grounds, which had been denied. Jan, 7, 2026 Tr. 233:3-235:7, 240:18-22, 241:21-24. Furthermore, after being selected as an alternate Juror 104 sought excusal on hardship grounds based upon a letter from her employer, the government advocated for excusal despite the thin support for hardship: "As you may suspect . . . the Government believes the basis submitted is valid for a hardship excusal." Jan. 9, 2026 Tr. 3:20-4:7. The Court again disagreed with the government: "Well, you say 'as you may suspect.' I didn't suspect that. . . . I know that you want her off for other reasons, but I would not expect you to say that that's a valid hardship excusal. . . . So I'm not going to excuse her. And I think that's that." *Id.* at 3:23-4:13. Importantly, the government had opposed the excusal of non-Chinese prospective jurors with similar hardships. *See* Jan. 6, 2026 Tr. 7:5-9:2 (opposing excusal of person with panic attacks and language difficulties), 9:11-23 (opposing excusal of person with ADHD who was in first trimester of pregnancy and experiencing nausea and fatigue), 10:8-11:19 (opposing excusal of person who had recently had a bone marrow transplant).

The government's attempts to use different methods of excusal to exclude jurors of Chinese descent from the jury are shown here:

| Juror | Hardship | Cause | Peremptory |
|---|---|---|---|
| 43 | | | X |
| 45 | | X (both prior to and after voir dire) | X |
| 84 | X | X | X |
| 104 | X | X | |

The government used every mechanism at its disposal to attempt to remove jurors of Chinese descent from the jury. The government's repeated attempts to exclude jurors of Chinese

descent on hardship and cause grounds provides further confirmation that its proffered reasons for striking Jurors 43, 45, and 84 were pretextual. *See Kesser*, 465 F.3d at 359 ("The court must evaluate the record and consider each explanation within the context of the trial as a whole because '[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.'") (citation omitted)).

**E.      The Seating of Jurors 61 and 104 Does Not Undermine Evidence of Discrimination.**

As noted, the government did not exercise peremptory strikes against Juror 61, who was seated on the jury, or Juror 104, who was seated as the second alternate. This does not, however, undermine evidence of discrimination because it cannot neutralize the government's earlier discriminatory strikes. *See Miller-El*, 545 U.S. at 250 (holding the prosecution had discriminatory intent where it exercised peremptory strikes against 10 of 11 black veniremen, explaining that a late-stage decision to accept a black panel member does not neutralize the early-stage decision to challenge a comparable venireman, particularly where the prosecution would want to accept a black juror to obscure the otherwise consistent pattern of opposition to seating one); *Turner*, 63 F.3d at 811, 814 (finding evidence of discriminatory intent even where four African Americans were seated on the jury and explaining that the exclusion of a single minority juror on account of race would constitute a *Batson* violation).

This is especially so here, where the government evidently decided not to strike Jurors 61 and 104 because the defense had already twice raised *Batson* challenges to three of the government's peremptory strikes and the Court had expressed concern about at least one of those peremptory strikes. *Shirley*, 807 F.3d at 1102 (finding the seating of a black juror not to significantly undermine an inference of discrimination because it was preceded by a *Batson* challenge and suggestion from the court that the prosecution would have to justify its strikes if it struck another black juror). And, again, the government later advocated for Juror 104 to be excused on hardship grounds. The government is not entitled to any credit for allowing two jurors of Chinese descent to be seated post-*Batson* challenge, particularly where it later moved to excuse one of them for

20

hardship despite the lack of adequate support for such an excusal and its failure to seek similar excusals for similarly situated jurors not of Chinese descent.

All of the circumstances taken together demonstrate that the government engaged in purposeful discrimination when it exercised three of its first five peremptory strikes to exclude three prospective jurors of Chinese descent from the jury, thus depriving Mr. Ding of a fair trial and warranting a new trial. *See Ali v. Hickman*, 584 F.3d 1174, 1193 (9th Cir. 2009) (concluding based upon an analysis of the "totality of the relevant facts" that the actual reason for striking juror was her race and reversing and remanding for retrial).

## V.   **CONCLUSION**

For the reasons discussed above, the Court should conclude that the government violated *Batson*, declare a mistrial, and order a new trial pursuant to Federal Rule of Criminal Procedure 33(a).

Respectfully submitted,

Dated: February 19, 2026

By: /s/ *Grant P. Fondo*

GRANT P. FONDO (SBN 181530)
*GFondo@goodwinlaw.com*
DARRYL M. WOO (SBN 100513)
*DWoo@goodwinlaw.com*
RACHEL M. WALSH (SBN 250568)
*RWalsh@goodwinlaw.com*
JESSICA HUANG FUZELLIER (SBN 315208)
*JHFuzellier@goodwinlaw.com*
FARZAD FEYZI (SBN 343538)
*FFeyzi@goodwinlaw.com*
DAVID RAPP-KIRSHNER (SBN 344494)
*DRappKirshner@goodwinlaw.com*
NIRAV BHARDWAJ (SBN 350829)
*NBhardwaj@goodwinlaw.com*
NICHOLAS C. WILEY (SBN 351161)
*Nwiley@goodwinlaw.com*
COLETTE A. LOWRY (SBN 359889)
*CLowry@goodwinlaw.com*
**GOODWIN PROCTER LLP**

LORA J. KRSULICH (SBN 315399)
*LKrsulich@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, Suite 4100
Los Angeles, CA 90017

21

Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Attorneys for Defendant:
LINWEI DING

22

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on **February 19, 2026**. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on **February 19, 2026**.

*/s/ Grant P. Fondo*
Grant P. Fondo

23

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR A NEW TRIAL
CASE NO. 3:24-CR-00141-VC