### Investment Agreement of Shanghai Zhisuan Technology Co., Ltd.

This Investment Agreement of Shanghai Zhisuan Technology Co., Ltd. (the "**Agreement**") is signed by the following parties on November 20, 2023 (the "**Signing Date**"):

1. Shanghai Zhisuan Technology Co., Ltd., a limited liability company legally established and validly existing under the laws of China, with its registered address at 487 Tianlin Road Building 27 Floor 1 Workstation 44, Xuhui District, Shanghai, and its legal representative is Linwei Ding (the "**Company**");

2. Linwei Ding, a natural person of Chinese nationality, whose ID number is 210202198609264233 (the "**Founder**");

3. Shanghai Chuangyuxin Enterprise Management Consulting Partnership (Limited Partnership), a limited partnership legally established and validly existing under the laws of the PRC, with its registered address at Tianlin Road Building 487 Floor 1 Workstation 60, Xuhui District, Shanghai ("**Employee Stock Ownership Platform**");

4. Shanghai Xinyuzhi Enterprise Management Consulting Partnership (Limited Partnership), a limited partnership legally established and validly existing under the laws of the PRC, with its registered address at 487 Tianlin Road Building 27 Floor 1 Workstation 54, Xuhui District, Shanghai ("**Executive Stock Ownership Platform**", together with the Employee Stock Ownership Platform and Linwei Ding, individually or collectively referred to as the "**Founding Shareholders**"); and

5. Beijing Qiji Chuangtan Phase II Venture Capital Center (Limited Partnership), a limited partnership legally established and validly existing under the laws of the PRC, with its registered address at 150 Chengfu Road Floor 6 No. 627, Haidian District, Beijing (No. 7 Sancai Hall, Tsinghua Park) ("**Qiji Chuangtan**" or "**Current Round Investor**").

Any of the above parties shall be referred to as a "**Party**" individually and collectively as the "**Parties**". "**Law**" in this Agreement refers to all applicable laws, administrative regulations, rules, regulations, policy documents, regulations, decisions, and policy documents of local governments or local government departments, etc., that are in effect at that time.

**Whereas:**

A. Linwei Ding, the founder of the company, and Qiji Chuangtan (Beijing) Investment Management Co., Ltd. ("**Qiji Chuangtan Management Company**") signed the "Entrepreneurship Camp Entry Commitment" ("**Entrepreneurship Camp Entry Commitment**"). In order to apply to join Qiji Chuangtan's 2023 Fall Entrepreneurship Camp

1

("**Entrepreneurship Camp**"), the founders jointly established the company, and the founders intend to use the company as the operating entity of the subsequent main business (as defined in the "Entrepreneurship Camp Commitment") and join the Entrepreneurship Camp as a whole.

B.  As of the date of signing of this Agreement, the equity structure of the Company is as follows:

| Shareholders | Subscribed capital (RMB/10,000 Yuan) | Investment ratio |
|---|---|---|
| Linwei Ding | 10 | 100% |
| **Total** | **10** | **100%** |

C.  All parties hope that the investors of this round will increase the company's capital in accordance with the provisions of this agreement.

To this end, the parties to the agreement, based on the principle of equality and mutual benefit, have reached the following agreement on this round of investment.

**1.      This round of investment**

1.1     Platform capital increase

All parties agree that the employee stock ownership platform and the senior management stock ownership platform intend to increase the company's capital by RMB 27,273 yuan and RMB 54,545 yuan respectively (the "**Platform Capital Increase**"). After the completion of the platform capital increase, the company's equity structure will be as follows:

| Shareholders | Subscribed capital (RMB/10,000 Yuan) | Investment ratio |
|---|---|---|
| Linwei Ding | 10 | 55% |
| Shanghai Chuangyuxin Enterprise Management Consulting Partnership (Limited Partnership) | 2.7273 | 15% |

2

| | | |
|---|---|---|
| Shanghai Xinyuzhi Enterprise Management Consulting Partnership (Limited Partnership) | 5.4545 | 30% |
| **Total** | **18.1818** | **100%** |

1.2   Investment arrangements for this round

All parties agree and acknowledge that immediately after the platform capital increase is completed, the investors in this round will subscribe for the company's additional registered capital of RMB 13,685 yuan at a premium of RMB 5,026,000 ("**Investment**") in accordance with the provisions of this Agreement, which corresponds to 7% of the company's equity after this round of investment ("**Target Equity**"). RMB 13,685 yuan of investment will be used as the company's newly registered capital, and the remaining part will be included in the company's capital reserve ("**Current Round Investment**").

