Agreement on Confidentiality, Non-competition and Intellectual Property Ownership

This Agreement on Confidentiality, Non-competition and Intellectual Property Ownership (hereinafter referred to as **the "Agreement"**) is signed by the following parties on November 23, 2023 in Xuhui District, Shanghai.

**Party A: Shanghai Zhisuan Technology Co., Ltd.**
Address: F8, Building A6, Caohejing Modern Service Park, 1528 Gumei Road, Xuhui District, Shanghai
Legal Representative: Ding, Linwei

**Party B: Guo, Shasha**
Home Address: Building 6, Phase II, Vanke Jinyu Mingdi, Nanhua Lane, High-tech Zone, Chengdu
Date of Birth: December 8, 1985
ID/Passport Number: 410782198512082421

In view of the fact that Party B is employed by Party A and receives remuneration from Party A, both parties are willing to accept and sign this Agreement. In this Agreement, "**Group**" includes Party A and its entities established or to be established, Party A's holding company, parent company, subsidiaries and affiliates, and any subsidiaries or offices of Party A's holding company.

1. **Employment**. Party B agrees that the terms and conditions of employment shall be stipulated in the employment contract signed separately by both parties, and the terms of this Agreement shall not be interpreted as confirmation of the employment relationship.

2. **Confidential information**

    The confidential information in this Agreement includes:

    2.1 **Party A's information**. Party A's information includes (i) business information of any member company of the Group, such as product development plans and other product-related information, pricing mechanisms, marketing methods, sales data, strategic planning, supplier information, user information, cooperation data and investment data; (ii) technical information, such as concepts, inventions, proposals, programs, techniques, reports, software, codes, products, designs, models, and operating instructions; (iii) internal management information related to operations, human resources, finance and legal affairs; and (iv) other information owned or controlled by any company in the Group that is required to be kept confidential by law or contract. Party A's information can be obtained through Party A's active disclosure to Party B or Party B's active acquisition from a group member company, and the form can be written or oral. The parties further understand that confidential information does not include the above-mentioned Party A information that has been made public and the information that Party B can independently obtain through legal and legitimate means.

    2.2 **Third-party information**. Party B acknowledges that Party A and/or other members of the Group are obliged to keep confidential or proprietary information obtained from third parties confidential and can only use such information for specific purposes. Unless necessary to complete the work agreed upon by Party A and/or other members of the Group with third parties, Party B will strictly keep such information confidential and will not disclose or apply any such confidential information and proprietary information to any individual, partnership or company.

3. **Carrier of confidential information**

AML-0003448

Trial Exhibit 1185 Page-001

    3.1    All documents, materials, photographs, charts, notes, reports, letters, faxes, tapes, disks, instruments and any other forms of media containing confidential information held or kept by Party B for the purpose of job duties shall belong to Party A, regardless of whether such confidential information has commercial value.

    3.2    Party B shall return all property belonging to Party A and all carriers containing Party A's confidential information upon leaving office (for whatever reason), or upon Party A's request. These carriers shall not be copied, retained or given to other parties anyone.

    3.3    If the carrier on which Party A's confidential information is recorded is prepared by Party B, Party A shall give Party B economic compensation equivalent to the value of the carrier when Party B returns such carrier.

4. **Confidentiality**

    4.1    Party B guarantees that during and after the employment period, it will strictly keep Party A's secrets and will not use any confidential information except for the interests of Party A or the Group. Party B shall not disclose, disseminate, publish or transfer any confidential information to any individual, partnership or company (including other employees of Party A who are not entitled to know the confidential information according to Party A's confidentiality provisions) without Party A's written authorization. Party B agrees to keep such confidential information confidential and to protect and maintain the confidential information to avoid it being used, disclosed, reported, transferred or published without authorization.

    4.2    Unless it is for the benefit of Party A or the Group, Party B shall not take any confidential information and carrier containing confidential information out of Party A's office without Party A's prior written consent.

    4.3    If Party B's superior agrees in writing to Party B's disclosure and use of confidential information, it will be deemed that Party A has agreed such disclosure and use, provided that Party A has previously stated that the supervisor has such authority.

