GRANT P. FONDO (SBN 181530)
*GFondo@goodwinlaw.com*
FARZAD FEYZI (SBN 343538)
*FFeyzi@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 Marshall Street
Redwood City, CA 94063
Tel.: +1 650 752 3100
Fax: +1 650 853 1038

DARRYL M. WOO (SBN 100513)
*DWoo@goodwinlaw.com*
RACHEL M. WALSH (SBN 250568)
*RWalsh@goodwinlaw.com*
JESSICA HUANG FUZELLIER (SBN 315208)
*JHFuzellier@goodwinlaw.com*
DAVID RAPP-KIRSHNER (SBN 344494)
*DRappKirshner@goodwinlaw.com*
COLETTE LOWRY (SBN 359889)
*CLowry@goodwinlaw.com*
**GOODWIN PROCTER LLP**
525 Market Street, Floor 32
San Francisco, CA 94105
Tel.: +1 415 733 6000
Fax: +1 415 677 9041

Attorneys for Defendant:
LINWEI DING

[*Additional Counsel Listed in Signature Block*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  3:24-CR-00141-VC |
| Plaintiff, | **DEFENDANT LINWEI DING'S REPLY IN SUPPORT OF MOTION FOR A JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, NEW TRIAL PURSUANT TO RULE 29(C) AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE** |
| v. | |
| LINWEI DING, | |
| Defendant. | |

Date:        May 12, 2026
Time:        2:00 p.m.
Courtroom:   4 (17th Floor)
Judge:       Hon. Vince Chhabria
             450 Golden Gate Avenue
             San Francisco, CA 94102

Filed/lodged concurrently herewith:
1.  Declaration of Grant P. Fondo

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

RULE 29 MOTION .......................................................................................................... 2

I.    ARGUMENT ........................................................................................................ 2

    A.    The Government Failed to Prove the Essential Elements of Economic Espionage as to Intent and Knowledge (Counts Eight through Fourteen). .............. 2

        1.    There Is Insufficient Evidence that Mr. Ding Had the Requisite Intent at the Time that the Trade Secrets Were Taken. ............................... 2

        2.    Intent to Benefit His Own Private Chinese Company Does Not Satisfy Intent. ........................................................................................ 7

        3.    The Economic Espionage Jury Instruction Should Have Provided that the Government Must Prove Activity Coordinated With or Sponsored by a Foreign Government, Which the Government Failed to Prove. ..................................................................................... 9

        4.    The Jury Instruction Regarding Economic Espionage Should Have Required the Jury to Find Mr. Ding Knew The Documents Included Trade Secrets, Which the Government Failed to Prove. ............. 10

    B.    The Government Failed to Prove the Essential Elements of Theft of Trade Secrets as to Mr. Ding's Intent (Counts One through Seven). .................... 10

    C.    The Government Failed to Prove the Essential Elements of a Trade Secret (All Counts). ...................................................................................... 11

        1.    The Government Failed to Prove Google Took Reasonable Measures to Protect the Trade Secrets (All Counts). ................................. 11

        2.    The Government Failed to Prove that Category Three, Category Five, and Category Seven are Non-Public (Counts Three, Five, Seven, Ten, Twelve, and Fourteen). ........................ 12

        3.    The Government Failed to Prove the Essential Elements of a Trade Secret as to the Combination Trade Secrets (Counts One, Two, Three, Six, Eight, Nine, Ten, and Thirteen). ................................... 14

RULE 33 MOTION ........................................................................................................ 18

II.    ARGUMENT ...................................................................................................... 18

    A.    The Government Failed to Adequately Identify the Relevant Trade Secrets, Resulting in an Unfair Trial. ............................................................................ 18

    B.    The Court's Rulings Regarding the Defense's Experts Resulted in an Unfair Trial. ...................................................................................................... 19

i

C.    The Court's Jury Instructions Were Confusing or Misleading and Resulted in an Unfair Trial................................................................... 20

D.    The Guilty Verdicts Are Against the Cumulative Weight of the Evidence............ 20

CONCLUSION ..................................................................................................................... 20

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*3M v. Pribyl*,
  259 F.3d 587 (7th Cir. 2001)............................................................................................ 15

*Buffets, Inc. v. Klinke*,
  73 F.3d 965 (9th Cir. 1996)............................................................................................. 11

*Deck v. Jenkins*,
  814 F.3d 954 (9th Cir. 2016)............................................................................................ 17

*Gasho v. United States*,
  39 F.3d 1420 (9th Cir. 1994)............................................................................................. 6

*Lansdown v. Bayview Loan Servicing, LLC*,
  2023 WL 2934932 (N.D. Cal. Apr. 12, 2023) ............................................................... 10

*United States v. Adamson*,
  291 F.3d 606 (9th Cir. 2002)............................................................................................. 5

*United States v. Cardenas*,
  408 F. App'x 106 (9th Cir. 2011) ..................................................................................... 5

*United States v. Chung*,
  633 F. Supp. 2d 1134 (C.D. Cal. 2009) .......................................................................... 10

*United States v. Gudino*,
  432 F.2d 433 (9th Cir. 1970)........................................................................................... 16

*United States v. Hernandez*,
  859 F.3d 817 (9th Cir. 2017)............................................................................................. 6

*United States v. Jin*,
  833 F. Supp. 2d 977 (N.D. Ill. 2012) ........................................................................... 9, 10

*United States v. Lan Lee*,
  2010 WL 8696087 (N.D. Cal. May 21, 2010) ............................................................. 9, 10

*United States v. Levandowski*,
  19-cr-00377-WHA, Dkt. 66 (N.D. Cal. Dec. 4, 2019)................................................... 19

*United States* v. *Liang Chen*,
  2020 WL 6342931 ........................................................................................................... 18

iii

*United States v. Liew*,
  2013 WL 2605126, at *8 (N.D. Cal. June 11, 2013) ............................................................... 18

*United States v. Liew*,
  856 F.3d 585 (9th Cir. 2017)......................................................................................................... 9

*United States v. Musacchio*,
  968 F.2d 782 (9th Cir. 1991).......................................................................................................... 3

*United States v. Nosal*,
  844 F.3d 1024 (9th Cir. 2016).......................................................................................... 12, 13, 14

*United States v. O'Rourke*,
  417 F. Supp. 3d 996 (N.D. Ill. 2019) ................................................................................*passim*

*United States v. Tsinhnahijinnie*,
  112 F.3d 988 (9th Cir. 1997)......................................................................................................... 5

*United States v. You*,
  74 F.4th 378 (6th Cir. 2023) ........................................................................................................ 10

