# Exhibit F

**Volume 1**

**Pages 1 - 195**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
  VS.                           )  **NO. 3:24-CR-00141-VC**
                                )
LINWEI DING, a.k.a. LEON DING,  )
                                )
          Defendant.            )
_____ )

San Francisco, California
Monday, January 12, 2026

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
> CRAIG H. MISSAKIAN
> UNITED STATES ATTORNEY
> 450 Golden Gate Avenue, Box 36055
> San Francisco, California 94102-3495
> **BY:  CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
> **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**
>
> CRAIG H. MISSAKIAN
> UNITED STATES ATTORNEY
> 1301 Clay Street, Suite 340S
> Oakland, California 94612-5217
> **BY:  MOLLY K. PRIEDEMAN**
> **ASSISTANT U.S. ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Defendant:

GOODWIN PROCTER LLP
525 Market Street
San Francisco, California 94105
BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
**DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
**RACHEL M. WALSH, ATTORNEY AT LAW**
**COLETTE A. LOWRY, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, California 94063
BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
**FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 South Figueroa Street, Suite 4100
Los Angeles, California 90017
BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:        **Andrea Valladao, Federal Bureau of**
**Investigation**
**Vernonica Hernandez, Paralegal**
**John Jay, Trial Technician**

(Discussion off the record.)

**MR. BOOME:**  As the defendant stole those documents from Google and continued to work for Google, he secretly founded his own artificial intelligence supercomputing company in China, and he pitched it to investors by telling them that he could replicate Google's technology.

This is the defendant on a stage in Beijing, China's capital city.  The date is November 24th, 2023, and the defendant's giving a speech to a room full of investors about his AI start-up company.

He told the crowd on that day that his company could create a product for artificial intelligence supercomputing that was better and faster that anything else that existed in China at the time.

He told the crowd that he was one of only ten people in the entire world who could build a product like this, and he could do it because of his experience at Google.

He told the crowd that when he worked for Google, he was the architect, he led the teams who built Google's artificial intelligence supercomputers, and he told the crowd that he could copy that technology in China.

The evidence will show, members of the jury, that while he was on this stage, the defendant's secret was that he was not who he said he was.  He was not the architect of Google's artificial intelligence supercomputers, and he wasn't

a former Google employee at all.

As he stood there on that stage in Beijing, he was still working for Google as a mid-level software engineer.  And for the 18 months leading up to this presentation, this moment on stage, the defendant had been stealing over 1200 documents containing proprietary technology, including trade secrets, about Google's AI supercomputers.

This is technology that it took Google engineers more than a decade to develop.  It's technology that Google keeps secret.  And the evidence will show that the defendant knew that when he took it.

While the defendant stole these documents and while he continued to work for Google the entire time, he secretly founded the start-up company that he's on stage talking about right here.  And he hid it all.  He hid it all from Google. And during this trial, you're going to hear some of the extraordinary things the defendant did to keep this all a secret while he stockpiled the documents and founded his company.

You'll hear, for example, that the defendant lied to a Google investigator about the documents he had.  You will hear that he impersonated a senior-level Google executive.  You'll hear that he deleted evidence from his Google computer once he found out that he was caught.  And you will hear the way he hid this trip to China from Google.

company.  And that's what this case is about.  That's what the charges in this case allege.

I'm going to talk for a little bit about those charges now.  The defendant is charged with seven counts of theft of trade secrets and seven counts of economic espionage.

And before I mention some things about the charges, I want to remind you quickly about something that you learned during jury selection, which is that it's the judge in the case that will give you your legal instructions.  And that'll happen at the very end of the case when Judge Chhabria instructs you on what the law is.  So that's not what I'm doing now.  I'm just giving you a high-level preview of some of the concepts you'll hear about, and I hope that that will help you put some of the evidence in context.

Theft of trade secrets means stealing technology that is valuable, secret, and protected, intending to use it for the benefit of somebody other than the owner.  And in this case, what we intend to prove is that the defendant stole Google's AI technology and intended to benefit himself and the company that he founded secretly in China.

The economic espionage charges are similar.  What they're about is stealing a trade secret knowing or intending that stealing that trade secret will benefit a foreign government or any organization controlled by a foreign government.  And in this case, we're talking about

the government of China because that's where the defendant went with these trade secrets.

Espionage is in the name of the crime, but this is not a case about spying.  Mr. Ding is not James Bond, and you will not hear any type of evidence like that in this case.  It's about what Mr. Ding intended to do with the trade secrets when he stole them and kept them.

We are the Government.  We have the burden of proof in this case, and we intend to meet that burden by proving to you that the defendant's guilty beyond a reasonable doubt.  But there are some things that we don't have to prove, and I want to mention a couple of them now.

We do not have to prove that the defendant gave the trade secrets to anyone.  We don't have to prove that he shared them with anyone.  We don't have to prove that he actually successfully used them to build a product for his start-up company.  What matters for these charges is what the defendant intended to do with the trade secrets at the time he stole them and at the time he kept them.

So why seven counts of each charge?  It's because there are seven trade secret categories in this case, seven categories of information, each relating to a different aspect of Google's AI supercomputing technology.

And I cannot sugarcoat this part for you because it is true that when it's time for you to learn about these trade

that will show you what it takes to log into a Google computer and get into the Google network where the company's technology and confidential information is stored.  The way that process works is, first, sit down at your Google computer, enter a username and password.  That gets you into the laptop, but it doesn't get into the network where the technology and documents are stored.

There's another step you have to take to get into the network, which involves entering another set of username and password, more credentials.  And then you have to touch your finger on a specialized device that Google gives to all its employees.  It plugs into your laptop and it scans your finger to make sure that you are a real person and you are the right person, a trusted employee.

Once you take those steps and you can get into the network where the documents and technology are stored, pretty much everything that goes on in that network is tracked and logged by the security system.  Documents that are visited by Google employees, every document that's printed, shared, uploaded, downloaded, all that activity is logged and tracked by the security system.  It goes into a database, and it's used by an automated threat detection system to try to detect and find out when something is going wrong, if there's any threat to the company's data from the inside or from the outside.

So with all this in place, with this system, what I

want to talk about now is how the defendant managed to get around it to take 1200 documents outside the company.

During this trial, you're going to hear from a witness from the Google security team, and his name is Matt Linton. Matt Linton was part of the team that responded and initially was a part of Google's internal investigation of the defendant once they found out what he was up to.  He'll explain that the way the defendant created the documents that he stole helped him avoid detection by Google's security system.

So let's walk through the steps that the defendant took to get these documents containing Google's proprietary technology off the network.

His first step was to go to the internal documents in the Google network that contained the confidential and the trade secret technology.  He visited these documents, but it wasn't these source documents that he transferred off the network.  Instead, what he did was he copied information from the internal documents.  He copied text, he copied diagrams, tables, schematics, you name it.  Everything in the documents that he wanted to take, he copied and pasted them into the Apple Notes application on his Google work computer.

Apple Notes is like a digital notebook that comes standard on Mac products, on Apple products like the one Google gave the defendant to do his work.

