GRANT P. FONDO (SBN 181530)
*GFondo@goodwinlaw.com*
FARZAD FEYZI (SBN 343538)
*FFeyzi@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 Marshall Street
Redwood City, CA 94063
Tel.: +1 650 752 3100
Fax: +1 650 853 1038

DARRYL M. WOO (SBN 100513)
*DWoo@goodwinlaw.com*
RACHEL M. WALSH (SBN 250568)
*RWalsh@goodwinlaw.com*
JESSICA HUANG FUZELLIER (SBN 315208)
*JHFuzellier@goodwinlaw.com*
DAVID RAPP-KIRSHNER (SBN 344494)
*DRappKirshner@goodwinlaw.com*
COLETTE LOWRY (SBN 359889)
*CLowry@goodwinlaw.com*
**GOODWIN PROCTER LLP**
525 Market Street, Floor 32
San Francisco, CA 94105
Tel.: +1 415 733 6000
Fax: +1 415 677 9041

Attorneys for Defendant:
LINWEI DING

[*Additional Counsel Listed in Signature Block*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:24-CR-00141-VC |
| Plaintiff, | **DEFENDANT LINWEI DING'S REPLY IN SUPPORT OF MOTION FOR A MISTRIAL AND NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE AND *BATSON V. KENTUCKY*** |
| v. | |
| LINWEI DING, | |
| Defendant. | Date: May 12, 2026<br>Time: 2:00 p.m.<br>Courtroom: 4 (17th Floor)<br>Judge: Hon. Vince Chhabria<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 |
| | Filed/lodged concurrently herewith:<br>1. Declaration of Grant P. Fondo |

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR A MISTRIAL AND NEW TRIAL
CASE NO. 3:24-CR-00141-VC

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.    ARGUMENT ..................................................................................................... 2

    A.    The Government's Step One and Step Two Arguments Are Misplaced. ............... 2

    B.    The Government Disproportionately Exercised Its Peremptory Strikes Against Prospective Jurors of Chinese Descent. ..................................................... 3

        1.    The government argues that Ding undercounts venire members of Chinese descent. But the government's own statistical argument backfires. ................................................................................................... 3

        2.    Juror 48 does not neutralize the government's pattern. ............................... 4

        3.    The government's speculation about Jurors 24 and 37 is unsupported. ...... 5

        4.    A statistical disparity alone can and does show an inference of bias. .......... 6

        5.    Ding's status as a Chinese defendant charged with conduct benefitting the Chinese government reinforces this pattern. ....................... 7

    C.    The Government's Proffered Reasons for Exercising Its Three Strikes Are Inconsistent With the Record. ....................................................................... 8

        1.    The government's proffered reasons for striking Juror 43 are contradicted by the record. ........................................................................ 8

        2.    The government's proffered reasons for striking Juror 45 are contradicted by the record. ........................................................................ 9

        3.    The government's proffered reasons for striking Juror 84 are contradicted by the record and the Court's own assessment. ...................... 9

        4.    Jurors' rehabilitation may not be ignored. ................................................. 11

    D.    Jurors 109 and 71 Are Comparative Jurors Who Show The Government's Reasons for Striking Jurors 43, 45, and 84 Are Pretextual. ................................... 12

        1.    The government's failure to question Juror 109 is fatal to its Google-bias rationale. ............................................................................... 12

        2.    The government's claim that Juror 71 is an "irrelevant" comparator to Jurors 45 and 84 is refuted by the record. .............................................. 14

        3.    The government has not shown a consistent practice. ............................... 16

        4.    The government's focus on the defense's strikes is misplaced. ................. 18

i

E.   The Government's Efforts to Exclude Jurors of Chinese Descent for Cause and Hardship Further Demonstrates its *Batson* Violation...................................... 18

F.   The Seating of Jurors 61 and 104 Does Not Undermine Evidence of a *Batson* Violation.................................................................................................... 19

G.   All Circumstances Support a *Batson* Violation. ...................................................... 19

III.   CONCLUSION ............................................................................................................ 20

ii

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Ali v. Hickman*,
  584 F.3d 1174 (9th Cir. 2009).............................................................................................. 11

*Cook v. Lamarque*,
  593 F.3d 810 (9th Cir. 2010)........................................................................................... 10, 12

*Cummings v. Martel*,
  796 F.3d 1135 (9th Cir. 2015)............................................................................................. 10

*Currie v. McDowell*,
  825 F.3d 603 (9th Cir. 2016)............................................................................................... 11

*Flowers v. Mississippi*,
  588 U.S. 284 (2019)............................................................................................................ 13

*Foster v. Chatman*,
  578 U.S. 488 (2016)......................................................................................................... 5, 20

*Green v. LaMarque*,
  532 F.3d 1028 (9th Cir. 2008)............................................................................................. 13

*Harrison v. Ryan*,
  1990 WL 45740 (E.D. Pa. Apr. 12, 1990) ........................................................................... 10

*Hernandez v. New York*,
  500 U.S. 352 (1991)............................................................................................................ 11

*Hoyos v. Davis*,
  51 F.4th 297 (9th Cir. 2022) ........................................................................................... 6, 11

*Infante v. Martel*,
  953 F.3d 560 (9th Cir. 2020)............................................................................................... 11

*Johnson v. California*,
  545 U.S. 162 (2005)........................................................................................................ 2, 19

*Kesser v. Cambra*,
  465 F.3d 351 (9th Cir. 2006)............................................................................................ 4, 19

*Miller-El v. Cockrell*,
  537 U.S. 322 (2003)............................................................................................................ 19

*Pao Lo v. Kane*,
  584 F. App'x 885 (9th Cir. 2014) .......................................................................................... 9

iii

*Shirley v. Yates*,
807 F.3d 1090 (9th Cir. 2015)......................................................................................... 7, 19

*Simmons v. Beyer*,
44 F.3d 1160 (3d Cir. 1995)............................................................................................. 4, 8

*SmithKline Beecham Corp. v. Abbot Labs*,
740 F.3d 471 (9th Cir. 2014)................................................................................................ 7

*Snyder v. Louisiana*,
552 U.S. 472 (2008)............................................................................................................. 2

*Stevenson v. Hedgpeth*,
2010 WL 1609214 (C.D. Cal. Feb. 2, 2010)........................................................................ 2

*United States v. Chinchilla*,
874 F.2d 695 (9th Cir. 1989)........................................................................................... 6, 7

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015)............................................................................................. 11

*United States v. Mitchell*,
502 F.3d 931 (9th Cir. 2007)............................................................................................ 10

