GRANT P. FONDO (SBN 181530)
*GFondo@goodwinlaw.com*
FARZAD FEYZI (SBN 343538)
*FFeyzi@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 Marshall Street
Redwood City, CA 94063
Tel.: +1 650 752 3100
Fax: +1 650 853 1038

DARRYL M. WOO (SBN 100513)
*DWoo@goodwinlaw.com*
RACHEL M. WALSH (SBN 250568)
*RWalsh@goodwinlaw.com*
JESSICA HUANG FUZELLIER (SBN 315208)
*JHFuzellier@goodwinlaw.com*
DAVID RAPP-KIRSHNER (SBN 344494)
*DRappKirshner@goodwinlaw.com*
COLETTE LOWRY (SBN 359889)
*CLowry@goodwinlaw.com*
**GOODWIN PROCTER LLP**
525 Market Street, Floor 32
San Francisco, CA 94105
Tel.: +1 415 733 6000
Fax: +1 415 677 9041

Attorneys for Defendant:
LINWEI DING

[*Additional Counsel Listed in Signature Block*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LINWEI DING,<br><br>Defendant. | Case No. 3:24-CR-00141-VC<br><br>**DEFENDANT LINWEI DING'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR A JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, NEW TRIAL PURSUANT TO RULE 29(C) AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**<br><br>Date:        June 16, 2026<br>Time:        2:00 p.m.<br>Courtroom:  3 (17th Floor)<br>Judge:       Hon. Vince Chhabria<br>             450 Golden Gate Avenue<br>             San Francisco, CA 94102<br><br>Filed/lodged concurrently herewith:<br>1.  Declaration of Grant P. Fondo |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

I.      There Is Insufficient Evidence that Mr. Ding Had the Requisite Intent To Commit Economic Espionage at the Time that the Trade Secrets Were Taken. .............................. 3

        A.      The December 2023 Download Is Not a Theft Under Section 1831. ..................... 3

        B.      Government Did Not Charge or Prosecute the December 14, 2023 Download as a Theft. ................................................................................. 10

        C.      Evidence from September 2023 and Later Provides No More Than Speculation About Intent for Uploads Between May 2022 and April 2023. ......... 19

II.     The Government Was Required—And Failed—To Demonstrate That Each Individual Alleged Trade Secret Document Contributed to Each Alleged Combination Trade Secret. ................................................................................. 22

CONCLUSION ................................................................................................................ 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*3M v. Pribyl*,
259 F.3d 587 (7th Cir. 2001)..................................................................................... 23

*Adcor Indus., Inc. v. Bevcorp, LLC*,
252 F. App'x 55 (6th Cir. 2007) ................................................................................ 8

*Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*,
53 F.4th 368 (6th Cir. 2022).................................................................................... 22

*Howard v. Daggett*,
526 F.2d 1388 (9th Cir. 1975)................................................................................. 16

*McCormick v. United States*,
500 U.S. 257 (1991)................................................................................... 15, 19, 22

*Toussie v. United States*,
397 U.S. 112 (1970)............................................................................................ 7, 10

*United States v. Adamson*,
291 F.3d 606 (9th Cir. 2002)............................................................................. 16, 17

*United States v. Beard*,
713 F. Supp. 285 (S.D. Ind. 1989) ........................................................................ 7, 8

*United States v. Cardenas*,
408 F. App'x 106 (9th Cir. 2011) ........................................................................... 16

*United States v. Case*,
656 F. Supp. 2d 603 (S.D. Miss. 2009).................................................................. 17

*United States v. Chung*,
633 F. Supp. 2d 1134 (C.D. Cal. 2009).................................................................... 9

*United States v. Crary*,
2013 WL 6054607 (D. Mont. Nov. 15, 2013) ......................................................... 7

*United States v. Dipentino*,
242 F.3d 1090 (9th Cir. 2001)................................................................................. 16

*United States v. Echeverry*,
719 F.2d 974 (9th Cir. 1983)................................................................................... 18

*United States v. Hernandez*,
859 F.3d 817 (9th Cir. 2017)............................................................................ 20, 21

ii

*United States v. Katakis*,
    800 F.3d 1017 (9th Cir. 2015)........................................................................................ 21

*United States v. Krstic*,
    558 F.3d 1010 (9th Cir. 2009)........................................................................................ 9

*United States v. Lapier*,
    796 F.3d 1090 (9th Cir. 2015)........................................................................................ 18

*United States v. Lee*,
    19 F.3d 31 (9th Cir. 1994)............................................................................................. 18

*United States v. Lopez*,
    484 F.3d 1186 (9th Cir. 2007)........................................................................................ 21

*United States v. McDougald*,
    990 F.2d 259 (6th Cir. 1993)......................................................................................... 21

*United States v. Metcalf*,
    156 F.4th 871 (9th Cir. 2025)........................................................................................ 10

*United States v. Niven*,
    952 F.2d 289 (9th Cir. 1991)......................................................................................... 7

*United States v. Nosal*,
    844 F.3d 1024 (9th Cir. 2016).................................................................................. 22, 23

*United States v. O'Rourke*,
    417 F. Supp. 3d 996 (N.D. Ill. 2019) .............................................................................. 23

*United States v. Payseno*,
    782 F.2d 832 (9th Cir. 1986)......................................................................................... 18

*United States v. Pease*,
    2008 WL 808683 (D. Ariz. Mar. 24, 2008) ...................................................................... 7

*United States v. Reynolds*,
    2018 WL 1071303 (E.D. Cal. Feb. 23, 2018) .................................................................... 7

*United States v. Tsinhnahijinnie*,
    112 F.3d 988 (9th Cir. 1997)......................................................................................... 16

*United States v. UCO Oil Co.*,
    546 F.2d 833 (9th Cir. 1976)......................................................................................... 17

*United States v. Ward*,
    747 F.3d 1184 (9th Cir. 2014)........................................................................................ 16

*United States v. Yates*,
    16 F.4th 256 (9th Cir. 2021)................................................................................ 15, 19, 22

iii

**Other State Cases**

*People v. Blitstein*,
192 Ill. App. 3d 281 (1989)................................................................................8

*State v. Hippler*,
545 N.W.2d 568 (Iowa 1996) ..........................................................................8

*State v. King*,
282 So. 2d 162 (Fla. 1973)...............................................................................8

**Federal Statutes**

18 U.S.C. § 641 .......................................................................................................7

18 U.S.C. § 1831 ............................................................................................. *passim*

18 U.S.C. § 1832 ......................................................................................... 1, 3, 5, 17

18 U.S.C. § 3284 .......................................................................................................9

22 U.S.C. § 618 .........................................................................................................9

**Other Authorities**

Remarks by Sens. Kohl and Specter upon Introduction of S. 1556 and S. 1557,
February 1, 1996, Debate: 142 Congressional Record (Daily Edition), 104th
Congress, 2d Session (1996) ............................................................................4

https://www.dictionary.com/browse/exfiltrate (last visited May 27, 2026) ...............11

Robert Krulwich, *Which Is Greater, The Number Of Sand Grains On Earth Or
Stars In The Sky?,* National Public Radio (September 17, 2012),
https://www.npr.org/sections/krulwich/2012/09/17/161096233/which-is-
greater-the-number-of-sand-grains-on-earth-or-stars-in-the-sky (last visited
May 27, 2026) ................................................................................................24

Senate Report No. 104-258, to Accompany S. 1718, April 30, 1996...........................4

Senate Report No. 104-359, to Accompany S. 1556, August 27, 1996.................. 4, 5, 6

House Report No. 104-788, to Accompany H.R. 3723, September 16, 1996 ...............5

Senate Agreed to the House Amendment to the Senate Amendment to H.R. 3723,
with Full Text of the Measure Printed, Clearing the Measure for the President,
October 2, 1996...............................................................................................6

**INTRODUCTION**

At the May 12, 2026 hearing,[1] the Court expressed significant skepticism toward the government's opposition to Mr. Ding's motion for acquittal on the Economic Espionage convictions, and directed the parties to further brief several issues relating to those counts and to the charged trade-secret compilations. *See also* Dkt. 425. This supplemental brief seeks to address each of the Court's questions.

