# Exhibit B

**Volume 1**

**Pages 1 - 195**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )
                                     )
    VS.                              )  **NO. 3:24-CR-00141-VC**
                                     )
LINWEI DING, a.k.a. LEON DING,       )
                                     )
            Defendant.               )
_____)

San Francisco, California
Monday, January 12, 2026

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
**BY:  CASEY E. BOOME, ASSISTANT U.S. ATTORNEY
ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY
1301 Clay Street, Suite 340S
Oakland, California 94612-5217
**BY:  MOLLY K. PRIEDEMAN
ASSISTANT U.S. ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:
                              GOODWIN PROCTER LLP
                              525 Market Street
                              San Francisco, California 94105
                    BY:   **DARRYL M. WOO, ATTORNEY AT LAW**
                              **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
                              **RACHEL M. WALSH, ATTORNEY AT LAW**
                              **COLETTE A. LOWRY, ATTORNEY AT LAW**

                              GOODWIN PROCTER LLP
                              601 Marshall Street
                              Redwood City, California 94063
                    BY:   **GRANT P. FONDO, ATTORNEY AT LAW**
                              **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

                              GOODWIN PROCTER LLP
                              601 South Figueroa Street, Suite 4100
                              Los Angeles, California 90017
                    BY:   **LORA J. KRSULICH, ATTORNEY AT LAW**


Also Present:         **Andrea Valladao, Federal Bureau of**
                              **Investigation**
                              **Vernonica Hernandez, Paralegal**
                              **John Jay, Trial Technician**

want to talk about now is how the defendant managed to get around it to take 1200 documents outside the company.

During this trial, you're going to hear from a witness from the Google security team, and his name is Matt Linton. Matt Linton was part of the team that responded and initially was a part of Google's internal investigation of the defendant once they found out what he was up to.  He'll explain that the way the defendant created the documents that he stole helped him avoid detection by Google's security system.

So let's walk through the steps that the defendant took to get these documents containing Google's proprietary technology off the network.

His first step was to go to the internal documents in the Google network that contained the confidential and the trade secret technology.  He visited these documents, but it wasn't these source documents that he transferred off the network.  Instead, what he did was he copied information from the internal documents.  He copied text, he copied diagrams, tables, schematics, you name it.  Everything in the documents that he wanted to take, he copied and pasted them into the Apple Notes application on his Google work computer.

Apple Notes is like a digital notebook that comes standard on Mac products, on Apple products like the one Google gave the defendant to do his work.

He pasted the information from the source documents

into the Apple Notes, and when he had what he wanted, he converted them to PDFs and uploaded them off the network.

PDFs are a type of document that's easy to send digitally from place to place.

Once he had the PDFs, he sent them from his Google computer, uploaded them to a personal cloud account that he controlled, linweidin@gmail.com.

Mr. Linton will explain that while the defendant copied the confidential and trade secret information from the source documents, he did not copy a lot of the identifying information for those documents.

For instance, many of the documents the defendant stole from had confidentiality markings on them.  He didn't copy those.  Many of the documents the defendant stole from had the names of the authors, the names of the inventors on the documents, but he didn't copy that either.

And what Mr. Linton will explain is that the absence of that identifying information made it more difficult for the automated security system to find out what the defendant was up to when he was transferring files off of the Google network to his personal account.

Another witness you'll hear from about how the defendant stole the documents is an independent expert named Andy Crain.  He is a computer forensics expert.  And he's looked at the digital evidence that was recovered in this case,

and what he'll explain to you is that in total, over the course of about a year, between May of 2022 and May of 2023, the defendant transferred 1,255 documents, a total of over 14,000 pages, including more than 4,000 individual screenshots, from his Google computer to this personal cloud account.

105 of those documents are the trade secret documents that this case is going to focus on, 105 from that group.

Now I want to change gears and talk about the evidence you'll see in this trial that shows what the defendant intended to do with the information he stole from Google. And the reason that you'll get to see some of this evidence, and it will include -- it'll include all the things that the defendant was trying to hide from Google at the time. It'll include evidence about the things he said and the things he did as he was founding his start-up company, his artificial intelligence start-up company in China and marketing that company to investors.

And the reason you'll get to see this information at this trial is because Special Agent Valladao and her team got a search warrant for the defendant's home, his computer, his phone, some of his other electronic devices, and the cloud account that he sent the trade secret documents to.

When Special Agent Valladao testifies later in the trial, she'll walk you through a timeline that's apparent from the evidence that she recovered, and it starts in 2019 when the

defendant joined Google as a software engineer.

