CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

CASEY BOOME (NYBN 5101845)
MOLLY K. PRIEDEMAN (CABN 302096)
ROLAND CHANG (CABN 271511)
Assistant United States Attorneys

> 450 Golden Gate Avenue, Box 36055
> San Francisco, California 94102-3495
> Telephone: (415) 436-6627
> casey.boome@usdoj.gov
> molly.priedeman@usdoj.gov
> roland.chang@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br> v.<br><br>LINWEI DING,<br><br>  Defendant. | ) No. 3:24 cr-00141 VC<br>)<br>) **UNITED STATES' SUPPLEMENTAL**<br>) **BRIEFING IN OPPOSITION TO**<br>) **DEFENDANT'S MOTION FOR A JUDGMENT**<br>) **OF ACQUITTAL OR, IN THE ALTERNATIVE,**<br>) **NEW TRIAL PURSUANT TO RULE 29(C) AND**<br>) **RULE 33 OF THE FEDERAL RULES OF**<br>) **CRIMINAL PROCEDURE**<br>)<br>) The Honorable Vince Chhabria<br>) Courtroom 4, 17th Floor<br>)<br>) **Hearing Date:** June 16, 2026<br>) **Hearing Time:** 2:00 pm<br>) |

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................................1

ARGUMENT ........................................................................................................................................2

I.    Economic Espionage Counts (Counts Eight-Fourteen) ....................................................2

      (a)    Section 1831 Expressly Criminalizes Unauthorized Downloads of Trade Secrets with The Requisite Intent .............................................................................2

      (b)    Section 1831 Defines a Single Offense with Multiple Means ............................4

      (c)    There Was No Constructive Amendment or Variance ........................................7

      (d)    Sufficient Evidence Supports the Jury's Economic Espionage Verdicts............13

II.    Combination Trade Secret Counts (Counts One, Two, Three, Six, Eight, Nine, Ten, and Thirteen) ...................................................................................................................17

      (a)    The Jury Was Not Required to Conclude that Each Document in a Category Contributed to the Value of a Combination Trade Secret....................................17

      (b)    Sufficient Evidence Supports the Combination Trade Secret Verdicts ............19

CONCLUSION....................................................................................................................................25

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

# TABLE OF AUTHORITIES

## Other Authorities

2020 WL 5408165 (N.D. Cal. Sept. 9, 2020) ........................................................................... 7

*Barrett Bus. Servs., Inc. v. Colmenero*,
  2025 WL 2048985 (9th Cir. July 22, 2025) .................................................................... 18

*Mickey*,
  897 F.3d ...................................................................................................................... 13

*Musacchio v. United States*,
  577 U.S. 237 (2016) ..................................................................................................... 19

*Turner v. United States*,
  396 U.S. 398 (1970) ................................................................................................. 1, 13

*United States v Morales*,
  11 F.3d 915 (9th Cir. 1993) ............................................................................................ 5

*United States v. Adamson*,
  291 F.3d 606 (9th Cir. 2006) ............................................................................... 8, 10, 11

*United States v. Agrawal*,
  726 F.3d 235 (2d Cir. 2013) ................................................................................... 3, 4, 5

*United States v. Awad*,
  551 F.3d 930 (9th Cir. 2009) .......................................................................................... 9

*United States v. Bradford*,
  148 F.4th 699 (9th Cir. 2025) .............................................................................. 4, 5, 6

*United States v. Chung*,
  659 F.3d 815 (9th Cir. 2011) ........................................................................................ 16

*United States v. Fuchs*,
  218 F.3d 957 (9th Cir. 2000) ........................................................................................ 17

*United States v. Garcia-Paz*,
  282 F.3d 1212 (9th Cir. 2002) ................................................................................. 9, 10

*United States v. Gordon*,
  844 F.2d 1397 (9th Cir. 1988) ........................................................................................ 5

*United States v. Hernandez*,
  859 F.3d 817 (9th Cir. 2017) ........................................................................................ 16

*United States v. Hinkle*,
  637 F.2d 1154 (7th Cir. 1981) ........................................................................................ 9

*United States v. Holmes*,
  163 F.4th 547 (9th Cir. 2025) ......................................................................................... 8

*United States v. Johnson*,
  934 F.2d 936 (8th Cir. 1991) ........................................................................................ 16

*United States v. Kakos*,
  483 F.3d 441 (6th Cir. 2007) .......................................................................................... 7

*United States v. Katakis*,
  800 F.3d 1017 (9th Cir. 2015) ...................................................................................... 19

*United States v. Kelley*,
  551 F.3d 171 (2d Cir. 2009) .......................................................................................... 15

*United States v. Kennedy,*
    726 F.2d 546 (9th Cir. 1984) ........................................................................................ 7
*United States v. Lam,*
    No. CR 18-00527 WHA, 2019 WL 6913141 (N.D. Cal. Dec. 19, 2019)............................ 5
*United States v. Lapier,*
    796 F.3d 1090 (9th Cir. 2015) ...................................................................................... 7
*United States v. Latimore,*
    No. CRIM. 08-20633, 2010 WL 431739 (E.D. Mich. Feb. 2, 2010) ...................................... 5
*United States v. Mares,*
    441 F.3d 1152 (10th Cir. 2006) ................................................................................... 15
*United States v. McDougald,*
    990 F.2d 259 (6th Cir. 1993) .............................................................................. 16, 17
*United States v. Mehanna,*
    735 F.3d 32 (1st Cir. 2013)........................................................................................ 15
*United States v. Mehrmanesh,*
    689 F.2d 822 (9th Cir. 1982) ...................................................................................... 15
*United States v. Mickey,*
    897 F.3d 1173 (9th Cir. 2018) ............................................................................ 1, 4, 6, 9
*United States v. Nosal,*
    844 F.3d 1024 (9th Cir. 2016) ................................................................................ 18, 19
*United States v. Payseno,*
    782 F.2d 832 (9th Cir. 1986) ........................................................................................ 7
*United States v. Rodrigues,*
    159 F.3d 439 (9th Cir. 1998) .................................................................................... 6, 7
*United States v. Rodriguez,*
    360 F.3d  (9th Cir. 2004) ............................................................................................ 9
*United States v. Tuan Ngoc Luong,*
    965 F.3d 973 (9th Cir. 2020) ........................................................................................ 9
*United States v. UCO Oil Co.,*
    546 F.2d 833 (9th Cir. 1976) .................................................................................... 4, 6
*United States v. Viruet,*
    539 F.2d 295 (2d Cir. 1976)........................................................................................ 15
*United States v. Ward,*
    747 F.3d 1184 (9th Cir. 2014) ...................................................................................... 8

## Statutes

18 U.S.C. § 1831(a) ............................................................................................................ 2

18 U.S.C. § 1832............................................................................................................. 3, 5

18 U.S.C. § 1832(a)(1)........................................................................................................ 5

18 U.S.C. § 1839(3) ......................................................................................................... 18

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

**INTRODUCTION**

At the May 12, 2026 hearing, the Court raised a number of questions regarding the economic espionage charges, including whether the Economic Espionage Act ("EEA") criminalizes Ding's December 14, 2023 downloads, whether the downloads would constitute a separate offense requiring a unanimity instruction, whether the government properly charged and presented that theory at trial, and whether sufficient evidence supports Ding's intent to benefit a foreign instrumentality or government at the time of the uploads. The answer to each question supports the jury's verdict.