1.3   Equity structure after this round of investment

After the platform capital increases and this round of investment is completed, the company's registered capital should be RMB 195,503 yuan, and the company's equity structure is as follows:

| Shareholders | Subscribed capital (RMB/10,000 Yuan) | Investment ratio |
|---|---|---|
| Linwei Ding | 10 | 51.15% |
| Shanghai Chuangyuxin Enterprise Management Consulting Partnership (Limited Partnership) | 2.7273 | 13.95% |
| Shanghai Xinyuzhi Enterprise Management Consulting Partnership (Limited Partnership) | 5.4545 | 27.90% |
| Beijing Qiji Chuangtan Phase II Venture Capital Center (Limited Partnership) | 1.3685 | 7% |
| **Total** | **19.5503** | **100.00%** |

1.4   Purpose of investment funds

3

The company should use all its investment funds to operate and develop the company's main business.

1.5   Document signing and change registration process

All parties shall sign the legal documents related to this round of investment before the closing date, including but not limited to the shareholders' meeting resolution approving the company to sign this Agreement and to increase the platform capital and this round of investment, the board resolution/executive director's decision and other relevant documents (including the payment notice shown in Appendix 1 and the documents required by Article 3.2 of this Agreement), and the existing shareholders shall confirm that they waive their priority subscription rights for the platform capital increase and this round of investment. The company shall complete the registration for change and filing procedures for the platform capital increase and this round of investment with the market supervision and management department within 30 working days after the closing date, so that the equity structure registered by the company with the market supervision and management department is as shown in Article 1.3 of this Agreement.

2.    **Investment payment**

**2.1.**  Subject to the provisions of Article 1.5 of this Agreement, Qiji Chuangtan shall pay its investment in a lump sum to the company's RMB bank account specified in the payment notice shown in Appendix 1 within 15 working days after the signing of this Agreement ("**Closing Date**").

**2.2.**  From the closing date, the investors in this round become shareholders of the company, enjoy shareholder rights, and assume shareholder obligations.

3.    **Guarantor commitments**

**3.1.**  The Company and the founding shareholders (collectively referred to as the "**Guarantors**") promise to investors of this round that: (i) the Company's equity does not involve any proxy holding, pledge, convertible bonds, transfer of income rights or other equity burdens, nor does it involve any withdrawal of registered capital or false capital contribution; (ii) since its establishment, the Company has complied with all applicable laws in major aspects, has not committed any illegal or irregular acts, has not been punished by any government agency, and has no disputes or controversy regarding the ownership or rights of its assets; (iii) except for the circumstances that the Guarantors have properly disclosed to investors of this round at the time of signing this Agreement, the founders and other core personnel of the Company do not enjoy any equity or interest or hold any position in any other entity; (iv) The founder

and other core personnel (as defined below) will not violate their commitments with their former employers when accepting employment with the Company, nor will they infringe upon the legal rights (including intellectual property rights) of their former employers or other third parties; (v) All documents, materials, and information provided by the guarantor to investors of this round are true, accurate, complete, and non-misleading. The guarantor promises to investors of this round that it has full power and authorization to sign this Agreement, and the signing of this Agreement will not violate or conflict with other relevant legal documents or agreements.

3.2　　The founder promises that he/her and other core personnel of the company will serve the company for at least four (4) years from the date of signing this Agreement, and shall sign a full-time labor contract with the company no later than the closing date (which shall include confidentiality, intellectual property ownership, and non-compete clause), and promises that except for the circumstances that have been properly disclosed to the current round investors, he/she and other core personnel of the company will not engage in part-time work or any behavior that competes with the company's main business. For the purpose of this Agreement, "**core personnel**" means personnel who, if they fail to provide services to the company in accordance with this Agreement and the labor-related contracts signed by the company with them, will reasonably be expected to have a substantial impact on the company's business, as listed in Appendix 2.

3.3　　The founding shareholders promise that before the investors of this round completely exit the company or the company is listed (whichever is earlier), unless with the prior consent of investors of this round, the founding shareholders shall not directly or indirectly transfer or dispose of any of the company's equity held by them.

3.4　　The company shall comply with the relevant provisions of the law in its production and operation activities and all other major aspects (including but not limited to finance, taxation, labor and personnel, social insurance and housing provident fund payment, business, and assets), operate in a normal manner, shall not conduct any abnormal transactions or incur abnormal debts, maintain legal operations, and obtain and maintain all government approvals and other permissions and consents required for its operations.