    4.4    Unless it is for the benefit of Party A or the Group, Party B shall not inquire about, disclose or discuss salary, bonuses, benefits, options or any form of remuneration with any other entity (except Party B's immediate family members).

5. **Intellectual property**

    5.1  **Intellectual property holding and licensing**. If, during the period of Party B's employment with Party A, Party B integrates the prior technology which he/she owns or has an interest in into Party A's or its group members' products, Party A shall be deemed to be granted a non-exclusive, royalty-free, irrevocable, perpetual and worldwide license to such prior technology, and Party A shall have the right to modify, use or sell such prior technology as part of its products.

    5.2  **Disclosure**. Party B agrees to disclose to Party A or its designee the intellectual property rights generated by Party B alone or in collaboration with others (collectively referred to as the "**Target Intellectual Property**") and all related information during the period of Party B's employment.

AML-0003449

Trial Exhibit 1185 Page-002

5.3 **Intellectual property**. Both parties confirm that (i) the Target Intellectual Property generated by Party B during his/her tenure at Party A based on his/her position, the performance of tasks assigned by Party A, or mainly by utilizing Party A's material conditions, business information, etc., and (ii) the Target Intellectual Property completed by Party B using Party A's information after his/her resignation from Party A, or that is directly related to his/her job or assigned tasks at Party A, are all work-related inventions and work-related results (collectively referred to as "**Work-related Results**"). Party B shall have the right of authorship over the Work-related Results, and all other rights under the Work-related Results shall belong to Party A. Party B shall assist in transferring the Work-related Results to Party A. Party B understands and agrees that Party A has the right to decide at its sole discretion whether to commercialize or sell the Work-related Results for the benefit of Party A and/or other group members. If Party B claims that he/she owns the intellectual property rights to the above-mentioned Work-related Results, he/she shall promptly make a written statement to Party A. If Party A confirms in writing that any result is indeed not work-related, Party B shall enjoy the intellectual property rights of such result. If Party B does not declare a result, it is presumed to be the Work-related Results. If certain Target Intellectual Property does not belong to the aforementioned Work-related Results, but is related to Party A or the Group's business, within three months from the date on which Party B discloses such results to Party A, Party A and other members of the Group shall have the right of first refusal to purchase all or part of the rights to such results (at Party A's option).

5.4 **Custody**. Party B agrees to record and keep in a timely manner during the period of employment all physical materials and written documents of the Target Intellectual Property completed by Party B alone or in collaboration with others. The materials and documents may be in the form of record sheets, outlines, drawings or any other format. Party A has the right to obtain these materials and documents at any time and has sole ownership of them.

5.5 **Patent and copyright registration**. Party B agrees to fully assist Party A or its designee in filing applications for intellectual property protection of the Work-related Results in any or all countries and regions, at Party A's expense, including disclosing all relevant information and data to Party A, signing and preparing various applications, instructions, certificates, transfer documents, and other credentials that Party A deems necessary for applying for, obtaining and transferring such rights, guarantees and interests. Party B agrees that after the termination of this Agreement, he/she will continue to perform his/her obligations under this clause to the best of its ability.

6. **Professional conflict**. During the period of employment by Party A, Party B will provide full-time services to Party A and will not directly or indirectly provide services to any third party or serve as its director or supervisor, or directly or indirectly hold any interests in any third-party entity engaged in competing business.

7. **Non-competition**

7.1 Party B agrees that during the period of employment and during the non-competition period following termination of the employment relationship with Party A for any reason, whether intentional or unintentional, voluntary or involuntary, with or without prior notice, Party B will not directly or indirectly engage in any business similar to or in competition with Party A's principal business ("**Competing Business**"), and will not directly or indirectly hold any interest in any entity engaged in a Competing Business, including but not limited to (i) establishing, holding a controlling stake in, participating in or controlling a competing entity, without the prior unanimous written consent of Party A's board of directors. (ii) providing loans, customer information, or any other form of assistance to competing entities; (iii) directly or indirectly obtaining benefits from competing entities; (iv) seeking for clients related to Party A's business in any form, or conducting or attempting to conduct transactions with clients related to Party A's business; (v) hiring any person who has left Party A through any person or organization directly or indirectly controlled by it or in which it has an interest in, in any form; (vi) seeking to employ the employees then employed by Party A, in any form; and (vii) providing services in any form to a competing entity.