*United States v. Zheng*,
  113 F.4th 280 (2d Cir. 2024)..................................................................................................... 9, 10

**Other State Cases**

*People v. Blitstein*,
  192 Ill. App. 3d 281 (1989)............................................................................................................ 3

**Federal Statutes**

18 U.S.C. § 1831 ............................................................................................................................... 9

18 U.S.C. § 1831(a)(2) ...................................................................................................................... 3

18 U.S.C. § 1832 ............................................................................................................................... 9

**Other Authorities**

Fed. R. Crim. P. 29(c) ............................................................................................................ 2, 5, 9, 20

Fed. R. Crim. P. 33................................................................................................................... 5, 18, 20

**<u>INTRODUCTION</u>**

The government's Opposition cannot escape the fact that the jury did not find 97 of the 112 alleged trade secrets proven beyond a reasonable doubt, conceding that "the jury did not indicate unanimous agreement that additional specific documents were trade secrets." Opp. at 24:1-2. The jury's verdict is the predictable consequence of a prosecution whose overambitious scope produced fundamental, irreparable evidentiary gaps as to the essential elements of the charged offenses.

Among other shortcomings, the government has failed to demonstrate that it adequately proved intent for the Economic Espionage counts or that many of the trade secrets[1] even qualify as such. **First**, the government argues as to the Economic Espionage counts that it proved Mr. Ding intended to benefit a PRC instrumentality at the time he stole the trade secrets. But purported evidence of intent five to 16 months after a theft cannot supply concurrent intent without rewriting the case presented to the jury or engaging in rank speculation. And **second**, the government argues that it sufficiently proved that the trade secrets meet the legal elements. But the government cannot get around the fact that it showed the jury only 18 of the trade secret documents, eliciting only perfunctory summary testimony about the remaining 87 documents and seven combinations. The government runs into particular trouble with Categories One through Three and Six, for which the jury unanimously agreed only that the category-wide combinations were trade secrets and not that any of the constituent documents were trade secrets. The government is unable to explain how such verdicts are anything but speculative when the jury never saw or heard details about most of the documents that supposedly made up the combinations.

The government makes the same mistakes in its briefing as it did at trial, presuming that a general point should apply to specific documents or exhibits without ever having showed that it actually does apply. Details matter and the government has overlooked the details. For these reasons, the Court should grant a judgment of acquittal on all counts. In the alternative, a new trial is warranted.

---

[1] Mr. Ding continues to maintain that the government failed to prove any of the alleged trade secrets and reserves all rights in this respect.

1

**RULE 29 MOTION**

I.    **ARGUMENT**

      A.    **The Government Failed to Prove the Essential Elements of Economic Espionage as to Intent and Knowledge (Counts Eight through Fourteen).**

            1.    **There Is Insufficient Evidence that Mr. Ding Had the Requisite Intent at the Time that the Trade Secrets Were Taken.**

Mr. Ding argued that the government failed to establish he had the intent to benefit a foreign instrumentality (Economic Espionage element four) at the time of the theft of trade secrets (Economic Espionage element three). Mot. at 7-11; Dkt. 362 at 19 (Instruction No. 16). As discussed in greater detail below, (1) the government concedes that there is no evidence of the intent to benefit a foreign instrumentality on or about the date of the four uploads from May 2022 to April 2023; (2) the government does not dispute that it abandoned its charge of possession of trade secrets through January 2024 in the middle of trial, so it may not rely on possession to address the mismatch between the timing of the actus reus and timing of intent; and (3) during its prosecution, the government never took the position that a December 2023 download constituted a theft or was made with the intent to benefit a foreign instrumentality, so again this act cannot serve as a temporal bridge between act and intent.

First, the government does not dispute that it must prove Mr. Ding's intent to benefit a foreign instrumentality *at the time* of the trade secret theft. Opp. at 10-13; Mot. at 8. The government cannot do so, as it also does not dispute that the earliest evidence of a discussion by Mr. Ding of PRC instrumentalities occurred on September 27-28, 2023 (Opp. at 10-13; Mot. at 8-9), more than five months after Mr. Ding's last upload of documents to his personal Google drive in April 2023, and more than 16 months after Mr. Ding's first such upload in May 2022. Indeed, the government concedes, as it must, that "there are no explicit statements of Ding's intent to benefit the PRC prior to uploading the stolen trade secrets." Opp. at 13.

Second, though the government charged possession as an operative criminal act in the Second Superseding Indictment ("SSI"), the government does not contest that it abandoned Mr. Ding's possession as such an act during trial. Opp. at 10-13; Mot. at 10. Having abandoned possession as an operative act before the jury, the government cannot seek to resurrect it now.

2

Third, confronted with the consequences of these inescapable concessions, the government fundamentally recharacterizes its own case to attempt to link the criminal act and intent to benefit an instrumentality of the PRC. The government says it alleged Ding's download activity on December 14, 2023 to be a date of theft, citing paragraph 46 of the SSI. Opp. at 10-11. Paragraph 46 of the SSI, however, states only that Ding "knowingly and without authorization copied, duplicated, sketched, drew, downloaded, uploaded, altered, photocopied, replicated, transmitted, delivered, sent, communicated, and conveyed trade secrets alleged in each of Counts Eight through Fourteen below belonging to Google." This language is nothing more than a verbatim recitation of the statutory text of 18 U.S.C. § 1831(a)(2). In contrast, the SSI specifically alleged the dates and details of the uploads: "DING began uploading Google Confidential Information from Google's network into a personal Google Cloud account ('DING Account 1') on May 21, 2022, and continued periodic uploads until May 2, 2023." SSI ¶ 17; *see also id.* at ¶ 30. The SSI's conspicuous specificity as to the uploads and conspicuous silence as to the December 14, 2023 download shows the government did not charge, let alone argue to the jury, the download as an operative criminal act. This is likely because under the government's theory, all of the trade secrets had already been stolen and were in Mr. Ding's possession by April 2023, and Mr. Ding's transfer from one repository to another was not theft. The government cites no law providing otherwise.[2]

The government attempts to cure this glaring omission by emphasizing the date range specified for each offense in the SSI: May 21, 2022 to January 13, 2024. Opp. at 10. The date range is more than 600 days long, however, providing no indication that it is specifically meant to include the December 14, 2023 download where the December 14, 2023 download is alleged nowhere in the SSI. Furthermore, the only logical interpretation of the end date is that it refers to the operative act of <u>possession</u>, which continued until the execution of a search warrant on Mr. Ding's personal Google drives on January 13, 2024, an event and date that *is* specifically alleged in the SSI. SSI ¶ 34. The government also points to brief grand jury testimony regarding the December 14, 2023

---

[2] *Cf. United States v. Musacchio*, 968 F.2d 782, 790 (9th Cir. 1991) (theft occurred when money left control of victim); *People v. Blitstein*, 192 Ill. App. 3d 281, 285 (1989) (theft occurred when defendant received check and "[h]e could not commit a second, separate theft of the same check when he cashed it").

download. Opp. at 10. But this testimony mentioned the download not as an act of theft but as evidence of Mr. Ding's efforts to hide what he was doing from Google, with the agent testifying that Mr. Ding made this download six days after he had signed an affidavit saying he had deleted all copies of nonpublic Google information. Chang Decl. Ex. A at 6:12-22.