He pasted the information from the source documents

into the Apple Notes, and when he had what he wanted, he converted them to PDFs and uploaded them off the network.

PDFs are a type of document that's easy to send digitally from place to place.

Once he had the PDFs, he sent them from his Google computer, uploaded them to a personal cloud account that he controlled, linweidin@gmail.com.

Mr. Linton will explain that while the defendant copied the confidential and trade secret information from the source documents, he did not copy a lot of the identifying information for those documents.

For instance, many of the documents the defendant stole from had confidentiality markings on them.  He didn't copy those.  Many of the documents the defendant stole from had the names of the authors, the names of the inventors on the documents, but he didn't copy that either.

And what Mr. Linton will explain is that the absence of that identifying information made it more difficult for the automated security system to find out what the defendant was up to when he was transferring files off of the Google network to his personal account.

Another witness you'll hear from about how the defendant stole the documents is an independent expert named Andy Crain.  He is a computer forensics expert.  And he's looked at the digital evidence that was recovered in this case,

and what he'll explain to you is that in total, over the course of about a year, between May of 2022 and May of 2023, the defendant transferred 1,255 documents, a total of over 14,000 pages, including more than 4,000 individual screenshots, from his Google computer to this personal cloud account.

105 of those documents are the trade secret documents that this case is going to focus on, 105 from that group.

Now I want to change gears and talk about the evidence you'll see in this trial that shows what the defendant intended to do with the information he stole from Google.  And the reason that you'll get to see some of this evidence, and it will include -- it'll include all the things that the defendant was trying to hide from Google at the time.  It'll include evidence about the things he said and the things he did as he was founding his start-up company, his artificial intelligence start-up company in China and marketing that company to investors.

And the reason you'll get to see this information at this trial is because Special Agent Valladao and her team got a search warrant for the defendant's home, his computer, his phone, some of his other electronic devices, and the cloud account that he sent the trade secret documents to.

When Special Agent Valladao testifies later in the trial, she'll walk you through a timeline that's apparent from the evidence that she recovered, and it starts in 2019 when the

chief technology officer.  By this time, by November of 2022, he had uploaded an additional 500 documents, including more than 50 of the trade secret documents in this case.

But soon after he arrived in Beijing, the defendant and the CEO of Rongshu started a new business plan.  They had a new idea for an artificial intelligence supercomputing company that was called Zhisuan Technology.  They started trying to raise money for this company.

And you're going to hear about something that happened on April 17th of 2023, when the defendant and his partner had a big meeting with a Chinese investment bank, a big investment bank based in China.  It was on the day of this meeting, when they met with this -- these investors to pitch the artificial intelligence supercomputing company, that the defendant transferred the largest batch of confidential and trade secret documents in the case, nearly 400 documents in total and over -- and 50, exactly 50 of the trade secret documents in this case.

But the month after, in May of 2022, the defendant broke away from his business partner and he took over the company himself.  He took over Zhisuan Technology himself and he became the company's CEO.  The first thing he did was apply for the MiraclePlus program.

Before I talk about MiraclePlus, I just want to make clear, this whole time, the defendant was still working

full-time for Google.  He never told Google that he had become the CTO of Rongshu in Beijing.  He never told Google that he had founded his own AI start-up company because, as you'll hear from Google witnesses, had he told them that, he would have been fired and his access to Google's technology would have been terminated.  So this whole time he's working for Google, collecting his Google paycheck, and still has access to Google's confidential internal information.

So MiraclePlus.  You'll hear during this trial that MiraclePlus is a start-up incubation program, and what you'll hear is that that means it is a program where start-up company founders apply.  If they get accepted, they'll get investment capital.  They'll get introductions to investors and help making a business plan and pitching that business plan to investors.

You'll hear about some things that the defendant did during his application process to this program, and I'm going to mention two of those things right now.

First, as part of his application, the defendant needed to submit a product demonstration video for the product that he claimed his company could build.  But instead of doing that, what he did was he took his Google work computer and he took a video of some Google technology running on his computer. He took that video and he sent it to MiraclePlus, claiming that it was a product demonstration video for a product that his

company had created.

The second thing he did during the application process that you'll learn about is he faked a professional reference from a senior-level Google executive. During his application to MiraclePlus, they asked him for a professional reference. The name the defendant gave was Aamer Mahmood.

The real Aamer Mahmood is a senior-level Google executive, very high up the food chain at Google, like the defendant's boss's boss's boss's boss or maybe even more layers than that.

The defendant gave MiraclePlus Aamer Mahmood's name and he gave them an email address, aamermahmood@gmail.com.

You're going to hear from the real Aamer Mahmood during this trial. He will tell you he has never met the defendant. He doesn't know the defendant. The defendant never asked him to be a reference for him. And he's going to say that aamermahmood@gmail.com is not his email address.

The defendant made it up. It's a complete fake. The defendant created it so that he could communicate with MiraclePlus pretending to be Aamer Mahmood. And you will see some of the emails that the defendant exchanged with MiraclePlus pretending to be his boss's boss's boss.

So the fake product demonstration video and the fake reference worked. The defendant got into the program. And you'll see the investment agreement, the contract that he

signed with MiraclePlus during this trial.

That contract says that the defendant promises to give 7 percent equity in Zhisuan, his company, to MiraclePlus in exchange for 5 million yuan.  The yuan is the Chinese currency.  And you'll learn that at the time, 5 million yuan was worth a little more than 700,000 U.S. dollars.

So the culmination, the culmination of this program, the MiraclePlus program, was that speech that you saw at the beginning of this presentation.  This is the investor conference in Beijing, the MiraclePlus conference that took place on November 24th, 2023.

Special Agent Valladao will show you some of the evidence that she found that shows what the defendant planned to say to the investors that day and how he planned to pitch his company at this meeting.

You will hear, in the defendant's own words, a video of what he planned to say to the investors.  You'll hear him say that his company can create a product that can connect tens of thousands of computer chips into one and make them work like a supercomputer.  You'll hear him say he was one of only ten people in the world who can do this because he worked at Google and he built Google's supercomputers and he can replicate Google's technology in China.

I want to talk for a little bit about the things the defendant said he could do to help groups and organizations

controlled by the government in China develop their AI technology. But, again, here, it's important that I pause and say that it's not a crime to want China to succeed. It's not a crime to want to help China. That's not what the economic espionage charges in this case are about.

What they're about, again, is stealing technology that doesn't belong to you, that you didn't invent, stealing secret technology invented by other people and owned by someone else, and then trying to help a foreign government create the same technology that you stole.

And the reason that this trial's going to focus a lot on entities and organizations that are controlled by the Chinese government is because that's where the defendant went with this information.

So some of the evidence you'll hear, about how the defendant intended to help these organizations, you'll hear that he tried to create partnerships between his company, Zhisuan, and a government investment fund, a state-run research university, and a government-sponsored high-tech zone. And when it comes -- and I'll talk about what that means in a second.