*United States v. Thompson*,
827 F.2d 1254 (9th Cir. 1987)........................................................................................... 10

*Walker v. Davis*,
822 F. App'x 549 (9th Cir. 2020) ..................................................................................... 19

*Williams v. Runnels*,
432 F.3d 1102 (9th Cir. 2006)............................................................................................. 3

**Other Authorities**

Fed. R. Crim. P. 33(a) ............................................................................................................. 20

iv

## I.     INTRODUCTION

A defendant is entitled to a trial by a fairly selected jury. The government's actions during jury selection deprived Mr. Ding of that fundamental Constitutional right. The government's Opposition does not and cannot explain away the pattern revealed by this record: in its prosecution of Mr. Ding, a Chinese national of Chinese descent charged with stealing trade secrets from Google to benefit the Chinese government, the government exercised three of its first five peremptory strikes against Jurors 43, 45, and 84, all prospective jurors of Chinese descent. The government used 60% of its first five strikes to remove 50% of the jurors of Chinese descent even though they comprised only 16.67% of the remaining jury pool.

The government's attempts to justify its strikes fall short. First, the government's contemporaneous reasons for the strikes do not withstand scrutiny. The government claims it struck Juror 43 because of his "strong views" about Google, yet the government acknowledged that Juror 43 had "walked back" any suggestion of anti-Google bias. For Juror 45, the government ignores his explicit and sustained assurances that he could logically weigh the evidence, set aside his personal views, and not allow biases to influence the outcome. As to Juror 84, the government cited his concern about discriminatory prosecutions against Chinese defendants, which itself shows the government's discriminatory purpose generally and as to that specific juror. This is further emphasized by the government's initial inability to recall the reason for the strike at all, the juror's statement he was "positive" he could be unbiased, and the Court's statement that Juror 84 "seemed very solid" and concern about the strike.

The government's argument that it consistently struck jurors who expressed views like Jurors 43, 45, and 84, is incorrect. Non-Chinese Jurors 71 and 109 raised similar concerns about law enforcement and Google, but the government struck neither and did not even bother to question Juror 109. The non-Chinese jurors that the government challenged for cause or strike were far more extreme than Jurors 43, 45, and 84, expressing views that the charges were fabricated, Google was lying, or they would refuse to follow the law. The government also fails to meaningfully refute the fact that it sought to have Jurors 45, 84, and 104—all prospective jurors of Chinese descent— excluded on hardship and cause grounds a total of six times and the Court found two of those efforts

1

baseless. The totality of the record compels the conclusion that the government violated *Batson v. Kentucky*. A new trial is not only warranted, but required.

## II.    ARGUMENT

### A.    The Government's Step One and Step Two Arguments Are Misplaced.

The government begins by arguing that Mr. Ding has failed to make a prima facie case at Step One and that the government has presented facially race-neutral reasons for exercising its three peremptory strikes at Step Two. Opp. at 12-18. These arguments are misplaced because this Court has already proceeded past Steps One and Two to Step Three of the *Batson* analysis when it asked for the government's rationale for striking jurors twice and expressed doubt and concern as to the striking of Juror 84. Jan. 7, 2026 Tr. 246:18-250:11, 251:15-255:6;[1] *see Stevenson v. Hedgpeth*, 2010 WL 1609214, at *7 (C.D. Cal. Feb. 2, 2010) (the trial court's "comments and invitation to the prosecutor to state her reasons for excusing Prospective Juror Nos. 8, 13, and 21 indicated that the trial court made an implied finding of a prima facie case" (internal quotations omitted)). The Court's proper task at this stage is to evaluate the totality of the record, including the government's proffered reasons, at Step Three. *Cf. Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) ("[A]ll of the circumstances that bear upon the issue of racial animosity must be consulted." (citation omitted)).

Even if Step One remained live, the defense has plainly satisfied it. The government struck three jurors of Chinese descent, using 60% of its first five peremptory challenges against members of that group, and attempted to eliminate a fourth through a meritless hardship challenge. The Supreme Court has made clear that "[t]he Court did not intend the first step to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination." *Johnson v. California*, 545 U.S. 162, 163 (2005). Rather, "a defendant satisfies Batson's first step requirements by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Id.* The Ninth Circuit has

---

[1] References to the January 6, 2026 transcript are denoted as "Jan. 6, 2026 Tr.," and are set forth for this Court's reference in Ex. 9 to the Fondo Decl. and in Dkt. 392-5. References to the January 7, 2026 transcript are denoted as "Jan. 7, 2026 Tr.," and are set forth for this Court's reference in Ex. 10 to the Fondo Decl. and in Dkt. 392-6. References to the January 9, 2026 hearing transcript are denoted as "Jan. 9, 2026 Tr.," and were set forth for this Court's reference in Dkt. 392-7.

2

squarely held that "a defendant can make a prima facie showing based on a statistical disparity alone." *Williams v. Runnels*, 432 F.3d 1102, 1107 (9th Cir. 2006). As discussed below, the Ninth Circuit has repeatedly found an inference of discrimination in circumstances exactly like those here.

### B.    The Government Disproportionately Exercised Its Peremptory Strikes Against Prospective Jurors of Chinese Descent.

#### 1.    The government argues that Ding undercounts venire members of Chinese descent. But the government's own statistical argument backfires.

The numerical record in this case is straightforward and cannot reasonably be disputed by the government. Before the parties began exercising peremptory challenges, six of the thirty-six remaining prospective jurors were of Chinese descent—approximately 16.67% of the venire. The government exercised three of its first five peremptory challenges (of six total) against prospective jurors of Chinese descent: Jurors 43, 45, and 84. In other words, the government immediately used 60% of its peremptory strikes to remove 50% of the identified Chinese-descent prospective jurors, even though those jurors constituted only 16.7% of the remaining venire.[2] The government's attempts to muddy the waters are unsuccessful.

The government argues that Mr. Ding undercounted jurors of Chinese descent (Opp. at 12), but it does not identify a single specific prospective juror of Chinese descent that the defense failed to count. Instead, the government argues that additional Chinese jurors may have been present in the venire without self-identifying, citing to two jurors who may have been Asian American. The government's argument is unsupported by the factual record, and the defense addresses below why inclusion of Jurors 24 and 37 in the Chinese-descent count is off the mark. In counting the jurors of Chinese descent in the venire, the defense erred on the side of inclusion, counting Juror 61 as a prospective juror of Chinese descent even though he stated only that he was born in Hong Kong and provided no questionnaire answer or testimony establishing Chinese descent. Mot. at 11 n.2.