The government's opposition and its arguments at the hearing confirm what Mr. Ding's motion already established: unable to defend the jury's verdict on the record it created at trial, the government now seeks to rewrite the record after the fact. The difficulty is fundamental. The earliest evidence that Mr. Ding was aware of any connection between Zhisuan and a PRC instrumentality postdates the charged uploads by at least five months. To bridge that gap, the government now asks this Court to sustain the economic espionage conviction on a theory it never charged in the Second Superseding Indictment ("SSI"), never argued to the jury, and never even articulated until after Mr. Ding filed his post-trial motion: that the December 14, 2023 download of the previously stolen files to Mr. Ding's personal laptop was itself a fresh theft of the 112 trade secrets, committed with the intent to benefit China. That theory is legally untenable, factually unsupported, and fundamentally unfair.

The government's belated reliance on the December 14, 2023 download fails for multiple independent reasons. First, as a matter of law, a theft under Sections 1831 and 1832 is complete when the defendant first takes the trade secrets; duplicating or moving files that have already been stolen does not give rise to a new offense when involving the same trade secrets. The legislative history of the Economic Espionage Act and the caselaw on analogous theft statutes also compel this conclusion.

Second, the government never charged the December 14, 2023 download as a theft and never presented that theory to the jury. The SSI does not mention the download. The government's

---

[1] References to the May 12, 2026 hearing transcript are noted as "Hrg. Tr." in this memorandum and are set forth for this Court's reference in Ex. A to the Fondo Decl. References to trial testimony are denoted as "Trial Tr." and are set forth for this Court's reference in Ex. B to the Fondo Decl. References to trial exhibits are denoted as "Ex." and are set forth for this Court's reference in Ex. C to the Fondo Decl.

pretrial filings uniformly described the download as an act of concealment of "previously exfiltrated" information. The government's opening statement drew a clear distinction between the uploads (the thefts) and the download (the cover-up). And the government's closing argument discussed the download in the context of consciousness of guilt, not as an independent criminal act. The government cannot now, months after trial, backfill its case with a theory it never advanced to the jury when Mr. Ding still had the opportunity to confront it. When this Court asked the government at the May 12, 2026, hearing to identify the precise criminal act underlying each count at the hearing, the government could not provide a clear answer, instead ultimately characterizing the uploads and the download as "two instances of the same crime." If the government itself, after all this time and a full round of briefing on this very issue, cannot clearly articulate whether Mr. Ding was charged with one theft or two, Mr. Ding plainly lacked the notice to which he was entitled.

The government's fallback argument—that the jury could have inferred Mr. Ding's intent to benefit PRC instrumentalities at the time of the uploads based on evidence from September 27, 2023 and later—should be summarily rejected. The government concedes that "there are no explicit statements of Ding's intent to benefit the PRC prior to uploading the stolen trade secrets," and the government never even argued to the jury that it could infer intent between May 21, 2022 and April 17, 2023 based on connections with the PRC beginning no earlier than September 27, 2023. That the government is now, more than three months after the verdict, asking the Court for supplemental briefing so that it could "go back" and "try to find in the record the earliest possible instances" of intent, rather than identify any instances in prior briefing or at the May 12, 2026 hearing, only underscores that this theory is an unsupported afterthought, not the case the jury heard.

What the government asks this Court to accept is fundamentally unfair and constitutionally improper: that Mr. Ding can be convicted of Economic Espionage based on a theory of the criminal act that was never charged, never argued, and is legally wrong, supported by an inference of intent that the government itself never asked the jury to draw. The Constitution does not permit such a result. Mr. Ding respectfully submits that the Court should grant his motion for a judgment of acquittal on Counts Eight through Fourteen.

2

Additionally, the government was required at trial to prove that each individual document in an alleged combination trade secret meaningfully contributed to the unique combination, thereby giving the whole of the combination trade secret a greater value than the sum of its parts. The government failed to introduce sufficient evidence to meet this standard beyond a reasonable doubt and Mr. Ding respectfully requests that the Court grant his motion for judgment of acquittal on Counts One through Three, Six, Eight through Ten, and Thirteen accordingly.

**I.    THERE IS INSUFFICIENT EVIDENCE THAT MR. DING HAD THE REQUISITE INTENT TO COMMIT ECONOMIC ESPIONAGE AT THE TIME THAT THE TRADE SECRETS WERE TAKEN.**

**A.    The December 2023 Download Is Not a Theft Under Section 1831.**

During the May 12, 2026 hearing, the Court asked for further briefing on: (1) caselaw regarding whether 18 U.S.C. §§ 1831 and 1832 cover a second theft of the same trade secrets; (2) legislative history regarding the same; (3) treatment of analogous crimes; and (4) other issues relevant to whether Mr. Ding had the requisite intent at the time of the criminal act. Hrg. Tr. 25:23-26:15, 34:13-20. The government charged the Economic Espionage Counts under 18 U.S.C. § 1831(a), which criminalizes "[w]hoever, intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent, knowingly—

(1) steals, or without authorization appropriates, takes, carries away, or conceals, or

by fraud, artifice, or deception obtains a trade secret; [or]

(2) without authorization copies, duplicates, sketches, draws, photographs,

downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers,

sends, mails, communicates, or conveys a trade secret,"

as well as possession with knowledge of appropriation without authorization (subsection 3), attempt to commit any aforementioned offense (subsection 4), or conspiracy to commit any aforementioned offense (subsection 5). Subsections (1) and (2) in 18 U.S.C. § 1832(a) are identical.

This provision addresses only the initial theft of a trade secret, and not subsequent handling of the same trade secret. The government's interpretation of the statute as creating exponentially-proliferating crimes is novel and unpersuasive. The defense is unaware of any case specifically addressing whether Section 1831(a)(1) or (a)(2) treat each subsequent handling of an already-

DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
CASE NO. 3:24-CR-00141-VC

misappropriated trade secret as a separate theft of that same trade secret, or whether the initial misappropriation of that trade secret is instead a single completed offense that cannot be recommitted as to the same trade secret. The defense is also unaware of any case charging two separate counts under Section 1831(a)(1) and (a)(2) for the taking of a trade secret and later duplication or movement of that same trade secret.

Although the defense is unaware of any case that has addressed these precise questions, the Economic Espionage Act's legislative history makes it clear that Congress intended to punish the theft of trade secrets, not to create a new crime for subsequent handling of stolen trade secrets. First, what was to become the Economic Espionage Act was introduced in early 1996 to address a gap in the law: federal criminal laws focused on theft of *tangible* property but left unpunished the theft of intangible information, particularly the kind of theft in which the owner is never dispossessed because the information is merely copied, leaving the original in the owner's hands. *See* Remarks by Sens. Kohl and Specter upon Introduction of S. 1556 and S. 1557, February 1, 1996, Debate: 142 Congressional Record (Daily Edition), 104th Congress, 2d Session (1996). In enumerating the conduct covered by what became Sections 1831(a)(1) and (a)(2), Congress's aim was ensuring that the theft of trade secrets reached this intangible form of taking—not to create a new category of crime, unknown to prior criminal law, that punishes absent any misappropriation at all:

- "Section 572(a) defines the offense of 'economic espionage' and punishes the theft or wrongful appropriation, duplication, alteration, destruction, or conversion of proprietary economic information on behalf of a foreign government. . . . The intangible nature of vital proprietary economic information requires the section to be written broadly enough to cover both traditional instances of theft, where the object of the crime is removed from the rightful owner's control and possession, as well as non-traditional methods of misappropriation involving electronic duplication or alteration in which the original property never leaves the dominion or control of the rightful owner." Senate Report No. 104-258, to Accompany S. 1718, April 30, 1996, at 23; *see also* Senate Report No. 104-359, to Accompany S. 1556, August 27, 1996, at 15 (providing similarly for what becomes 18 U.S.C. § 1832).