About a year later, a little more than a year later, the defendant started looking for a job in China.  And there's nothing wrong with that.  Not a crime.  But the timing here is important for the following reason:  The defendant started communicating with a recruiter in China about finding a job in August of 2020.  Remember that date, August of 2020.

What you'll see is that between the time he was hired at Google until right around August of 2020, he hardly made any Notes files on his Google laptop.  He started creating Notes files by copying from internal Google documents right around the time he started talking to that recruiter in China.

He initially didn't get the jobs that he interviewed for, but he kept at it until he found a company based in Beijing called Rongshu.  It was a technology company based in China called Rongshu.  The defendant interviewed for that company in May of 2022.  He interviewed to become the company's chief technology officer.

And there's something else in this case that happened in May of 2022.  It was the first time that the defendant uploaded a large batch of confidential and trade secret documents from his Google computer to his personal cloud account.

The defendant took the job.  He got the job.  He flew to Beijing in November of 2022 and started working as Rongshu's

chief technology officer.  By this time, by November of 2022, he had uploaded an additional 500 documents, including more than 50 of the trade secret documents in this case.

But soon after he arrived in Beijing, the defendant and the CEO of Rongshu started a new business plan.  They had a new idea for an artificial intelligence supercomputing company that was called Zhisuan Technology.  They started trying to raise money for this company.

And you're going to hear about something that happened on April 17th of 2023, when the defendant and his partner had a big meeting with a Chinese investment bank, a big investment bank based in China.  It was on the day of this meeting, when they met with this -- these investors to pitch the artificial intelligence supercomputing company, that the defendant transferred the largest batch of confidential and trade secret documents in the case, nearly 400 documents in total and over -- and 50, exactly 50 of the trade secret documents in this case.

But the month after, in May of 2022, the defendant broke away from his business partner and he took over the company himself.  He took over Zhisuan Technology himself and he became the company's CEO.  The first thing he did was apply for the MiraclePlus program.

Before I talk about MiraclePlus, I just want to make clear, this whole time, the defendant was still working

absolutely false.  He did not do the things that he said he did.  He did not build a 60,000-TPU supercomputer.  He did not build a 26,000-GPU supercomputer.

And I don't say that, you know -- I don't mean to demean the defendant's actual experience as a software engineer at Google.  I am 100 percent certain that I would be fired on Day One as a low-level software engineer.  So I'm not mentioning -- I'm not mentioning this to demean the defendant's experience.  But the reason I'm mentioning it is because it is a fact that the evidence will show in this case that this is not who the defendant was.  He didn't have this experience.

But what he did have by the time he said these things was the stolen trade secret documents that contained information about Google's TPU-based supercomputers and GPU-based supercomputers.

Sorry.

Okay.  Finally, I want to talk to you about the things the defendant did to hide what he was up to from Google, hide his theft of the documents, and hide his creation of his start-up company in China.

First, he lied to a Google investigator about the fact that he had these documents.  That happened in December of 2023 when the defendant was interviewed by a Google investigator about some documents that he had uploaded in early December of 2023.

December 8th, 2023.  It says [as read]:

"I have searched my personal possessions,
including all devices, accounts, and documents in my
custody or control for any non-public information
originating from my job at Google (except personal
information).

"I have permanently deleted or destroyed all
copies of such information.  And as a result, I no
longer have access to such information outside the
scope of my employment."

At the bottom, he swears he's "attesting to the truth
of these representations and I may face discipline or
termination if anything proves untrue."

Six days later, six days after he signed this
document, he went into that personal cloud account where he had
his secret stash of more than 1200 documents, including the
trade secret documents in this case, he copied every single one
of them, and made a backup copy on his personal computer.  That
was December 14th, six days after he signed this.

I mentioned earlier, when he was on that stage in
Beijing giving the speech to the MiraclePlus crowd in November
of 2023, he didn't have his Google access badge with him in
China because he had left it with his former intern, and he
told her to swipe the badge on Google's Sunnyvale campus while
he was gone so that it would make it look like he was showing

PROCEEDINGS

Thank you.

THE COURT:  Okay.  Thank you.