Section 1831 expressly criminalizes the unauthorized downloading of trade secrets with the intent to benefit a foreign government or foreign instrumentality. Nothing in the statutory text limits liability to the initial taking of a trade secret from its owner. Because the statute defines a single offense that may be committed through multiple alternative means, the jury could convict if it found that Ding possessed the requisite intent while engaging in any of the unauthorized acts involving the charged trade secrets, including when he uploaded the documents or when he later downloaded them to his personal computer. The jury was also not required to unanimously agree on which means supported the conviction, and the Court must sustain the verdict if the evidence was sufficient as to any of the charged means. *United States v. Mickey*, 897 F.3d 1173, 1181 (9th Cir. 2018); *Turner v. United States*, 396 U.S. 398, 420 (1970).

The Second Superseding Indictment ("SSI") expressly charged Ding with downloading the trade secrets during the operative time period, the government consistently disclosed and argued that the December 2023 downloads were among the unauthorized acts supporting the economic espionage counts, and the jury instructions tracked the language of the SSI. As a result, there was no constructive amendment or prejudicial variance. In any event, the verdict stands even if the Court considers only the uploads, because sufficient evidence supports Ding's intent at the time of the uploads.

Finally, the Court did not commit plain error by instructing the jury that a collection of documents may constitute a protectable combination trade secret if the combination as a whole derives independent economic value from its secrecy, and the government introduced overwhelming evidence that each charged combination satisfied that standard. The Court should therefore deny Ding's motion in its entirety.

**ARGUMENT**

**I.      Economic Espionage Counts (Counts Eight-Fourteen)**

      **A.      Section 1831 Expressly Criminalizes Unauthorized Downloads of Trade Secrets with The Requisite Intent**

Section 1831 describes a unified mens rea requirement with numbered subsections illustrating different ways of committing economic espionage, including when an individual (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains a trade secret; or (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys a trade secret.  18 U.S.C. § 1831(a).

Contrary to defendant's suggestion, the crime of economic espionage is not limited to only the initial "taking" of a trade secret from the owner with the requisite intent.  Nothing in § 1831(a)(2) limits "downloads" to downloads from the trade-secret owner or to the very first download of a trade secret.  If Congress had intended to limit the applicability of the statute to the initial wrongful acquisition of the trade secret, it could have added language to § 1831(a)(2) to limit its applicability to instances where the defendant "copied," "duplicated," "uploaded," or "downloaded" a trade secret *from its owner*.  It did not do so, and the Court should resist the defendant's suggestion to alter the plain language of the statute.

This interpretation is consistent with the nature of trade secrets themselves. Unlike physical theft, where the deprivation occurs when property is taken, the value of a trade secret "is almost entirely dependent on it being closely held."  H.R. Rep. 104-788 at 7.  Subsequent unauthorized downloading, retention, or transmission therefore continues to interfere with the owner's exclusive control over the information even where the owner retains the original data.

Defendant's interpretation of the statute would restrict the EEA to only those cases in which a defendant's requisite intent accompanies his initial acquisition of a trade secret, effectively immunizing an individual who acquired or stole a trade secret without the requisite intent but then later decided to download the trade secrets without authorization for the benefit of a foreign government or foreign instrumentality.  It could also prevent prosecution of an individual who lawfully acquired a trade secret but later took a statutorily proscribed action with the requisite intent.  For example, consider an

employee who copied his employer's trade secrets onto a personal computer intending at the time to use the copies to work from home, but several months later downloaded, uploaded, or possessed the same trade secrets after forming a plan to pass those trade secrets to a foreign agent for the benefit of a foreign government or instrumentality. Under Ding's interpretation of the statute, the employee committed no crime. That result would defy common sense, as well as Congress's intent to deter the misuse and theft of trade secrets.

The Second Circuit's opinion in *United States v. Agrawal*, 726 F.3d 235 (2d Cir. 2013) confirms this interpretation. Although *Agrawal* involved § 1832 rather than § 1831, the operative language is materially identical. The government charged the defendant *Agrawal* with one count of violating 18 U.S.C. § 1832 between June 12, 2009 and April 2010 via multiple means, including the initial theft of the trade secret, and his continued possession of the same trade secret. *Agrawal*, 726 F.3d 235 at 239–40. At trial, Agrawal admitted taking the trade secrets, but argued that he lacked the requisite intent at the exact moment he initially took the trade secrets, instead asserting that he formed the intent to convert the trade secret only later. *Id.* The district court held that "there was no basis in either the indictment or the law for requiring the government to prove that Agrawal possessed culpable intent at the precise time he printed and removed," the trade secrets, and instructed the jury that the defendant could have possessed the requisite intent to convert when he "removed the code *or at any point thereafter when he was still in unauthorized possession of the computer code." Id.* at 241. The Second Circuit affirmed, holding that the district court's "instruction comports with the language of the EEA" because it referenced "two proscribed actions – the unauthorized removal of a trade secret from its owner's offices and the unauthorized possession of that trade secret – either of which could support an EEA conviction, provided that when the defendant engaged in that removal or possession, he had formed the requisite intent to convert." *Id.* As the Second Circuit recognized, theft of trade secrets, and by analogy, economic espionage, can be completed by multiple alternative means, if the defendant has the requisite intent at the time of the operative act. That reasoning applies with equal force here, where the government charged Ding with committing economic espionage via multiple means, including both the unauthorized uploading and subsequent downloading of the same trade secrets during the operative time period.

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

3

The legislative history likewise makes clear that Congress intended to criminalize actions taken by the defendant after the initial theft vis à vis the trade secrets with the requisite intent.  As the House Report explained, the EEA was designed to create "a new crime of wrongfully copying or otherwise *controlling* trade secrets" if done with the requisite intent.  H.R. Rep. No. 104-788 (emphasis added)*; see also* Sen. Rep. No. 104-258 (stating that the offense of economic espionage was designed to punish "the theft *or* wrongful appropriation, duplication, alteration, destruction, or conversion of proprietary economic information on behalf of a foreign government")(emphasis added).  The statute was intended to be interpreted broadly to include "situations in which the information has been transmitted from one place to another (regardless of whether by electronic means, through the mails, or by person), even if in transmitting the information it continues to remain in the possession of its rightful owner" as well as "the mere possession of the information, regardless of the manner by which the non-owner gained possession of the information."  *Id.*

### B.  Section 1831 Defines a Single Offense with Multiple Means

It is well established that the government may charge alternative means of committing a single offense.  *See United States v. UCO Oil Co.*, 546 F.2d 833, 836 (9th Cir. 1976); *Mickey*, 897 F.3d at 1181; *United States v. Bradford*, 148 F.4th 699, 706 (9th Cir. 2025).  When determining if a statute defines a single offense that can be committed via alternative means, Courts consider several relevant factors including the language of the statute, the legislative history and statutory context, the nature of the conduct, and the appropriateness of multiple punishment for the conduct charged in the indictment.  *Bradford* 148 F.4th at 706.  Here, § 1831 lists multiple offense verbs in a single clause with a unified mens rea requirement describing the different ways one can commit economic espionage, none of the listed alternatives carries a different punishment, and the statute does not identify the alternatives as separate elements.  *See UCO Oil Co.*, 546 F.2d at 836; *Mickey*, 897 F.3d at 1181; *Bradford*, 148 F.4th at 706.  The initial wrongful acquisition and subsequent unauthorized uploading, downloading, or possession of the same trade secrets also "are not distinctly different types of conduct" and the rule of lenity also weighs against concluding that Congress intended § 1831 to criminalize separate offenses.  *UCO Oil Co.*, 546 F.2d at 837-38; *Bradford*, 148 F.4th at 708.  Under defendant's proposed construction of the statute, he would be exposed to separate charges for the uploads, download, and possession of the

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

4

same documents, exposing him to separate punishment for each action. In such situations, the defendant may raise a "multiplicity challenge to that indictment for 'charging a single offense in more than one count.' " *Bradford*, 148 F.4th at 708. The legislative history of the EEA also confirms that Congress intended to create a single offense, rather than multiple offenses. H.R. Rep. 104-788 (explaining that the EEA created "*a new crime* of wrongfully copying or otherwise controlling trade secrets") (emphasis added).