**4.**　　**Special rights**

Investors in this round enjoy the following special rights:

4.1　　Preemptive subscription rights

The guarantor agrees that if the investors in this round hold shares in the company, when the company increases its registered capital or issues new shares or other securities that can be

converted or exchanged to the company's shares, the investors in this round have the rights (but not the obligation) to subscribe for the company's newly increased registered capital or other equity securities on the same terms and in proportion to their shares held in the company at that time.

4.2    Right to information and inspection

The Company shall regularly provide financial statements and other information that the investors of this round may reasonably request and promptly notify the investors of this round of any major changes in the Company. In particular, the financial statements that the Company shall provide to investors of this round shall include: (1) unaudited quarterly financial statements prepared in accordance with Chinese accounting standards within 30 days after the end of each quarter; (2) unaudited annual financial statements prepared in accordance with Chinese accounting standards within 30 days after the end of each fiscal year; and (3) within 90 days after the end of each year, the company's annual financial statements and audit reports prepared in accordance with Chinese accounting standards and audited by an auditing agency. In addition, the investors of this round have the right to review and verify the company's financial books and other operating records, and when reasonably necessary and with prior written notice to the company, visit its consultants, employees, independent accountants, and lawyers regarding the company's operations.

4.3    The most favorable terms

If the company or founders provide any rights or privileges to other existing shareholders or other shareholders in the same financing round that are superior to the current round investors in any aspect, such more favorable terms and conditions will automatically apply to the current round investors. Before this round of investment, if the company has no external investors or shareholders who enjoy any preferential rights, the current round investors shall enjoy the same preferential rights or preferential conditions that the company grants to the next round of financing institutional investors when the company raises funds from institutional investors in the next round (except for the right to appoint directors, the right to veto major matters, and the higher priority allocation of economic priority rights for institutional investors who invest in the company at a higher valuation than this round of investment in the next round of financing).

4.4    Company restructuring

If the company and its directly or indirectly controlled enterprises restructure their capital structure for reasons such as overseas financing or overseas listing, etc., the above restructuring plan shall be implemented only after approval by the shareholders' meeting

through appropriate procedures. The investors of this round have the right to participate in the restructuring and have the right to request to hold the same or similar target equity/interests as before the aforementioned restructuring at the level of the company's overseas affiliates or other financing entities.

4.5   The disposal of equity of investors in this round

4.5.1   If the investors in this round intend to sell all or part of the company's equity held by them to any third party other than the affiliates of the investors in this round (the "**transferee**"), the founders have the right to purchase all (and not less than all) of the equity that the investors in this round intend to sell or otherwise dispose of by themselves or designate a third party on the same terms and conditions as those planned by the investors in this round (the "**founders' preemptive right**").

The current round investors shall notify the founders in writing of the following information (the "**Transfer Notice**"): (a) their transfer intention; (b) the amount of equity they intend to transfer; (c) the terms and conditions of the transfer, and (d) the basic information of the transferee. The founders shall notify the current round investors in writing within ten (10) business days after receiving the Transfer Notice (the "**Response Deadline**") whether they will exercise the founder's preemptive purchase right. If the founder notifies the current round investors in writing within the response period that he or she intends to exercise the founder's preemptive right, the founder or a third party designated by him or her shall purchase all (and not less than all) of the company's equity that the current round investors intend to sell, and shall sign an equity transfer agreement with the current round investors and pay the full equity transfer consideration to the current round investors within fifteen (15) business days after the issuance of the written notice or a longer period agreed upon by the current round investors at that time (the "**Purchase Period**"). If the founder fails to notify the current round investors within the response period that he or she will exercise the founder's preemptive right or fails to sign an equity transfer agreement with the current round investors and pay the full equity transfer price within the purchase period, it shall be deemed that the founder has waived the exercise of the founder's preemptive right, and the current round investors shall have the right to transfer the company's equity held by it to the transferee.

4.5.2   Without the consent of the founder, the current round investors shall not transfer the company's equity held by them to a third party that is in direct competition with the company's main business as shown in Appendix 3 of this Agreement.

4.5.3   Subject to the provisions of Articles 4.5.1 and 4.5.2 of this Agreement, the guarantor agrees that if the current round investors transfer or dispose of all or part of the company's equity held by them, the guarantor shall and shall ensure that other shareholders of the company

7

waive their preemptive purchase rights and other relevant rights and cooperate with the current round investors to sign relevant legal documents and complete the registration and filing procedures of the relevant market supervision and management departments.