3

AML-0003450

Trial Exhibit 1185 Page-003

       For the avoidance of doubt, the above-mentioned principal business of the company is the development of artificial intelligence infrastructure software and application software; and the aforementioned non-competition period is two (2) years from the date Party B terminates the employment contract (regardless of the reason for termination), or ceases to hold any equity interest in the Group or ceases to hold any position in the Group (whichever occurs later).

    7.2 Party B agrees that upon the termination of the employment relationship, Party B will receive compensation from Party A (hereinafter referred to as "**Compensation**") so as to fulfill the provisions of Article 7.1 hereof. Party A agrees to pay Party B a monthly non-compete compensation equivalent to 30% of Party B's average salary in the last 12 months prior to Party B's resignation or the minimum amount permitted by law at the time (whichever is lower) during the non-compete period after Party B's resignation. If Party A waives its non-competition requirement for Party B or shortens the non-competition period, such compensation shall be cancelled or reduced proportionally accordingly.

8. **Return of Party A's documents**. Party B agrees to return to Party A all designs, documents, data, records, reports, plans, lists, correspondence, instructions, planning drawings, outlines, materials, equipment, other documents or property generated during the period of employment with Party A and copies of the aforementioned items or any other information belonging to Party A and/or other members of the Group and their successors and assigns upon leaving Party A (Party B shall not possess or copy such documents or give them to any other person).

9. **Liability for breach of contract**. If Party B breaches the contract and causes losses to Party A, Party B shall bear the liability for breach of contract and compensate Party A for all losses. Compensation for losses can be directly deducted from Party B's salary, bonus and other income after Party B is notified in writing, and Party A has the right to require Party B to make up the shortfall.

10. **Notice to new employer**. When Party B terminates or cancels the labor relationship with Party A, Party B promises to notify Party A in advance in writing of his/her future employer (if any) and the type of work he/she will perform for such employer. If Party B is not clear about his/her future employer when he/she terminates or cancels the labor relationship with Party A, during the non-competition period, Party B agrees to immediately inform Party A in writing of the name, contact person and address of his/her future employer and the type of work to be performed once he/she becomes aware of such information. Party B hereby agrees that if Party B resigns, Party A may notify Party B's new employer of Party B's rights and obligations under this Agreement.

11. **Statement**. To fulfill the terms of this Agreement, Party B will perform his/her commitments and verify necessary documents. Party B's performance of the terms of this Agreement will not constitute a breach of the confidentiality agreement regarding any proprietary information protected by confidentiality measures obtained by Party B before Party B was employed by Party A. Party B has not and will not enter into any oral or written agreement that is inconsistent with this Agreement.

12. **General terms**

    12.1 **Applicable law**. This Agreement shall be governed by the laws of the People's Republic of China without regard to the choice of law and conflict of law principles.

    12.2 **Entire agreement**. This Agreement is a complete provision regarding the subject matter between Party A and Party B, supersedes any prior agreements between the parties in this regard, and covers all prior discussions between the parties. Any changes or modifications to this Agreement and any waiver of rights under this Agreement shall be deemed invalid without the written consent of both parties. Any changes in Party B's duties, salary and compensation shall not affect the validity and scope of this Agreement.

AML-0003451

Trial Exhibit 1185 Page-004

12.3 **Ancillary agreement**. This Agreement is an annex to the Employment Contract signed by Party A and Party B and shall be interpreted together with the Employment Contract. For matters not stipulated in this Agreement, if there are clear provisions in the law, the provisions of the law shall prevail; otherwise, the provisions of the Labor Contract shall prevail. However, the validity of this Agreement shall not be terminated due to the termination of the Employment Contract.

**Party A: Shanghai Zhisuan Technology Co., Ltd.**

[Seal: Shanghai Zhisuan Technology Co., Ltd.]

**Signature:**_____

**Position:**

**Party B: Guo, Shasha**

**Signature: [Signature]**