The government next asserts that its theory of the case at trial provided that the December 14, 2023 download was an act of theft. Not so. During its opening statement, the government emphasized that it would present evidence that the alleged thefts occurred via Mr. Ding's uploads: "Another witness you'll hear from about *how the defendant stole* the documents is an independent expert named Andy Crain. . . . he's looked at the digital evidence that was recovered in this case, and what he'll explain to you is that in total, over the course of about a year, *between May of 2022 and May of 2023*, the defendant transferred 1,255 documents, a total of over 14,000 pages, including more than 4,000 individual screenshots, from his Google computer to this personal cloud account." Trial Tr. 39:22-40:5[3] (emphasis added); *see also* Trial Tr. 37:25-38:2, 39:5-7. The government did not address the December 14, 2023 download until later in its opening when it discussed it only to argue Mr. Ding's purported concealment efforts. Trial Tr. 51:17-20, 53:14-19.

During closing argument, the government confirmed this same theory of the case. At the very outset, the government clearly said, "*from May 2022 to April 2023*, the defendant *stole* over 2,000 pages of Google's cutting-edge AI trade secrets." Trial Tr. 2110:18-20 (emphasis added). The government went on to describe the mechanics of the theft as follows: "starting on May 21st, 2022, he uploaded them in multiple mass *uploads* to his personal Google Drive account, where he then saved them to dozens of folders on his personal account." Trial Tr. 2115:7-14 (emphasis added). The government never discussed the December 14, 2023 download as part of its narrative of how Mr. Ding stole the trade secrets. When the government did eventually reference the December 14, 2023 download, it framed it not as a theft but only as evidence of concealment: "Instead of deleting all the information like he said he would, he downloaded all of the information *he had stolen* and stored on his personal account to his personal computer, over a thousand

---

[3] References to trial testimony are denoted as "Trial Tr." in this memorandum. They are set forth for this Court's reference in Ex. F to the Fondo Decl. and in Dkt. 394-4.

4

documents . . . That was December 14th, six days after he signed this." Trial Tr. 2149:6-13 (emphasis added); Trial Tr. 2154:20-2155:4. The government argued that the only conceivable reason for this download was to use the documents for his company, Zhisuan, making no mention of PRC instrumentalities. Trial Tr. 2149:19-23. And while the government discussed PRC instrumentalities at length, it never attempted to tie the December 14, 2023 download to Mr. Ding's contacts with PRC instrumentalities or any evidence of intent to benefit PRC instrumentalities. Trial Tr. 2127:21-2130:24, 2155:5-2156:19, 2220:11-2221:9.

The government next responds to Mr. Ding's argument that the government may not rewrite its prosecution to contend the December 14, 2023 download constitutes a theft because that would be an impermissible constructive amendment or variance. (Opp. at 4-5, 11-12.) The government's response misconstrues Mr. Ding's argument as an improper Rule 33 argument. Opp. at 4-5. But Mr. Ding argues not that there actually was a constructive amendment or variance, but rather that this Court may not consider the December 2023 download to be an operative criminal act where it was not charged as such and was not the theory of the case presented to the jury because that rewriting of trial would be a constructive amendment or variance. This is a proper Rule 29 argument in support of Mr. Ding's contention that the government has presented insufficient evidence of intent at the time of the thefts, which as presented to the jury ceased in April 2023.[4]

The government points to its statement in a pre-trial brief as providing notice to Mr. Ding, but that brief confirms the government did not view the December 14, 2023 download as a theft: "***Ding stole trade secrets documents on four of those dates: May 21, 2022, June 1, 2022, June 3, 2022, and April 17, 2023***. On December 14, 2023, Ding downloaded all the documents he had ***previously exfiltrated*** to his personal computer." Dkt. 142 at 2 (emphasis added). The government next cites the report of its forensic expert, Mr. Crain, who described the December 14, 2023

---

[4] Contrary to the government's arguments, the circumstances here are on all fours with cases in which fatal variances have been found. *United States v. Adamson*, 291 F.3d 606, 615-16 (9th Cir. 2002) (fatal variance where the indictment specified one misrepresentation for wire fraud charge and government focused on another misrepresentation at trial); *United States v. Cardenas*, 408 F. App'x 106, 109 (9th Cir. 2011) (fatal variance where defendant was charged with providing false name to law enforcement but government argued during closing the jury could convict if defendant had used the charged name or one other name); *United States v. Tsinhnahijinnie*, 112 F.3d 988, 991 (9th Cir. 1997) (fatal variance where government charged crime on one date and government then presented evidence the crime had taken place on a different date during trial).

5

download. Opp. at 11-12. But a description of the download is consistent with the government's theory that the download was simply evidence of concealment, not a theft. Mr. Ding's defense responded to the SSI and government's theory as presented, including arguing that there was a mismatch between the timing of the uploads and the requisite intent for Economic Espionage. *See, e.g.*, Trial Tr. 2202:4-10. Mr. Ding would be prejudiced by the adoption of a new theory after trial.

The government concludes by arguing that, even if the December 14, 2023 download is not considered to be an operative criminal act, reasonable jurors could have concluded that Mr. Ding had the requisite intent at the time of the uploads because he was building Zhisuan at the time and he later acted through Zhisuan to benefit a PRC instrumentality. Opp. at 12-13. But this argument fails because the government itself acknowledges that "there are no explicit statements of Ding's intent to benefit the PRC prior to uploading the stolen trade secrets." Opp. at 13. Simply put, intent must accompany the wrongful act, not be presumed from later events. And the temporal gap here is not marginal: it spans between five and 16 months. This is not consistent with a reasonable logical inference; it is consistent with only rank speculation. Further, the government never asked the jury to infer that Mr. Ding had an intent to benefit the PRC government between May 2022 and April 2023 based on evidence of his state of mind many months later, even after the defense raised this very issue during its closing argument. *See* Trial Tr. 23:2-24:19, 30:21-31:7, 42:19-49:1, 2127:21-2130:24, 2155:5-2156:19, 2202:4-18, 2220:11-2221:10. Nowhere in the government's rebuttal argument did it make the arguments to the jury that it is now making to this Court. Having declined to press its post hoc theory before the jury, the government cannot rely upon it now to paper over a fatal shortcoming in its case. Significantly, the government has cited no case in which a court has found concurrent intent based upon evidence that post-dates the operative criminal act by five to 16 months. Nor has the government distinguished or even discussed the cases Mr. Ding cited in his opening brief, which hold that there is inadequate evidence of a crime if the requisite intent arose only after the operative criminal act. Mot. at 9 (citing *United States v. Hernandez*, 859 F.3d 817, 824-25 (9th Cir. 2017); *Gasho v. United States*, 39 F.3d 1420, 1430 (9th Cir. 1994)).