When it comes time to learn about how the government in China directs the economy and how these organizations are connected to the government, you're going to have expert guidance during that part of the case too. This time from Adam

Segal.  Dr. Segal is an academic, he works at the Council on Foreign Relations, and he's an expert on the government and the technology industry in China.

And what he's going to explain is that the Chinese government, the government in Beijing, directs and controls the national economy in a way that's much different than the government interacts with the economy here in the United States.  He'll explain that the government controls state-run universities and charts a course for where it wants the economy to go.

And Dr. Segal will explain that most recently, artificial intelligence technology and artificial intelligence supercomputing technology is a major priority for economic development in China.  And one of the ways that the government promotes the development of this technology is by something called high-tech zones.

Dr. Segal will explain what those are.  And he'll actually tell you a story about something that happened here back in the 1980s, when a group of government officials from China came to Silicon Valley.  And what they wanted to do was learn about how and why Silicon Valley was successful.

Dr. Segal will explain --

**MS. KRSULICH:**  Objection, Your Honor.

**THE COURT:**  Overruled.

But I'll just remind everybody that the lawyers'

statements are not evidence, and you'll -- the statements that the lawyers make are designed to help you understand the evidence, but what really matters is the evidence that comes in at trial.

You can proceed.

**MR. BOOME:**  So what Dr. Segal will explain is that when these officials came here to Silicon Valley, their goal was to learn about what made Silicon Valley successful.  And when they went back to China, they started high-tech zones to try to replicate the recipe for success that they saw.

So what they brought together, as Dr. Segal will explain, is they brought together universities, they -- universities, venture capital, private sector businesses, and spaces for technology companies to grow.  That's what a high-tech zone is.  So the government brings all those things together and tries to innovate.

Dr. Segal will explain that all of these high-tech zones are controlled and sponsored by the Government.  And you'll see evidence that the defendant tried to build -- offered to build an artificial intelligence supercomputer for one specific high-tech zone in a place called Chongqing.  And you'll hear a lot more about that during the trial.

While the defendant was on the stage, giving this presentation, he actually -- he made reference to the high-tech zone, the state-run university, and the government investment

fund that he was seeking to create partnerships with.

But now I want to transition and talk about some of the other ways that the defendant told this crowd why his company could do what he claimed it could do.

So you see him here in this photo standing behind a giant white screen giving a speech to a room full of investors. And I want to show you one of the other slides that appeared behind him.  This is obviously a translated version, an English translation of the original Mandarin.

[As read]:

"Why we can do it.  We developed Google's tens-of-thousands-of-cards compute platform, replicate and upgrade it, and then build a platform adapted to domestic conditions."

What you'll learn is that the tens of thousands of cards compute platform, what that means is an AI supercomputer that connects tens of thousands of chips.

In this slide, the defendant stood on stage behind these letters that say [as read]:

"Replicate and upgrade.  We developed Google's technology, and we can replicate and upgrade it."

The red text was in the original.  That's not something we added.

I want to look at another presentation that the defendant prepared to pitch his company, and I want to look at

absolutely false.  He did not do the things that he said he did.  He did not build a 60,000-TPU supercomputer.  He did not build a 26,000-GPU supercomputer.

And I don't say that, you know -- I don't mean to demean the defendant's actual experience as a software engineer at Google.  I am 100 percent certain that I would be fired on Day One as a low-level software engineer.  So I'm not mentioning -- I'm not mentioning this to demean the defendant's experience.  But the reason I'm mentioning it is because it is a fact that the evidence will show in this case that this is not who the defendant was.  He didn't have this experience.

But what he did have by the time he said these things was the stolen trade secret documents that contained information about Google's TPU-based supercomputers and GPU-based supercomputers.

Sorry.

Okay.  Finally, I want to talk to you about the things the defendant did to hide what he was up to from Google, hide his theft of the documents, and hide his creation of his start-up company in China.

First, he lied to a Google investigator about the fact that he had these documents.  That happened in December of 2023 when the defendant was interviewed by a Google investigator about some documents that he had uploaded in early December of 2023.

December 8th, 2023.  It says [as read]:

"I have searched my personal possessions, including all devices, accounts, and documents in my custody or control for any non-public information originating from my job at Google (except personal information).

"I have permanently deleted or destroyed all copies of such information.  And as a result, I no longer have access to such information outside the scope of my employment."

At the bottom, he swears he's "attesting to the truth of these representations and I may face discipline or termination if anything proves untrue."

Six days later, six days after he signed this document, he went into that personal cloud account where he had his secret stash of more than 1200 documents, including the trade secret documents in this case, he copied every single one of them, and made a backup copy on his personal computer.  That was December 14th, six days after he signed this.

I mentioned earlier, when he was on that stage in Beijing giving the speech to the MiraclePlus crowd in November of 2023, he didn't have his Google access badge with him in China because he had left it with his former intern, and he told her to swipe the badge on Google's Sunnyvale campus while he was gone so that it would make it look like he was showing

PROCEEDINGS

Thank you.

THE COURT:  Okay.  Thank you.

MS. KRSULICH:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Proceedings adjourned at 3:27 p.m.)

---o0o---


**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:  Monday, January 12, 2026


_Ana Dub_

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter

**Volume 2**

**Pages 196 - 414**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,    )
                             )
          Plaintiff,         )
                             )
  VS.                        )  **NO. 3:24-CR-00141-VC**
                             )
LINWEI DING, a.k.a. LEON DING, )
                             )
          Defendant.         )
_____)

San Francisco, California
Tuesday, January 13, 2026

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

              CRAIG H. MISSAKIAN
              UNITED STATES ATTORNEY
              450 Golden Gate Avenue, Box 36055
              San Francisco, California 94102-3495
          BY: **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
              **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

              CRAIG H. MISSAKIAN
              UNITED STATES ATTORNEY
              1301 Clay Street, Suite 340S
              Oakland, California 94612-5217
          BY: **MOLLY K. PRIEDEMAN**
              **ASSISTANT U.S. ATTORNEY**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:
                          GOODWIN PROCTER LLP
                          525 Market Street
                          San Francisco, California 94105
                    BY:   **DARRYL M. WOO, ATTORNEY AT LAW**
                          **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
                          **RACHEL M. WALSH, ATTORNEY AT LAW**
                          **COLETTE A. LOWRY, ATTORNEY AT LAW**
                          **NICHOLAS C. WILEY, ATTORNEY AT LAW**

                          GOODWIN PROCTER LLP
                          601 Marshall Street
                          Redwood City, California 94063
                    BY:   **GRANT P. FONDO, ATTORNEY AT LAW**
                          **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

                          GOODWIN PROCTER LLP
                          601 South Figueroa Street, Suite 4100
                          Los Angeles, California 90017
                    BY:   **LORA J. KRSULICH, ATTORNEY AT LAW**


Also Present:             **Andrea Valladao, Federal Bureau of**
                            **Investigation**
                          **Veronica Hernandez, Paralegal**
                          **John Jay, Trial Technician**

at all, that means most of the documents that are alleged to be trade secrets in this case have no marking on them and are not confidential; right?