---

[2] The government should not get "credit" for not using its remaining strike on someone of Chinese descent after its striking of Juror 84, as the government by then clearly was on notice of the danger of seeking to strike a fourth juror, and that the defendant would almost certainly again raise a *Batson* challenge. Jan. 7, 2026 Tr. 252:13-16; 254:8-11; 254:25-255:6.

3

The government's reliance on the Court's observation during the *Batson* colloquy that there appeared to be a "pretty high concentration of Asian American prospective jurors" in the venire is misplaced. Opp. at 12 (quoting Jan. 7, 2026 Tr. at 250:10-19). The relevant inquiry here is not whether Asian Americans were well-represented in the venire, but whether prospective jurors of Chinese descent were disproportionately struck. The Court's remark about Asian American representation in the venire does not speak to this inquiry and cannot alter the math. The Court's remark was also made at the time of the first *Batson* challenge but before the full three-strike pattern had unfolded. Jan. 7, 2026 Tr. at 249:15-250:19. The Court's mid-colloquy observation cannot serve as a justification for the government's overall strike pattern. Indeed, the Court's own expressed concern about the strike of Juror 84 and invitation to file a motion for mistrial shows the Court did not view its earlier remark as dispositive of the *Batson* question. *Id.* at 254:11-255:6.

The government also asserts that there is no accurate statistical record of the ethnic makeup of the prospective jurors. Opp. at 12. But as the defense set out in its opening brief (Mot. at 10-11), there is in fact record evidence to support the counting of six and only six prospective jurors of Chinese descent, and the defense's count was conservative. A perfect record is not required. *See Kesser v. Cambra*, 465 F.3d 351, 361 (9th Cir. 2006) (inquiry focuses on "circumstantial and direct evidence of intent as may be available"); *Simmons v. Beyer*, 44 F.3d 1160, 1168 (3d Cir. 1995) (finding *Batson* violation even where "[n]o one recall[ed] how many potential African American jurors were peremptorily challenged").

### 2.    Juror 48 does not neutralize the government's pattern.

The government focuses on the defense's strike of Juror 48, going as far as to accuse the defense of a lack of "candor" for omitting Juror 48 from its analysis. Opp. at 13. The defense, however, did count Juror 48 as one of the thirteen prospective jurors of Chinese descent identified in its Motion. Mot. at 10. The government also concedes that the defense had clear, documented, non-racial reasons for striking Juror 48: Juror 48 was a principal engineer at NVIDIA who had personal relationships with product managers at Google directly involved in the AI infrastructure technologies at issue in this case. Opp at 23; Jan. 7, 2026 Tr. at 237:20-238:3, 249:25-250:9.

4

The government further argues that striking Juror 48 despite assurances of impartiality undercuts the defense's argument that the government could not rely on the struck jurors' pre-rehabilitation statements. But the situations are not analogous. The struck jurors initially expressed only general views regarding Google and law enforcement, after which they testified they could be impartial. *See* Mot. at 3-6. In contrast, Juror 48 specified that he had "personal relationships with product managers at Google directly developing AI infrastructure technologies[,]" noting that they would "hang out and [were] on . . . WhatsApp chats together." Jan. 7, 2026 Tr. at 112:4-7, 114:1-9. Notably, Juror 48 made this last statement after his so-called "assurance of impartiality." *See* Opp. at 23.

Furthermore, a defendant's own peremptory strike does not authorize or excuse the government's violation of *Batson*. The government's implicit suggestion that Mr. Ding forfeited his *Batson* rights by striking a juror of Chinese descent for non-racial reasons has no support in the law. *See Foster v. Chatman*, 578 U.S. 488, 499 (2016) ("The Constitution forbids striking even a single prospective juror for a discriminatory purpose." (cleaned up)). Moreover, the defense struck one juror of Chinese descent out of approximately six such jurors it could have struck (roughly 16.67%), a rate consistent with the proportion of Chinese-descent jurors in the venire. In contrast, the government struck three of six, a 50% strike rate against the same group.

### 3. The government's speculation about Jurors 24 and 37 is unsupported.

The government, not surprisingly, tries to reduce its disproportionate 50% strike rate by asserting that two additional seated jurors, Juror 24 and Juror 37, may have been of Chinese or Asian descent, in an effort to undermine an inference of discrimination. Opp. at 13; Valladao Decl. ¶¶ 7, 9. Agent Valladao states only that Juror 24 "appeared to be a woman of Chinese descent" based on her personal observation. Valladao Decl. ¶ 7. No questionnaire answer, no voir dire testimony, and no other record evidence establishes that Juror 24 is of Chinese descent. Nor does Agent Valladao make any effort to explain what specific features of Juror 24's appearance led her to conclude that Juror 24 was of Chinese descent as opposed to any other Asian ethnicity, or why she has relevant expertise. A *Batson* analysis must be grounded in the record, not an FBI agent's subjective impressions of a juror's appearance. The government also notes that Juror 37 "appeared

5

to be of Asian descent" and "stated that she was born in Mongolia, which neighbors China." Opp. at 13; Valladao Decl. ¶ 9. The government cannot identify people's ethnicity by sight, and improperly conflates being of Chinese descent with being of Asian descent. Mongolia is a sovereign nation with its own distinct ethnic population. The government does not explain how the fact that Mongolia neighbors China even remotely demonstrates that Juror 37 is of Chinese descent. Geographic proximity is not a substitute for record evidence of Chinese ancestry.

### 4. A statistical disparity alone can and does show an inference of bias.

The government relies on *Hoyos v. Davis*, 51 F.4th 297 (9th Cir. 2022), for the proposition that "a statistical disparity alone is insufficient to raise an inference of discrimination at step one where the totality of circumstances undermines any inference of racial bias." (Opp. at 12). *Hoyos* stands for no such thing, recognizing that "the Supreme Court has never held that a prima facie showing requires a particular statistic or even a pattern because '[i]n the eyes of the Constitution, one racially discriminatory peremptory strike is one too many.'" 51 F.4th at 310-11 (quoting *Flowers v. Mississippi*, 588 U.S. 284, 303 (2019)). *Hoyos* expressly recognized that "striking two out of four prospective jurors or three out of five veniremembers could support a prima facie showing of discrimination" while noting that "such a presumption may be dispelled by other relevant circumstances if the circumstances do more than indicate that the record would support race-neutral reasons for the questioned challenges.'" *Id. at* 311 (cleaned up). The government argues that the "other relevant circumstances" identified in *Hoyos* dispel the inference of discrimination here. But those circumstances cut in Defendant's favor, not the government's, as discussed below. And in *Hoyos*, the court found the inference rebutted in part because the defendant himself had included a struck juror in his statistical count even though he had attempted to remove that juror. 51 F.4th at 311. Here, by contrast, the government has not identified any comparable methodological flaw in the defense's statistical analysis.