- "Under many Federal statutes, even basic concepts can prove problematic. For example, if an individual 'downloads' computer source code without permission of the owner, has a theft occurred even though the true owner never lost possession of the original and is not permanently deprived of its

4

use?" Senate Report No. 104-359, to Accompany S. 1556, August 27, 1996, at 10.

- Providing regarding a parallel House of Representatives bill that "[i]t is the Committee's intent that the phrase 'copies or otherwise controls' be read broadly to include virtually any means by which information can be recorded, altered, or otherwise manipulated. This phrase includes both the taking of physical possession of the medium on which the information is stored, recorded, or otherwise memorialized as well as situations where the information has been copied, duplicated, photographed, drawn, or otherwise reproduced in some form from the original and where the original information continues to remain in the possession of the owner. This concept of control also includes situations in which the information has been transmitted from one place to another (regardless of whether by electronic means, through the mails, or by person), even if in transmitting the information it continues to remain in the possession of its rightful owner." House Report No. 104-788, to Accompany H.R. 3723, September 16, 1996, at 7-8.

The government said during the hearing that "Congress intended [Sections 1831 and 1832] to be broad statutes." Hrg. Tr. 8:22-24. But the legislative history shows that the breadth of subsections (1) and (2) is a reflection of Congress's focus on ensuring simply that the theft in any form or manner of any kind of intangible trade secret information, including the theft of information that, because it is merely copied, remains in the owner's possession even as it is taken, is criminalized. There is no support for the notion that Congress intended to create a continuing crime or create double liability for copying or moving the previously stolen information after it has been misappropriated. Rather, the legislative history demonstrates that Congress intended for 1831(a)(1) to cover instances of traditional theft, where the owner is dispossessed of property, and for 1831(a)(2) to cover instances of less conventional theft, where the property remains in the owner's possession but is nonetheless misappropriated via copying, duplication, or other means.

Second, the legislative history confirms that Congress understood subsection (a)(2) as seeking to describe the various means of accomplishing the intangible taking of a trade secret:

- "Ironically, the very conditions that make this proprietary information so much more valuable make it easily stolen. Computer technology enables rapid and surreptitious duplications of the information. Hundreds of pages of information can be *loaded* onto a small computer diskette, placed into a coat pocket, and *taken from the legal owner*." Senate Report No. 104-359, to Accompany S. 1556, August 27, 1996, at 7 (emphasis added).

5

- "While the [National Stolen Property Act] works well enough for crimes involving traditional 'goods, wares, and merchandise,' it was drafted at a time when computers, biotechnology, and copy machines did not even exist. Consequently, it is not particularly well suited to deal with situations in which intangible information alone is wrongfully *duplicated and transmitted electronically* with a few keystrokes." Senate Report No. 104-359, to Accompany S. 1556, August 27, 1996, at 10 (emphasis added).

- "With these nontraditional methods the original property never leaves the dominion or control of the rightful owner, but *the unauthorized duplication or misappropriation* effectively *destroys the value of what is left* with the rightful owner. In an electronic environment, information can be stolen without asportation, and the original usually remains intact." Senate Report No. 104-359, to Accompany S. 1556, August 27, 1996, at 15 (emphasis added).

- "[T]heft usually requires that the thief take the property with the intention of depriving the lawful owner of its use. *But such a test if [sic] useless when a person copies software and leaves the original software with the lawful owner, taking only the secrets on the software but leaving the physical property. The lawful owner still has full use of the property, but its value is significantly reduced.*" Senate Agreed to the House Amendment to the Senate Amendment to H.R. 3723, with Full Text of the Measure Printed, Clearing the Measure for the President, October 2, 1996, at S12208 (emphasis added).

And third, the legislative history shows that, in adding the intangible means of conversion in subsection (a)(2), Congress was not attempting to remake the crime of theft into something new; it was extending a familiar, well-settled concept to reach a form of taking that older statutes failed to capture:

- "Our intent, therefore, is to ensure that the theft of intangible information is prohibited in the same way that theft of physical items are protected." Senate Report No. 104-359, to Accompany S. 1556, August 27, 1996, at 15.

- "For many years, the United States has had a variety of theft statutes in the United States Code. These laws are derived primarily from the common law of theft. . . . In order to violate such laws, however, the courts have held that the property stolen cannot be intangible property, such as trade secrets or intellectual property. In addition, theft usually requires that the thief take the property with the intention of depriving the lawful owner of its use." Senate Agreed to the House Amendment to the Senate Amendment to H.R. 3723, with Full Text of the Measure Printed, Clearing the Measure for the President, October 2, 1996, at S12208 (emphasis added).

6

DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
CASE NO. 3:24-CR-00141-VC

In addition to the legislative history, caselaw on when a crime is considered "continuing" is also instructive for determining whether the subsequent handling of stolen documents constitutes a separate theft of those same documents. If the original theft is a continuing offense, later handling may be a part of that ongoing crime; if it is not, the theft was complete at the moment of taking, and any later handling stands apart from it. The Supreme Court has made clear that the continuing offense doctrine "should be applied in only limited circumstances." *Toussie v. United States*, 397 U.S. 112, 115 (1970). A crime is therefore not continuing "unless [1] the explicit language of the substantive criminal statute compels such a conclusion, or [2] the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Id.* And critically, that inquiry "turns on the nature of the substantive offense, not on the specific characteristics of the conduct in the case at issue." *United States v. Niven*, 952 F.2d 289, 293 (9th Cir. 1991), *overruled on other grounds by United States v. Scarano*, 76 F.3d 1471, 1477 (9th Cir. 1996).

In the theft context, Ninth Circuit courts applying the continuing-offense doctrine have consistently held that a theft is complete when the defendant took the relevant item, and later acts with the stolen item form no part of the initial offense. *See United States v. Pease*, 2008 WL 808683, at *3 (D. Ariz. Mar. 24, 2008) (holding, for statute-of-limitations purposes, that conversion of government funds under 18 U.S.C. § 641 is not a continuing offense); *United States v. Crary*, 2013 WL 6054607, at *3 (D. Mont. Nov. 15, 2013) (same); *United States v. Reynolds*, 2018 WL 1071303, at *3 (E.D. Cal. Feb. 23, 2018) (holding, for statute-of-limitations purposes, that embezzlement of health care plan assets is not a continuing crime). Under the logic of these cases, each theft in violation of Section 1831(a)(1) or (a)(2) is complete once a defendant has the trade secrets. There is no additional or continuing theft of the same trade secret.