MS. KRSULICH:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Proceedings adjourned at 3:27 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Monday, January 12, 2026

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter

**Volume 3**

**Pages 415 - 652**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )   **NO. 3:24-CR-00141-VC**
                                 )
LINWEI DING, a.k.a. LEON DING,   )
                                 )
          Defendant.             )
_____)

                    San Francisco, California
                    Wednesday, January 14, 2026

<u>**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

For Plaintiff:
                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
               BY:  **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                    **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612-5217
               BY:  **MOLLY K. PRIEDEMAN**
                    **ASSISTANT U.S. ATTORNEY**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:

GOODWIN PROCTER LLP
525 Market Street
San Francisco, California 94105
BY:   **DARRYL M. WOO, ATTORNEY AT LAW**
**DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
**RACHEL M. WALSH, ATTORNEY AT LAW**
**COLETTE A. LOWRY, ATTORNEY AT LAW**
**NICHOLAS C. WILEY, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, California 94063
BY:   **GRANT P. FONDO, ATTORNEY AT LAW**
**FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 South Figueroa Street, Suite 4100
Los Angeles, California 90017
BY:   **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:        **Andrea Valladao, Federal Bureau of**
**Investigation**
**Veronica Hernandez, Paralegal**
**John Jay, Trial Technician**

Comp2 folders, we had 4,374 screenshots and, within the 105 alleged trade secret files, 655 screenshots.

Q.   Okay.  I want to ask you now about December of 2023.  Tell us what happened then to these files.

A.   So on December 14th of 2023, the Comp and Comp2 folders from Mr. Ding's personal Google Drive account were downloaded to his personal MacBook.  And we know this from basically the browser history records on the personal MacBook, as well as, again, metadata contained in the personal Google Drive account.

Q.   And what files specifically, what groups of files did Mr. Ding back up to his personal computer?

A.   So the download of the Comp and Comp2 folders from the personal Google Drive account to the personal MacBook contained 1,255 PDF files, which included all of the 105 alleged trade secrets.

Q.   Did Mr. Ding delete the 1,255 PDFs and 105 alleged trade secret files from his cloud account when he downloaded them to his personal computer?

A.   No.

Q.   Did you see evidence of any other materials on December 14th, 2023, also being downloaded to his personal computer along with the alleged trade secret files and the rest of Comp1 and Comp2?

A.   No.  The only thing I saw being downloaded was the Comp and Comp2.

identity card.

The piece of paper handwritten says [as read]:

"For Ziroom leasing only."

And then the time stamp, the digital time stamp dated December 6, 2022, says that [as read]:

"It is only for Linwei Ding to apply for a residence permit."

**Q.**   Is that stamp on -- in the original source document?

**A.**   It is, yes.

**Q.**   Okay.  I'd like to change gears now and ask you, did there come a time when the defendant and Yuan Ye, the CEO of Rongshu, started discussing a new business plan?

**A.**   They did, yes.

**Q.**   Can you tell us about that a little bit?

**A.**   Yes.  Around -- I believe this was around February of 2023, they started discussing building a company and creating a business plan.

       **MR. BOOME:**  Ms. Hernandez, can we now go to Exhibit 1130, the chat between the defendant and Yuan Ye, page 169, please.

**BY MR. BOOME:**

**Q.**   Is this the portion of the chat where they begin discussing a new plan?

**A.**   It is, yes.

       **MR. BOOME:**  Your Honor, we move to admit page 169.

representatives of I&R Capital?

A.   I did, yes.

Q.   Based on the chats that you reviewed, what was I&R Capital's role?

A.   They are -- they seem to be a consulting firm that advises early stage companies on how to get investment.

Q.   Is the chat involving I&R, the defendant, and Yuan Ye, is that Exhibit 1155?

A.   Yes.

Q.   Is that chat about anything else other than this fundraising project?

A.   It is -- no.  It's only about -- solely about that.

        MR. BOOME:  Your Honor, we move to admit 1155 in its entirety.

        MR. FONDO:  No objection, Your Honor.

        THE COURT:  Admitted.

     (Trial Exhibit 1155 received in evidence.)

BY MR. BOOME:

Q.   Okay.  Let's just look at the participants here.  And can you identify the names that you recognize and tell us who they are.

A.   Yes.  So going through it again, remember, there's the WeChat user ID as well as the display name.  So at the top is the user ID starting with the chat room, that would be the ID of this group.  And then you've got Mr. Ding, Ding Yong, and

one, two, three -- four individuals, and then Yuan Ye.  And then you have the display names of those user IDs.

So the participants in this chat are Mr. Ding, Yuan Ye, and then members of I&R.

Q.   Including Kunjie Jiao?

A.   Correct.

MR. BOOME:  Let's go to page 17, please, Ms. Hernandez.

BY MR. BOOME:

Q.   Okay.  I want to focus on the bottom and ask you to point out discussion about the potential name of the company.

A.   Yes.  So this is April 10, 2023.  They've been discussing the business plan.  And then Yuan Ye, at this point in the conversation, has various options about what they could call the company, one of them being Fine-Grained Supercomputing.

Q.   Fine-Grained Supercomputing, Smart Supercompute Utilization, and Emergent Supercomputing?

A.   Correct.

Q.   Let's go to the next page.  And sorry.  One more down, page 19.

And where is the discussion about -- do they eventually decide on a name?