Indeed, courts that have analyzed identical language in 18 U.S.C. § 1832 have reached the same conclusion. *See United States v. Latimore*, No. CRIM. 08-20633, 2010 WL 431739, at *6 (E.D. Mich. Feb. 2, 2010) (holding that indictment charging defendant with 18 U.S.C. § 1832(a)(1), (2), and (3) in a single count alleged alternative means by which a defendant committed a single offense of trade secret theft and therefore was not duplicitous); *United States v. Lam*, No. CR 18-00527 WHA, 2019 WL 6913141, at *2 (N.D. Cal. Dec. 19, 2019) (same); *Agrawal*, 726 F.3d at 260–62 (the statutory text of 18 U.S.C. § 1832 "exhaustively details the *means* by which theft can be committed") (emphasis added). Because § 1831 likewise describes one offense with multiple means, defendant's suggestion that the charges in this case were duplicitous has no merit. *See Bradford*, 148 F.4th at 708. Regardless, defendant has waived any objection to the form of indictment. *United States v. Gordon*, 844 F.2d 1397, 1400–01 (9th Cir. 1988) (requiring that "objections based on defects in the indictment be raised prior to trial.").

The defendant's reliance on the continuing offense doctrine is misplaced. Defendant conflates the question of whether a *completed* offense persists over time for purposes of statute of limitations[1] with the question, relevant here, of whether § 1831 permits conviction based on any of several alternatively charged unauthorized acts involving the same trade secrets. Regardless of whether § 1831 is a continuing offense, it does not follow that the statute only criminalizes the initial taking of a trade secret. *Bradford* is instructive. The government charged the defendant in a single count with sex

---

[1] The continuing offense doctrine is typically used to determine whether an offense should be deemed to continue beyond the defendant's initial conduct for statute of limitations purposes. The Ninth Circuit has held it has no applicability to a situation like this "where the charged criminal conduct itself extends over a period of time." *United States v Morales*, 11 F.3d 915, 918 (9th Cir. 1993). Rather, "the doctrine comes into play where it is contended that the actual conduct of the defendant ended but the crime continued past that time." *Id.*

trafficking a minor over a period of time by "recruiting, enticing, harboring, transporting, providing, obtaining, maintaining, patronizing, or soliciting a minor to engage in a commercial sex act" and by "advertising a minor for commercial sex acts." *Bradford*, 148 F.4th at 703.  The *Bradford* defendant argued that the superseding indictment was duplicitous because § 1591's advertising prong constituted a separate offense from the statute's other sex-trafficking verbs. *Id.* at 705.  The Ninth Circuit rejected that argument, holding that advertising was merely an alternative means of violating § 1591. *Id*. at 706–08.  In *Bradford*, the defendant would have necessarily "enticed," "transported" and "advertised" the victim for commercial sex acts at different points in time.  But the fact that one of these acts committed with the requisite intent would have been sufficient to "complete" the offense of sex trafficking did not preclude the government from charging the other statutory means of committing the same offense within the charged period, nor did the Court ever engage with the continuing offense doctrine when considering whether the statute enumerated different means.  Accordingly, here, the jury could rely on the charged December 2023 downloads as one of the statutorily prohibited acts supporting conviction, regardless of whether the earlier uploads independently violated § 1831 when they occurred.

Because the uploads and downloads constituted alternative means of committing the same offense rather than separate elements, no specific unanimity instruction was required.  *UCO Oil Co.,* 546 F.2d at 838 (finding that it is "not a valid objection that ... the jury, in arriving at a unanimous verdict, may not agree on the particular means by which the offense was committed."); *Mickey*, 897 F.3d 1173 ("elements are those circumstances on which the jury must unanimously agree, while means are those circumstances on which the jury may disagree yet still convict")(quotations omitted).

Even if the Court were to determine that Ding's uploading and downloading of the same trade secret documents were separate offenses rather than alternative means, which it should not for the reasons outlined above, the verdict should still stand.  As an initial matter, Ding never asked for a unanimity instruction as to the "uploads" and "downloads."  Indeed, when Ding wanted unanimity on a specific item, "he knew how to ask for it," as he did when he requested a special verdict form as to the specific trade secrets. *See United States v. Rodrigues*, 159 F.3d 439, 446 (9th Cir. 1998).  His failure to ask for unanimity as to the underlying actions "strongly suggests a deliberate choice and intelligent waiver." *Id*.

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

Ding also cannot demonstrate plain error. *United States v. Lapier*, 796 F.3d 1090, 1096 (9th Cir. 2015) (applying plain error review where defendant fails to request specific unanimity instruction); *United States v. Kramer*, No. 16-CR-00322-EJD-1, 2020 WL 5408165, at *5 (N.D. Cal. Sept. 9, 2020) (adopting plain error review when analyzing Rule 33 motion for a new trial for failure to give proper jury instructions). The jury's verdict would have been unanimous even if the Court had given a unanimity instruction. A specific unanimity instruction "is required if there is a 'genuine possibility of jury confusion' or a possibility 'that a conviction may occur as the result of different jurors concluding that the defendant committed different acts.' " *Lapier*, 796 F.3d at 1096 (quoting *United States v. Payseno*, 782 F.2d 832, 834 (9th Cir. 1986)). Here, the facts that Ding uploaded the trade secrets to his personal cloud account and later downloaded them to his personal computer were never contested at trial. Moreover, as discussed below, the government presented the same evidence of Ding's intent to benefit a foreign government or instrumentality as to the uploads and the downloads, with even more evidence presented closer time to the downloads. In other words, because there was no question that Ding uploaded and downloaded the documents, and the government presented even more intent evidence as to the downloads, there is nothing in the record that would allow a juror to infer that Ding had the requisite intent at the time of the uploads, but not at the time of the downloads. "There is consequently no risk that the jury was not unanimous in its belief" that Ding possessed the requisite intent at the time of the downloads. *United States v. Kakos*, 483 F.3d 441, 445 (6th Cir. 2007) (finding no plain error in failure to give specific unanimity instruction where there was no risk that jury was not unanimous in its belief as to one of the alternative acts, but not the other). Therefore, it is not plausible that if a specific unanimity instruction was given, the jury would not have reached a unanimous verdict on the relevant counts. *Id.*; *United States v. Kennedy*, 726 F.2d 546, 548 (9th Cir. 1984) (finding no plain error where there was "no danger that the jury could convict . . . without reaching unanimous agreement"); *Rodrigues*, 159 F.3d at 446 (finding no plain error where "the possibility of jury confusion was slight").

**C.     There Was No Constructive Amendment or Variance**

Ding cannot establish either a constructive amendment or prejudicial variance. The plain language of the SSI charged Ding with committing economic espionage by downloading the trade

secrets within the operative time period, the government consistently disclosed the inclusion of the download in its theory of the case, and the jury instructions mirrored the language of the SSI.

Where, as here, a defendant fails to object to the district court's jury instructions, a constructive amendment claim is reviewed for plain error. *United States v. Ward*, 747 F.3d 1184 (9th Cir. 2014). "The line between a constructive amendment and a variance is at times difficult to draw." *United States v. Adamson*, 291 F.3d 606, 614 (9th Cir. 2006). "Discrepancies between an indictment and evidence presented at trial amount to a constructive amendment in two general situations: first, when 'there is a complex set of facts distinctly different from those set forth in the charging instrument' such that the defendant lacked notice; and second, when 'the crime charged was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." *United States v. Holmes*, 163 F.4th 547, 571 (9th Cir. 2025). "A variance, on the other hand occurs when . . . the evidence offered at trial proves facts materially different from those alleged in the indictment." *Adamson*, 291 F.3d at 614 (quotations omitted).