4.5.4   The guarantor promises that if the company's existing shareholders enjoy or the company grants any new investors in subsequent financing (including equity financing and debt financing) higher priority rights in equity disposal than the current round of investors, more relaxed transfer restrictions, or other more favorable terms ("**conversion restriction preferential terms**"), the current round investors shall have the right to automatically enjoy such conversion restriction preferential terms.

4.5.5   If after the closing date, the founder loses his or her actual control of the company due to natural dilution of the company's subsequent financing, the current round investors promise to negotiate with the founder in good faith and take necessary measures, including but not limited to setting up a special voting rights mechanism, so that the founder can maintain actual control over the company.

4.6   New investment targets

The founders may start a new company or project ("**New Investment Target**") with the prior written consent of the current round investors before the closing date. The current round investors or their designated affiliates have the right to invest in the New Investment Target in accordance with the provisions of this Agreement and enjoy the corresponding rights and interests in the New Investment Target, that is the equity ratio and shareholder rights enjoyed in the New Investment Target are the same as those that the current round investors are entitled to enjoy in the company after the closing is completed in accordance with the provisions of this Agreement.

5.   **Liability for breach of contract**

If any party to this Agreement breaches any of the provisions of this Agreement (including representations and warranties) and causes any losses to other parties, the breaching party shall compensate other parties for the losses caused by its breach of contract and the reasonable expenses, and all attorney fees paid to recover such losses. Notwithstanding the above provisions, unless the founder has committed fraud or willful breach of contract, his/her liability for compensation under this Agreement shall be limited to the fair market value of the company's equity held directly and indirectly by him/her at that time.

6.   **Applicable of the law and dispute resolution**

6.1   The conclusion, validity, interpretation, implementation, and dispute resolution of this

Agreement shall be governed by and interpreted in accordance with Chinese law.

6.2 All disputes arising from or related to the execution of this Agreement shall be resolved by the parties through friendly negotiation. If any dispute cannot be resolved through negotiation within 30 days after the occurrence of the dispute, either party shall have the right to submit the dispute to the Beijing Arbitration Commission for arbitration in Beijing in accordance with the arbitration rules of the Commission in effect at that time. The arbitration award is final and binding on all parties.

6.3 During the dispute resolution period, each party shall continue to have its other rights under this Agreement and shall continue to perform its corresponding obligations under this Agreement.

7. **Confidentiality**

Each Party shall keep confidential on any proprietary, secret or confidential data and information, as well as the relevant contents of this Agreement ("**Confidential Information**") concerning the Company, its business or belonging to other parties, or disclosed by other parties at any time, or for the purpose of negotiation of this Agreement, or for the purpose of establishing or operating the Company; and shall not disclose such information to any third party or person other than the parties to this Agreement or their affiliates, professional advisors, and relevant government departments.

8. **Supplementary provisions**

8.1 This Agreement shall take effect after being signed or sealed by all parties to this Agreement. This Agreement may be amended or modified by consensus of all parties to this Agreement; any amendment or modification must be made in writing and shall come into effect after being signed by all parties to this Agreement. This Agreement may be terminated in the following circumstances: (i) all parties agree to terminate the Agreement in writing through consensus; (ii) any party seriously breaches its representations, warranties, or commitments under this Agreement, and the other parties may terminate this Agreement after notifying the breaching party in writing.

8.2 This Agreement shall be effective for the successors and assignees of each party, and the above successors and assignees may enjoy the rights and interests under this Agreement. Unless otherwise agreed in this Agreement or by the unanimous consent of all parties, no party may transfer its rights or obligations under this Agreement to a third party. Despite the above restrictions, in order to facilitate the transfer between the affiliated funds of current round investors, the investors of this round have the right to transfer this Agreement and part or all of the rights or obligations of the company held by it to the funds or investment

       entities managed by current round investors or managed by the same manager or controlled by the actual controller ("**Affiliated Entity**"). The Affiliated Entity may directly exercise the rights under this Agreement, including but not limited to the completion of this round of investment by the Affiliated Entity. All parties hereby confirm and shall cooperate.

8.3     The "Entry Commitment" and this Agreement together constitute the entire understanding reached by the parties regarding the matters proposed in this Agreement, and supersede all letters of intent, agreements, commitments, arrangements, communications, statements and/or guarantees previously reached in written or oral form by the parties or any of their principals, employees, or representatives regarding the same matters. If there is any conflict or inconsistency between the "Entry Commitment" or the company's articles of association and this Agreement, the provisions of this Agreement shall prevail.