**2.      Intent to Benefit His Own Private Chinese Company Does Not Satisfy Intent.**

In his opening brief, Mr. Ding argued that the government failed to prove an intent to benefit the PRC, recounting testimony that there was no evidence Mr. Ding had shared, used, or received payment for the trade secrets, and that Zhisuan had not and could not develop any product from those trade secrets that would purportedly benefit the PRC. Mot. at 11-13. The government responds, because it has to, that the absence of this evidence is "wholly irrelevant." Opp. at 6. While the Economic Espionage Act may not require such proof as a freestanding element of the offense, the absence of such evidence is certainly relevant to whether the government proved that Mr. Ding intended to benefit an instrumentality of the PRC. Certainly if the government had this type of evidence they would have argued at trial such an exchange or benefit was highly relevant of intent. Not having any such evidence, the government instead walks through purported intent evidence relating to a few PRC instrumentalities (Opp. at 6-9), but the evidence as to each of these instrumentalities falls short.

**Industrial Innovation Park**: The government first points to Dr. Segal's high-level testimony that the Industrial Innovation Park ("Park") is a government-controlled high-tech zone, combined with Zhisuan pitch deck materials listing it as a prospective customer, and a November 2023 introductory presentation by Mr. Ding to the Park.[5] But the government concedes that no agreement was ever entered into with the Park. Opp. at 8. A pitch deck listing an instrumentality as a hoped-for customer, paired with a single introductory presentation, does not prove an intent to benefit that entity with stolen proprietary technology. The government's own witnesses confirmed that Google's technology infrastructure would be extraordinarily difficult to replicate, making the suggestion that Zhisuan could provide an "AI ecosystem" for the Park infeasible.

**Tianfu Research Institute**: The government similarly points to a draft strategic cooperation agreement between Zhisuan and Tianfu Research Institute. Opp. at 8. But the government does not dispute that the agreement is not executed. Trial Ex. 1002. While there is

---

[5] Dr. Segal's brief testimony, based solely on online research, merely provided his assessment of the Park's administrative formation and structure and did not address Mr. Ding's specific conduct. Trial Tr. 926:13-929:20, 946:1-6.

7

some circumstantial evidence that an agreement was later entered into on some unknown date, the government presented no evidence about the terms of any such agreement. The government's Opposition does not dispute this; it simply asks the Court to infer that the agreement that was later signed had terms similar to the draft. Furthermore, even if an agreement had been signed on the draft's terms (of which there is no proof), the draft speaks at the level of generic AI "achievements," which is equally consistent with work based on open-source technology, publicly available research, or Mr. Ding's own know-how as it would be with use of the trade secrets.

**PRC's AI Goals**: The government next relies on the PRC's broad AI development aspirations. Opp. at 8. Again this proves nothing. Dr. Segal testified that PRC leadership has signaled that artificial intelligence is of strategic interest to China's economic, political, and military goals, and that Mr. Ding was tailoring his company and products to help the PRC meet those high-level goals. *See* Trial Tr. 920:21-922:18. These are aspirational statements that apply equally to any entrepreneur in the AI space in China. By the government's logic, any AI entrepreneur operating in China who is aware of published government development plans or refences them intends to benefit the Chinese government. Moreover, the government never established a nexus between the specific trade secrets at issue—documents concerning the granular architecture of Google's TPUs, SmartNICs, and software infrastructure—and any particular government plan. Dr. Segal testified only about high-level strategic PRC AI priorities. Trial Tr. 906:4-9. He did not testify that the PRC's government plans called for, or would be advanced by, specifically, knowledge of Google's interchip interconnect specifications or software scaling techniques.

**Shanghai Talent Plan:** The government next references Mr. Ding's application to the Shanghai Talent Plan in late 2023. Opp. at 9. This fails also because an application to a program designated to promote economic and technological growth does not show an intent to benefit a PRC instrumentality versus a private business in China. *See* Dkt. 362 at 19 (Instruction No. 16). Moreover, any receipt of potential funding from the PRC does not constitute a "benefit" running *to* the PRC; it is a benefit running *from* the PRC to Zhisuan.

8

The inadequacies of the government's evidence are further confirmed by *Lan Lee* and *Jin*. The government attempts to distinguish *United States v. Lan Lee*, 2010 WL 8696087 (N.D. Cal. May 21, 2010), on the ground that, unlike the defendants in *Lan Lee*, Mr. Ding intended to provide services to PRC governmental entities rather than merely receive a grant. Opp. at 9. But this distinction is illusory. In *Lan Lee*, the court granted the Rule 29 motion because there was "no evidence that Defendants intended or were required as a condition of the grant to transfer any technology to the PRC" and no evidence of a relationship such that the PRC would benefit from the use of stolen trade secrets in a private company's operations. 2010 WL 8696087, at *7-8. The evidence here rises no higher. No Chinese government entity took an ownership interest in Zhisuan. There is no evidence of any technology transfer or transfer obligation. As the court in *Lan Lee* held, "[e]vidence that Defendant[] solely intended to benefit [himself] in the PRC, or benefit a private corporation in the PRC is insufficient for the charge of Economic Espionage." *Id.*

The government's effort to distinguish *United States v. Jin*, 833 F. Supp. 2d 977 (N.D. Ill. 2012), fares no better. Opp. at 9-10. The government argues that *Jin* involved a finding of not guilty after a bench trial where the court found any link between the private PRC employer and the PRC government to be too speculative, and that here the evidence of links to PRC governmental entities was more direct. But as demonstrated above, the "links" the government identifies are unsupported.

### 3. The Economic Espionage Jury Instruction Should Have Provided that the Government Must Prove Activity Coordinated With or Sponsored by a Foreign Government, Which the Government Failed to Prove.