A.   I don't think a lack of marking necessarily implies they're not confidential.  Again, you have to assess the nature of the documents in order to understand the sensitivity.

Q.   Most of the documents in this case are not labeled at all; right?

A.   I would say most of the documents in this document -- if you assert to me the numbers, which could be checked -- I would agree are not marked, but that does not mean they're not sensitive.

        MS. KRSULICH:  Could we scroll up to the first -- sorry.  Could we please scroll up to the first page of this document, the demonstrative.

BY MS. KRSULICH:

Q.   The third column, it reflects the "Alleged Trade Secret File Title"; right?

A.   Correct.

Q.   You testified that that is the file name that Mr. Ding gave to the documents?

A.   I don't remember if Mr. Ding gave these names to the documents or if this is the way the system created them.  That mechanism, I'm not familiar with.

Q.   You testified that the third column is the file name of

**Q.**   Okay.  And then I'd like to look at just one more ISA.

        **MR. RAPP-KIRSHNER:**  Mr. Jay, could you pull up Exhibit 47.

**BY MR. RAPP-KIRSHNER:**

**Q.**   So this is a source document entitled "TensorCore Instruction Set Architecture JFC DFC."

       Mr. Linton, there's no confidentiality label on this first page; correct?

**A.**   I do not see an explicit label.

        **MR. RAPP-KIRSHNER:**  Mr. Jay, could you please scroll for about ten seconds again.

        And then, Mr. Jay, could you please scroll to the bottom.

**BY MR. RAPP-KIRSHNER:**

**Q.**   Mr. Linton, there's no confidentiality label in any of these pages we've just viewed; correct?

**A.**   I haven't seen any.

**Q.**   Mr. Linton, isn't it true that roughly 100 of the 175 source documents had no confidentiality markings on them whatsoever?

**A.**   Almost all of the documents had either an access control explicitly set or a confidentiality marking.

**Q.**   But I asked just about the confidentiality label.

**A.**   Oh.

**Q.**   Isn't it true that 100 of the 175 source documents had no

confidentiality label?

**A.**    I don't know if the number is a hundred.  That seems high.  But a number of them had no labeling.

**Q.**    Isn't it true that Google designated its most confidential documents as L4 Secret?

**A.**    That's not a Google-wide designation.  That's a designation that was used by the particular AI team that designated some of their files that way.

**Q.**    So for some of these files, the most confidential document label would be L4 Secret; correct?

**A.**    There was a subset of them where the owner of the documents made their own kind of more granular classification scheme than we usually use.  They had four levels.  All of them were pretty secret, but I think L4 was only accessible to individual precleared people.

**Q.**    And none of the 175 source documents had that label; correct?

**A.**    Not that I recall, although a number of the documents were only accessible to individuals.

**Q.**    So wouldn't the most confidential documents be the crown jewels of Google?

**A.**    Again, that's kind of a colloquial term we use.  We don't really have, like, the crown jewels.  We have a lot of product areas, some of which you may consider -- like, self-driving car material for Waymo would be highly sensitive.  AI material for

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Wednesday, January 14, 2026

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter

**Volume 3**

**Pages 415 - 652**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
   VS.                             )   **NO. 3:24-CR-00141-VC**
                                   )
LINWEI DING, a.k.a. LEON DING,     )
                                   )
          Defendant.               )
_____    )

San Francisco, California
Wednesday, January 14, 2026

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
              BY:   **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                    **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612-5217
              BY:   **MOLLY K. PRIEDEMAN**
                    **ASSISTANT U.S. ATTORNEY**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:
                        GOODWIN PROCTER LLP
                        525 Market Street
                        San Francisco, California 94105
                BY:    **DARRYL M. WOO, ATTORNEY AT LAW**
                        **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
                        **RACHEL M. WALSH, ATTORNEY AT LAW**
                        **COLETTE A. LOWRY, ATTORNEY AT LAW**
                        **NICHOLAS C. WILEY, ATTORNEY AT LAW**

                        GOODWIN PROCTER LLP
                        601 Marshall Street
                        Redwood City, California 94063
                BY:    **GRANT P. FONDO, ATTORNEY AT LAW**
                        **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

                        GOODWIN PROCTER LLP
                        601 South Figueroa Street, Suite 4100
                        Los Angeles, California 90017
                BY:    **LORA J. KRSULICH, ATTORNEY AT LAW**


Also Present:          **Andrea Valladao, Federal Bureau of**
                            **Investigation**
                        **Veronica Hernandez, Paralegal**
                        **John Jay, Trial Technician**

file that you got from the Government?

A.   Correct, as stored on the Google network.

Q.   As stored on the Google network.

Okay.  And we're back in...

After going to internal Google documents and copying information into Apple Notes, what was the next step for these documents for Mr. Ding?

A.   So then, as I mentioned in the sort of summary of my opinions, Mr. Ding exported copies of many of these Apple Notes out of the Apple Notes program into PDF copies.

And so we can know this because of the Santa logs.  And I've got an excerpt of that here.  The Santa log is showing us that these PDF files are being written, or created, at the times indicated in the left-hand column.

So here, I'm showing some from April 16th, 2023.  And it's the PDF file that you can see in the rightmost column which has its folder path leonding, his profile, his documents folder, a Notes subfolder and other subfolders, and then sort of the final component of that is the file name of the PDF that's being created.

Q.   And so this folder structure and the documents inside them, where were those living before Mr. Ding deleted them?

A.   Those were living on his Google-issued MacBook.

Q.   Okay.  What did he do next?

A.   So then the next step was for Mr. Ding to upload these

PDFs from his Google-issued MacBook to his personal Google Drive account associated with the address linweidin@gmail.com.

**Q.**   Where did you get that information?  How were you able to determine that that's what happened?

**A.**   So we determined that from two sources.  One is WebProtect, that logging I talked about that tracks essentially uploads off of the Google laptop.  That's pictured in the box in the center of the screen where we see a file upload happening, again, at the date and time indicated in the leftmost column, going to drive.google.com.  And then we can see in the right side what's being uploaded, Fabric Topology for Astrophel.pdf.

That evidence is then also separately corroborated by metadata that lives in Mr. Ding's personal Google Drive account.  That's what's called JSON metadata.  And I have that pictured in the black box in the upper right.  But those two things essentially corroborate each other.

**Q.**   Can you give us a quick primer on what metadata is and what it shows, at least as it pertains to your analysis here?

**A.**   Sure.  Metadata is just a fancy word that means data about data, and it's -- maybe to use an example, if I had a copy of my resume, the metadata of my resume would include things like its file name, its size, its hash value, the folder it's stored in, the date it was created, the date it was modified, et cetera.