The government next argues that *United States v. Chinchilla*, 874 F.2d 695 (9th Cir. 1989) is distinguishable because the prosecutor there challenged every Hispanic juror. Opp. at 14. But the *Chinchilla* court itself forecloses this argument: "[t]he fact that all the Hispanic jurors were challenged is significant though not required for a prima facie case to exist." 874 F.2d at 698 n.4.

6

*Chinchilla* further instructed that "although the striking of one or two members of the same racial group may not always constitute a prima facie case, it is preferable for the court to err on the side of the defendant's rights to a fair and impartial jury." *Id.* at 698 n.5. Here, the government struck not one, not two, but three jurors, constituting 50% of prospective jurors of Chinese descent after only five strikes where such jurors made up only 16.67% of the venire. Under *Chinchilla*'s own framework, Step One is satisfied. *Shirley v. Yates*, 807 F.3d 1090 (9th Cir. 2015), as amended (Mar. 21, 2016), is similarly supportive for the defense. In *Shirley*, the Ninth Circuit found an inference of discrimination where the prosecutor struck two of three black veniremembers, noting that it had "found an inference of discrimination in cases where smaller percentages of minority veniremembers were peremptorily struck," citing cases involving 56% strike rates. *Id.* at 1101-02. The government's 50% strike rate against Chinese-descent veniremembers falls squarely within the range approved by *Shirley*.

Moreover, the defense cited several cases finding a prima facie case in circumstances similar to those here, which the government does not discuss or distinguish. Mot. at 12-14 (citing *e.g., Turner v. Marshall*, 63 F.3d 807, 812-13 (9th Cir. 1995) (inference of discrimination where 56% of prosecution's peremptory challenges used against members of group constituting 30% of the pool); *Williams v. Runnels*, 432 F.3d 1102, 1107 (9th Cir. 2006) (inference of discrimination where prosecutor used three of first four peremptory challenges to remove African Americans)).

### 5. Ding's status as a Chinese defendant charged with conduct benefitting the Chinese government reinforces this pattern.

The government offers no answer to the defense's argument that the unique ethnic configuration of the case is also relevant. Mot. at 13-14. Where, as here, the protected characteristic of the juror "coincide[s] with the subject matter of the case, the potential for an impermissible strike based on [the protected characteristic] increases substantially." *SmithKline Beecham Corp. v. Abbot Labs*, 740 F.3d 471, 476 (9th Cir. 2014). Mr. Ding is a Chinese national of Chinese descent, and the charges allege that he acted to benefit the Chinese government or an instrumentality thereof. Mot. at 13-14 (citing *Williams*, 432 F.3d at 1107 (African American defendant's race relevant in finding that the prosecution's disproportionate use of peremptory challenges against African

7

American veniremen supported an inference of discrimination); *Simmons v. Beyer*, 44 F.3d 1160, 1168 (3d Cir. 1995) ("[T]he nature of the crime and its racial configurations are relevant to whether there is an inference of discrimination"; finding a *Batson* violation where the defendant was African American, the victim was white, and the government excluded African American venirepersons).

### C.   The Government's Proffered Reasons for Exercising Its Three Strikes Are Inconsistent With the Record.

#### 1.   The government's proffered reasons for striking Juror 43 are contradicted by the record.

During voir dire, the government claimed that it struck Juror 43 because he harbored "strong views on Google in terms of it being a monopolist" and "had some concerns about laws being unreasonable and whether he would be able to follow them." Jan. 7, 2026 Tr. at 248:14-22. But the record fails to support these assertions. Juror 43 confirmed that his opinions about Google would not influence his view of the case, Jan. 7, 2026 Tr. 175:14-18. The government itself acknowledged during the *Batson* colloquy that Juror 43 "walked back" any suggestion of anti-Google bias. Jan. 7, 2026 Tr. 247:25-248:22. Even so, the government argues it was concerned because it expected the defense to focus on Google's role in the prosecution. Opp. at 19. A peremptory strike, however, must be justified by reasons that were genuinely operative at the moment of the strike, not rationalizations constructed after trial has unfolded. The defense's opening statement cannot retroactively supply a race-neutral reason for a strike exercised during voir dire for an event that had not yet happened. Further, the Court had already ruled before trial that the defense was precluded from arguing that the prosecution was driven by Google. Dkt. 205 at 4.

The government also asserts that Juror 43 expressed "hesitancy" to commit to following the Court's legal instructions regarding laws he disagreed with. Opp. at 19. Not only is this a common statement by prospective jurors, but the record plainly refutes the government's assertion. When asked during voir dire, Juror 43 could not identify any law he viewed as unreasonable, and certainly never referenced the laws at issue in this case, Jan. 7, 2026 Tr. 174:16-175:10; 249:15-24. These clear, affirmative assurances of impartiality negate the government's proffered basis for the strike. The government's characterization of Juror 43 as someone who would not follow instructions cannot be squared with Juror 43's testimony. *See* Opp. at 19. A proffered reason that is not

8

supported by the record cannot be credited as the genuine basis for the strike and in fact raises heightened concerns. *See Pao Lo v. Kane*, 584 F. App'x 885, 887 (9th Cir. 2014) (where record contradicted prosecutor's assertion that he struck Asian member of venire because she did not respond to prosecution's questions, the court found "serious questions" were raised regarding the legitimacy of the prosecutor's reasons).

### 2. The government's proffered reasons for striking Juror 45 are contradicted by the record.

In its Opposition, the government does not once cite Juror 45's specific and repeated assurances of impartiality. Instead, the government contends that Juror 45's "extremely negative opinions about the current Administration" and desire "to know the motivation behind the prosecution's charging process" warranted his removal. Opp. at 19-20; Jan. 7, 2026 Tr. at 249:8-13. Again, the record tells a different story. First, the Court suggested that the parties tell the prospective jurors that the charges were brought by the former administration if anyone raised concerns with the current administration, and the government knew that the jury would hear that the investigation began under the former administration, undercutting the legitimacy of this concern. *E.g.*, Jan. 6, 2026 Tr. at 42:23-43:14, 67:14-69:8; Dkt. 325 at 4. Second, Juror 45 stated explicitly that he could logically weigh evidence, set aside his personal views, and not allow outside biases to influence the outcome. Jan. 7, 2026 Tr. 167:15-169:1. He expressed with equal clarity his commitment to decide the case on the evidence presented. *Id*. These assurances were not a begrudging "yes," but rather a sustained and detailed explanation of his ability to serve impartially, elicited over the course of extended questioning. And the government made the decision not to ask Juror 45 if his concerns were addressed by the fact the charges were brought by the former administration, despite the Court's suggestion.