Other courts construing other federal and state theft statutes have reached the same conclusion, and several have explained why in terms that map directly to the facts in this case. *United States v. Beard* is instructive. 713 F. Supp. 285 (S.D. Ind. 1989). There, the defendant, a Director of Real Estate for the Indiana University Foundation, was charged with conversion under 18 U.S.C. § 641 for diverting $27,000 from the foundation to his own use. Section 641 prescribes

7

criminal penalties for "[w]hoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted." Defendant argued that the indictment was untimely under the five-year statute of limitations because the conversions occurred in 1976 and he was not indicted until 1988. 713 F. Supp. at 289. The government responded that conversion is a continuing offense such that the statute of limitations would not begin running until defendant ceased retaining the converted funds. *Id.* at 298-90. The court disagreed, reasoning that "retention of the converted property is not in any way an element or part of the crime of conversion. . . . [w]hat the converter intends to do (or in fact does) with the converted property is irrelevant: the act of 'conversion' is completed upon the initial interference with the owner's interest." *Id.* at 291.

Similarly, in *People v. Blitstein*, the indictment stated that "by deception defendant obtained control over property, specifically 'checks or orders for the payment of money.'" 192 Ill. App. 3d 281, 284 (1989). The court found that the indictment was untimely because the relevant date was the date on which defendant obtained the check, not the date on which he cashed the check: "We find that the theft of the March 18 check was complete when defendant obtained control over it. He could not commit a second, separate theft of the same check when he cashed it." *Id.* at 285; *accord State v. Hippler*, 545 N.W.2d 568, 571-72 (Iowa 1996) (holding, in the felony-murder context, that car theft under Iowa law is not a continuing offense, and collecting cases); *State v. King*, 282 So. 2d 162, 167 (Fla. 1973) (holding, for statute-of-limitations purposes, that larceny is not a continuing crime).[2]

---

[2] The defense mentioned *Adcor Indus., Inc. v. Bevcorp, LLC*, 252 F. App'x 55, 62 (6th Cir. 2007) during the May 12, 2026 hearing. While this civil case presents factual similarities—the court found plaintiff's claim untimely as to the alleged taking of the trade secrets and rejected plaintiff's request for discovery regarding defendant's later movement of a safe containing the trade secrets as irrelevant—analysis of the statute of limitations in the civil context is too different to provide helpful insight in the criminal context.

DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
CASE NO. 3:24-CR-00141-VC

The statutory text here confirms what the legislative history and the case law establish. A crime is continuing only where its text reflects that Congressional intent, and nothing in Sections 1831(a)(1) and (a)(2) does. Congress has made clear in other statutes that particular crimes are to be viewed as continuing. In 18 U.S.C. § 3284, for example, Congress stated that concealment of assets of a debtor "shall be deemed a continuing offense" until the debtor is discharged or discharge is denied. *Id.* (discussing other statutes). Similarly, in 22 U.S.C. § 618(e), Congress provided that a failure to file foreign registration statements "shall be considered a continuing offense for as long as such failure exists." *Id.* Unlike these statutes, Congress expressed no intent here to treat sections 1831(a)(1) or (a)(2) as continuing offenses. Rather, in 1831(a)(1) and (a)(2), Congress defined each offense through verbs—"takes," "downloads," "uploads"—that describe discrete acts complete upon commission. This statutory text is no different from the statutes the courts construed in the theft cases above, where they rejected the idea that theft could be a continuing crime. Taking a trade secret is accomplished when it is taken, and copying or downloading it when the copy is made or the file transferred. Nothing in the nature of these acts suggests they persist after the act is done.[3]

Taken together, the language of the statute, the legislative history, and courts' treatment of similar theft crimes all point to a single conclusion: a violation of Section 1831(a)(1) or (a)(2) is complete when a defendant finishes taking the trade secret. The offense does not stretch forward to encompass whatever the defendant later does with what he has taken. The government conceded this argument precisely in its rebuttal argument, telling the jury that it did not matter what Mr. Ding did with the trade secrets.[4] Trial Tr. 2211:13-2212:5. This is dispositive here. Because the offense was complete at the moment of the taking, that is the moment at which Mr. Ding's intent must be measured—and at that moment, there is no evidence that he had intent to benefit a Chinese instrumentality as Section 1831 requires.

---

[3] *United States v. Chung* is not to the contrary. *See* 633 F. Supp. 2d 1134, 1146 n.12 (C.D. Cal. 2009), *aff'd* 659 F.3d 815 (9th Cir. 2011). *Chung* treated § 1831(a)(3) as continuing because that subsection criminalizes possession—a classic continuing offense that persists as long as the defendant retains the item. *See United States v. Krstic*, 558 F.3d 1010, 1017-18 (9th Cir. 2009) ("possessory offenses have long been described as 'continuing offenses'"). The jury here was not instructed on § 1831(a)(3). Dkt. 362 at 17.

[4] In fact, the government repeatedly told the jury this, to counter the fact that the government had no evidence Mr. Ding ever used or transferred the alleged trade secrets.

9

To the extent there is any ambiguity, it must be construed in Mr. Ding's favor. *Toussie*, 397 U.S. at 115 (finding a crime to be continuing is disfavored and it must be found that "the explicit language of the substantive criminal statute compels such a conclusion, or that the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one"); *United States v. Metcalf*, 156 F.4th 871, 883 (9th Cir. 2025) (reversing denial of motion to dismiss a charge for possessing a firearm near a school, explaining in part that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity"). Indeed, this approach makes good sense. It would be absurd if the defendant could be charged with trade secret theft for simply moving trade secret files that had already been taken.

Finally, it is worth emphasizing that this is not a possession case. Subsection (a)(3) criminalizes receiving, buying, or possessing a trade secret known to have been stolen—a distinct offense from the taking charged under subsections (a)(1) and (a)(2). The government conceded to and never objected to dropping that offense at the charging conference (Dkt. 394 at 10, Dkt. 421 at 2), and it would be unfair to let the government recharacterize now what charges were actually presented to the jury. Nor is the omission surprising: the government's presentation at trial focused throughout on the taking, not on the receipt, purchase, or possession of trade secrets Mr. Ding knew to have been stolen. The case was tried as a taking case, and it should be decided as one.

Because the December 14, 2023 download cannot be considered a theft as a matter of law, Mr. Ding is entitled to a judgment of acquittal on Counts Eight through Fourteen.

**B.      Government Did Not Charge or Prosecute the December 14, 2023 Download as a Theft.**

In addition to the fact that the December 14, 2023 download is not a separate theft under Section 1831(a)(1) or (a)(2), the download also cannot be a bridge to the requisite intent because the government did not present this theory at trial.

First, the government charged Mr. Ding with uploading trade secrets on four dates between May 21, 2022 and April 17, 2023, but it did not charge Mr. Ding with perpetrating a theft by downloading the trade secrets on December 14, 2023. As Mr. Ding argued in his opening and reply briefs, the download is not so much as mentioned in the SSI, and a generic reference to the statutory

10

language and a date range spanning nearly two years is far from adequate to put Mr. Ding on notice. Dkt. 394 at 9-10; Dkt. 421 at 3.

Second, nor did the grand jury testimony or the government's filings put Mr. Ding on notice. In addition to Mr. Ding's discussion of the grand jury testimony relied upon by the Government and discussed in his opening and reply briefs, additional submissions by the government confirm that it did not consider the December 14, 2023 download to be a theft, but simply evidence of concealment:

- In its motion to admit inextricably intertwined evidence filed *the same day as the SSI*, the government said in: "Ding stole trade secrets documents on four of those dates: May 21, 2022, June 1, 2022, June 3, 2022, and April 17, 2023. On December 14, 2023, Ding downloaded all the documents he had previously exfiltrated to his personal computer." Dkt. 142 at 2. The government goes on to note that the "timing of Ding's theft was not a coincidence" because he started interviewing with Rongshu in early May 2022 and meeting with Zhisuan investors in April 2023, making no mention of events in December 2023. *Id.* at 2. The government also used the term "exfiltrations" to refer to the thefts— notably, "exfiltrate" means "escape from an area under enemy control"[5]—and the government made clear the December 2023 download concerned "*previously exfiltrated* Google information." *Id.* at 3.