A.   They do, yes.

Q.   Can you show us where that happens?

A.   Yes.  So the last three messages on this part of the chat,

Ye Yuan asks Mr. Ding if -- what he thinks of the name Fine-Grained Supercomputing, to which Mr. Ding replies that he thinks it sounds great.

And then on the following page, he goes on to say that if you -- if he wants to use two characters, so two Mandarin characters, that they could call it Zhisuan.

MR. BOOME:  Ms. Hernandez, can you bring up 1137, please.

BY MR. BOOME:

Q.   Do you recognize this?

A.   I do.

Q.   What is this?

A.   So this is the final business plan that was created by I&R Capital in this chat, so...

Q.   Can you give us -- I don't want to go through chat by chat, but can you give us an overview, based on your review of 1155 and the chat between Yuan Ye and the defendant, the defendant's involvement in creating this document?

A.   Yes.  There was extensive editing.  So I&R Capital created a draft of what became this teaser and then asked both Yuan Ye and Mr. Ding to put in the technical terms and to create edits and make sure that it was accurate to what they wanted for their business plan.

MR. BOOME:  Your Honor, the Government moves 1137 into evidence.

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Thursday, January 15, 2026

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter

**Volume 4**

**Pages 653 - 852**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
  VS.                           )  **NO. 3:24-CR-00141-VC**
                                )
LINWEI DING, a.k.a. LEON DING,  )
                                )
            Defendant.          )
_____  )

                        San Francisco, California
                        Thursday, January 15, 2026


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
                BY: **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                    **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612-5217
                BY: **MOLLY K. PRIEDEMAN**
                    **ASSISTANT U.S. ATTORNEY**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Defendant:

          GOODWIN PROCTER LLP
          525 Market Street
          San Francisco, California 94105
  BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
      **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
      **RACHEL M. WALSH, ATTORNEY AT LAW**
      **COLETTE A. LOWRY, ATTORNEY AT LAW**
      **NICHOLAS C. WILEY, ATTORNEY AT LAW**

          GOODWIN PROCTER LLP
          601 Marshall Street
          Redwood City, California 94063
  BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
      **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

          GOODWIN PROCTER LLP
          601 South Figueroa Street, Suite 4100
          Los Angeles, California 90017
  BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:      **Andrea Valladao, Federal Bureau of**
          **Investigation**
      **Veronica Hernandez, Paralegal**
      **John Jay, Trial Technician**

Q.   Special Agent Valladao, in China on April 17th, 2023, at 3:00 p.m., what time was it United States Pacific Time?

A.   I believe it was 12:00 p.m. -- 12:00 a.m.

Q.   3:00 p.m. Beijing time?

A.   That's right.

Q.   Okay.

     MR. BOOME:  Let's go back to Exhibit 1155, please, Ms. Hernandez.  Bottom of page 31.

BY MR. BOOME:

Q.   Can you tell the members of the jury --

     MR. BOOME:  Thank you.

BY MR. BOOME:

Q.   Can you tell the members of the jury what you see in these two pages regarding the meeting with IDG Capital?

A.   Yes.  So on the left-hand side, Yuan Ye asks on April 17th [as read]:

     "Which line we're using for the IDG call later?"

And then on the right-hand side, there appears to be a link, Zi Xiong IDG Capital, that is sent, and then Mr. Ding responds [as read]:

     "Thank you.  Got it."

     MR. BOOME:  Okay.  I want to now bring up Exhibit 780, not in evidence.

BY MR. BOOME:

Q.   What is Exhibit 780, Special Agent Valladao?

**A.**   It's a summary exhibit that I created listing the files uploaded to Mr. Ding's Google Drive account on April 17th, 2023.

**Q.**   And the column on the right-hand side, what does that indicate?

**A.**   That's the time of upload.

        **MR. BOOME:**   Your Honor, the Government moves 780 into evidence.

        **MR. FONDO:**   No objection.

        **THE COURT:**   Admitted.

     (Trial Exhibit 780 received in evidence.)

        **MR. BOOME:**   Can we go to page --

**BY MR. BOOME:**

**Q.**   So let's show it to the jury and give them a quick orientation before we jump to page 7.

**A.**   So this is the list of all the files uploaded on April 17, 2023.  On the left-hand column, the originating subfolder, that is the folder that that file was found on Mr. Ding's Google-issued laptop.  Then you have a file name, and then the time of upload on UTC time.

     And I do want to point out, there's some files that are highlighted, and those are alleged trade secret files.  And I've included the exhibit number as well.