On February 4, 2025, the grand jury issued a Superseding Indictment charging Ding with seven counts of theft of trade secrets and seven counts of economic espionage related to seven categories of trade secrets. Dkt. 44. The operative date range for each count was June 1, 2022 to April 17, 2023, reflecting the timing of the initial uploads of the trade secrets from Ding's corporate device to his personal cloud account. Dkt. 44 at 11. Later that year, on September 9, 2025, the grand jury returned the SSI. Dkt. 140. The date range for each count in the SSI was expanded to May 21, 2022 and January 13, 2024, encompassing Ding's initial uploads of the trade secrets, the December 14, 2023 downloads, and his continued possession of the trade secrets until the FBI's execution of the search warrant. Dkt. 140 at 11. The charging language plainly alleged Ding's unauthorized downloads. Dkt. 140 ¶ 46 (emphasis added) ("knowingly and without authorization . . . ***downloaded*** . . . trade secrets alleged in each of Counts Eight through Fourteen [] belonging to Google.").

The jury instructions at trial tracked the language of the SSI. Specifically, the jury was instructed that for the economic espionage counts, they must find that "the defendant knowingly: (a) took the trade secret information without authorization; or (b) without authorization copied, *downloaded*, uploaded, or transmitted the trade secret information." Dkt. 362 (Jury Instruction No. 16)

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

(emphasis added). Despite ample opportunity during two different charging conferences, Ding never objected to the inclusion of the "download" language in the jury instructions. Instead, defense counsel affirmatively endorsed the accuracy of the instruction. Tr. 1858:12-15 (statement from defense counsel that the instruction captured "what the act was that the defendant took, so that the defendant without authorization copied, downloaded, or uploaded.").

An indictment is typically " 'sufficient if it sets forth the elements of the charged offense' so as to provide the defendant with fair notice of the charges against him and to ensure that the defendant is not placed in double jeopardy." *United States v. Tuan Ngoc Luong*, 965 F.3d 973, 985 (9th Cir. 2020) (quoting *United States v. Rodriguez*, 360 F.3d 949, 958 (9th Cir. 2004); *United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir. 1981) ("[g]enerally, an indictment is sufficient when it sets forth the offense in the words of the statute itself, as long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished."). Here, Ding was charged with committing economic espionage by multiple different means, including by downloading the trade secrets, during a timeframe that clearly encompassed the December 14, 2023, downloads. When an indictment uses statutory language to charge a defendant with committing multiple means of the same crime, he is necessarily on notice that he would have to defend against each of these means. *Mickey*, 897 F.3d at 1183 (holding that because the indictment charged the defendant with four means of committing the same crime, defendant was "given notice he would have to defend against all four means").

In each of the constructive amendment cases cited by the defendant, the jury instructions materially altered the charges contained in the indictment. By contrast, here, the charging language was not limited to the "uploads," and clearly charged the downloads during the relevant timeframe. The jury instructions mirrored that language. The fact that the background allegations referenced the uploads, but not the downloads, does not alter the analysis. "The test for sufficiency of the indictment is 'not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *United States v. Awad*, 551 F.3d 930, 935 (9th Cir. 2009) (citation omitted). The background allegations were "mere surplusage" that did not limit the scope of the charging language in each count.

The Ninth Circuit's opinion in *United States v. Garcia-Paz*, 282 F.3d 1212 (9th Cir. 2002), is

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

instructive. There, the government charged the defendant with importation of merchandise in violation of 18 U.S.C. § 545. *Id.* at 1213. The indictment alleged that the defendant knowingly imported "certain merchandise, to wit, marijuana," but at trial the jury was instructed that the defendant could be deemed culpable if he believed he was "smuggling any illegal merchandise across the border." *Id.* at 1214. The defendant argued that by not requiring the jury to find that he knowingly imported marijuana, the district court constructively amended the indictment. *Id.* at 1215. The Ninth Circuit rejected that argument, holding that the reference to marijuana in the indictment was "mere surplusage and did not cause the indictment to allege that Garcia-Paz had knowledge of the marijuana. Consequently, the removal of the reference to marijuana from the jury instruction did not alter the charge against Garcia-Paz." *Id.* at 1215-16. Here, as in *Garcia-Paz*, to the extent there is any difference between the SSI and the jury instructions, it did not allow Ding "to be convicted on the basis of *different behavior* than that alleged in the original indictment" because the SSI explicitly charged the downloads. *Id.* at 1216.

The Ninth Circuit's opinion in *Adamson* is distinguishable. In *Adamson*, the Court found a variance between the indictment and the proof at trial because the "misrepresentation specified in the indictment and the misrepresentation shown at trial" differed. *Adamson*, 291 F.3d at 615-16. Here, there was no variance because each count charged the defendant with "uploading" and "downloading" the trade secrets within the operative timeframe. Moreover, unlike *Adamson*, where the government represented at a pretrial hearing that the misrepresentation in the indictment was the only misrepresentation at issue, this is not a case where the government "affirmatively misled the defendant and obstructed his defense at trial." *Id.*

Rather, Ding was given ample notice of the government's theory of the case. On September 22, 2025, within weeks of the grand jury's return of the SSI, the government produced the relevant grand jury transcript to defense describing the December 14, 2023, downloads as part of the evidence presented to the grand jury in support of the expanded date range in the SSI. Ex. A to Priedeman Decl. In its presentation to the grand jury, the government presented evidence about the "time frame of Mr. Ding's theft," and FBI Special Agent Pelusi testified to three different actions vis-à-vis the trade secrets relevant to the operative timeframe in the SSI: (1) the uploads that occurred between May 2022 and April 2023; (2) the download on December 14, 2023; and (3) the execution of the search warrants on

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

10

January 13, 2024 (i.e. the last date Ding was in possession of the trade secrets). *Id.*

The government also articulated that its theory of the case encompassed the December 14, 2023 downloads in its pretrial filings. In a motion *in limine* filed on September 9, 2025, the factual background included a section titled "Ding's Copying, Exfiltration, and *Downloading* of Google Documents that Included Trade Secret Information." Dkt. 142 at 2 (emphasis added). Later in the motion, in a section titled "Ding *Downloaded* the Stolen Documents and Continued to Copy Google Information," the government described in detail that six days prior to the December 14 download, Ding was interviewed by a Google investigator who reminded him of Google's policies and required him to sign a self-deletion affidavit promising to delete all Google information from his personal systems. *Id.* at 3 (emphasis added). On August 26, 2025, the government disclosed that its forensic expert would testify regarding the December 14, 2023 downloads. Dkt. 323 at 14, 23-25.

At trial, consistent with the SSI, the government's pretrial filings, and the jury instructions, the government argued to the jury that it could convict Ding of economic espionage if they determined that he either uploaded *or* downloaded the trade secrets without authorization and with the requisite intent. In its opening statement, the government explained that on December 14, 2023, six days after Ding signed an affidavit swearing to delete or destroy all confidential Google information, Ding accessed his personal account "where he had his secret stash of more than 1200 documents, including the trade secret documents in this case, he copied every single of them, and made a backup copy on his personal computer." Tr. 53:15-19. At trial, the government's forensic expert and the case agent testified that on December 14, 2023, Ding downloaded all of the alleged trade secrets from his personal cloud account to his personal computer. Tr. 451:5-19; Tr. 768:6-8. And in closing argument, when discussing the instruction requiring the jury to find that the defendant knowingly took an operative action without authorization, government counsel argued "This is not contested. You know that the defendant uploaded all of the stolen trade secrets to his personal e-mail account, which is against Google's policies. And then, as we talked about, he downloaded all of the trade secrets on December 14th, just six days after Mr. Fuller reminded him of the policies and after he had sworn that he would delete all Google information from his accounts and devices." Tr. 2154:20-2155:4.