8.4     Each party shall bear its own expenses incurred in signing and performing this Agreement.

8.5     Unless otherwise provided in this Agreement, failure or delay by a party to exercise any right, power, or privilege under this Agreement shall not constitute a waiver of such right, power, and privilege; and the single or partial exercise of such right, power, and privilege shall not exclude the exercise of any other right, power, and privilege.

8.6     This Agreement is made in multiple copies. Each party shall hold one copy, and each copy shall have the same legal effect.


[No text below]

AML-0000010

Trial Exhibit 1001 Page-010

[This page has no text  It is the signature page of "Investment Agreement on Shanghai Zhisuan Technology Co., Ltd."]


Company                                             (seal: Shanghai Zhisuan Technology Co., Ltd.)


**Shanghai Zhisuan Technology Co., Ltd. (official seal)**


Legal representative (signature)        <u>Linwei Ding</u>




Signature page



11

[This page has no text. It is the signature page of "Investment Agreement on Shanghai Zhisuan Technology Co., Ltd."]

Founder

Linwei Ding (signature)     <u>Linwei Ding</u>

Signature page

12

[This page has no text. It is the signature page of "Investment Agreement on Shanghai Zhisuan Technology Co., Ltd."]

**Shanghai Chuangyuxin Enterprise Management Consulting Partnership (Limited Partnership) (official seal)**

(Seal: Shanghai Chuangyuxin Enterprise Management Consulting Partnership (Limited Partnership)

Executive partner (signature):    <u>Linwei Ding</u>

Signature page

[This page has no text. It is the signature page of "Investment Agreement on Shanghai Zhisuan Technology Co., Ltd."]

**Shanghai Xinyuzhi Enterprise Management Consulting Partnership (Limited Partnership) (official seal)**

(Seal: Shanghai Xinyuzhi Enterprise Management Consulting Partnership (Limited Partnership)

Executive partner (signature):        <u>Linwei Ding</u>

Signature page

[This page has no text. It is the signature page of "Investment Agreement on Shanghai Zhisuan Technology Co., Ltd."]

**Current round investors**

**Beijing Qiji Chuangtan Phase II Venture Capital Center (Limited Partnership) (official seal)**

(Seal: Beijing Qiji Chuangtan Phase II Venture Capital Center (Limited Partnership) 11010810260053)

Designated representative of executive Partner (signature):  Qi Lu

Signature page

Appendix I

**Payment Notice**

Year 2023  Month ___   Date ___

**To: Beijing Qiji Chuangtan Phase II Venture Capital Center (Limited Partnership) ("your Company")**

According to the "Investment Agreement on Shanghai Zhisuan Technology Co., Ltd." signed by your company, Shanghai Zhisuan Technology Co., Ltd. ("**the Company**"), and other relevant parties on November 20, 2023, your company is requested to remit the investment amount of RMB 5.026 million yuan to the following account of the company after receiving this payment notice:

Account name: Shanghai Zhisuan Technology Co., Ltd.

Opening bank: China Merchants Bank Co., Ltd., Shanghai Tianlin Branch

Account number: 121951811510004

**Shanghai Zhisuan Technology Co., Ltd.** (seal)

Signature：_____

Name：Linwei Ding

Position：Legal representative

**Appendix II  List of core personnel**

| Name | Position | Part-time job description |
|---|---|---|
| Linwei Ding | CEO | No |
| Shasha Guo | Marketing manager | No |
| Lucy Li | Head of General Department | No |

**Appendix III List of company competitors**

| Sequence no. | Company Name |
|---|---|
| 1 | Huawei Technologies Co., Ltd. |
| 2 | Alibaba Cloud Computing Co., Ltd. |
| 3 | Tencent Cloud Computing (Beijing) Co., Ltd. |
| 4 | JD Cloud Computing Co., Ltd. |
| 5 | Dawn Information Industry Co., Ltd. |
| 6 | iFlytek Co., Ltd. |
| 7 | H3C Technologies Co., Ltd. |
| 8 | China Electronics Technology Group Co., Ltd. |
| 9 | China Telecom Co., Ltd. |
| 10 | China Mobile Communications Group Co., Ltd. |
| 11 | Baidu Online Network Technology (Beijing) Co., Ltd. |