In challenging Mr. Ding's argument that the Economic Espionage jury instruction should have required the government to prove activity coordinated with or sponsored by a foreign government, the government relies primarily on *United States v. Zheng*, 113 F.4th 280 (2d Cir. 2024). But *Zheng* is persuasive authority only. The controlling Ninth Circuit case is *United States v. Liew*, 856 F.3d 585, 597 (9th Cir. 2017), which explains that § 1832 is a general criminal trade secret provision while § 1831 "is designed to apply only when there is evidence of foreign government sponsored or coordinated intelligence activity." This is not dicta, as the government contends, but the Ninth Circuit's considered explanation of the purpose and structure of § 1831. Furthermore, the reasoning reflected in *Zheng* has been thoughtfully rejected by a district court in

9

this circuit. *See United States v. Lan Lee*, 2010 WL 8696087, at *4-6 (N.D. Cal. May 21, 2010) (legislative history, structure of the Economic Espionage Act, and plain meaning of "espionage" supported a coordination requirement).[6] Additionally, the government elected not to dispute that it presented no evidence of sponsorship or coordination. *See* Opp. at 32; *Lansdown v. Bayview Loan Servicing, LLC*, 2023 WL 2934932, at *4 (N.D. Cal. Apr. 12, 2023) (failure to respond is waiver).

        **4.**      **The Jury Instruction Regarding Economic Espionage Should Have Required the Jury to Find Mr. Ding Knew The Documents Included Trade Secrets, Which the Government Failed to Prove.**

Mr. Ding argued that the Court should have instructed the jury that it must find Mr. Ding knew the documents included trade secrets, based upon *United States v. Chung*, 633 F. Supp. 2d 1134, 1143 (C.D. Cal. 2009), and *United States v. Jin*, 833 F. Supp. 2d 977, 1012 (N.D. Ill. 2012). The government's Opposition dismisses those two decisions as non-binding on this Court, yet goes on to rely on another decision that is not binding on this court, *United States v. You*, 74 F.4th 378 (6th Cir. 2023). Opp. at 33. For the reasons addressed in Mr. Ding's opening brief, *Chung* and *Jin* offer the more persuasive reading of the statute. Mot. at 14. Under the instruction Mr. Ding requested, the evidence was insufficient because none of the trade secret documents was marked as an "L4" secret, many of the documents included no outward markings of confidentiality at all, many of the documents were shared with more than 160,000 people,[7] all in addition to Google's inconsistent, confusing, and inadequate security measures. Mot. at 14-15.

        **B.**      **The Government Failed to Prove the Essential Elements of Theft of Trade Secrets as to Mr. Ding's Intent (Counts One through Seven).**

The government's assertion that evidence that Mr. Ding did not use or disclose the trade secrets is "irrelevant" is again incorrect. Opp. at 13. Proof of use or disclosure may not be required to satisfy a separate element of Theft of Trade Secrets, but the lack of use or disclosure is certainly relevant to determining whether Mr. Ding intended to benefit someone other than Google and hurt Google. Next, the government characterizes the trial record as providing "overwhelming" evidence of intent. Opp. at 13. That characterization cannot be squared with the testimony its own witnesses

---

[6] Tellingly, the government did not present the economic espionage charges to the grand jury until after the Second Circuit issued its opinion in *Zheng* on August 28, 2024.
[7] Trial Ex. 1195 at 16, 18, 21-22.

10

gave that they found no evidence of sharing, use, or payment; that Mr. Ding's companies used open-source technology rather than Google's trade secrets; and that those companies were repeatedly rejected by investors and unsuccessful, and still Mr. Ding did not use Google's trade secrets. Mot. at 15-17. That Mr. Ding never used or shared the documents undermines any inference of criminal intent. Mr. Ding's alleged concealment of his activities does not show otherwise. Opp. at 14. The file names in Mr. Ding's personal Google Drive mirrored the naming conventions of the source documents. Trial Ex. 777. Mr. Ding uploaded the materials to a Google Drive account on a Google-issued computer that he knew was subject to monitoring. Trial Tr. 447:24-448:2.

**C.   The Government Failed to Prove the Essential Elements of a Trade Secret (All Counts).**

**1.   The Government Failed to Prove Google Took Reasonable Measures to Protect the Trade Secrets (All Counts).**

In its Opposition, the government belabors Google's security efforts and argues that the many gaps in Google's security measures that Mr. Ding detailed in his opening brief do not "matter under the law." Opp. at 17; Mot. at 18-19. The fact that Google took some measures to protect trade secrets does not make Google's measures reasonable. Rather, each lapse in Google's security apparatus is relevant to the question of whether Google's measures to protect its trade secrets were reasonable as a whole. *See Buffets, Inc. v. Klinke*, 73 F.3d 965, 969 (9th Cir. 1996) (company had not taken reasonable measures to protect its job manual where company had some protections but did not sufficiently enforce the protections or educate employees about secrecy or protection). Further, the government does not rebut the testimony of Google's employees admitting Google's significant security gaps and lapses, explain how the wide disbursement of purportedly highly sensitive technical documents to over 160,000 employees can be consistent with "reasonable measures," or demonstrate that a marking system so ambiguous that an employee cannot determine from a document's label whether it is confidential or public serves as a reasonable safeguard. Opp. at 17; Mot. at 18-19. It also offers no substantive answer to the defense's expert James Pooley, who testified that industry standards require clear and consistent labels, and a policy providing that all information is to be considered confidential is ineffective. Mot. at 19.

Even if Google's measures were generally reasonable (they were not), the government

11

failed to show they were reasonable or even applied as to the specific trade secrets at issue in this case and, in particular, the 15 alleged trade secrets the jury found were stolen trade secrets. The government asserts without any supporting citation that it "presented more than sufficient evidence that Google took reasonable measures to protect the stolen trade secrets, including the documents that made up each combination trade secret." Opp. at 18. But it does not dispute that neither Ms. Adkins nor Mr. Linton testified about Google's protective measures specifically as to the trade secret documents the jurors marked for Counts Four, Five, Seven, Ten, Eleven, and Fourteen (Exhibit Nos. 402, 407, 408, 410, 429, 431, 434, 448, 451, 461, and 462) or the combination trade secrets the jurors marked for Counts One-Three, Six, Eight-Ten, and Thirteen. This is significant because the trade secret documents had many different confidentiality markings (most had none), were shared more or less widely, and were treated differently under Google's policies. Trial Tr. 256:7-12; Trial Tr. 363:25-364:3; *see also* Mot. at 18-19. Exhibits 410, 429, 431, 434, 461, and 462 had no confidentiality markings and/or were shared with 160,000 people. Mot. at 14-15.