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Thursday, January 15, 2026

*Ana Dub*

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter

**Volume 5**

**Pages 853 - 1067**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

```
UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
   VS.                          )  NO. 3:24-CR-00141-VC
                                )
LINWEI DING, a.k.a. LEON DING,  )
                                )
          Defendant.            )
_____)
```

San Francisco, California
Friday, January 16, 2026

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
               BY:  **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                    **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612-5217
               BY:  **MOLLY K. PRIEDEMAN**
                    **ASSISTANT U.S. ATTORNEY**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Defendant:

                    GOODWIN PROCTER LLP
                    525 Market Street
                    San Francisco, California 94105
              BY:   **DARRYL M. WOO, ATTORNEY AT LAW**
                    **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
                    **RACHEL M. WALSH, ATTORNEY AT LAW**
                    **COLETTE A. LOWRY, ATTORNEY AT LAW**
                    **NICHOLAS C. WILEY, ATTORNEY AT LAW**

                    GOODWIN PROCTER LLP
                    601 Marshall Street
                    Redwood City, California 94063
              BY:   **GRANT P. FONDO, ATTORNEY AT LAW**
                    **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

                    GOODWIN PROCTER LLP
                    601 South Figueroa Street, Suite 4100
                    Los Angeles, California 90017
              BY:   **LORA J. KRSULICH, ATTORNEY AT LAW**


Also Present:       **Andrea Valladao, Federal Bureau of**
                        **Investigation**
                    **Veronica Hernandez, Paralegal**
                    **John Jay, Trial Technician**

**A.**   Yes.

**Q.**   What -- generally, what kinds of topics have you been asked to provide expert opinions on?

**A.**   Similar to as in this case, I've been asked to talk about Chinese technology policies and how they support China's development goals; I've been asked to speak about why China is interested in developing specific types of technologies; and I've been asked to talk about the relationship of specific entities in China to the Chinese government.

**Q.**   What is your hourly rate in this matter?

**A.**   $650.

**Q.**   Let's turn now to your testimony in this case, Dr. Segal.

Have you prepared a demonstrative to assist with your testimony today?

**A.**   Yes.

        **MR. CHANG:**   Ms. Hernandez, if you could please pull up Demonstrative Number 8.

**BY MR. CHANG:**

**Q.**   Dr. Segal, is this the demonstrative that you prepared for today's testimony?

**A.**   Right now it's just the front slide, but I'm going to say yes.

        **MR. CHANG:**   Ms. Hernandez, can you turn to the next slide of the demonstrative.

\\\

Q.   Before we get into the specifics of those opinions, can you talk the jury through your process for coming to these opinions?

A.   Yes.  So I am a qualitative researcher.  I don't run numbers or big models or anything like that.  I essentially read Chinese documents.  I read Chinese press reports.  When possible, I do interviews with people that are involved in the decisions to make the policies or to implement the policies.

I look at what we call open source, so anything that's generally available on the Web or publicly published in China, and then look at what other scholars and academics produce in the United States.

Q.   Did you undergo that process for your opinions in this case?

A.   Yes.  Plus the documents that came from the defendant's device.

Q.   In addition to all those sources of information that you just talked about, did you also rely on your 30 years of training and experience in this field?

A.   Yes.

Q.   Okay.  Let's talk through some of these opinions.  First, were you asked to provide an opinion explaining the role of artificial intelligence in the PRC today?

A.   Yes.

Q.   At a high level, can you explain what is the role of

artificial intelligence in the PRC economy and government?

MR. FONDO:  Your Honor, objection just as to the time period.

THE COURT:  Well, I mean, I think this question is fine; but I think the important thing for everybody to understand is that this testimony is relevant only to the extent that it's describing conditions in China at the time Mr. Ding was engaged in his activities in China.

MR. CHANG:  That's correct, Your Honor.

THE WITNESS:  So the Chinese leadership has signaled at the highest levels that artificial intelligence is of strategic interest to China's economic, political, and military goals.  There have been numerous speeches from Xi Jinping and other top Chinese leaders about the importance of artificial intelligence and the competition around artificial intelligence.

BY MR. CHANG:

Q.   Has the Government mentioned artificial intelligence in any of the plans that we've talked about?

A.   So in 2017, the State Council issued what they called the Next Generation Artificial Intelligence Development Plan.

Q.   What is that plan?

A.   It broadly talks about the goals for AI development inside of China.  So it talks about developing a domestic market of artificial intelligence inside of China that would be worth

$100 billion by 2025, and says that it wants to make China a world leader in artificial intelligence by 2030.  It talks about some specific areas of hardware and software that it thought China needed to develop and, in particular, focused on what they saw as a significant weakness around chips.

Q.   We'll talk about chips more in a little bit.

But other than the 2017 plans, has the Government issued other follow-up plans related to artificial intelligence?

A.   Yes.  There's been, both at the State Council and provincial and municipal level, numerous policies that put more meat on the bones of what the State Council 2017 plan said, including a 2023 plan from the Ministry of Industry and Information Technology and the Cyberspace Administration of China that focused on compute and energy infrastructure.

Q.   What does that 2023 plan talk about?

A.   About the increasing energy demands for building data centers and running models and other types of AI systems, and the need for -- to build those out and support them.

Q.   Okay.  Separately, Dr. Segal, were you asked to provide an opinion on PRC governmental policies related to technology transfer and development?

A.   Yes.

Q.   Can you explain that opinion?

A.   Yes.  So the opinion has two parts, a domestic part and an absorption, attraction part.

**A.**   Yes.

**Q.**   And the type of materials that you relied on for these opinions, were they typical for the type of research that you've been doing in this field?

**A.**   Yes.

        **MR. CHANG:**  Ms. Hernandez, if you could please pull up Slide 4 of Demonstrative Number 8 for the jury and Dr. Segal. Thank you.

        Let's start with the first bullet point, if we could go back.

        Yeah.  Okay.

**BY MR. CHANG:**

**Q.**   Let's start with the Chongqing Mingyue Lake International Intelligent Industry Science and Technology Innovation Base and Park.  For the benefit of Madam Court Reporter, we'll call that the Industrial Innovation Park.  Is that okay?

**A.**   Yes.

**Q.**   Was this one of the entities that you did some research on?

**A.**   Yes.

**Q.**   Before we get into the specifics, what is the Industrial Innovation Park?

**A.**   It is one of the high-tech zones that we were talking about, focused on intelligent industries, which means digital technologies and artificial intelligence.

Q.   Where is it located geographically?

A.   It's outside of Chongqing.  So that was the -- in the middle of the country, one of the municipal-level countries we talked about earlier.

Q.   Based on your research, what were you able to determine about how the Industrial Innovation Park was created?

A.   The park was created by a -- by the municipality, by Chongqing municipality.  It created the park and has an administrative committee that manages the park.

Q.   Okay.  And when you say the "Chongqing municipality," is that the government of Chongqing?

A.   Yes, the municipal government.

Q.   Okay.  And is that Industrial Innovation Park within any specific area of Chongqing?

A.   It's in a part of Chongqing that's called the Liangjiang New Industrial Area, which was created by the State Council as part of Chongqing.

Q.   What is a new area?

A.   So this area was created in 2010, so this probably was farmland, so before the massive expansion of Chongqing that we've seen over the last 15 years.  And the idea was to take that farmland and turn it into a place where factories and high-tech zones and other places would locate.