### 3. The government's proffered reasons for striking Juror 84 are contradicted by the record and the Court's own assessment.

Mr. Ding noted in his opening brief that when first asked about why it struck Juror 84, moments after striking Juror 84, the government could not recall the reason. Mot. at 9, 15. The government does not and cannot explain this away. A prosecutor's inability to recall the reason for

9

the strike calls into question any subsequent reason cited for the strike. *See Harrison v. Ryan*, 1990 WL 45740, at *1 (E.D. Pa. Apr. 12, 1990) ("[A] prosecutor's failure to recall his reason for using his peremptory challenge to strike a black juror does not meet his burden under *Batson*[.]").

After initially being unable to recall the reasons for its strike, the government later cited to Juror 84's questionnaire response that "[m]ost cases of U.S. IP theft against Chinese nationals were proven to be either witch hunt or racial discrimination[,]" noting that "in terms of just, in general, prosecutions involving these types of allegations . . . raised some concerns about his ability to be a hundred percent fair and impartial." Jan. 7, 2026 Tr. at 251:15-252:24. The government, however, acknowledges that Juror 84 stated he was "positive" he could be fair and unbiased, and that his views would not affect him in this case. Jan. 7, 2026 Tr. 160:16-161:17. The Court also noted that Juror 84 "seemed very solid to me today" and expressed concern about the government's decision to strike him. Jan. 7, 2026 Tr. 252:13-16; 254:8-255:6. The government then expressly agreed: "He did walk them back today. We agree with Your Honor." Jan. 7, 2026 Tr. 251:22-252:24.

As Mr. Ding argued in his opening brief, the government's rationale for the strike actually shows that the strike was discriminatory and violates *Batson* because a non-white juror is more likely to recognize such discrimination. Mot. at 14-15. **This alone requires the granting of Mr. Ding's motion**. "The fact that the potential juror might identify too much with the defendant because they are of the same race is precisely what *Batson* said was not legitimate." *United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987). The government responds that caselaw holds that the government does not discriminate by striking a juror based on statements made by the juror that indicate potential bias, even where those statements are related to race. Opp. at 21-22.

None of the cases the government cites supports this statement of the law. In *United States v. Mitchell*, 502 F.3d 931, 953 (9th Cir. 2007), the struck juror admitted that sitting in judgment of a fellow tribal member would have a long-term emotional and spiritual effect on him, a plain admission of his inability to serve impartially. The government also relies on *Cook v. Lamarque*, 593 F.3d 810, 820-21 (9th Cir. 2010) and *Cummings v. Martel*, 796 F.3d 1135, 1146-47 (9th Cir. 2015). In *Cook*, the juror answered "yes" when asked whether his experiences with racism might cause him to be unfair in that particular case. And in *Cummings*, the juror noted that the two

10

defendants were black and viewed it as his duty to apply a heightened legal standard to scrutinize the evidence to make sure it was fair (among other things). These circumstances are qualitatively different from Juror 84's general observation about the treatment of Chinese nationals in IP cases, which unlike the cited cases was immediately followed by an unequivocal declaration that he could serve as a fair and impartial juror. Jan. 7, 2026 Tr. at 160:16-161:17. A juror is not rendered partial simply because he is aware of discrimination that intersects with the subject matter of the case. If that were true, every person who is aware of racism could be stricken and *Batson* would have little meaning. The government also briefly quotes *Hernandez v. New York*, 500 U.S. 352, 375 (1991), but that case involved jurors' ability to understand English, not statements about awareness of discrimination, and the concurrence noted that a court may view a disproportionate impact as evidence of discrimination.

Even if the Court finds only some of the government's proffered reasons undermined, racial discrimination may and should be found. *See Currie v. McDowell*, 825 F.3d 603, 605 (9th Cir. 2016) (defendant "need not prove that all of the prosecutor's race-neutral reasons were pretextual[] or even that the racial motivation was 'determinative.'" (citation omitted)); *Ali v. Hickman*, 584 F.3d 1174, 1182 (9th Cir. 2009) ("The prosecution's proffer of [one] pretextual explanation "'naturally gives rise to an inference of discriminatory intent[.]'" (citation omitted)).

### 4.   Jurors' rehabilitation may not be ignored.

The government relies on *Infante v. Martel*, 953 F.3d 560 (9th Cir. 2020), *Hoyos v. Davis*, 51 F.4th 297 (9th Cir. 2022), and *United States v. Christensen*, 828 F.3d 763 (9th Cir. 2015), for the sweeping proposition that a juror's later impartiality assurances cannot neutralize earlier bias statements. Opp. at 22-23. But in *Infante* and *Hoyos,* the jurors' assurances of impartiality were qualified or incomplete. *See Infante*, 953 F.3d at 566 (juror repeatedly insisted that being objective in the trial would be "hard" for him due to defendant's ethnic origin); *Hoyos*, 51 F.4th at 313 (juror categorically opposed the death penalty due to strong religious beliefs, "persistently gave qualified answers[,]" and indicated that she would place the incorrect burden on the prosecution). And *Christensen* involved serious juror misconduct during deliberations, including lying under oath. 828 F.3d at 812-13. None of these decisions support the proposition that clear rehabilitation

11

conceded by the striking party during voir dire is irrelevant, nor do they support the striking of Jurors 43, 45, or 84. *Cook v. Lamarque*, 593 F.3d 810 (9th Cir. 2010), relied on by the government for another proposition, is also illuminating. In *Cook*, the Ninth Circuit credited the prosecutor's reliance on questionnaire responses over voir dire assurances because the record established a consistent, across-the-board practice of weighing questionnaires more heavily than oral responses, a practice applied evenhandedly to all jurors regardless of race. 593 F.3d at 820-21, 825 & n.6. No such consistent practice exists here, as discussed in greater detail below. Furthermore, the government did not meaningfully discuss or distinguish two cases cited by the defense holding that proffered reasons not credibly supported by the record, as is the case here, compelled the conclusion that the strikes were racially motivated. Mot. at 15 (citing *Pao Lo v. Kane*, 584 F. App'x 885 (9th Cir. 2014) and *Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006) (en banc)).