- In another motion filed *the same day*, the government wrote: "On January 13, 2024, the government executed search warrants on multiple of Ding's personal Google accounts and recovered over a thousand files that Ding had exfiltrated from Google." Dkt. 144 at 1. The government made no statement about the documents Mr. Ding had downloaded to his laptop on December 14, 2023.

- The government said in a motion in limine opposition: "Ding applied for MiraclePlus [in May 2023] a month after he exfiltrated hundreds of documents from his corporate device, including dozens of trade secret documents." Dkt. 168 at 4-5.

- And in another opposition, the government said: "The government expects the evidence at trial to show that, at the time the defendant presented his company, Zhisuan, to investors at the Miracle Plus conference in Beijing on November 24, 2023, Google did not know that the defendant had exfiltrated more than 1,000 files containing Google's confidential and trade secret information[.]" Dkt. 181 at 7.

---

[5] Dictionary.com, "exfiltrate," https://www.dictionary.com/browse/exfiltrate (last visited May 27, 2026).

11

Each and every one of these filings shows that the government took the position that the thefts took place when Mr. Ding "exfiltrated" the files from the enemy territory of Google, not when he moved them from the friendly territory of his own personal Google drive to his laptop. The government never argued or provided notice that it considered the December 2023 download to be an additional theft of trade secrets, exposing him to additional liability under subsection (a), instead repeatedly affirmatively representing that the alleged thefts occurred when Mr. Ding uploaded the trade secrets on four dates between May 21, 2022 and April 17, 2023. Indeed, the parties filed numerous pretrial motions, and the subject of the December 14, 2023 download as a theft was never brought up by the government, the defense, or the Court. That is because it was clear the government did not consider the December 14, 2023 download to be a theft.

Third, in the case the government presented to the jury, the government's theory was that the thefts took place on the dates of the four uploads between May 21, 2022 and April 17, 2023, not on December 14, 2023. Mr. Ding set out much of this information in his opening and reply briefs (Dkt. 394 at 10-11; Dkt. 421 at 4-5), and the Government offered no response to it. Mr. Ding highlights the key passages here. To start, the government's opening argument distinguished between Mr. Ding's efforts to exfiltrate or steal the documents between May 21, 2022 and April 17, 2023, and his efforts to conceal his prior theft through his download in December 2023:

- "So let's walk through the steps that the defendant took to get these documents containing Google's proprietary technology off the network." Trial Tr. 38:10-12.

- After describing the Apple Notes process, the government then said, "Once he had the PDFs, he sent them from his Google computer, uploaded them to a personal cloud account that he controlled, linweidin@gmail.com [sic]." Trial Tr. 39:5-7.

- The government added that Mr. Crain would testify "about how the defendant stole the documents" and that Mr. Crain would explain "that in total, over the course of about a year, between May of 2022 and May of 2023, the defendant transferred 1,255 documents, a total of over 14,000 pages, including more than 4,000 individual screenshots, from his Google computer to this personal cloud account." Trial Tr. 39:22-40:5.

- The government noted the importance of the coincidence in timing between Mr. Ding's interview with Rongshu in May 2022 and the first upload of trade secrets in May 2022. *Id.* at 41:13-23. The government similarly emphasized the

12

importance of the fact that Mr. Ding met with a Chinese private investment bank for Zhisuan on April 17, 2023, and argued that he made his largest upload of trade secrets that very day in response to that meeting. Trial Tr. 42:9-18.

- It was not until ten transcript pages later that the government turned to "the things the defendant did to hide what he was up to from Google, hide his theft of the documents[.]" Trial Tr. 51:17-20. The government then discussed the December 14, 2023 download as an effort to hide his prior theft from Google. Trial Tr. 53:14-19.

At the May 12 hearing, the government pointed to Mr. Crain's report and Agent Valladao's testimony as support for its assertion "that the December 14th downloads were not part of the Government's theory of the case" being "flatly wrong" and "erroneous." Hrg. Tr. 30:13-25. Mr. Ding has never asserted in his briefing or at the hearing that the December downloads were not part of the government's case, but rather that these downloads were never charged or argued as a separate and an additional theft of 112 trade secrets or done with the intent commit economic espionage. According to the government's post-trial theory, it charged and argued this case based on Mr. Ding's commission of an additional 112 trade secret thefts on December 14, 2023, and tied those thefts to the Economic Espionage charges. If that was an accurate statement, then the government should have been able to quickly identify in its prior brief and during the hearing the precise statements where such theories were asserted; these are not complicated theories and easily could have been articulated throughout the case and trial. But the government cannot, because that was never its theory until *after the trial*. As already argued, Mr. Crain's report did no more than mention the download, and provided no suggestion of the government's consideration of the download to be an additional theft. Dkt. 421 at 5-6. Similarly, Mr. Crain's testimony addressed the fact of the download, but provided no information whatsoever regarding the government's view of its significance. Trial Tr. 451:3-19. The government relied on Agent Valladao's testimony for the first time in the hearing, but it fails for the same reason as its reliance on Mr. Crain's. Agent Valladao's testimony covered 249 pages (approximately 6,225 lines) of testimony over two days, and yet she gave but *two lines* of testimony about the December 2023 download: "December 14th, Mr. Ding downloaded the trade secret files from his personal Google Drive account into his

personal laptop." Trial Tr. 768:6-8.[6] She provided no testimony whatsoever to support the notion that the government viewed the December 14, 2023 download to be a theft, or evidence of Mr. Ding's intent to commit Economic Espionage.

During the hearing, the government placed great emphasis on a statement it made in its closing argument, contending that statement shows that it considered the December 14, 2023 download to be a theft. Not so. That statement, made as the government was ticking through the elements of trade secret theft, provides: "And finally, you have to find that the defendant knowingly took the trade secret information without authorization. This is not contested. You know that the defendant uploaded all of the stolen trade secrets to his personal e-mail account, which is against Google's policies. And then, as we talked about, he downloaded all of the trade secrets on December 14th, just six days after Mr. Fuller reminded him of the policies and after he had sworn that he would delete all Google information from his accounts and devices." Trial. Tr. 2154:20-2155:4. This statement is clearly focused on consciousness of guilt: the government begins by noting the download, and concludes the sentence by emphasizing that this shows Mr. Ding lied to Google when he did not delete all these files. This understanding is confirmed by the government's reference to its earlier discussion of the download, where the government again framed the December 14, 2023 download as showing Mr. Ding's lack of honesty with Google: "The defendant said he searched his personal possessions . . . . and that he permanently deleted or destroyed all copies of that information. . . . **The defendant did not do any of that**. Instead, on December 14th, 2023, six days later . . . [i]nstead of deleting all the information **like he said he would**, he downloaded **all of the information he *had* stolen** and stored on his personal account to his personal computer[.]" Trial Tr. 2148:19-2149:13 (emphasis added).

The government's mischaracterization of this snippet of argument is further demonstrated by the fact that it is not just inconsistent but contradicted by the rest of the government's closing argument:

---

[6] In contrast, the government went so far as to elicit Agent Valladao's testimony about the precise timing of Mr. Ding's April 17, 2023 upload during a meeting with an investment bank on behalf of Zhisuan. Trial Tr. 682:1-684:12.

14

- "From May 2022 to April 2023, the defendant stole over 2,000 pages of Google's cutting-edge AI trade secrets." Trial Tr. 2110:18-20.