**Q.**   So the ones that are highlighted are the alleged trade secret files.  The other ones are the other Google files that

were uploaded at the same time?

A.    Correct.

MR. BOOME:    Let's go to page 7, please, Ms. Hernandez.

BY MR. BOOME:

Q.    Special Agent Valladao, can you tell us whether there was anything significant about the timing of these uploads in your investigation?

A.    Yes.    So some of the files, the ones that you see up in the top portion under TPU, the time of upload UTC time is 7:00 in the morning, which corresponds to 3:00 p.m. Beijing time.

Q.    The same time as the meeting we just discussed?

A.    That's right.

MR. BOOME:    Ms. Hernandez, can you bring up Exhibit 1029, please, just for the witness.

BY MR. BOOME:

Q.    Do you recognize 1029?

A.    I do, yes.

Q.    At a high level, what is it?

A.    It is a document with a set of questions regarding Zhisuan.

Q.    Where did you find it?

A.    In Mr. Ding's Google Drive account.

Q.    Do you know how he got it based on your review of the chats?

A.    I did, yes.    He received it on the I&R Capital chat.

evidence.

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 1009 received in evidence.)

BY MR. BOOME:

Q.   I want to ask you about Xuwen -- Xuwen Cao.  Do you recognize that name?

A.   I do, yes.

Q.   Can you tell us where -- where from?

A.   It's in various communications in WeChats, as well as emails, and then also from the InfiniCompute video.

Q.   Tell us about the InfiniCompute video.

A.   It's a video that Mr. Crain talked about and found on Mr. Ding's drive -- Google Drive account, and when -- it was accessed by a person by the name of Xuwen Cao.

MR. BOOME:  Ms. Hernandez, let's bring up 1010 and 1011 just for the witness.

BY MR. BOOME:

Q.   Do you recognize these, Special Agent Valladao?

A.   I do, yes.

Q.   What are they?

A.   They're the confirmation email from Mr. Ding's MiraclePlus application submission and then his invitation for the entrepreneurship camp.

Q.   Where did you find these in?

A.   In his email account.

Q.   Are Exhibits 1014 and 1013 similarly emails you recovered from Mr. Ding's account regarding his application process to MiraclePlus?

A.   That's right, yes.

        MR. BOOME:  Your Honor, Government moves 1010, 1011, 1014, and 1013 into evidence.

        MR. FONDO:  No objection.

        THE COURT:  Admitted.

     (Trial Exhibits 1010, 1011, 1014, and 1013 received in evidence.)

BY MR. BOOME:

Q.   Okay.  Let's go through --

        MR. BOOME:  Let's start with 1010, please, Ms. Hernandez.

BY MR. BOOME:

Q.   Okay.  What information did Mr. Ding receive in this email?

A.   So this email is dated May 30th, 2023.  And Mr. Ding is being congratulated for applying for the MiraclePlus camp -- entrepreneurship camp.

        MR. BOOME:  Let's move ahead to 1011, Ms. Hernandez.

BY MR. BOOME:

Q.   The date on this exhibit is May 30th.  Can you give us the date of this -- the next email that you found?

On November 20th, Mr. Ding signed the MiraclePlus investment agreement.

November 24th, Mr. Ding presented at MiraclePlus.

December 8th, Mr. Ding signed the self-deletion affidavit from Google.

December 14th, Mr. Ding downloaded the trade secret files from his personal Google Drive account into his personal laptop.

And then on December 29th, that's when Google cut Mr. Ding's access to their internal systems, and that's when he deleted the trade secret -- the PDF versions that were stored at his Google-issued computer.

Q.   On the bottom, the rectangle indicated in red, can you tell us what that means?

A.   Yes.  So this indicates that between April 17th, 2023, the last time that Mr. Ding uploaded documents to his Google Drive account, and December 29th, when his access was cut off from the Google internal systems, he created over 13,000 new Apple Notes -- created or modified on his Google MacBook.

Q.   1,300.  Sorry.  I think you said 13,000.

A.   Yes, sorry.  1,300.

(Reporter interrupts to clarify the record.)