There is no question that the defendant was aware that the December 14, 2023 downloads were

part of the charged conduct. Indeed, in closing argument, defense counsel argued that Ding had no nefarious intent at the time of the downloads, referring to the December 14, 2023 downloads as a "drive backup." Tr. 2193:17–23; *see also* Tr. 2194:16–21 (arguing that Ding never transferred the trade secrets to anyone else after downloading them to his personal computer). Ding cannot now claim that he was blindsided by the fact that his intent at the time of the downloads was at issue in his trial, when his counsel specifically addressed it in closing argument.

The fact that the government referred to the uploads as "theft" and "exfiltration" in its pretrial filings and arguments at trial is not inconsistent with the government's reliance on the December 14, 2023 downloads as an unauthorized action. As discussed above, and as the jury instructions made clear, § 1831 criminalizes multiple alternative means; not only the initial taking of a trade secret, but also the subsequent unauthorized downloading of that trade secret when undertaken with the requisite intent. The fact that the government characterized the uploads as "theft" or "exfiltration" and characterized the downloads as "making a backup copy" does not alter the fundamental character of Ding's conduct, which the government disclosed before trial, charged in the SSI, included in the jury instructions, and argued to the jury. Taken together, there can be no question that Ding had fair notice that the uploads between 2022 and 2023, as well as the December 14, 2023 downloads, constituted alternative means of committing the same offense expressly covered by § 1831.

Defendant's suggestion that the government limited its description of the evidence of the December 14, 2023 download to evidence of "concealment" also falls flat. In the first instance, nothing about Ding's creation of a second copy of the trade secret files after being interviewed by Google's security team concealed his crimes, particularly because he never deleted the first copy of the trade secret documents that remained in his personal cloud account. In its pretrial filings, and at trial, the government repeatedly emphasized that Ding downloaded all of the trade secrets just six days after his interview with the Google investigator. The government's argument was straightforward: Ding uploaded the trade secrets without authorization and downloaded them on December 14, 2023 without authorization, shortly after being reminded of Google's policies and signing a self-deletion affidavit. The government argued that both actions constituted unauthorized conduct covered by the statute and that the timing of the download was probative of Ding's knowledge and intent.

Finally, Ding cannot demonstrate that he would "have approached his defense any differently" if the December downloads had been included in the background allegations of the SSI. *Mickey*, 897 F.3d at 1184. The government presented overwhelming evidence that Ding downloaded the trade secrets to his personal computer on December 14, 2023. Despite hiring a forensic expert to analyze Ding's devices, Ding never contested that fact. As a result, even if the Court were to find that there was a constructive amendment or variance, which it should not for the reason above, it "did not seriously affect the integrity of the proceedings." *Id.*

### D.    Sufficient Evidence Supports the Jury's Economic Espionage Verdicts

Based on the ample evidence presented at trial, a reasonable juror could conclude that Ding had the requisite intent to benefit a foreign government or instrumentality both at the time of the uploads and at the time of the downloads. The SSI alleged in the conjunctive that Ding committed economic espionage through multiple means, including by "upload[ing]" and "download[ing]" Google's trade secrets. Dkt. 140 at 12. Similarly, the jury instructions correctly explained that the jury could convict Ding of economic espionage if they determined that he uploaded or downloaded Google's trade secrets with the required intent. Dkt. 362, Inst. No. 16. The Supreme Court established in *Turner v. United States* that "when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." 396 U.S. at 420.

As the jury instructions correctly explained, the government could satisfy § 1831 by proving that Ding "intended or knew that his actions would benefit a foreign government *or* foreign instrumentality." Dkt. 362 at 17 (emphasis added).[2] As detailed in the government's initial opposition, most of the government's intent evidence on economic espionage focused on Ding's intent to use the stolen trade

---

[2] During the May 12, 2026 hearing, the Court stated that it was "already a little bit of a stretch to conclude" that Ding's marketing of Zhisuan's services to, and partnerships with, the Industrial Innovation Park and the Tianfu Research Institute "reflected an intent to benefit the Chinese government." May 12, 2026 Tr. 34:15-20. But this concern implies that the government must prove both that Ding intended to benefit a PRC government instrumentality *and* the PRC government more broadly, an interpretation at odds with the statute and the Final Jury Instructions. Dr. Segal's testimony provided a sufficient basis for the jury to find that the Industrial Innovation Park and the Tianfu Research Institute each met the statutory definition of "foreign instrumentality." Because the trial evidence proved that Ding intended to use the stolen trade secrets to build Zhisuan and then to provide Zhisuan's services to the Industrial Innovation Park and the Tianfu Research Institute, the government proved that Ding intended or knew that his offense would benefit a foreign instrumentality. No more was required.

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

13

secrets to provide Zhisuan's services to two foreign instrumentalities. This is precisely the type of proof that the Court previously concluded would satisfy the elements of Section 1831. *Order Denying Ding's Motion to Dismiss,* Dkt. 105 at 2 (holding that proof of "Ding's intent to directly provide a service to a government entity, would satisfy section 1831") (internal citations omitted)).

As detailed during trial, Ding uploaded the trade secrets from his Google corporate computer to his personal cloud account on four dates: May 21, 2022, June 1, 2022, June 3, 2022, and April 17, 2023. He downloaded all the trade secret documents onto his personal laptop on December 14, 2023. The trial evidence showed that no later than May 2022, *i.e.*, around the time of his first uploads, Ding already had a vision to create his own company that would be "like Google." TX 349; Tr. 621:18-623:13. By April 2023, Ding, together with Yuan Ye and I&R Capital, had drafted the "Zhisuan Teaser" business plan document (TX 1137), which both parties discussed extensively at trial. *See* Tr. 646:7-649:14, 677:25–678:4, and 679:5–680:10 (Valladao Direct); Tr. 895:3–895:21 (Zhiyao "Mazy" Ma Direct); Tr. 1218:23–1222:19 (Dr. Sanchez Direct); Tr. 1402:4–1403:19 (Dr. Sanchez Cross); Tr. 2118:11–2121:9 (Government Closing); Tr. 2182:25–2183:12 (Defense Closing). The Teaser explicitly listed "national supercomputing centers in Beijing" among Zhisuan's "potential customers." TX 1137 at 2. On April 12, 2023, Ding sent the Teaser to a PRC-based investor. Tr. 679:5-18. Five days later, on April 17, 2023, Ding uploaded 50 trade secret documents into his personal cloud account. Tr. 767:23-24; TX 768. Ding later echoed the Teaser's reference to supporting national supercomputing centers in his November 29, 2023 presentation to investors at the Miracle Plus conference by listing "Supercomputing centers" among the "Government agencies" that would become Zhisuan's customers. TX 1158 at 9.

Ding's focus on creating partnerships with and providing services to instrumentalities of the Chinese government persisted through the fall of 2023. On September 27, 2023, a Zhisuan associate sent Ding a document about the Innovation Park, noting that it was a government entity. Tr. 749:23 - 751:1; *see also* TXs 1178, 1018. On November 6, 2023, Ding circulated a draft of a Zhisuan pitch deck that he and his colleagues prepared in advance of a November 9, 2023 meeting with the leadership team of the Innovation Park. Tr. 745:10–747:8. The final Innovation Park pitch deck, TX 1034, advertised that Zhisuan could "provide customized computing power services" and "customize the R&D of underlying chips and network structures" for the Park. TX 1034 at 34. By November 14, 2023, Ding

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

had reviewed and discussed a draft Strategic Cooperation Agreement between Zhisuan and the Tianfu Research Institute. Tr. 756:16–757:16; TX 1002. On November 29, 2023, Ding gave his presentation to investors at the MiraclePlus conference, touting Zhisuan's partnerships with the Innovation Park, Tianfu Research Institute, and listing government agencies and supercomputing centers among Zhisuan's target customers, as discussed above. *See* TX 1158 at 9-10; TX 1004 (presentation video). Finally, by December 2023, Ding had applied to a government talent program, citing his desire to "help[] China to develop world-class compute infrastructure capabilities . . . ." Tr. 761:14-765:7; Ex. 1160.