        **2.**      **The Government Failed to Prove that Category Three, Category Five, and Category Seven are Non-Public (Counts Three, Five, Seven, Ten, Twelve, and Fourteen).**

The government does not dispute that each of the 105 trade secret documents included some public information or that the jury found that only 15 of the 112 alleged trade secrets qualified as such. Opp. at 18-19, 24; Mot. at 19-20. Nonetheless the government argues that it was not required to prove that any specific part of a document was secret, relying on the general proposition that combinations of information can be secret even if some components are public. Opp. at 18. Mr. Ding does not dispute the notion that a trade secret may be a combination of public information. But the government must still prove that the identified combination as a whole is secret. The government failed to do so by presenting only conclusory testimony regarding secrecy for these materials.

*Nosal* and *O'Rourke*, the only cases cited by the government to support its argument, illustrate exactly why the government's proof is inadequate. In *Nosal*, which involved three source lists generated by the victim's executive search database that included both public and secret information, the government did far more than elicit testimony providing that the database included

12

some unidentified secret information, nor did the government in that case create the database. Rather, the government presented evidence that showed precisely what made the database secret as a whole, and that the victim created it:

> When launching a new search to fill an open executive position, Korn/Ferry teams started by compiling a 'source list' of potential candidates. In constructing the list, the employees would run queries in Searcher to generate a list of candidates. To speed up the process, employees could look at old source lists in Searcher to see how a search for a similar position was constructed, or to identify suitable candidates. The resulting source list could include hundreds of names, but then was narrowed to a short list of candidates presented to the client. . . . Searcher included data from a number of public and quasi-public sources like LinkedIn, corporate filings and Internet searches, and also included internal, non-public sources, such as personal connections, unsolicited resumes sent to Korn/Ferry and data inputted directly by candidates via Korn/Ferry's website. The data was coded upon entry; as a result, employees could run targeted searches for candidates[.]

*United States v. Nosal*, 844 F.3d 1024, 1030-31 (9th Cir. 2016).

Similarly in *O'Rourke*, the court made clear that "[f]or both O'Rourke and the jury to be on notice of what exactly the Government contended were the trade secrets at issue, the Government had to describe how the unique combination of information was a trade secret and not publicly known." *United States v. O'Rourke*, 417 F. Supp. 3d 996, 1006 (N.D. Ill. 2019). The court explained the evidence that the government had presented satisfied this requirement:

> [T]he Government argued to the jury that the unique combination of information contained in the lab reports constituted a trade secrets because it identified how Dura-Bar (1) tested products in development, (2) checked for potential defects, and (3) fine-tuned products in response to client complaints or concerns. Put differently, taken together, the lab reports showed precisely how Dura-Bar performed quality control. . . . [S]ome of the lab reports included in Category Two are available in the public domain. But even if a few of the documents within the Category were available in the public domain, the vast majority of them were not, and more importantly, no one other than Dura-Bar had access to *all* of them. The jury was therefore entitled to believe the Government's contention that the combination of lab reports together was a uniquely valuable set of information that constituted a trade secret.

*Id.*

Here, in contrast, the government did not present any evidence explaining what information was private or how this played in to the overall secrecy of the trade secret. The government did little more than ask Dr. Sanchez a yes or no conclusory question about whether each document or

13

combination contained some secret information. *See* Mot. at 20 (citing Dr. Sanchez's testimony regarding secrecy for Categories Three, Five, and Seven). This falls far short of the showings made in *Nosal* and *O'Rourke*, including the requirement "to describe how the unique combination of information was a trade secret and not publicly known." *O'Rourke*, 417 F. Supp. 3d at 1006.

> **3.    The Government Failed to Prove the Essential Elements of a Trade Secret as to the Combination Trade Secrets (Counts One, Two, Three, Six, Eight, Nine, Ten, and Thirteen).**

>> **a.    The Jury Instructions Should Have Required the Jury to Find that Google Maintained the Combination Trade Secrets, Which the Government Failed to Prove.**

The defense's opening brief marshaled substantial authority supporting the proposition that a combination trade secret requires its ***owner*** to have assembled the combination contemporaneously as a source of competitive value. Mot. at 21-23. Yet the government's Opposition does not address any of this authority. Opp. at 33-34. The government also expressly acknowledges the intuitive point that a combination must have been created by the trade secret owner, writing: "Based on the plain language of the EEA, information can constitute a trade secret regardless of how it is 'stored,' or 'compiled' ***by the trade secret owner*** . . . ." Opp. at 34 (emphasis added). Nor does the government dispute the defense's citation of evidence showing that the government, not Google, created the alleged "combinations." The government did not respond to the testimony that Mr. Ding cited in his opening brief showing that the government's witnesses could not establish that the trade secret owner, Google, created the combinations. Opp. at 34; Mot. at 23. And the government had no response to the defense's citation of the government's admission in pretrial filings that "***the government*** selected and organized a portion of the documents stolen by the defendant into trade secret categories." Dkt. 167 at 5. The government has consistently taken the position that none of this matters, and it is wrong.

Despite ample opportunity, the government has never cited a single criminal case in which the government brought a charge under the Economic Espionage Act for an alleged combination that the government (not the owner) assembled after the fact (not contemporaneously) for purposes of prosecution (not business). That is because it is inconsistent with the fundamental purpose of trade secret law, which is to protect confidential, commercially valuable information that provides

14

the trade secret owner with a competitive advantage. *See 3M v. Pribyl*, 259 F.3d 587, 595-96 (7th Cir. 2001) ("A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.").

> **b.     Even Under the Given Jury Instruction, the Government Did Not Prove the Combination Trade Secrets Qualify as Trade Secrets Because It Did Not Address Them in Any Detail.**

Even accepting arguendo the jury instruction as correctly given, the government's proof fails because no rational juror could conclude beyond a reasonable doubt that Mr. Ding is guilty based upon combination trade secrets in Categories One through Three and Six consisting of documents that the government never showed the jury and for which the government failed to elicit detailed testimony. The government's argument that its evidence was sufficient because the trade secret documents were admitted into evidence and the jury heard "detailed testimony about exemplar documents" and the "categories of documents as a whole" fails. Opp. at 20.

The government does not dispute that it showed and elicited detailed testimony about only 10 of the 46 documents that comprise Categories One through Three and Six. *See* Mot. at 25-26 (describing which documents were shown and walked through for each category). For the remaining 36 documents, the jury heard only general, conclusory testimony summarizing the documents. *Id.* (describing Dr. Sanchez's testimony about the "type of information" in or what the "technology is" that's reflected in these 36 documents). Even the government's rosy descriptions of Dr. Sanchez's testimony about these 36 documents show how cursory it was. For instance, the government provides the following descriptions of his testimony: "describing the TensorCore ISA"; "documents that discuss other accelerators designed by Google"; and "low-level software used to manage and control the TPU-based AI supercomputers." Opp. at 20-23.