Q.   And this Industrial Innovation Park is within this new area?

**A.**   Yes.

**Q.**   Based on your review of the documents and your research, what were you able to determine about the governance structure of the Industrial Innovation Park?

**A.**   It has a management committee that is part of the municipal government.  Officially, it is part of Liangjiang New Industrial Area.

**Q.**   When you say there's a committee that's part of the government, how does that actually work for a high-tech zone?

**A.**   So it set up the zone.  It determines the policies for the zone.  It provided some investment in the zone and basic oversight of the zone.

**Q.**   Is this kind of governance structure by the government, is that unusual for a high-tech zone in the PRC?

**A.**   No.

**Q.**   As far as you're aware, are you aware of a single high-tech zone that's not controlled by the Government?

**A.**   Not that I'm aware of.

**Q.**   Next I want to talk a little bit about how this high-tech zone is structured.

Are there investment funds that are affiliated with the zone?

**A.**   This zone, in particular, had a specialized venture capital fund.

**Q.**   Explain what that is.

**A.**   So a venture capital fund is an investment entity that, you know, looks for early technological -- generally, technological investments that are big bets that could have 10 or 20 or 100 times rewards and often involve kind of a -- more than just the money, has a relationship of trying to instruct the entrepreneurs and help them develop markets.

**Q.**   This venture capital fund that you referenced related to the park, is it controlled by the government or is it a private fund?

**A.**   It's controlled by the government.  This fund is owned by the Liangjiang New Industrial District.

**Q.**   Are there also private venture capital funds in the PRC?

**A.**   Yes.

**Q.**   Explain how those work.

**A.**   They work like they work here.  I mean, actually, many of the private companies in Silicon Valley on Sand Hill Road used to have investment in -- very high investment in China and have branches in China, and there are Chinese companies that operate the same way.

          **MR. FONDO:**  Your Honor, permission to approach?

          **THE COURT:**  Sure.

             (Discussion held at sidebar, not reported.)

          **THE COURT:**  You can proceed.

          **MR. CHANG:**  Thank you, Your Honor.

**Q.**   And so you learned about it by essentially searching open-source resources?

**A.**   Yes.

**Q.**   Essentially surfing the Internet, among other things?

**A.**   Looking at the Internet and government documents and Chinese press reports on the Internet, yes.

**Q.**   And that -- so you mentioned the Innovation Park.  We discussed that a little bit; correct?

**A.**   Yes.

**Q.**   All right.  Now, that has a lot of small, private start-ups that interact with that hub; correct?

**A.**   Yes.

**Q.**   And you've never spoken to anyone at the Innovation Park; correct?

**A.**   No.

**Q.**   Never visited any of their offices?

**A.**   No.

**Q.**   Next I want to ask you about the venture fund.  And that's the Mingyue Lake Venture Fund.

So lots of small companies apply to that fund as well; correct?

**A.**   Yes.

**Q.**   And you've never spoken to anyone at that fund, have you?

**A.**   No.

**Q.**   Never visited their offices in China?

PROCEEDINGS

that'll be the standard that I apply.

MS. WALSH:  Understood.

THE COURT:  Okay.  Anything else to discuss right now?

MS. PRIEDEMAN:  Not from the Government, Your Honor.
Thank you.

MS. WALSH:  Not from defense.

THE COURT:  Okay.  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Proceedings adjourned at 3:33 p.m.)

---oOo---


**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.


DATE:  Sunday, January 18, 2026




*Ana Dub*

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter

**Volume 9**

**Pages 1605 - 1884**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
  VS.                              )  **NO. 3:24-CR-00141-VC**
                                   )
LINWEI DING, a.k.a. LEON DING,     )
                                   )
          Defendant.               )
_____    )

                        San Francisco, California
                        Monday, January 26, 2026


                **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        CRAIG H. MISSAKIAN
                        UNITED STATES ATTORNEY
                        450 Golden Gate Avenue, Box 36055
                        San Francisco, California 94102-3495
                   **BY: CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                        **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                        CRAIG H. MISSAKIAN
                        UNITED STATES ATTORNEY
                        1301 Clay Street, Suite 340S
                        Oakland, California 94612-5217
                   **BY: MOLLY K. PRIEDEMAN**
                        **ASSISTANT U.S. ATTORNEY**

         **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:
                        GOODWIN PROCTER LLP
                        525 Market Street
                        San Francisco, California 94105
                BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
                     **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
                     **RACHEL M. WALSH, ATTORNEY AT LAW**
                     **COLETTE A. LOWRY, ATTORNEY AT LAW**
                     **NICHOLAS C. WILEY, ATTORNEY AT LAW**

                        GOODWIN PROCTER LLP
                        601 Marshall Street
                        Redwood City, California 94063
                BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
                     **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

                        GOODWIN PROCTER LLP
                        601 South Figueroa Street, Suite 4100
                        Los Angeles, California 90017
                BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**


Also Present:           **Andrea Valladao, Federal Bureau of**
                            **Investigation**
                        **Veronica Hernandez, Paralegal**
                        **John Jay, Trial Technician**

And so I guess that is -- I mean, I never -- until just now, I never thought of that as a compilation trade secret. I thought of a compilation trade secret as different documents from different places coming together, some of which may be public and some of which may be private, coming together to constitute a trade secret.

So I guess I'm feeling a little confused now about this concept of a single document being both a trade secret and a compil- -- and something called a compilation trade secret.

**MS. PRIEDEMAN:** I don't think it needs to be called a compilation or not called a compilation.

I think just the point is that the trade secret documents do include -- some of them include some public information. And under -- it's very clear black-letter law that a trade secret can be a mix of proprietary and public information.

**THE COURT:** Right.

**MS. PRIEDEMAN:** So I think that needs to be clear. I don't think we need to identify it or call it a compilation trade secret.

The Government's theories are that the documents are trade secrets themselves, each document, and the combination of the documents are separately a trade secret. I think that's been clear from the very beginning. We've been litigating this for a year at this point.

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Tuesday, January 27, 2026

_Ana Dub_

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter

**VOLUME 11**

**PAGES 2088 - 2224**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,           )
                                )
v.                              ) **No. 3:24-CR-00141-VC**
                                )
LINWEI DING, a.k.a. LEON DING,   )
                                )
            Defendant.           )
_____)


San Francisco, California

Wednesday, January 28, 2026

### TRANSCRIPT OF JURY TRIAL PROCEEDINGS

**APPEARANCES:**

For Plaintiff:
                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
              **BY:  CASEY E. BOOME, ASSISTANT U.S. ATTORNEY
                    ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612-5217
              **BY:  MOLLY K. PRIEDEMAN
                    ASSISTANT U.S. ATTORNEY**


        **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE.)**

REPORTED BY:  April Wood Brott, RPR, FCRR, CRG
            CSR No. 13782, Official United States Reporter

**APPEARANCES (continued):**

For Defendant:

                    GOODWIN PROCTER LLP
                    525 Market Street
                    San Francisco, California 94105
        BY:   **DARRYL M. WOO, ATTORNEY AT LAW**
              **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
              **RACHEL M. WALSH, ATTORNEY AT LAW**
              **COLETTE A. LOWRY, ATTORNEY AT LAW**
              **NICHOLAS C. WILEY, ATTORNEY AT LAW**