**D.    Jurors 109 and 71 Are Comparative Jurors Who Show The Government's Reasons for Striking Jurors 43, 45, and 84 Are Pretextual.**

**1.    The government's failure to question Juror 109 is fatal to its Google-bias rationale.**

The government argues that non-Chinese Juror 109 is not comparable to Jurors 43, 45, and 84, characterizing Juror 109's statement about anti-Google bias as "innocuous." Opp. at 15. In his questionnaire, Juror 109 answered "yes" when asked whether he had "strong feelings (positive or negative) about Google," explaining that "I do not like all their use of artificial intelligence." Juror 109, Question 35. In response to Questions 33, 37, and 44, he added: "I really do not like the use of artificial intelligence . . . I also hate the use of AI images and videos . . . Anything involving AI I will have a negative feeling towards, so I could be biased in that regard," and that he has views that may make it difficult for him to serve as a juror.

The government unpersuasively describes Juror 109's views of Google's AI use as "innocuous." Juror 109 did not merely express a passing dislike. He answered "yes" when asked if he had "strong" "negative" feelings about Google, going out of his way to anchor those strong negative feelings to Google's use of AI. He then stated in later questions that he "really" does not like and "hate[s]" AI, that he "could be biased in that regard," and that his views might make it difficult to serve as a juror. Juror 109's strong statements about AI cannot be disassociated from

12

Google's use of AI in this case involving trade secrets relating to Google's development of AI technology, especially where Juror 109 himself expressly tied his feelings about Google to AI.

Further, Juror 109's self-declared bias was at least as, if not more, significant as the sentiments the government attributed to Jurors 43 and 84. Juror 43's questionnaire included only a general statement that he had negative feelings about Google related to its status as a monopoly. (Juror 43 Questionnaire, Question 35). Juror 84's questionnaire included only a general statement that he enjoys Google's services but thinks it is too powerful. (Juror 84 Questionnaire, Question 39.) Unlike Juror 109, neither Juror 43 nor Juror 84 attributed their feelings about Google to Google's AI practices, the exact subject of the prosecution. If the government were truly as concerned about anti-Google bias as it argues in this Opposition, it is inconceivable that Juror 109's strong negative feelings about Google relating to Google's "use of artificial intelligence" would not have concerned the government enough to warrant at least some follow-up questioning.

And yet the government did not ask Juror 109 *any* questions during voir dire. *See Flowers v. Mississippi*, 588 U.S. 284, 310 (2019) ("The lopsidedness of the prosecutor's questioning and inquiry can itself be evidence of the prosecutor's objective as much as it is of the actual qualifications of the black and white prospective jurors who are struck or seated."). In contrast, the government asked Jurors 43 and 84 several follow-up questions each (likely in an attempt to gin up support for a cause challenge). The government questioned Juror 84 about his views on Google's power and whether those views would affect his ability to serve impartially, and Juror 84 replied twice that he was "positive" he could serve as a fair and unbiased juror and that his views about Google would not impact his ability to serve. Jan. 7, 2026 Tr. 160:16-161:17 The government similarly questioned Juror 43 about whether his general opinions about Google would influence his perspective, and Juror 43 answered: "I don't think so, no." *Id.* at 175:14-18. After receiving these assurances of impartiality, the government struck both Jurors 43 and 84. "The [prosecution]'s failure to engage in any meaningful voir dire examination on a subject the [prosecution] alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Green v. LaMarque*, 532 F.3d 1028, 1033 (9th Cir. 2008) (quoting *Miller-El*, 545

13

U.S. at 246) (prosecutor's rationale for striking black juror, visiting an incarcerated relative, was undermined where prosecutor did not question other jurors with incarcerated relatives).

The government's attempts to distinguish Juror 109 by pointing to statements Jurors 43 and 84 made during voir dire misses the point entirely. Opp. at 15. Juror 109 provided no testimony expounding on his negative feelings about Google's AI because the government asked him no follow-up questions.[3] Had the government bothered to ask Juror 109 any questions, he very well may have offered similar answers as Jurors 43 and 84. The government accordingly may not rely on any voir dire answers offered by Jurors 43 and 84 to distinguish Juror 109.

**2.      The government's claim that Juror 71 is an "irrelevant" comparator to Jurors 45 and 84 is refuted by the record.**

The government argues that Juror 71 is an "irrelevant" comparator because the government did not cite concerns about law enforcement or the criminal justice system as a reason for striking Jurors 43 or 84. (Opp. at 14.) But regardless of whether the government specifically used the phrases "law enforcement" or "criminal justice system," the clear undercurrent of its purported concerns with Jurors 45 and 84 related to their attitudes and skepticism about law enforcement and the criminal justice system. This makes Juror 71 directly relevant as a comparator.

Juror 71, who is not of Chinese descent, answered "less likely" when asked whether a law enforcement officer's occupation would make her more or less likely to believe their testimony, citing a "corrupt system." Juror 71 Questionnaire, Question 27. Similarly, Juror 45, who identified as Chinese, said that "[t]he current administration uses the law to favor their friends, punish their enemies, and enrich themselves. The military and law enforcement are blindly following corrupt orders." Juror 45 Questionnaire, Question 27. The government expressly quoted Juror 45's "law enforcement" and "following corrupt orders" language in its proffered reason for exercising the strike. Jan. 7, 2026 Tr. 248:25-249:13.

---

[3] The government had ample opportunity to ask questions of Juror 109, the Court did not cut either party off during voir dire, did not rush the questioning attorneys, and Court concluded by asking the parties "After hearing those questions and answers, does anybody want to ask any further ones?" The government responded, "None from the Government, your honor." Jan. 7, 2026 Tr. at 228:13-15.

14

The government now argues that Juror 45's concerns were "case-specific" because they referred to the current administration and the Department of Justice, while Juror 71's concerns were merely "general" concerns about American history regarding people of color. Opp. at 15. This is a distinction without a difference, and critically, one the government never articulated at the time of voir dire. The government also mischaracterizes Juror 71's testimony. While she mentioned "American history regarding people of color," she also mentioned broader concerns relating to her awareness of "different cases where it's not necessarily always fair, depending on just certain environments and the scenarios" and "I don't think it's always fair regarding the person, depending on the context[.]" Jan. 7, 2026 Tr. 184:5-16. Juror 71's questionnaire characterized the justice system as a "corrupt system"—language that parallels the tenor and subject of Juror 45's assertion that "law enforcement" is "blindly following corrupt orders." Juror 45 Questionnaire, Question 27. Moreover, Juror 45 clearly and convincingly explained that he could "logically weigh the evidence presented," and affirmed that he would be able to set aside his views to reach a verdict, remarking that "we can't let our outside biases influence the outcome in contradiction of what is presented to us." Jan. 7, 2026 Tr. 167:15-169:1. When Juror 71 was asked if she could listen to the evidence and follow the Court's instructions, she answered only "Yes." *Id.* at Tr. 184:22.