- "In mid-December 2023, about two weeks before the defendant resigned from Google and was on his way out the door, he downloaded all of the *stolen* trade secrets to his personal computer." Trial Tr. 2110:24-2111:2 (emphasis added).

- "So let's talk about how the defendant stole the trade secrets in this case. . . . the Government's forensic expert, Andrew Crain, testified that he was able to tell from Google's forensic logs that the defendant compiled information from multiple internal Google source documents and copied and pasted them into Apple Notes on his Google computer. The defendant then PDF'd the notes and uploaded them to his personal account." Trial Tr. 2112:19-2113:4.

- "About two weeks after that first conversation with Mr. Ye [the CEO of Rongshu] on May 21st, 2022, the defendant uploaded 129 documents from his Google computer to his personal account, including four of the trade secret documents." Trial Tr. 2117:7-10.

- "Special Agent Valladao testified that that meeting [on April 17, 2023, with a Chinese investment bank] occurred at 3:00 P.M. in Beijing, which is 7:00 A.M. UTC time. . . . you can see that as the meeting was starting with investors, the defendant was actively uploading dozens of trade secret documents[.]" Trial Tr. 2121:13-17.

The government's argument that *a few ambiguous (at best) lines* of a transcript from their closing argument is adequate to show the government's theory regarding one of the key elements of both offenses, the operative criminal act, is baseless. This is particularly so in light of the fact that this characterization conflicts with the SSI, months of motion filings, the government's opening statement, and the rest of the government's closing statement. If the government's theory was as it now seeks to assert, its three prosecutors and many witnesses certainly were capable of clearly articulating it over the course of two years and three weeks of trial. None did so, and for an obvious reason—it was not the government's theory. Courts reviewing the sufficiency of the government's evidence at trial cannot affirm a conviction on a different theory than was ever presented to the jury. *See McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991) (reversing opinion based on theories never presented to the jury); *United States v. Yates*, 16 F.4th 256, 265 (9th Cir. 2021) (vacating defendants' convictions on legally insufficient theories presented to jury).

15

If this extensive evidence about the government's actual theory at trial were not enough, it is further confirmed because if the government had adopted this position at trial, it would have run into two big problems. First, there would have been a constructive amendment or prejudicial variance of the SSI because the SSI did not charge Mr. Ding with the December 14, 2023 download. Courts have found constructive amendment or prejudicial variance in circumstances just like those here, where conviction could have been based on a different act on a significantly different date than what was charged. *See, e.g., United States v. Ward*, 747 F.3d 1184, 1192 (9th Cir. 2014) (constructive amendment where defendant charged with aggravated identity theft for two victims, but government's evidence, opening, and closing arguments referred to five victims total, and jury instruction did not limit conviction to two victims named in indictment); *United States v. Dipentino*, 242 F.3d 1090, 1095 (9th Cir. 2001) ("It is evident that the district court constructively amended the indictment because the jury instruction permitted the jury to convict the defendants of violating a work practice standard they were not charged in the indictment with violating."); *Howard v. Daggett*, 526 F.2d 1388, 1389-90 (9th Cir. 1975) (constructive amendment where defendant charged with inducing two specific women to engage in prostitution, but evidence and instructions allowed jury to convict defendant of inducing women neither named nor mentioned in indictment); *United States v. Cardenas*, 408 F. App'x 106, 109 (9th Cir. 2011) (fatal variance where defendant was charged with providing false name to law enforcement but government argued during closing the jury could convict if defendant had used the charged name or one other name); *United States v. Tsinhnahijinnie*, 112 F.3d 988, 991 (9th Cir. 1997) (fatal variance where government charged crime on one date and government then presented evidence the crime had taken place on a different date during trial).

The government argued during the hearing that a detailed speaking indictment is not required. Hrg. Tr. 7:14. But when the government chooses to indict with a speaking indictment, as it did here, it is limited to its allegations in proving its case. In *United States v. Adamson*, the government charged defendant with wire fraud relating to a statement that a set of servers had been updated, but at trial the jury instructions allowed the jury to convict if it found that the defendant had misrepresented how the servers had been upgraded. 291 F.3d 606, 615-16 (9th Cir. 2002). The

16

court explained that this frustrated the purpose of an indictment, which is to inform a defendant of what he is accused so that he can prepare his defense. *Id.* at 616. The court specifically explained that "[i]f the indictment had not specified a different particular misrepresentation, one might say the variance was benign. Having specified a different particular misrepresentation, however, the indictment not only failed to inform the defendant of the actual misrepresentation that would be shown at trial, but it also affirmatively misled the defendant and obstructed his defense at trial." *Id.* The same is true here. The government decided to include detail about the specific instances of theft in the SSI. That it included allegations about only the uploads when it purportedly intended to also take the position that the download was also a theft would have affirmatively misled Mr. Ding in the preparation of his defense at trial.

The second big problem the government would have faced if it argued that each count was adequately supported by two separate, independent acts is duplicity and the need for a unanimity instruction. "Duplicity is the joining in a single count of two or more distinct and separate offenses," which creates the problem that "a jury may find a defendant guilty on a count without having reached a unanimous verdict on the commission of a particular offense." *United States v. UCO Oil Co.*, 546 F.2d 833, 835 (9th Cir. 1976). At the hearing, when this Court attempted to elucidate the government's view of the indictment, the government should have been able to provide a clear, concise answer, it could not. Instead it said, "They're both theft of trade secrets; right? Our argument, as charged, both instances, the uploads and the downloads, were both theft of trade secrets and economic espionage. They're two instances of the same crime." Hrg. Tr. 13:13-16. The government thus conceded that under its interpretation of the SSI, it joined two distinct and separate offenses in each and every one of the 14 counts. This would make all 14 counts duplicitous, creating the risk that the jury would not unanimously agree on which act—the uploading or the downloading—constituted the theft. *Accord United States v. Case*, 656 F. Supp. 2d 603, 613-14 (S.D. Miss. 2009) (holding that § 1832(a)(1) and (a)(2) are separate and distinct acts that are properly charged separately).

This risk is often addressed through a specific unanimity instruction, which of course was not raised by the government. A specific unanimity instruction must be given if there is a "genuine

17

possibility" either that different jurors might vote to convict a defendant on the same count based on different sets of facts, or that jurors might otherwise be confused. *United States v. Echeverry*, 719 F.2d 974, 975 (9th Cir. 1983). Here, without a specific unanimity instruction, there would have been a genuine possibility that some jurors found Mr. Ding guilty of theft by uploading trade secrets from Google between May 21, 2022 and April 17, 2023, while other jurors would have found Mr. Ding guilty of theft by downloading the same trade secrets to his laptop on December 14, 2023. This was especially so here where the jury was tasked with evaluating 14 counts concerning seven categories of trade secrets; the government presented evidence of not only the four uploads and one download, but also numerous other uploads as "inextricably intertwined" with the charged conduct; and the charged conduct covered more than a year and a half. Courts find the risk of a lack of unanimity in just such circumstances and thus require a specific unanimity instruction. *See, e.g., United States v. Lapier*, 796 F.3d 1090 (9th Cir. 2015) (reversing defendant's conspiracy conviction where government charged conspiracy from September 2011 to December 2012, but evidence showed one conspiracy from December 2011 to September 2012 and another conspiracy from October 2012 to December 2012); *United States v. Lee*, 19 F.3d 31 (9th Cir. 1994) (reversing defendant's conviction for drug possession, where it was charged as occurring simply sometime in 1990 in the District of Hawaii, and government presented evidence of numerous similar drug transactions); *United States v. Payseno*, 782 F.2d 832, 837 (9th Cir. 1986) (reversing defendant's conviction where the government presented evidence that the defendant engaged in extortion on three occasions for one count of extortion because "there exists the genuine possibility that some jurors may have believed Payseno used extortionate means on one occasion while others may have believed that he was guilty of engaging in extortion at a different time and place"). If the government had actually argued two separate thefts at trial, the government, the defense, and the Court would all have recognized the need for a unanimity instruction. It is inconceivable that the government would blithely accept the likelihood of the need for a new trial for all 14 counts because of the lack of a unanimity instruction.