BY MR. BOOME:

Q.   Can you correct the number, please, Special Agent?

A.   Yes, sorry.  It's 1,349 new Apple Notes that were either

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Friday, January 16, 2026

*Ana Dub*

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter

**VOLUME 11**

**PAGES 2088 - 2224**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,          )
                                   )
             Plaintiff,            )
                                   )
v.                                 ) **No. 3:24-CR-00141-VC**
                                   )
LINWEI DING, a.k.a. LEON DING,     )
                                   )
             Defendant.            )
_____)


San Francisco, California

Wednesday, January 28, 2026

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

        CRAIG H. MISSAKIAN
        UNITED STATES ATTORNEY
        450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
    BY:  **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
        **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

        CRAIG H. MISSAKIAN
        UNITED STATES ATTORNEY
        1301 Clay Street, Suite 340S
        Oakland, California 94612-5217
    BY:  **MOLLY K. PRIEDEMAN**
        **ASSISTANT U.S. ATTORNEY**


**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE.)**

REPORTED BY:  April Wood Brott, RPR, FCRR, CRG
        CSR No. 13782, Official United States Reporter

**APPEARANCES (continued):**

For Defendant:

                     GOODWIN PROCTER LLP
                     525 Market Street
                     San Francisco, California 94105
          BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
               **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
               **RACHEL M. WALSH, ATTORNEY AT LAW**
               **COLETTE A. LOWRY, ATTORNEY AT LAW**
               **NICHOLAS C. WILEY, ATTORNEY AT LAW**

                     GOODWIN PROCTER LLP
                     601 Marshall Street
                     Redwood City, California 94063
        BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
               **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

                     GOODWIN PROCTER LLP
                     601 South Figueroa Street, Suite 4100
                     Los Angeles, California 90017
        BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:  **Andrea Valladao, Federal Bureau of Investigation**
                **Veronica Hernandez, Paralegal**
                **John Jay, Trial Technician**

A verdict form has been prepared for you.  You'll probably see it during closing arguments.  If you have reached a unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the courtroom deputy that you are ready to return to the courtroom.  Do not tell the courtroom deputy what your verdict is, and do not give her the verdict form.  And that -- those are your instructions

And with that, we will begin with closing arguments.  You will first hear from the Government, then the defense, and then Government will have a brief rebuttal.  We'll take a lunch break after you hear from the Government initially.

Take it away.

### GOVERNMENT'S CLOSING ARGUMENT

**MS. PRIEDEMAN:**  The defendant wanted more for himself than his own experience and knowledge could get him.  So he stole, he cheated, and he lied.  The technology in this case is complicated; what happened here is not.  From May 2022 to April 2023, the defendant stole over 2,000 pages of Google's cutting-edge AI trade secrets.

At the same time the defendant was stockpiling Google's trade secrets, he was secretly starting his own company in China with the explicit goal of copying Google's technology.  In mid-December 2023, about two weeks before the defendant resigned from Google and was on his way out the door, he

downloaded all of the stolen trade secrets to his personal computer.

The defendant took extensive steps to cover his tracks. He impersonated a senior Google executive, he deleted evidence, and he instructed his former intern to badge in for him at Google's offices.  As my colleague, Mr. Boome, told you at the beginning of this trial, the defendant did not commit a crime when he started another company while working at Google, and he did not commit a crime by wanting the benefit the government of China.

But he did commit a crime when he stole thousands of pages of Google's trade secret technology, technology that was created by thousands of other engineers, technology that he had no right to take, to benefit himself and the government of China.

The defendant is charged in this case of committing seven counts of trade secret theft and seven counts of economic espionage.  As you heard from the judge just now, each count corresponds to one of the seven categories of trade secrets that you've heard about throughout this trial.  Today I'm going to go through the evidence you've heard and explain why it meets the elements for each of the crimes beyond a reasonable doubt.

One thing I want to flag for you before I get started is that I might summarize some elements or speak in shorthand, and

I want to remind you that what the judge instructed you controls.  I also might talk about some of the witness testimony, and I want to remind you what I say is not evidence.  If your memory conflicts with something, you should -- something that you remember -- something that I say, you should go with your memory.

I'm also going to use a PowerPoint this morning to talk about the evidence.  You're not going to have the PowerPoint with you when you deliberate, so I would encourage you to take notes about the different evidence that supports each count.

I'm going to start this morning by walking through the evidence of how the defendant took the trade secrets.  Then I'm going to talk about the evidence showing that the defendant intended to use the trade secrets for the economic benefit someone other than Google.  Next I'll talk about the evidence that he intended to use the trade secrets to benefit the government of China.  And finally, I'll talk about the different trade secret categories.

All right.  So let's talk about how the defendant stole the trade secrets in this case.  And that's important not just because it shows he took the trade secrets, but it also shows that he knew the documents were confidential and that he intended to use them.

Now, the Government's forensic expert, Andrew Crain, testified that he was able to tell from Google's forensic logs

that the defendant compiled information from multiple internal Google source documents and copied and pasted them into Apple Notes on his Google computer.  The defendant then PDF'd the notes and uploaded them to his personal account.

By taking this extra step of copying the information from the source documents and putting it into the Apple Notes, Google's VP of Security Engineering, Heather Adkins, testified it made it harder for Google's systems to detect the defendant's theft.