The evidence presented at trial demonstrates that Ding clearly articulated his intent to benefit a foreign government or instrumentality as early as April 2023, and a reasonable juror could reasonably infer that when Ding began making plans for his startup company in May 2022 that he also began making plans for its ultimate success including through partnerships with government entities – plans that he clearly implemented throughout the spring and fall of 2023. Put another way, although the evidence of Ding's intent was explicit by April 2023, a reasonable juror could infer from Ding's conduct that the plans reflected in the Teaser were not first conceived in April 2023, but were already developing when he began acquiring and uploading the trade secrets for use at Zhisuan beginning in May 2022.

Courts should be particularly deferential to the jury's determination regarding the defendant's intent. *United States v. Mehanna,* 735 F.3d 32, 47 (1st Cir. 2013) ("It is the jury's role—not that of the [court]—to choose between conflicting hypotheses, especially when such choices depend on the drawing of inferences and elusive concepts such as motive and intent."). It is well-established that proof of subsequent conduct may be admissible to prove a defendant's state of mind at an earlier time, including on the issue of whether the defendant acted with criminal intent. *United States v. Mehrmanesh*, 689 F.2d 822, 832–33 (9th Cir. 1982) (approving introduction of subsequent drug sales to demonstrate intent to distribute); *United States v. Kelley*, 551 F.3d 171, 175–76 (2d Cir. 2009) (finding that fraudulent account statements sent by defendant two to four years after alleged securities violations were relevant to defendant's intent at the time of the alleged violations); *United States v. Viruet*, 539 F.2d 295, 296–97 (2d Cir. 1976) (upholding admission of evidence concerning subsequent transactions in stolen goods to show intent to participate in earlier stolen goods conspiracy); *United States v. Mares*, 441 F.3d 1152, 1157 (10th Cir. 2006) ("Subsequent acts evidence is particularly relevant when a

defendant's intent is at issue."); *United States v. Johnson*, 934 F.2d 936, 940 (8th Cir. 1991) ("Testimony concerning Johnson's subsequent acts helped to prove that he had the requisite intent . . .").

The Ninth Circuit's decision in *United States v. Chung*, 659 F.3d 815 (9th Cir. 2011), is likewise instructive. There, a jury convicted the defendant, a Boeing engineer, of six counts of economic espionage for possessing Boeing's trade secrets with intent to benefit the PRC government. *Id*. at 819. The government's evidence of intent included proof that, during the 1980s, Chung gave Chinese officials Boeing's technical information in response to their requests, and that the defendant delivered a presentation on the space shuttle to Chinese engineers in 2001. *Id*. at 828. Then, in 2003, Chung downloaded the trade secrets at issue in the case and stored them under his home where federal agents found them in 2006. *Id*. Chung appealed his convictions, arguing that there was insufficient evidence to prove his intent to benefit China with respect to the trade secret documents found under his home in 2006. *Id*. The Ninth Circuit rejected that argument, holding that "[g]iven Defendant's history of passing technical documents to China [in the 1980s] . . . a rational trier of fact reasonably could infer from Defendant's more recent possession of similar documents that his intent to benefit China persisted . . . and extended to his possession of the trade secrets." *Id*. By accepting a substantial gap between the charged possession and the best evidence supporting the defendant's intent, *Chung* exemplifies the wide latitude that must be given to a jury's verdict, particularly on the issue of intent.

Ding's reliance on *United States v. Hernandez*, 859 F.3d 817 (9th Cir. 2017) and *United States v. McDougald*, 990 F.2d 259 (6th Cir. 1993), is misplaced. In *Hernandez*, the Court vacated the defendant's conviction not because of insufficient evidence of the defendant's intent, but because the trial court's jury instruction on willfulness may have permitted the jury to find the defendant guilty even if he was unaware that the charged conduct (transporting guns into California) was unlawful. *Hernandez*, 859 F.3d at 820. In *McDougald*, a money laundering case involving the purchase of a car for $10,000, the Court held that the government offered "no testimony or documentary evidence that the $10,000 was drug money" or that the defendant knew the source of funds used for the purchase. *McDougald*, 990 F.2d at 261-262. *McDougald* is therefore distinguishable because the government presented compelling evidence of Ding's intent to benefit a foreign government or instrumentalities.

In any event, for Counts 8–13, the Court only needs to determine that there was sufficient

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

evidence of intent by April 17, 2023, mere days after Ding sent the Teaser (TX 1137) to investors articulating his goal of marketing his services to foreign instrumentalities.  This document, presented at trial, made clear that Ding uploaded the trade secrets with the intention of using them for his company Zhisuan, including to provide services to government owned or controlled entities, that is, to benefit a foreign government or instrumentality.  Each count of conviction based on a combination of documents in a category (Counts 8–10 and 13) included at least one Google document uploaded on April 17, 2023, meaning the upload of the combination trade secret was not complete until April 17, 2023.  Ex. B to Priedeman Decl., *Upload Dates of Trade Secret Documents*.  And for the counts on which the jury convicted based on individual documents (Counts 11, 12, and 14) the jury selected documents from the April 17, 2023 upload for both Counts 11 and 12.  *Id*.

The jury's verdict that Ding stole Google's trade secrets with the intent to benefit PRC government instrumentalities was based on reasonable inferences from the evidence, not speculation.  The trial record contained contemporaneous evidence that Ding was building Zhisuan to serve national supercomputing centers in China, and later evidence confirmed that he understood those customers to be government agencies.  Ding pursued that same strategy through partnerships with the Industrial Innovation Park and the Tianfu Research Institute, both proven at trial to be PRC government instrumentalities.  Viewing the record in the light most favorable to the verdict, a rational jury could— and did—find beyond a reasonable doubt that Ding intended his conduct to benefit PRC government instrumentalities both at the time of uploads and downloads.  The Court therefore should not disturb the jury's verdict on the economic espionage counts.

## II.   Combination Trade Secret Counts

### A.   The Jury Was Not Required to Conclude that Each Document in a Category Contributed to the Value of a Combination Trade Secret

The Court has inquired whether the jury was also required to conclude that every single document within a category contributed to the value of a combination trade secret comprising all documents in the category.  Dkt. 425.  Because Ding did not request a jury instruction requiring the jury to conclude that every document contributed to the value of the combination trade secret, the Court reviews any new objection to the instruction for plain error.  *United States v. Fuchs*, 218 F.3d 957, 961

(9th Cir. 2000).

Based on the plain language of the EEA, the combination of information in different documents or location can constitute a trade secret regardless of how the information is "stored," or "compiled" by the trade secret owner, as long as the information meets the definition of a trade secret. 18 U.S.C. § 1839(3). The EEA does not impose a heightened or different definition of a trade secret when a combination or compilation trade secret is at issue. Rather, the relevant question is whether the combination of information, viewed as a whole, derives independent economic value from not being generally known, not whether the government proved the distinct significance of each constituent document in isolation. *See United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016) ("The fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements."). Likewise, the Ninth Circuit recently emphasized that the relevant inquiry for compilation trade secrets concerns the secrecy of the "compilation as a whole," rather than each individual piece of information in isolation. *Barrett Bus. Servs., Inc. v. Colmenero*, 2025 WL 2048985, at *2 (9th Cir. July 22, 2025).