The government argues that these summaries were sufficient because they were combined with more detailed testimony regarding portions of ten exemplar documents. Opp. at 20. But this argument just shows that the government invited the jury to speculate about the contents of 36 documents of all types that span hundreds of pages based on only a few pages from 10 sample documents. The government continues that the jury was not required to sift through every single

15

trade secret document and could rely solely on Dr. Sanchez's summary testimony, citing *United States v. Gudino,* 432 F.2d 433 (9th Cir. 1970) and *United States v. O'Rourke*, 417 F.Supp.3d 996 (N.D. Ill. 2019). Opp. at 19-20. In *Gudino*, a drug case, a percipient witness testified that he saw the defendant discard a pack of heroin, while other witnesses who were present did not observe this act. 432 F.2d at 434. The court explained that the testimony of one witness was enough to support the conviction and it was up to the jury to make credibility determinations. *Id.* But *Gudino* is inapposite because Dr. Sanchez's credibility is not at issue. The issue is the absence of non-conclusory testimony to establish the documents included trade secret information.

And in *O'Rourke*, the court disagreed with defendant's proposed jury instruction requiring the jury to unanimously agree on which specific information constituted a trade secret, reasoning (as the government quoted) that "[t]he jury was not required to sift through every single lab report and declare, one by one, that each document was a trade secret in order to find that a given category of documents, such as the lab reports, constituted a trade secret." 417 F. Supp. 3d at 1007. The government conveniently failed to include, however, the rest of the *O'Rourke* court's reasoning: "The jury saw the reports and listened to Dura-Bar employees testify regarding the role and similarity of the reports. The jury was entitled to conclude that the reports highlighted by the Government were, in fact, representative of the lab reports as a whole." *Id.* Unlike *O'Rourke*, here each category did not consist of similar lab reports or documents that reflected the same process of the trade secret owner, but was a seemingly random group of documents of different types, about different components or different versions of a vast system, and part of much larger collections.

**c.**    **There Is Insufficient Evidence that the Combination Trade Secrets Had Independent Economic Value.**

The government opposes Mr. Ding's argument that the government failed to show any added value from the combination trade secrets by simply quoting testimony from Dr. Sanchez and Dr. Chandra that the combinations provided "more complete pictures" and "complementary information." Opp. at 21-23. But that testimony does not respond to Mr. Ding's actual argument: that the government established simply that more information is more valuable, not that there was any added value beyond just the sum of the constituent pieces. Mot. at 27-28. The government cites

16

no such evidence. Combination trade secrets require value derived from the combination itself, not value that simply tracks the sum of the constituent documents. Otherwise, any group of trade secret documents would automatically qualify as a combination trade secret. *See* Mot. at 27-28.

> **d.    The Government Failed to Prove the Essential Elements of Trade Secrets.**

The government fails to meaningfully oppose Mr. Ding's argument that the jury's verdict is inconsistent. Opp. at 23-24; Mot. at 28-29. It points to its own (incorrect) statements during closing argument, but ignores the verdict form itself, which expressly instructed the jury to check every trade secret upon which it unanimously agreed: "If you have found the defendant guilty of Count One, you must indicate with an 'X' which one or more of the following you agree unanimously constitute a trade secret." Dkt. 367. And because "[a] jury is presumed to follow the trial court's instructions," *Deck v. Jenkins*, 814 F.3d 954, 979 (9th Cir. 2016) (citation omitted), the only conclusion to be reached is that the jury did not unanimously agree that the constituent documents for Categories One through Three and Six were trade secrets. The government's contrary suggestion that the jury simply "did not feel the need to go document by document after determining that the combination itself was a trade secret" (Opp. at 24) is speculation that violates the presumption that the jury followed the court's instructions.

The government next asserts that Mr. Ding's reliance on *O'Rourke* "strains credulity." Opp. at 28. On the very same page of the *O'Rourke* opinion that the government cites, though, the *O'Rourke* court clearly explains that the jury there was required to identify a trade secret in one or more of the constituent lab reports:

> While O'Rourke contends that the Government improperly benefitted from the unique combination jury instruction by being able simply to point to the conglomeration of reports as trade secrets, . . . the Court *also* instructed the jury that the information also had to be a trade secret . . . . In reaching their verdict that the Category Two lab reports contained a trade secrets, the jury first had to identify a trade secret in the lab reports, including finding that all of the criteria for defining a trade secret had been met. The jury clearly did so.

417 F. Supp. 3d at 1006. Contrary to the government's understanding, *O'Rourke* supports the proposition that a combination trade secret may not be found in the absence of the jury finding some particular constituent information that is a trade secret. This the jury did not do.

17

**RULE 33 MOTION**

## II.    ARGUMENT

### A.    The Government Failed to Adequately Identify the Relevant Trade Secrets, Resulting in an Unfair Trial.

The government's overbroad, convoluted disclosures forced Mr. Ding to prepare to defend against 2,400 pages of documents plus 17 combinations, only for the government to focus on a handful of snippets from 18 documents and seven combinations while glossing over, withdrawing, or ignoring the remaining 87 documents and 10 combinations. In its Opposition, the government argues that because it "alleged (and proved) that each document and combination was a trade secret," no further identification was needed. Opp. at 25. This circular argument runs contrary to well-established law requiring the government to identify its trade secrets with particularity in order to avoid exactly what happened here: an "uncertain and shifting landscape" caused by an overbroad universe of potential trade secrets. *United States* v. *Liang Chen*, 2020 WL 6342931, at *5.

Neither the government's December 15, 2025 letter identifying 33 documents it intended to "focus on" at trial nor Dr. Sanchez's expert disclosure, were sufficient to cure the government's inadequate trade secret identifications, nor did the government explain why it deviated at trial so significantly from the letter. *Roughly half of the 33 documents identified in the letter were not even shown to the jury*. For those documents that were shown to the jury, only a few pages of each document were addressed in any detail. Moreover, the letter reaffirmed that the government intended to "elicit testimony relevant to each of the [105] trade secret documents" (Dkt. 394-5), forcing Mr. Ding to attempt to fully prepare as to all 105 documents. The same can be said about Dr. Sanchez's disclosure, which identified some page ranges, but included no commitment that these were the definitive identifications of the government's alleged trade secrets. *E.g.*, Dkt. 159-7. None of these disclosures provided adequate certainty of the identity of the trade secrets, making it difficult to identify the most effective defenses given the fact that the boundaries of the alleged trade secret may change what defenses would be available.