                    GOODWIN PROCTER LLP
                    601 Marshall Street
                    Redwood City, California 94063
       BY:   **GRANT P. FONDO, ATTORNEY AT LAW**
              **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

                    GOODWIN PROCTER LLP
                    601 South Figueroa Street, Suite 4100
                    Los Angeles, California 90017
       BY:   **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:  **Andrea Valladao, Federal Bureau of Investigation**
                **Veronica Hernandez, Paralegal**
                **John Jay, Trial Technician**

A verdict form has been prepared for you.  You'll probably see it during closing arguments.  If you have reached a unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the courtroom deputy that you are ready to return to the courtroom.  Do not tell the courtroom deputy what your verdict is, and do not give her the verdict form.  And that -- those are your instructions

And with that, we will begin with closing arguments.  You will first hear from the Government, then the defense, and then Government will have a brief rebuttal.  We'll take a lunch break after you hear from the Government initially.

Take it away.

### GOVERNMENT'S CLOSING ARGUMENT

**MS. PRIEDEMAN:**  The defendant wanted more for himself than his own experience and knowledge could get him.  So he stole, he cheated, and he lied.  The technology in this case is complicated; what happened here is not.  From May 2022 to April 2023, the defendant stole over 2,000 pages of Google's cutting-edge AI trade secrets.

At the same time the defendant was stockpiling Google's trade secrets, he was secretly starting his own company in China with the explicit goal of copying Google's technology.  In mid-December 2023, about two weeks before the defendant resigned from Google and was on his way out the door, he

One, it tells you that the defendant absolutely knew these documents were confidential, and two, it tells you he was taking efforts to hide the fact that these documents came from Google by stripping them of the identifying features that would show they were from Google.  Why?  Because he knew what he was doing was wrong.

Now, after creating the notes using the Google information, the defendant PDF'd the notes, and starting on May 21st, 2022, he uploaded them in multiple mass uploads to his personal Google Drive account, where he then saved them to dozens of folders on his personal account that corresponded to different aspects of Google's business.  For example, he had a folder for TPUs, for machine learning frameworks, hardware, and TCPDirect.

I want to emphasize a couple of things here.  Despite the fact that the defendant was using an application called Apple Notes, he was not taking notes.  He was copying text word for word from Google's documents and taking screenshots of Google's confidential information.

Mr. Crain testified that the defendant uploaded over 14,000 pages of information from his Google laptop to his personal laptop, including the over 2,000 pages of trade secret documents.  And the defendant inserted over 4,000 screenshots from internal Google documents into Apple Notes, including over 600 screenshots that went into the trade secret documents.

Why is he so confident?  Because he stole Google's technology.  It's plain and simple.

There's also no question that the defendant knew what he was doing was wrong.  That's why he gave his badge to his former intern and instructed her to badge in for him at Google's offices in Sunnyvale while he was in China presenting at MiraclePlus.  It's also why, when he was preparing for the MiraclePlus presentation and talking about his false claims and abilities to create a supercomputer, he messaged, "Oh, I won't dare to go back to the U.S. for some time now."

Why would he say that?  Because he had stolen at this point dozens and dozens of Google's trade secrets and was founding an entire company on the proposition that he could copy Google's technology.  He absolutely knew what he was doing was wrong.

The defendant's presentations and communications during the same timeframe also make clear that the defendant intended to use the stolen trade secrets not just to benefit Zhisuan itself, but also to benefit the Government in China.  I want to talk about that next.

You heard from the Government's expert, Dr. Adam Segal, that the defendant intended to benefit the Government in China and foreign instrumentalities, which we'll talk about that definition in a little bit, in three different ways.  There's applications to the talent plan and through pitching his

services through Zhisuan to two different entities controlled by the Chinese government, the Industrial Innovation Park and the Tianfu Research Institute.

Now, you heard from the Government -- you heard from Dr. Segal that the Chinese government issues multiple plans that lay out the economic and technological priorities for the country. You also heard that multiple different plans were in place at the time of the defendant's theft that made clear that the Chinese government wanted to prioritize making China a leader in AI technology, including by building and supporting AI data centers and encouraging the development of AI chips.

In presentations to investors like this one -- this is Exhibit 1143 -- the defendant specifically called out multiple of these national policies regarding artificial intelligence, making it clear the defendant planned to use the stolen trade secrets to solve the problems identified by the government of China and in turn benefit the government of China.

In late November to early December, the defendant applied for a talent plan in Shanghai. Dr. Segal explained that talent plans are programs set up by the government of China to encourage individuals to come back to China to promote the economic and technological growth.

You can see in the defendant's application, he stated that he planned to -- upon returning to China, he planned to deploy a single task, tens of thousands of cards, large model training

acceleration platform.  In other words, he planned to build a supercomputer, and he said he could do that by replicating and upgrading Google's tens of thousands of cards platform and building compute platforms adapted to China's national conditions.

In other words, he was quite explicit in stating that the way he could benefit the government of China through applying to this talent program was by copying Google's technology, using Google's trade secrets.

It's also clear that the defendant's business plan included using the stolen trade secrets to benefit government customers.  In the defendant's MiraclePlus presentation, he specifically stated that he intended to target government agencies with underlying compute.  And in a follow-up slide, he listed multiple government entities and customers that were already at the contract signing and cooperation stage.

I want to talk about the two customers that I mentioned earlier, Industrial Innovation Park and Tianfu Research Institute.  Let's talk about the Industrial Innovation Park first.

Dr. Segal testified that the Industrial Innovation Park is in a government-controlled, high-tech zone focused on artificial intelligence.  You heard that the defendant met with representatives of Innovation Park on November 9th, 2023, and you also heard that the park was created by the local municipal

government and that the management committee is part of that municipal government.

This is the PowerPoint presentation that the defendant helped create for that presentation.  That's Exhibit 1034.  And in this PowerPoint presentation, the defendant promised to help the Innovation Park build an AI ecosystem together and share the achievements of AI.

Specifically, the defendant told the Innovation Park that he could benefit them by helping, among other things, customizing the research and design of underlying chips and network structures according to the computing power requirements of large models.

All right.  Let's talk about the Tianfu New Area Innovation Research Institute next.  Dr. Segal testified that the research institute was created by Southwest University, which is controlled by the government of China and founded by Tianfu New Area, which is a branch of the local municipal government.

You saw a draft agreement between Zhisuan and Tianfu where Zhisuan was agreeing to collaborate with Tianfu including in the field of chips.  You also saw a document called "Key Customers," which included Tianfu and Innovation Park, and it promised that -- Zhisuan promised to assist Tianfu in the establishment of AI computing centers.

All right.  So now I want to talk about the different

to come forward, to tell Mr. Fuller that he hadn't understood the policy, that he took these documents by mistake.  And in fact, Mr. Fuller testified that he told Mr. Ding if something came up, if he remembered something, he could always reach back out.