The government further argues that Juror 45 is distinguishable because it struck him also for his curiosity about the government's motivation for bringing the case. Opp. at 15. But as discussed, Juror 45 was directly asked follow-up questions about both of these issues, and on both occasions he explained that he would be able to set aside his views to reach a verdict and that he could reach a verdict regardless of whether he understood the motivations behind the government's charging decision. Jan. 7, 2026 Tr. at 167:15-169:1. The government extracted these assurances from Juror 45 and then struck him anyway, but never asked Juror 71 any comparable follow-up about the nature or depth of her stated skepticism of the "corrupt system."

The government does not discuss Juror 84's skepticism of IP theft prosecutions against Chinese nationals in comparison to Juror 71 (Opp. at 14-15), but the defense addresses it here. Juror 84's questionnaire statement that "[m]ost cases of US IP theft against Chinese nationals were proven to be either witch-hunting or racial discrimination" (Juror 84 Questionnaire, Question 40)

15

is similar to Juror 71's statements that she may be less likely to believe the testimony of a law enforcement officer because of the "corrupt [justice] system." Juror 71 Questionnaire, Question 27. Like Juror 71, as the Court explained at the time, Juror 84's concerns were not a case-specific bias because he was speaking to general issues and was not calling this particular prosecution a witch hunt or saying he could not be impartial in this particular case. Jan. 7, 2026 Tr. at 254:12-255:6. In fact, similar to Juror 71, Juror 84 testified twice that he was "positive" he could serve as a fair and unbiased juror. Jan. 7, 2026 Tr. at 160:16-161:17. The fact that Juror 84, like Juror 71, expressed skepticism about the fairness of the justice system, yet only the Chinese-descent juror was struck for doing so, reinforces the inference of discrimination rather than rebutting it.

### 3.    The government has not shown a consistent practice.

The government next contends that its strikes of Jurors 43, 45, and 84 were consistent with its strikes of other jurors who expressed comparable biases relating to Google, ability to follow the law, and anti-Trump administration views. Opp. at 23-27. The record shows the opposite: the non-Chinese jurors the government struck expressed views that were more extreme, absolute, and case-specific than Jurors 43, 45, or 84. The questionnaire answers and testimony of the other struck jurors that the government cites speak for themselves:

- Juror 46 said "Google is a big part of the fascist Tech Oligarchy that is moving to control all of U.S. society." Jan. 6, 2026 Tr. at 16:21-17:15.

- Juror 108 stated that she has strong negative feelings about big tech, that she "Hate[s] AI" and believes it "should not be accessible," and that she "do[es]n't trust big tech — Google could be lying." (Juror 108 Questionnaire, Questions 35, 37 & 44.)

- Juror 68 stated he views the current Administration as "corrupt" and "criminal," that AI is a means for corporations to avoid paying people, that Google's layoff practices are "ridiculous," and that he does not have faith that the charges against Mr. Ding are not "conjured-up." Juror 68 Questionnaire, Questions 35, 37, 39, 44.

- Juror 36 testified that she could not follow the law if "it's very egregious under [her] personal belief and moral system." Jan. 7, 2026 Tr. at 182:19-183:8.

The government also attempts to pad its list with jurors that were excused for cause or did not show up:

- Juror 29 stated "I hate Google because they sell my personal information" and "I don't trust Google. Maybe all is a lie." Jan. 6, 2026 Tr. at 44:2-8. The government

acknowledges that Juror 29 failed to appear for voir dire on January 7, 2026. Opp. at 24 n.10.

- Juror 42 testified that he would consider jury nullification in a case where Google was the victim company because "considering the nature of Google, you can—whatever the laws may be, you can consider them not actually a victim from a political perspective." Jan. 7, 2026 Tr. 149:5-15. This juror was struck for cause rather than pursuant to a peremptory. *Id.* at 129:13-22.

- Juror 76 stated he "object[ed] to the very notion of theft of intellectual property, and would prefer it described more plainly as 'unauthorized copying'." Juror 76 Questionnaire, Question 39. Juror 76 then testified during voir dire that he considered himself a "radical technologist," he has "a reflexive kind of allergy to the idea of theft of these things [intellectual property]," that it would be difficult for him to put his opinions aside, and he could not be 100% impartial in this type of case. Jan. 7, 2026 Tr. 151:13-157:25. This juror was struck for cause rather than pursuant to a peremptory. Jan. 7, 2026 Tr. 231:7-232:24, 241:21-24.

The fact that the government struck these jurors does not establish consistency but instead highlights the gulf between the severity of views that justified action against non-Chinese jurors and the comparatively measured views that served as purported grounds for striking the three jurors of Chinese-descent. The struck non-Chinese jurors expressed unconditional hostility toward Google, announced they would engage in jury nullification against Google, stated they could not follow the law if they disagreed with it, and suggested that the charges against Mr. Ding were fabricated. By contrast, Juror 43 answered "I don't think so, no" when asked if his opinions about Google would influence his perspective, could name no specific laws that he disagreed with, and confirmed that he "would be able to follow protocol, follow my role as a juror." Jan. 7, 2026 Tr. 175:5-18. Juror 45 similarly confirmed that he could "logically weigh the evidence presented," that he would be able to set aside his views to reach a verdict, and that he would not let "outside biases influence the outcome in contradiction of what is presented." *Id.* at 167:15-169:1. And Juror 84 said he was "positive" he could serve as a fair and unbiased juror twice and that he did not think his views about Google would impact his ability to serve. *Id.* at 160:16-161:17.

Jurors 46, 29, 108, 42, 68, 76, and 36 are too extreme to provide any insight into whether the government acted consistently or not when it struck Jurors 43, 45, and 84. The Court must instead look only to a comparison with Jurors 109 and 71, non-Chinese jurors who were not struck despite their comparability to Jurors 43, 45, and 84. While anti-Google bias and criminal justice

17

system concerns may be facially valid reasons to exercise strikes, the government must nonetheless act consistently in exercising strikes on such bases against various groups of jurors. Here the government did not do that, instead striking jurors of Chinese descent but allowing jurors not of Chinese descent on the jury (in Juror 109's instance, without questioning) despite their similar views of Google and the criminal justice system.