Respectfully, this is not a close call—the government cannot seek to pick through two years of litigation and trial to try to find some statement somewhere that might support theories never

18

presented to the jury. For all of these reasons, the government's argument that it charged and argued that the December 14, 2023 download was an act of theft must be rejected. The link between Mr. Ding's intent and the Economic Espionage counts may not be supported on this new theory that was not presented to the jury. *McCormick*, 500 U.S. at 270 n.8 (explaining that a court of appeals may not affirm a conviction based on legal or factual theories never tried before the jury); *Yates*, 16 F.4th at 265 (concluding that convictions cannot be affirmed based on a new theory that the government did not present to the jury).

Mr. Ding is accordingly entitled to a judgment of acquittal on Counts Eight through Fourteen for this independent reason.

### C.   Evidence from September 2023 and Later Provides No More Than Speculation About Intent for Uploads Between May 2022 and April 2023.

The government failed to present legally-sufficient evidence of intent for the uploads between May 21, 2022 and April 17, 2023. Mr. Ding argued in his motion that the earliest evidence that Mr. Ding was aware of Zhisuan attempting to work with an instrumentality of the PRC is from a September 27-28, 2023 WeChat between a colleague and Mr. Ding about exploring whether Zhisuan could work with Chongqing Liang. Dkt. 394 at 8; Dkt. 394-6. The government did not dispute in its opposition or during the hearing that this is the earliest evidence of Mr. Ding's intent to benefit a PRC instrumentality, and even conceded that "there are no explicit statements of Ding's intent to benefit the PRC prior to uploading the stolen trade secrets." Dkt. 416 at 13; Hrg. Tr. 24:2-7. Yet remarkably, the government said during the hearing that it would go back to "try to find in the record the earliest possible instances that we can." Hrg. Tr. 36:7-11. The jury returned a verdict more than three months ago, the government filed its opposition, and on May 12, 2026, the Court held a hearing on this very issue, and yet the government is still trying to backfill its case. That the government needs additional time to comb through the record to see if it can uncover any evidence in the thousands of pages of exhibits and testimony that the government had as of the May 12 hearing had yet to find, never flagged for the jury, and its witnesses never testified about, underscores that the government is unfairly trying to rewrite its case. Its efforts to repeatedly revise

19

the record merely underscore the fact that it did not allege in the SSI or elsewhere or argue at trial that Mr. Ding had the requisite intent at the time of the charged theft.

The Court expressed interest in when Mr. Ding worked for Rongshu and Zhisuan at the hearing. The timing of his work with these organizations further bolsters the lack of intent at the time of the uploads. Mr. Ding worked for Rongshu from approximately November 2022 to May 1, 2023, when he resigned, which is two weeks after the April 17, 2023 upload. Mr. Ding began discussing what would later become Zhisuan in February 2023, but did not name the company until April 10, 2023. Trial Tr. 637:10-24, 644:19-646:6. Mr. Ding's primary first act as the CEO of Zhisuan was to submit an application for funding to a private organization called MiraclePlus on May 20, 2023. Trial Tr. 687:22-688:11. That application made no mention whatsoever of the PRC or a PRC instrumentality, nor did his August 23, 2023 video demo. *See* Fondo Decl. Ex. C (Trial Exs. 1170 and 1175).

At the hearing, the government also questioned whether it is really so outlandish to believe that the jury considered evidence from September 27, 2023, to draw inferences about Mr. Ding's intent at the time of the one or more of the four separate uploads between May 21, 2022 and April 17, 2023. Hrg. Tr. 36:1-11. In short, yes. The defense expressly raised the timing issue in their closing argument, and the government failed to respond to it on rebuttal, leaving the jury with no basis to reach the result the government urges now. *See* Fondo Decl. Ex. D; Dkt. 421 at 6. The government also had the opportunity to brief this issue in its opposition brief, but failed to cite any caselaw in support of its argument or to address the caselaw Mr. Ding cited. Dkt. 416 at 12-13. The government is now, once again, seeking a do-over, as it never even asked the jury to make such an improper, speculative conclusion. But even if it had, the law is not on the government's side.

The caselaw demonstrates that intent to commit a different offense that arises even a short time after a criminal act is not a substitute for proof of intent at the time of the charged offense. *United States v. Hernandez* is illustrative. 859 F.3d 817 (9th Cir. 2017). There, the defendant was charged with illegal transportation of five firearms from Arizona to California on January 20, 2011, which required the government to prove that the defendant knew he was violating the law when he transported the guns on that date. *Id.* at 819. The government presented evidence suggesting that

20

defendant had sold some of the guns sometime after bringing them to California but before the police learned of the guns on May 28, 2011, as well as evidence of defendant's statements made on or after May 28, 2011, when the local police department and ATF searched defendant's home after finding some of his guns in another person's possession. *Id.* at 820. In closing, the government argued that this evidence showed that Hernandez acted with the requisite intent. *Id.* at 820-21.[7] The Ninth Circuit reversed Hernandez's conviction, explaining that the law requires a defendant's mental state and actus reus to coincide, and reasoning that the government's evidence and argument, combined with a broad jury instruction, "raise[d] a substantial likelihood that he was convicted for the act of transporting guns with the intent to commit a later crime rather than the one with which he was charged." *Id.* at 824.

Similarly, in *United States v. McDougald*, defendant was charged with money laundering relating to his purchase of a car on June 4, 1990 for $10,000. 990 F.2d 259, 262 (6th Cir. 1993). The government was required to prove that defendant knew the money was drug money. *Id.* The government relied on defendants' false exculpatory statements on February 9, 1991, to attempt to prove defendants' intent. *Id.* at 262-63. The court rejected this argument, noting "it is a basic premise of Anglo-American criminal law that the physical conduct and the state of mind must concur" and emphasizing the nine months between the crime and the primary evidence of intent for the crime. *Id.* at 263.

The same result follows here. Even if the government had asked the jury to do so, it would not be a reasonable inference to conclude Mr. Ding had an intent to benefit PRC instrumentalities in May 21, 2022 through April 17, 2023 when the first evidence of Mr. Ding even discussing PRC instrumentalities is September 27, 2023. That would amount to impermissible speculation that cannot support a jury verdict. *See United States v. Katakis*, 800 F.3d 1017, 1024 (9th Cir. 2015) ("Although the [g]overnment is entitled to every reasonable inference from the evidence, a conviction may not be based on mere speculation . . . a reasonable inference is one that is supported by a chain of logic, rather than mere speculation dressed up in the guise of evidence."); *United States v. Lopez*, 484 F.3d 1186, 1201 (9th Cir. 2007) ("[M]ere suspicion or speculation does not

---

[7] Of course, in this case, the government made no such argument.

DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
CASE NO. 3:24-CR-00141-VC

rise to the level of sufficient evidence."). This is especially true where, as here, the government never even argued to the jury that it should infer based on the evidence of Mr. Ding's PRC connections in the fall of 2023 that he had the requisite intent between five and 16 months earlier. See Dkt. 421 at 6 (listing pages from opening and closing arguments showing the government never made this argument, even after the defense raised timing issue); *McCormick*, 500 U.S. at 270 n.8 (appellate court may not affirm a conviction based on legal or factual theories never tried before the jury); *Yates*, 16 F.4th at 265 (convictions cannot be affirmed based on a new theory that the government did not present to the jury). This speculative assertion is even more problematic given that not only did the government never make such an assertion, but in direct contrast to this theory the government argued to the jury that the last upload of April 17, 2023 took place in relation to and as a result of discussions with *private* investors. Thus, the government would need to rely on intent having been formed at the time of one of the three uploads in 2022, an even more speculative assertion.

## II.    THE GOVERNMENT WAS REQUIRED—AND FAILED—TO DEMONSTRATE THAT EACH INDIVIDUAL ALLEGED TRADE SECRET DOCUMENT CONTRIBUTED TO EACH ALLEGED COMBINATION TRADE SECRET.

In its May 13, 2026 Order (Dkt. 425), the Court asked the parties to address: (1) whether "the jury [was] required to conclude that every single document within a category contributed to the value of a combination trade secret comprising all documents in the category;" and (2) "if so, was the evidence presented at trial sufficient for the jury to conclude that as to Categories One, Two, Three and Six?" *Id*. With respect to Question 1, the government was required to prove that every single document in its alleged combination trade secrets (*i.e.*, Categories One through Seven) contributed to each "unique combination," thereby giving the whole of the combination greater value than the sum of its parts. With respect to Question 2, the government did not present sufficient evidence for the jury to conclude this burden was met beyond a reasonable doubt for Categories One, Two, Three and Six.

Both criminal and civil case law is clear that combination trade secrets arise out of the "unique integration, compilation, cultivation, and sorting of" particular individual elements. *United States v. Nosal*, 844 F.3d 1024, 1030-31 (9th Cir. 2016); *see also Caudill Seed & Warehouse Co.,*

*Inc. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 376 (6th Cir. 2022) (a combination-trade secret "plaintiff must offer concrete evidence that its business method uniquely strung together certain elements in a particular way."); *3M v. Pribyl*, 259 F.3d 587, 595-96 (7th Cir. 2001) ("A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret."). This necessarily requires a showing why each combination is "unique" and, therefore, why each component part is necessary. *Cf. United States v. O'Rourke*, 417 F. Supp. 3d 996, 1006 (N.D. Ill. 2019) (emphasizing that the value of the combination laid in the unique collection of the entire set, explaining that "even if a few of the documents within the Category were available in the public domain, the vast majority of them were not, and more importantly, no one other than Dura-Bar had access to **all** of them." (emphasis in original)). If a component is interchangeable or not necessary to give a combination trade secret its "whole-greater-than-sum" value, then such grouping does not meet the "unique combination" standard imposed by case law or Jury Instruction No. 13. Put another way, a combination which includes even one document that does not contribute to the whole-greater-than-sum value cannot be said to have a whole-greater-than-sum value by virtue of that specific, unique combination. If there are ten documents in an alleged combination but only seven contribute to the whole-greater-than-sum, then only the "unique integration, compilation, cultivating and sorting" of those specific seven documents would constitute a combination trade secret. *See Nosal*, 844 F.3d at 1030-31. Otherwise, a trade secret holder could claim a combination trade secret consisting of thousands of worthless elements if only a handful of elements therein create a whole-greater-than-sum value. That absurd result is not permitted under caselaw.

The government failed to present sufficient evidence at trial demonstrating that Categories One through Seven were unique combinations of particular elements combined in a manner that gave the whole greater value than the sum of the parts. This includes a complete failure to identify the role and importance of each particular document in the alleged combination trade secrets. In fact, the government failed to even show the majority of documents to the jury, let alone elicit testimony as to the role each particular document played in the alleged combination trade secrets.

23

*See* Dkt. 394 at 24-28; Dkt. 421 at 15-16. At trial, the government argued that each category qualifies as a compilation trade secret *because* the individual documents within it are themselves trade secrets. That theory collapses now because the jury did not find that the government proved beyond a reasonable doubt that any of the individual documents within Categories One through Three, and Six are trade secrets. As a result, the government never offered the jury any valid theory explaining why the combination trade secrets have independent economic value—value beyond simply being an accumulation of the individual trade secrets the jury declined to recognize.

As the government admitted in its Opposition to Mr. Ding's Rule 29 and 33 Motion, its core evidence regarding combination trade secrets comprised of testimony from Dr. Sanchez and Dr. Chandra that the alleged combination trade secrets provided "more complete pictures" and "complementary information," than just the individual documents. Dkt. 421 at 21-23. This testimony all but confirms that there was nothing unique about the particular groupings of documents in each combination which contributed to the whole-greater-than-sum value, as the same testimony could have arguably applied to *any* combination of the 105 alleged trade secret documents. This is especially the case given that Google's witnesses testified that the documents in each category represented a minuscule portion of Google's total documentation for the respective technologies and were not sufficient on their own to build such technology. *See* Dkt. 394 at 11-12. The fact that a random grouping of certain documents related to a technology may provide a "more complete picture" of that technology falls well short the required showing that each document contributed to the whole in a unique and meaningful way.

There were 40.56 *nonillion* possible combinations that the government could have created out of the 105 alleged trade secret documents.[8] The government ultimately self-created and charged seven of those possible combinations. By doing so, the government took on a burden to prove that each of those seven combinations it had created had a special, whole-greater-than-sum value that arose due to the unique combination of the specific documents contained therein, with each

---

[8] The defense understands that is roughly five *trillion* times the amount of grains of sand in all of earth's beaches and deserts. Robert Krulwich, *Which Is Greater, The Number Of Sand Grains On Earth Or Stars In The Sky?*, National Public Radio (September 17, 2012), https://www.npr.org/sections/krulwich/2012/09/17/161096233/which-is-greater-the-number-of-sand-grains-on-earth-or-stars-in-the-sky (last visited May 27, 2026)

24

document contributing to such surplus value. It failed to do so and Mr. Ding is therefore entitled to a judgment of acquittal as to Counts One through Three, Six, Eight through Ten and Thirteen.

## CONCLUSION

For the reasons discussed above and in Mr. Ding's opening and reply papers, the Court should grant Mr. Ding's motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c).

Respectfully submitted,

Dated: May 27, 2026

By: /s/      Grant P. Fondo
GRANT P. FONDO (SBN 181530)
GFondo@goodwinlaw.com
DARRYL M. WOO (SBN 100513)
DWoo@goodwinlaw.com
RACHEL M. WALSH (SBN 250568)
RWalsh@goodwinlaw.com
JESSICA HUANG FUZELLIER (SBN 315208)
JHFuzellier@goodwinlaw.com
FARZAD FEYZI (SBN 343538)
FFeyzi@goodwinlaw.com
DAVID RAPP-KIRSHNER (SBN 344494)
DRappKirshner@goodwinlaw.com
NIRAV BHARDWAJ (SBN 350829)
NBhardwaj@goodwinlaw.com
NICHOLAS C. WILEY (SBN 351161)
Nwiley@goodwinlaw.com
COLETTE A. LOWRY (SBN 359889)
CLowry@goodwinlaw.com
**GOODWIN PROCTER LLP**

LORA J. KRSULICH (SBN 315399)
LKrsulich@goodwinlaw.com
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, Suite 4100
Los Angeles, CA 90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Attorneys for Defendant:
LINWEI DING

25

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on **May 27, 2026**. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on **May 27, 2026**.

*/s/ Grant P. Fondo*
Grant P. Fondo

26

CERTIFICATE OF SERVICE
CASE NO. 3:24-CR-00141-VC