Mr. Crain testified that he was able to use the logs to see that during key times, the defendant was creating and editing those Apple Notes.  He was also accessing the source files on Google's internal networks.

In some instances, the defendant copied everything from one document into one Apple note, and in other instances, he used multiple documents in the Google system to create one trade secret note.

You also heard that using these same forensic logs, Google was able to actually identify the documents that the defendant was looking at when he made the notes, and you heard that Special Agent Valladao was able to compare those original internal source documents to the trade secret files and confirm that what the defendant took came from Google's documents. Those comparisons are in Exhibit 777, and you'll see here there's a red circle on the bottom.  As I go through this

used his real resume, and he struggled to find a job.

On May 6th, 2022, the defendant met Yuan Ye for the first time.  Remember, Mr. Ye is the CEO of a technology company in China called Rongshu.  And later, Mr. Ye became Mr. Ding's business partner for Zhisuan, the company the defendant created in China with the goal of copying Google's technology.

About two weeks after that first conversation with Mr. Ye on May 21st, 2022, the defendant uploaded 129 documents from his Google computer to his personal account, including four of the trade secret documents.

Included in that same upload was a note on the defendant's Google computer stating that he wanted to create a company -- he had a vision to create a company with Google culture and management, a company like Google.  In other words, the purpose of his uploads from the very beginning could not be more clear: He had a vision to create a company like Google, and he needed Google's trade secrets to make that a reality.

Between June 1st, 2022, and October 31st, 2022, the defendant uploaded hundreds more notes from his corporate computer to his personal account, including additional stolen trade secret documents.

On November 14th, 2022, the defendant started working at Rongshu.  Remember, that's the company that Mr. Ye was the CEO of.  By early 2023, Mr. Ye and the defendant had laid out a vision for the new company that would eventually become

You can look at the documents he uploaded that day -- and that's Exhibit 780 -- and you can see that there are dozens of documents that relate to the -- the technology that the defendant was trying to pitch, including multiple TCPDirect documents that Dr. Sanchez told you about; the Endurance B document, along with other hardware documents related to Google's GPU systems; and most of the documents in Trade Secret Category 1 related to Google's TPUs, all of which was relevant to the defendant's business plan.

Now, the same day as that mass upload, the same day that he uploaded 354 documents, the defendant and Mr. Ye met with investors from a firm called IDG Capital, a private investment firm.  Now, Special Agent Valladao testified that that meeting occurred at 3:00 P.M. in Beijing, which is 7:00 A.M. UTC time. If you look at Exhibit 780 again, you can see that as the meeting was starting with investors, the defendant was actively uploading dozens of trade secret documents, including all these documents related to Google's TPUs.

The timing here could not be more clear.  The defendant was gearing up to start his company.  He was busy meeting with investors, pitching ideas, and he needed Google's stolen trade secrets to provide the technical details that the investors had asked for.

On April 21st, 2023, again while Zhisuan was meeting with investors, the defendant received another document from a

fast-forward to December 2023.  You heard during Special Agent Valladao's testimony that she recovered screenshots from the defendant's calendar showing that he had scheduled meetings with 21 different potential investors for Zhisuan in the month of December.

Now, on December 2nd of 2023, the defendant uploaded documents from his corporate computer to his personal account. Because he uploaded those documents directly from his computer to his personal account, rather than copying it, it triggered an investigation from Google.

On December 8th, 2023, the defendant had an interview with a Google investigator, Brad Fuller.  And at that point, Mr. Fuller was not aware of the fact that the defendant had previously uploaded thousands of documents.  During that interview, Mr. Fuller reminded Mr. Ding of Google's policies, and he asked Mr. Ding to sign a self-deletion affidavit promising to delete all confidential Google information.  This is that affidavit.  That's Exhibit 280.

The defendant said he searched his personal possessions, including all devices, accounts, and documents for any non-public information originating from his job, and that he permanently deleted or destroyed all copies of that information.  This was signed on December 8th, the same day of that interview.

During that interview, the defendant had the opportunity

to come forward, to tell Mr. Fuller that he hadn't understood the policy, that he took these documents by mistake. And in fact, Mr. Fuller testified that he told Mr. Ding if something came up, if he remembered something, he could always reach back out.

The defendant did not do any of that. Instead, on December 14th, 2023, six days later, instead of downloading all the information like -- I'm sorry.

Instead of deleting all the information like he said he would, he downloaded all of the information he had stolen and stored on his personal account to his personal computer, over a thousand documents, including all of the trade secrets to his device.