The government is unaware of a single case where the court instructed or required the jury to find that each component of a combination trade secret contributed to the value of the combination trade secret. Rather, the caselaw is clear that the relevant question is whether the combination of the information *as a whole* derives value from its secrecy and otherwise meets the definition of a trade secret set forth in the EEA, consistent with the jury instructions in this case. In *Nosal*, for example, the trade secrets consisted of multiple source lists consisting of curated potential candidates for corporate positions. The jury was instructed that to find that the source lists were a trade secret, they needed to determine that the owner had taken reasonable measures to keep the information secret and that the information derives independent economic value from its secrecy. *United States v. Nosal*, 3:08-cr-00247-EMC, Dkt. 401 at 42 (N.D. Cal., April 19, 2023). The jury was not, however, instructed that it needed to determine that each name on an individual source list contributed to the value of the source list, nor was it given a different "combination" or "compilation" trade secret instruction. *Id.* Likewise, in considering the sufficiency of the evidence on appeal, the Ninth Circuit did not seek to determine whether there was evidence that each name on the source list contributed individually to the value of the

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

18

trade secret, but instead focused on the evidence related to the value of the information as a whole and held that "the nature of the trade secret and its value stemmed from the unique integration, compilation, [and] cultivation" of the source lists.  *Nosal*, 844 F.3d at 1043.

### B.    Sufficient Evidence Supports the Combination Trade Secret Verdicts

When considering a sufficiency-of-the-evidence challenge, the Court "considers only the 'legal' question 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Musacchio v. United States*, 577 U.S. 237, 243 (2016).

The government introduced the underlying trade secret documents in Categories One, Two, Three, and Six into evidence, and Dr. Sanchez explained both the independent economic value derived from the integrated combination of information within each category, as well as the value and relevance of the individual documents in each category.  Dr. Sanchez's testimony was further corroborated by Google Distinguished Engineer Prashant Chandra who testified regarding each category of trade secrets.  This evidence was sufficient for the Government to prove the value of the combination trade secrets.  "It is a well-established that the uncorroborated testimony of a single witness may be sufficient to sustain a conviction." *United States v. Katakis*, 800 F.3d 1017, 1028 (9th Cir. 2015).

**Category One.**  Dr. Sanchez testified that each of the sixteen different documents (TXs 358-373) in Category One contained implementation details about the internal components of Google's TPU chip (TensorCore, BarnaCore, interchip interconnect (ICI), memory system, and host communication) that "would allow someone to bypass most of the effort in architectural design," which is a lengthy process that could take "years for a single chip" and is a "very complex and intricate process," because determining how the different components are structured and how they interact with each other "requires a lot of experimentation."  Tr. 996:10-997:9; Tr. 1006:3-11.

When asked if there is an additional value based on the combination of all the documents in Category One that is different from the value of each document on its own, Dr. Sanchez said "Yes, absolutely."  Tr. 1049:16-20.  He further explained that the design of the components in Category One "depend on trade offs," and are "not necessarily designed in isolation."  Tr. 1049:21-25.  As an example, Dr. Sanchez stated "a TensorCore is designed with a particular memory system in mind, and so

designing those components independently would not yield an efficient system.  And so because all of these files are describing . . . the internals of all these different interacting components, the combination is valuable because it reveals additional information about their code design and their interactions."  Tr. 1050:1-7.  Dr. Chandra further testified that the documents in Category One taken together described the "complete architectural specifications" for Google's TPU chip and they are "used together by the respective teams working on building these components when [Google] build[s] the entire TPU product."  Tr. 1553:9-23.  In addition to testifying about the value of the combination trade secret, Dr. Sanchez explained the relevance and value of each individual document in Category One.

**Exhibit 363-370:** Dr. Sanchez testified that these exhibits were all logically a "single document" that had been spread across eight files that contained the complete instruction set architecture (ISA) for the TensorCore for Google's TPU v.4, the largest component in Google's TPUs.  Tr. 1007:11-1019:10.  Dr. Sanchez explained that the TensorCore component of the TPU chip is specialized for machine learning workloads and designed to run complex mathematical operations.  Tr. 999:7-20.  Dr. Sanchez further explained that because the TensorCore is the type of processor that exposes hardware details to the software, the information in Exhibits 363-370 contained enough information to replicate important components of Google's TensorCore component that were not publicly available.  Tr. 1006:3-13; 1008:14-1010:7.  Dr. Sanchez went into further detail regarding particular features of the ISA, including the specific sizes of the memories within a TensorCore that have an effect on the functionality and performance of a TensorCore, but testified that the examples he described were "very selected examples, but the whole document is revealing information that would be valuable."  Tr. 1014:5-Tr. 1019:10.

**Exhibit 372:**  Dr. Sanchez testified that Exhibit 372 contained the complete ISA for the TensorCore component for Google's TPU v.2 and 3, a prior version of Google's TPU chip.  Tr. 1020:9-1021:19.  Dr. Sanchez testified that this information would add value to the other documents in Category One because it would give additional insight into how the design of Google's TensorCore has evolved over different generations, which a competitor could use to benefit their own design process.  *Id.*

**Exhibit 371:** Dr. Sanchez testified that Exhibit 371 included the ISA for the BarnaCore component of Google's TPU v.4.  Tr. 1021:20-1026:7.  Dr. Sanchez testified that the BarnaCore is a specialized core that runs a particular type of machine learning computation.  Tr. 999:21-1000:5.  Dr.

Sanchez testified that Exhibit 371 included key implementation choices and features about how the BarnaCore works that would substantially reduce the effort to replicate it or implement a similar core. Tr. 1021:20-1026:7. Dr. Sanchez also walked through a particular portion of the document and explained how it included code listing that a competitor could use to replicate one of BarnaCore's functionalities. Tr. 1022:25-1026:7.

**Exhibits 359, 360, 361, 373:** Dr. Sanchez testified that these four exhibits describe Google's inter-chip interconnect (ICI) technology. Tr. 1026:11-1035:9. He testified that the ICI component is the part of the chip that allows TPUs to communicate with other TPUs and that the combination of these documents reveals information about how Google has used different techniques together that it has not disclosed and would be valuable to a competitor building a machine learning accelerator. Tr. 1026:15-1029:22. Dr. Sanchez testified further regarding a particular technique disclosed in Exhibit 373 as an example of the type of information contained in these documents, including "internal data formats that are used to exchange data among TPUs." Tr. 1029:23-1035:9.

**Exhibit 362:** Dr. Sanchez testified that Exhibit 362 contains information about the memory system of Google's TPU chip including performance characteristics, and how different components of the system communicate with each other, including information "about the specific communication rates of different memories, so how fast data can move between all of these different memories in the system" and "other implementation details about how those memory transfers are performed." Tr. 1035:13-1043:10. Dr. Sanchez testified that "this is valuable implementation information, hardware-level information that would be useful to build a memory system for this kind of chip." Tr. 1043:6-8.

**Exhibit 358:** Dr. Sanchez testified that this document describes the part of the chip that "facilitates or implement that communication between the host and . . . the TPU chip." Tr. 1043:16-1048:3. Dr. Sanchez testified that this information would be valuable because it would enable a competitor to understand "the kinds of functionality that the host is allowed to perform or the TPU is allowed to perform within the context of the entire system, and then how those are implemented," including details "of how the hardware is structure[d]." Tr. 1045:20-1046:13.

**Category Two.** Dr. Sanchez testified that the seven documents (TXs 374-380) in Category Two contained information about the physical design of Google's chips and systems, including the physical

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

design of the chips, how the chips are integrated into servers, how the servers are placed into racks, and how the racks are structured to form entire systems called "pods."  Tr. 1085:2-1091:1.