Both cases cited by the government reaffirm that its disclosures were inadequate. While the *United States v. Liew* court found that the prosecution sufficiently identified a document as an

alleged trade secret, in that case the government did not allege certain *portions* of that document were standalone trade secrets or that the document was part of numerous combinations. 2013 WL 2605126, at *8 (N.D. Cal. June 11, 2013). The same goes for *Levandowski*, where the court found the identification of specific documents as a whole to be sufficient on the basis that the trade secrets "are the implementation of each of the files in its entirety, not a subset of specific elements therein." *United States v. Levandowski*, 19-cr-00377-WHA, Dkt. 66 at 2 (N.D. Cal. Dec. 4, 2019). Here, in contrast, the government alleged that certain elements within documents were standalone trade secrets (a theory it abandoned at trial), the documents themselves were separate trade secrets, and that documents were part of numerous compilations (a theory it partially abandoned at trial).

Last, despite the government's assertion to the contrary, the record is rife with instances of actual confusion that resulted from the government's inadequate and convoluted identification of alleged trade secrets. *See, e.g.*, Trial Tr. 1818:7-9 (The Court: "So I guess I'm feeling a little confused now about this concept of a single document being both a trade secret and a compil -- and something called a compilation trade secret.").

**B.    The Court's Rulings Regarding the Defense's Experts Resulted in an Unfair Trial.**

Mr. Ding was prejudiced by rulings against two of his experts, Isaac Pflaum and James Pooley. As to Mr. Pflaum, the government's ever-changing and expanding *Daubert* arguments and resultant delay in a definitive ruling meant that Mr. Ding was left with an impossible choice on the eve of trial: proceeding with an expert whose admissibility was uncertain or rapidly substituting a new expert. When Mr. Novak was ultimately allowed to testify, he had only three weeks to review technical documents spanning over 2,400 pages, while the government's expert Dr. Sanchez had been reviewing them for over a year. The government does not deny that it exploited this disparity by pointedly asking Mr. Novak and Dr. Sanchez about their time spent. Mot. at 33.

The government claims that Mr. Ding was "on notice" that Mr. Pflaum was deficient since it filed its first *Daubert* motion in September 2025. Opp. at 28-29. Incorrect. The government filed three separate *Daubert* motions against Mr. Pflaum through late December 2025 (weeks before the trial was set to commence), the first a narrow motion with each additional filing raising a new set

19

of issues. At no point did the Court rule conclusively on any of them, instead scheduling a mid-trial *Daubert* hearing which caused Mr. Pflaum's admissibility to remain uncertain and forced Mr. Ding to make the difficult decision to substitute Mr. Novak on the eve of trial.[8]

As to Mr. Pooley, the preclusion of testimony on whether Google's security measures met industry standards significantly prejudiced Mr. Ding. Courts frequently admit such opinions as proper expert testimony. Mot. at 33-34; *see also* Dkt. 170. The government cites no case law for its assertion that such testimony is improper and does not refute Mr. Ding's prejudice. Opp. at 29; Mot. at 33. The government's assertion that "the EEA does not require expert testimony on reasonable measures" is beside the point—this does not mean the exclusion of such testimony was harmless. Opp. at 29.

**C.     The Court's Jury Instructions Were Confusing or Misleading and Resulted in an Unfair Trial.**

As described in Sections I.A.3, I.A.4, and I.C.3.a, *supra*, jury instructions 13 (Trade Secret-Defined), 15 (Trade Secret-Elements), and 16 (Economic Espionage) were confusing and misleading, resulting in an unfair trial and warranting a new trial.

**D.     The Guilty Verdicts Are Against the Cumulative Weight of the Evidence.**

For all the reasons described above and in Mr. Ding's opening brief, the guilty verdicts returned are against the manifest weight of the evidence and a new trial is warranted.

**CONCLUSION**

For the reasons discussed above and in Mr. Ding's opening papers, the Court should grant Mr. Ding's motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) and enter a judgment of acquittal on all counts. *See* Appendix 3. In the alternative, the Court should order a new trial pursuant to Federal Rule of Criminal Procedure 33.

Respectfully submitted,

Dated: March 26, 2026                    By: /s/      *Grant P. Fondo*
                                         GRANT P. FONDO (SBN 181530)
                                         *GFondo@goodwinlaw.com*

---

[8] Mr. Ding appreciates the Court's consideration regarding Mr. Pflaum throughout the process.

20

DARRYL M. WOO (SBN 100513)
*DWoo@goodwinlaw.com*
RACHEL M. WALSH (SBN 250568)
*RWalsh@goodwinlaw.com*
JESSICA HUANG FUZELLIER (SBN 315208)
*JHFuzellier@goodwinlaw.com*
FARZAD FEYZI (SBN 343538)
*FFeyzi@goodwinlaw.com*
DAVID RAPP-KIRSHNER (SBN 344494)
*DRappKirshner@goodwinlaw.com*
NIRAV BHARDWAJ (SBN 350829)
*NBhardwaj@goodwinlaw.com*
NICHOLAS C. WILEY (SBN 351161)
*Nwiley@goodwinlaw.com*
COLETTE A. LOWRY (SBN 359889)
*CLowry@goodwinlaw.com*
**GOODWIN PROCTER LLP**

LORA J. KRSULICH (SBN 315399)
*LKrsulich@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, Suite 4100
Los Angeles, CA 90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Attorneys for Defendant:
LINWEI DING

21

*United States v. Ding*, Case No. 3:24-CR-00141-VC
Reply in Support of Motion for Judgment of Acquittal –
Bases for Acquittal for Each Count of Second Superseding Indictment

| Count | Lack of EE Intent and Knowledge | Lack of TS Intent | No Reasonable Measures | Not Secret | Combination TS Issues |
|---|---|---|---|---|---|
| One | | X | X | | X |
| Two | | X | X | | X |
| Three | | X | X | X | X |
| Four | | X | X | | |
| Five | | X | X | X | |
| Six | | X | X | | X |
| Seven | | X | X | X | |
| Eight | X | | X | | X |
| Nine | X | | X | | X |
| Ten | X | | X | X | X |
| Eleven | X | | X | | |
| Twelve | X | | X | X | |
| Thirteen | X | | X | | X |
| Fourteen | X | | X | X | |

**Appendix 3**

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on **March 26, 2026**. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on **March 26, 2026**.

*/s/ Grant P. Fondo*
Grant P. Fondo