The defendant did not do any of that.  Instead, on December 14th, 2023, six days later, instead of downloading all the information like -- I'm sorry.

Instead of deleting all the information like he said he would, he downloaded all of the information he had stolen and stored on his personal account to his personal computer, over a thousand documents, including all of the trade secrets to his device.

Now, this was not just a backup.  The Government's forensic expert testified the defendant didn't download anything else from his personal account that day.  In other words, the defendant made a specific and deliberate decision to download all of the stolen trade secrets to his computer.

Just 12 days later, the defendant told his manager he was resigning.  If the defendant did not intend to use the stolen documents, why would he have downloaded them?  He was on his way out.  He had no conceivable reason to need them unless he was going to use them for Zhisuan.

On December 29th, 2023, Google learned about the defendant's presentation and cut off his access.  The defendant

that the defendant intended to harm or knew that he would harm Google.  You know that the defendant took some of Google's most sensitive trade secret information and was planning to start a company in China with that same information.

You heard from the Government's first witness, Google's VP of AI and Computing Infrastructure, Mr. Lohmeyer, that Google serves customers in China and competes with Chinese companies like Alibaba, and that if a competitor like Zhisuan were able to develop competing TPU or GPU products, it would harm Google because they would have to either reduce their price or lose customers.

And you saw -- this is Exhibit 1001, which is the MiraclePlus investment agreement, where the defendant has a list of company competitors companies including Alibaba.  In other words, he intended to compete in the same market as Alibaba, one of Google's competitors.  So if the defendant were to -- if he planned to create a competing product, it would harm Google by causing them to either reduce their price or lose customers.

All right.  And finally, you have to find that the defendant knowingly took the trade secret information without authorization.  This is not contested.  You know that the defendant uploaded all of the stolen trade secrets to his personal e-mail account, which is against Google's policies. And then, as we talked about, he downloaded all of the trade

secrets on December 14th, just six days after Mr. Fuller reminded him of the policies and after he had sworn that he would delete all Google information from his accounts and devices.

All right. Now I want to talk about the economic espionage charges. Before I do, I want to reiterate what Mr. Boome told you at the beginning of this trial. Despite the word "espionage," this is not a spying case. The Government does not have to prove that he was a spy, that he worked for a foreign government, or that he gave secrets to the government of China.

This charge is about whether the defendant intended to use the stolen trade secrets to benefit not just himself and Zhisuan, but entities that are controlled by the government of China.

You will see that the first three elements of the economic espionage charge map on to the trade secret theft counts. It's really that last element that is different. Instead of finding that the defendant intended to benefit himself and Zhisuan, you need to find that the defendant intended or knew that his actions would benefit a foreign government or foreign instrumentality.

The term "foreign instrumentality" sounds fancy, but it basically just means an organization or entity that is substantially controlled by the government of China.

Here, we talked about the fact that the government of China sent out multiple plans prioritizing the development of AI technology in China and that the defendant applied for a program sponsored by the government of China to encourage people like the defendant to come back to China and contribute to the technological growth in China.

You also heard evidence that the defendant was marketing himself and Zhisuan to two entities that were controlled by the government of China.  That's the Innovation Park and Tianfu Institute.  Dr. Segal told you that both of these organizations are substantially controlled by the government of China and, thus, meet the definition of a foreign instrumentality.

And as we've discussed, he clearly intended -- the defendant clearly intended to use the trade secrets to benefit both of these entities.  He told the Innovation Park he could help them with the research and development of custom AI chips and infrastructure, and he told Tianfu that he could help them build AI computing centers, both of which directly relate to the stolen trade secrets.

I know we have asked you to absorb a lot of technical information throughout this trial, but at the end of the day, this case is simple.  This case is about the defendant's greed, his theft, and his lies.

You don't need a PhD in computer science to understand what happened here.  You can use your reason, your common

what was going on.  And there's no money.

Shanghai talent program, no money, no contract.  This is an economic espionage case.

The other thing I want to point out to you is timing.  So according to the Government, he's been scheming since April 2022 to steal these trade secrets, move them to China, benefit himself, et cetera.  You see no interaction with any of these alleged Chinese instrumentalities in 2022, April 2023, when the last upload took place, and the first actual meeting is not until roughly November 2023.  That timing doesn't work.

There's simply no intent to benefit here.  We walked through these elements before, right?  There's no interaction with alleged instrumentalities.  There's no benefit.  Identifying growth markets, "Hey, China thinks this is a growth opportunity," that's not intent to benefit a government.  There were no funds exchanged.  Zhisuan was not a successful company.  The GitHub was developed from open source technology, not from alleged trade secrets.

You have no information at all provided to you, no evidence, that any of these alleged trade secrets were ever transferred to the Chinese government.  Nothing, nothing, nothing.  There's no allegation that he met with the Chinese military or intelligence agencies.  That's the economic espionage case.

We believe when you go back into that room and consider

technology companies in Silicon Valley.

He joined Google in 2019, and he worked on at least some aspect of Google's AI supercomputing technology. The idea that he could look at these documents and be confused about what was confidential is not credible.

The information in these documents is information that Google took years, invested millions of dollars to create, and the idea that if there had just been markings on a few more documents, the defendant might not have been so confused is just not credible.

I want to mention quickly the economic espionage charges in this case. Mr. Fondo mentioned that -- so the thing to remember about the economic espionage charges is that the -- the thing that is unique about them is the intent, what the defendant intended to do with the information.

As I said in my opening statement, this case is not about spying. It's a very direct and very simple economic espionage case. The defendant offered the services of his company to the Industrial Innovation Park at Mingyue Lake and the Sichuan Tianfu New Area Research Administration associated with Southwest University. He partnered with these two organizations and offered to do things for them that he could only do with the alleged trade secret documents.

Mr. Fondo mentioned that the -- that there was no evidence that the defendant knew these entities were part of the

Government, but you saw -- Ms. Hernandez, could we go to Exhibit 1158, page 9?

In his presentation to the MiraclePlus investors, the defendant -- page 10, please.  Sorry.

The defendant listed the Industrial Innovation Park as a government entity and said he had already signed a contract with the government entity and with the university.  He offered to help these organizations do research on chips.  He could only do that by using the alleged trade secret documents.

Ms. Hernandez, can we go to 1156, please.

I want to end by talking about what actually matters in this case for your decision, which is what the defendant intended to do with the trade secrets documents in this case, and I cannot sum it up any better than this slide.

This is November 24th, 2023.  The defendant has just given his speech at the MiraclePlus investor conference.  Four days earlier, he signed the contract for a 700,000-dollar-investment from MiraclePlus from Lu Qi.  He is now, in this moment, the CEO of a startup that has a 10-million-dollar valuation.  This is -- this is what he wanted.  He is now the CEO of that company, and the reason that he got that investment and the reason he became that CEO is because of the promises behind him.

"Why we can build a computing power platform of 10,000 GPU scale:  With the R&D experience and technology of Google" -- he

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Thursday, January 29, 2026


_____

April Wood Brott, CSR No. 13782