### 4. The government's focus on the defense's strikes is misplaced.

The government points to four jurors the defense excused, arguing that they show the defense "recognized that a prospective juror's opinions about Google may be a source of bias in this case." Opp. at 24-25. Each of the four jurors the defense excused did not merely express opinions about Google, but had applied for jobs at Google, worked with Google, or had direct financial investments in Google, such that there were tangible, concrete reasons to believe they had a personal interest or had knowledge of the facts underlying the prosecution. *Id.* These are not comparable situations, and the government's attempt to draw an equivalence between them only underscores the incoherence of the government's purported jury selection strategy.

### E. The Government's Efforts to Exclude Jurors of Chinese Descent for Cause and Hardship Further Demonstrates its *Batson* Violation.

Mr. Ding argued in his opening brief that the government's additional attempts to exclude Jurors 45, 84, and 104, all prospective jurors of Chinese descent, for cause and hardship further supported a *Batson* violation. Mot. at 18-20. The government responds by feigning that Mr. Ding's logic is hard to follow and doing little more than noting that its cause challenge for Juror 104 was a close question. Opp. at 16. The government does not address its overall pattern, which shows that the government sought to have Jurors 45, 84, and 104 excluded on hardship and cause grounds a total of six times (and together with the peremptories, eight times). Mot. at 19. Nor does the government address the fact that, after Mr. Ding raised a second *Batson* challenge and the government was constrained not to exercise a peremptory as to Juror 104, the government supported an ill-founded hardship excusal for Juror 104 that the government itself suggested it was supporting for an ulterior purpose. Jan. 9, 2026 Tr. 3:20-4:7 ("As you may suspect, though, the Government believes that the basis submitted is valid for a hardship excusal"). Nor does the

18

government address the fact that the Court found two of the government's hardship and cause challenges to be baseless. Jan. 6, 2026 Tr. 24:16-25:4 ("I don't think that these responses [of Juror 84] come close to a basis for excusing the person for cause on the papers alone."); Jan. 9, 2026 Tr. 3:23-4:13 ("I know that you want her [Juror 104] off for other reasons, but I would not expect you to say that that's a valid hardship excusal."). The government's repeated and sometimes unfounded efforts to remove jurors of Chinese descent through hardship and cause challenges is relevant context for evaluating its exercise of peremptories as to Jurors 43, 45, and 84. *See Kesser*, 465 F.3d at 359 ("The court must evaluate the record and consider each explanation within the context of the trial as a whole[.]'") (citation omitted)). Here this context provides further and important confirmation that the government's proffered reasons for striking these jurors were pretextual.

**F.      The Seating of Jurors 61 and 104 Does Not Undermine Evidence of a *Batson* Violation.**

The government does not respond to Mr. Ding's argument that the seating of Jurors 61 and 104 does not undermine evidence of a *Batson* violation, including the caselaw Mr. Ding cited for the proposition that a late-stage decision to accept jurors from the relevant group does not insulate earlier strikes. Mot. at 20-21 (citing *Miller-El*, 545 U.S. at 250 (a late-stage decision to accept a black panel member does not neutralize an early-stage decision to challenge a comparable venireman where the prosecution would want to obscure the otherwise consistent pattern); *Shirley*, 807 F.3d at 1102 (seating of a black juror did not significantly undermine showing of discrimination because it was preceded by a *Batson* challenge)). The government has thus conceded it is not entitled to any credit for the seating of two jurors of Chinese descent after the defense's *Batson* challenges.

**G.      All Circumstances Support a *Batson* Violation.**

Direct evidence of intent is not common or necessary to establish a *Batson* violation. *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) ("[T]he decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." (citation omitted)); *Walker v. Davis*, 822 F. App'x 549, 552 (9th Cir.

19

2020) ("The circumstantial and direct evidence needed for this inquiry may include a comparative analysis of the jury voir dire and the jury questionnaires of all venire members." (cleaned up).) All of the circumstances taken together here show that the government violated Mr. Ding's Constitutional rights when it struck Jurors 43, 45, and 84 from the jury: the government's disproportionate exercise of peremptory challenges against jurors of Chinese descent; the lack of record support for the government's proffered reasons for exercising the strikes; the government's strike of Juror 84 due to his concern about discriminatory prosecutions against Chinese defendants; the government's failure to question or strike Juror 109 and failure to strike Juror 71, jurors not of Chinese descent who are otherwise comparable to Jurors 43, 45, and 84; and the government's repeated attempts to remove Jurors 45, 84, and 104 for hardship and cause, often without merit. Indeed, the government's removal of even one of these prospective jurors for a discriminatory purpose would violate Mr. Ding's Constitutional right to a trial by jury selected free from discrimination and warrant a new trial. *Foster v. Chatman*, 578 U.S. 488, 499 (2016) ("Constitution forbids striking even a single prospective juror for a discriminatory purpose." (citations omitted)).

## III.    CONCLUSION

For the reasons discussed above and in Mr. Ding's opening papers, the Court should conclude that the government violated *Batson*, declare a mistrial, and order a new trial pursuant to Federal Rule of Criminal Procedure 33(a).

Respectfully submitted,

Dated: March 26, 2026

By: */s/ Grant P. Fondo*
GRANT P. FONDO (SBN 181530)
*GFondo@goodwinlaw.com*
DARRYL M. WOO (SBN 100513)
*DWoo@goodwinlaw.com*
RACHEL M. WALSH (SBN 250568)
*RWalsh@goodwinlaw.com*
JESSICA HUANG FUZELLIER (SBN 315208)
*JHFuzellier@goodwinlaw.com*
FARZAD FEYZI (SBN 343538)
*FFeyzi@goodwinlaw.com*
DAVID RAPP-KIRSHNER (SBN 344494)
*DRappKirshner@goodwinlaw.com*
NIRAV BHARDWAJ (SBN 350829)
*NBhardwaj@goodwinlaw.com*

20

NICHOLAS C. WILEY (SBN 351161)
*Nwiley@goodwinlaw.com*
COLETTE A. LOWRY (SBN 359889)
*CLowry@goodwinlaw.com*
**GOODWIN PROCTER LLP**

LORA J. KRSULICH (SBN 315399)
*LKrsulich@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, Suite 4100
Los Angeles, CA 90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Attorneys for Defendant:
LINWEI DING

21

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on **March 26, 2026**. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on **March 26, 2026**.

*/s/ Grant P. Fondo*
Grant P. Fondo

22

CERTIFICATE OF SERVICE
CASE NO. 3:24-CR-00141-VC