Now, this was not just a backup. The Government's forensic expert testified the defendant didn't download anything else from his personal account that day. In other words, the defendant made a specific and deliberate decision to download all of the stolen trade secrets to his computer.

Just 12 days later, the defendant told his manager he was resigning. If the defendant did not intend to use the stolen documents, why would he have downloaded them? He was on his way out. He had no conceivable reason to need them unless he was going to use them for Zhisuan.

On December 29th, 2023, Google learned about the defendant's presentation and cut off his access. The defendant

that the defendant intended to harm or knew that he would harm Google. You know that the defendant took some of Google's most sensitive trade secret information and was planning to start a company in China with that same information.

You heard from the Government's first witness, Google's VP of AI and Computing Infrastructure, Mr. Lohmeyer, that Google serves customers in China and competes with Chinese companies like Alibaba, and that if a competitor like Zhisuan were able to develop competing TPU or GPU products, it would harm Google because they would have to either reduce their price or lose customers.

And you saw -- this is Exhibit 1001, which is the MiraclePlus investment agreement, where the defendant has a list of company competitors companies including Alibaba. In other words, he intended to compete in the same market as Alibaba, one of Google's competitors. So if the defendant were to -- if he planned to create a competing product, it would harm Google by causing them to either reduce their price or lose customers.

All right. And finally, you have to find that the defendant knowingly took the trade secret information without authorization. This is not contested. You know that the defendant uploaded all of the stolen trade secrets to his personal e-mail account, which is against Google's policies. And then, as we talked about, he downloaded all of the trade

secrets on December 14th, just six days after Mr. Fuller reminded him of the policies and after he had sworn that he would delete all Google information from his accounts and devices.

All right. Now I want to talk about the economic espionage charges. Before I do, I want to reiterate what Mr. Boome told you at the beginning of this trial. Despite the word "espionage," this is not a spying case. The Government does not have to prove that he was a spy, that he worked for a foreign government, or that he gave secrets to the government of China.

This charge is about whether the defendant intended to use the stolen trade secrets to benefit not just himself and Zhisuan, but entities that are controlled by the government of China.

You will see that the first three elements of the economic espionage charge map on to the trade secret theft counts. It's really that last element that is different. Instead of finding that the defendant intended to benefit himself and Zhisuan, you need to find that the defendant intended or knew that his actions would benefit a foreign government or foreign instrumentality.

The term "foreign instrumentality" sounds fancy, but it basically just means an organization or entity that is substantially controlled by the government of China.

anybody -- does anybody see an issue with that?

**MR. BOOME:**  No, Your Honor.

**MR. FONDO:**  No objection, Your Honor.

**MR. CHANG:**  No, Your Honor.

**THE COURT:**  Given its complexity and all that.

**THE COURTROOM DEPUTY:**  Court is in recess.

(Recess taken.)

(The jury entered the courtroom.)

**THE COURTROOM DEPUTY:**  All rise.

Please be seated.

**THE COURT:**  Okay.  Mr. Boome?

**MR. BOOME:**  Thank you, Your Honor.

### GOVERNMENT'S REBUTTAL ARGUMENT

**MR. BOOME:**  Good afternoon.  The most remarkable thing about Mr. Fondo's closing argument was how much time he spent arguing that there wasn't enough evidence for things that do not matter for the decision that you are required to make.  He spent half of his closing argument telling you there's no evidence that the defendant sold, transferred, or used the alleged trade secrets.

You now have -- you will have when you go back into the jury room the jury instructions.  These are what will guide your decisions.  Your decisions on these questions and these elements will guide your decision of whether the defendant is guilty or not guilty, and there is absolutely nowhere in these

instructions requiring the Government to prove that the defendant used, transferred, gave these trade secrets to anyone.

So why did Mr. Fondo spend so much time on things that don't matter? I have to assume because if he had talked about the question you will actually be required to answer, which is what the defendant intended to do with these trade secrets when he stole them, there is no way around finding that the defendant is guilty on every single count of the indictment.

Here, you saw evidence that over and over and over again, the defendant told investors in China that he could build an AI supercomputer by replicating Google's AI technology. The evidence is absolutely clear about what he intended to do with the technology.

It makes sense that he did not sell or transfer them, because what was his plan? He told lies to investors in China about what he could do, about the knowledge and capabilities that he had. He needed these documents to make himself valuable. He was going to use these documents to close the gap between the lies that he told to investors and what was true.

As soon as he gave -- if he would have given or sold these documents to anyone, then he would no longer be valuable. It wouldn't make sense for his plan to use these documents to benefit himself and Zhisuan. And of course the defendant did not have the opportunity to use, actually use the trade secrets

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Thursday, January 29, 2026

_____

April Wood Brott, CSR No. 13782