When asked if there is additional value based on the "combination of all the information in Category 2 that goes above and beyond the individual documents," Dr. Sanchez said "yes," and explained that because the documents describe "successive generations of Google's TPU's systems . . . they give a more complete picture of how to build such a system because they're describing complementary information."  Tr. 1106:7-1107:11.  As an example, Dr. Sanchez stated that by combining the information about the physical design of Google's TPU v.6, with the information about the TPU v.5 system, a competitor would get a more complete picture of "how Google's systems have evolved and how the physical design at different levels works together to deliver an efficient system."  Tr. 1106:19-1107:11.  Dr. Chandra also testified that the information in Category Two is valuable when considered together because it provides how different components of Google's TPU systems are used together. Tr.1564:18-1565:14.  In addition to testifying about the value of the combination trade secret, Dr. Sanchez explained the relevance and value of each individual document in Category Two.

**Exhibit 377:**  Dr. Sanchez testified that this document contained architectural details, including the size and performance of memories, of Google's TPU v.6, as well as detailed physical design information that reveals how the chip is organized, how the different units are placed on the chip, and how power management is performed.  Tr. 1092:19-1100:25.  Dr. Sanchez testified that the information in Exhibit 377 would save a competitor time in the design process by providing them "careful design choices that Google has made in optimizing these chips."  Tr. 1099:20-1100:25.

**Exhibit 375 and 376:**  Dr. Sanchez testified that these documents contain "complementary information" about the design of Google's TPU v.6 chip that "provide additional value" because they provide a more "complete understanding of the capabilities" of the chip, including additional information about Google's internal workloads.  Tr. 1101:9-1102:3.

**Exhibit 378, 379, 380:** Dr. Sanchez testified that these documents describe the physical structure of Google's TPU v.5 systems, "essentially looking at how chips are assembled into each system, into its server, how servers are connected and assembled together to form entire collections of TPUs."  Tr. 1102:7-17.  Dr. Sanchez further stated "this set of documents contain not only the information about the

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

final product – [*e.g.*], how these servers are assembled into racks, what connections are made at different points of the design – but they also contain a lot of information about the development of the projects," and that this information would be "useful for a competitor looking to build a similar type of system," because it shows how Google structured its development and the final product.  Tr. 1103:12-1104:13.

**Exhibit 374:**  Dr. Sanchez testified that Exhibit 374 contains information about the designs of different Google accelerators and systems that have not been publicly disclosed, including information about what design choices worked and did not work, which would give a competitor "a more complete picture of how Google has structured the development of their accelerator projects," and would be useful to assist a competitor in their own design choices.  Tr. 1104:14-1106:1.

**Category Three.**  Dr. Sanchez testified that the nineteen documents (TXs 381-399) in Category Three focus on the software used in Google's TPU systems and their TPU-based AI infrastructure.  Tr. 1112:20-23.  Dr. Sanchez testified that Category Three contained three types of information: (1) software technologies for a project that seeks to scale machine learning workloads to large collections of TPUs; (2) software technologies that are crucial to achieve reliable operations in TPU pods; (3) low-level system software and other internal software that Google uses to manage and control their TPU-based AI supercomputers.  Tr. 1113:8-1116:11.

Dr. Sanchez testified that the individual documents in this category describe a "range of techniques," but "[i]n combination, they give . . . a picture that encompasses all these different layers of software that Google uses to manage AI supercomputers," which is a "crucial component of this AI infrastructure."  Tr. 1117:1-10. When asked if there is additional value based on the combination of all of the documents in Category Three that goes above and beyond the value of the individual documents, Dr. Sanchez said "yes," and explained that while each of the documents in Category Three describes a particular technique or technology, "the combination of these documents gives a more complete picture of what is the custom software that Google uses in managing these TPU-based systems in making them useful, in making them reliable, in making them able to run these really large machine learning workloads."  Tr. 1134:10-24.  Dr. Sanchez further testified that a competitor could use the combination of the information in Category Three to "structure the software used for their machine learning accelerators in a similar way."  Tr. 1135:5-14.  Dr. Chandra likewise testified that the combination of the

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

23

information in Category Three would give a competitor "an understanding of all of the software involved in building these large TPU supercomputers and the scale of the effort that Google is taking on in building this, as well as what is the end user benefit that these particular software projects will bring." Tr. 1572:5-14. In addition to testifying about the value of the combination trade secret, Dr. Sanchez explained the relevance and value of the individual documents in Category Three.

**Exhibit 383:** Dr. Sanchez testified that Exhibit 383 describes a technology that enables the reliable operation of large pods of TPUs, and testified in detail about the technique it describes that enables pods of TPUs to continue operation even when an important component within the TPU pod breaks. Tr. 1117:11-1129:9. Dr. Sanchez testified that the technique contained in this document would be useful to a competitor because it would help them identify a potential problem and develop the right hardware and software techniques to solve that problem. Tr. 1127:22-1128:6.

**Exhibits 390-392, 397-399:** Dr. Sanchez testified that this combination of documents describes software technologies that enable machine learning workloads to span multiple pods of TPUs. Tr. 1129:14-1133:10. Dr. Sanchez testified that the information contained in these documents would be valuable to a competitor because it could help them determine how to structure their hardware and software to train larger models faster and more efficiently. *Id.*

**Exhibits 381, 382, 384-389, 393-396:** Dr. Sanchez testified that the remaining exhibits in this category contain different types of software that is used to manage TPUs. For example, he testified that these documents contain information that "describes algorithms to choose collections of TPUs when – to run a particular workload," "documents that concern how these TPUs are exposed to third parties in Google Cloud," and documents that discuss "aspects of how the different layers of software in TPUs are structured and organized." Tr. 1133:11-1134:9.

**Category Six.** Category Six consisted of four different documents. TXs 437-440. Dr. Sanchez testified that these documents relate to the hardware implementation of Google's custom SmartNIC internally called "Diorite" that it uses to facilitate high-speed communication. Tr. 1181:1-1186:13. Dr. Sanchez also testified that the combination of all the information in Category 6 would be valuable separate and apart from the individual value of the documents. Tr. 1198:24-1199:3. Dr. Sanchez explained that a competitor could use the combination of documents in Category Six together to "reduce

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC

24

the amount of effort needed to build a SmartNIC with similar functionality," and that the documents provide "complementary information" that gives "a more complete picture of what the road map is . . . for Google's SmartNIC devices, as well as what their strategy is for producing these components." Tr. 1199:4-20.

In addition to testifying about the value of the combination trade secret, Dr. Sanchez explained the relevance and value of each individual document in Category Six.

**Exhibit 438:** Dr. Sanchez testified that Exhibit 438 includes details of a hardware block on Google's "Diorite" chip that would enable a competitor to build a high-performance implementation of Google's technology. Tr. 1187:2-1197:2.

**Exhibit 437:** Dr. Sanchez testified that Exhibit 437 provides additional information about the organization about the chip used within Diorite, the components within the chip, and how the components are used within Google. Tr. 1197:8-17.

**Exhibit 439:** Dr. Sanchez testified that Exhibit 439 is similar to Exhibit 438 but includes additional diagrams that provide additional value. Tr. 1197:18-21.

**Exhibit 440:** Dr. Sanchez testified that Exhibit 440 describes Google's strategy for developing its SmartNICs that would be "very useful to a competitor . . . because it would allow that competitor to intercept what Google is planning to do in the future." Tr. 1198:3-12.

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny Ding's Rule 29 Motion and Rule 33 Motion in its entirety and reaffirm the jury's verdict on Counts One through Fourteen.

DATED: June 5, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Molly K. Priedeman*
CASEY BOOME
MOLLY K. PRIEDEMAN
ROLAND CHANG
Assistant United States Attorneys

U.S.' SUPPLEMENTAL POST-TRIAL BRIEFING
CR 24-00141 VC