UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>LINWEI DING,<br><br>　　　　Defendant. | Case No.  24-cr-00141-VC-1<br><br><br>**ORDER REGARDING DING'S MOTION FOR JUDGMENT OF AQUITTAL OR, IN THE ALTERNATIVE, NEW TRIAL**<br><br>Re: Dkt. No. 394 |

The question of whether Ding is entitled to judgment of acquittal on the economic espionage counts based on a lack of evidence of Ding's intent to benefit the Chinese government when he stole Google's trade secrets will be addressed separately in a forthcoming published opinion. This ruling addresses all other issues raised in Ding's motion for a judgment of acquittal or, in the alternative, new trial. Ding's motion is denied as to each of these issues. This ruling assumes the reader is familiar with the record, the applicable legal standards, and the arguments made by the parties.

**Intent to Benefit Anyone Other than Google.** A rational juror could easily have found beyond a reasonable doubt that Ding intended to take the trade secret information to benefit someone other than Google. *See* Final Jury Instructions (Dkt. No. 362) at 16. At trial, the government offered overwhelming evidence that Ding intended to benefit himself and Zhisuan, the company he was in the process of forming with his business partner in China, when he surreptitiously uploaded Google's trade secrets during the May 2022–April 2023 timeframe. For example, there is evidence of his vision to form a company "like Google" as early as May 2022, around the time that he first uploaded some of the trade secret documents. *See* Trial Ex. 349

(Dkt. No. 395-21) at 001; Trial Tr. 621:18–623:13. By April 2023, when he completed his last upload, Ding was involved in discussions about the company that would become Zhisuan (in fact, the decision to name the company Zhisuan was made earlier that month). That was the company Ding pitched at the MiraclePlus conference in November 2023, where he represented that Zhisuan could "replicate and upgrade" Google technology. *See* Trial Ex. 1158 (Dkt. No. 400-13) at 005; Trial Tr. 721:15–723:6. The fact that nobody ended up receiving a benefit is irrelevant; under the statute, all that matters is what Ding intended when he stole the documents.

**Reasonable Measures.** A rational juror could conclude beyond a reasonable doubt that Google took reasonable measures to keep the trade secret information secret. *See* Final Jury Instructions at 14. Two Google employees—Heather Adkins (VP of Security Engineering) and Matt Linton (Lead for Security Response & Incident Management)—testified at length about the systems Google has in place to protect its confidential information, and the repeated communications it made to employees about the importance of confidentiality. Ding highlights aspects of these employees' testimony that potentially cut against the conclusion that Google took reasonable measures—for example, these witnesses acknowledged that many documents did not have confidentiality markings or had the wrong confidentiality markings. But overall, the evidence supported a conclusion that Google's system and policies—which involved tradeoffs between maintaining secrecy and giving employees access to documents to promote creativity— reflected a reasonable effort to keep the information secret.

**Failure to Prove that Categories Three, Five, and Seven Are Non-Public.** Dr. Sanchez's testimony was sufficient to support a conclusion that the documents in Categories 3, 5, and 7 were not generally known or readily ascertainable through proper means.[1] Trade secret protection is not precluded if some portion of the information is public; it is the secrecy of the

---

[1] With respect to Category 3, the jury convicted Ding on the basis of the combination of all documents in that category. *See* Verdict Form (Dkt. 367) at 3, 10. With respect to Category 5, the jury convicted Ding based on three individual documents: trial exhibits 429, 431, and 434. *See id.* at 5, 12. With respect to Category 7, the jury convicted Ding based on four individual documents: trial exhibits 448, 451, 461, and 462. *See id.* at 7, 14.

whole that matters. *See United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016). There was enough for a rational juror to conclude that the documents (or collection of documents) it based its convictions on were, as a whole, non-public. Sanchez testified that he undertook a comprehensive review of the documents and assessed whether they were publicly available or readily ascertainable. Based on his review of technical documentation, product announcements, presentations, and patents, as well as conversations with relevant Google employees, he concluded that none of the trade secret documents presented to the jury were publicly available or reverse-engineerable in their entirety. Sanchez also testified that the combination of documents in each category was not publicly available. Ding contends that this falls short of the showing made in *Nosal*, which involved an executive search firm's source lists of potential candidates, and *United States v. O'Rourke*, which involved lab reports detailing results from experiments testing materials for clients. *See* 844 F.3d at 1030–31; 417 F. Supp. 3d 996, 1001, 1006 (N.D. Ill. 2019). But those cases don't stand for the proposition that the government has to parse out which portions of a given trade secret are public and which are not. Of course, "it is not enough for a party simply to point to a large swath of information and assert that it is secret." *See O'Rourke*, 417 F. Supp. 3d at 1006. But that's not what the government did. It provided expert testimony, based on over a year of reviewing the trade secrets at issue, to support a conclusion that each alleged trade secret, taken as a whole, was not available in the public domain.

**Combination Trade Secrets.** The government argued at trial that, in addition to the 105 documents at issue, which were split up over seven categories, the combination of documents in each category comprised a separate trade secret. With respect to four of the seven categories of trade secrets at issue in this case (Categories 1, 2, 3 and 6), the jury convicted Ding of theft of trade secrets and economic espionage solely based on these "combination trade secrets."

Ding argues that a combination of documents can only be a trade secret if the owner maintains the documents in that form, meaning the jury should have been instructed that, to find that a given combination of documents constituted a separate trade secret, Google had to maintain the documents in that particular combination. As discussed in a prior ruling, there is no

reason to think that information could not be a trade secret if the owner did not keep the information comprising that trade secret together. *See* Order Regarding Ding's Motions in Limine 12-13, 16, 20, 21, 22-25 (Dkt. No. 292) at 1–2. In fact, a trade secret owner might want to keep the information siloed as an additional measure against theft. *See id.* The cases cited by Ding do not undercut this logic. Although those cases happen to involve combination trade secrets where the owner had organized the trade secrets as they were presented at trial, nowhere do those cases imply that is a necessary feature of a combination trade secret. *See Nosal*, 844 F.3d 1024; *O'Rourke*, 417 F. Supp. 3d 996.[2]

Ding next asserts that, even under the instructions that were given to the jury, the government did not present enough evidence for a rational juror to conclude that the combinations were indeed trade secrets because the government only focused on a subset of the documents at trial and only elicited high-level testimony with respect to the remaining documents. Relatedly, Ding asserts that the high-level nature of Sanchez's testimony means that a rational juror could not have concluded that the combination trade secrets had independent economic value, that is, "the value of the combination [was] greater than the sum of its parts." Final Jury Instructions at 14. Sanchez generally testified, as to each category at issue, that the combination of the documents in that category provided a more complete picture of specific aspects of Google's technology. Another government witness, Dr. Prashant Chandra, a high-level Google engineer, also testified about how the documents in the relevant categories, considered together, reveal information beyond what is contained in the individual documents. For example, with respect to Category Two, Chandra explained how the documents considered together reveal information about how different generations of TPUs compare to each other and

---

[2] Ding raises the challenge to the combination trade secret jury instruction, as well as challenges to the economic espionage jury instruction, in his Rule 29 motion and references them in his Rule 33 motion, asserting that these alleged errors rendered the instructions confusing and misleading. The government correctly points out that Rule 29 is "not the proper vehicle for raising an objection to jury instructions." *United States v. Crowe*, 563 F.3d 969, 972 n.5 (9th Cir. 2009) (citation modified). Thus, the Court construes all of Ding's arguments regarding jury instructions as part of his motion for a new trial.

how different components of Google's TPU systems are used together. Over the course of several days, the witnesses explained the value of each category of documents, provided a detailed overview of at least one document per category (and more for some categories), and described the contribution of the remaining documents to the overall category. Their testimony, viewed in its totality, was enough for a rational juror to conclude that the combination trade secrets had independent economic value.

At the hearing on this motion, the Court inquired whether the government needed to demonstrate that each document in a given combination trade secret contributed to the value of the trade secret. *See* Tr. Hearing on Post-Trial Motions (Dkt. No. 428) at 42–45; Dkt. No. 425. Ding argues such a requirement follows from the fact that a combination trade secret must necessarily be a unique compilation of individual elements, and that a combination cannot be unique if it contains any superfluous elements. But the cases Ding relies on do not stand for that proposition; they merely discuss how combinations including (or even entirely composed of) public elements can have value if they are compiled in a unique way. *See Nosal*, 844 F.3d at 1043; *3M v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir. 2001); *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 380 (6th Cir. 2022). Even if there were a uniqueness requirement, it does not follow that each component part would necessarily have to add value to the combination. Just as adding a superfluous annotation on the secret formula for Coca Cola wouldn't render the formula unprotectable, adding one useless document to a collection of documents that would otherwise be protectable as a trade secret wouldn't necessarily render the collection unprotectable. Ultimately, what matters is whether the collection, as a whole, satisfies the definition of a trade secret.

Finally, Ding argues that the jury's verdicts with respect to Categories 1, 2, 3, and 6 were inconsistent because for each of these categories, the jury found that the combination of all documents in the category constituted a trade secret but did not find that the individual documents within the category were trade secrets. To convict Ding, the jury was told it only had to unanimously agree upon one trade secret for each given category, and the combination trade

secret could be that trade secret. *See* Final Jury Instruction at 13. In light of this instruction, the jury's silence as to the other trade secrets does not mean that it determined those documents were not trade secrets. In any event, it is not inconsistent for the jury to find that a combination of documents is a trade secret, but that its constituent documents are not. *See Nosal*, 844 F.3d at 1042 (source lists comprised entirely of public components can be trade secrets so long as the requirements for a trade secret are satisfied as to the whole).

**Challenges to Economic Espionage Jury Instructions.** There is no requirement in 18 U.S.C. § 1831 that a foreign government needs to be a participant in the trade secret theft. *United States v. Chung*, 659 F.3d 815, 828 (9th Cir. 2011); *see also United States v. Zheng*, 113 F.4th 280 (2d Cir. 2024). To be sure, a panel of the Ninth Circuit once said in passing that § 1831 "is designed to apply only when there is evidence of foreign government sponsored or coordinated intelligence activity." *United States v. Liew*, 856 F.3d 585, 597 (9th Cir. 2017) (quoting *United States v. Hsu*, 155 F.3d 189, 195 (3d Cir. 1998)). But *Liew* (and the Third Circuit opinion it quoted) made this statement as part of a generic discussion of the differences between § 1831 (the crime of economic espionage) and § 1832 (the crime of theft of trade secrets). It's not a holding, and it's not consistent with the language of the statute. The Ninth Circuit's earlier opinion in *Chung* describes the statute correctly, and the Second Circuit's opinion in *Zheng* explains why.

Nor did the jury have to be instructed that Ding needed to know that the documents met the legal definition of trade secrets. As discussed by the Sixth Circuit in *United States v. You*, 74 F.4th 378 (6th Cir. 2023), the presumption of scienter "requires a court to read into the statute only that mens rea which is necessary to separate wrongful conduct from otherwise innocent conduct." *Id.* at 395 (quoting *Carter v. United States*, 530 U.S. 255, 269 (2000)) (citation modified). Assuming that the information that was taken constitutes a trade secret and that it was taken without authorization, allowing a jury to convict someone who only knows the information is proprietary but not whether the legal elements of a trade secret are satisfied does not risk

criminalizing innocent conduct. *See id.*[3]

**Adequacy of the Government's Identification of Trade Secrets.** Ding asserts that the government did not adequately identify the trade secrets prior to trial, and that the government's lack of precision as to which trade secrets it would focus on at trial forced the defense to prepare for trial based on a voluminous set of technical documents, most of which were never presented in more than a cursory fashion to the jury. Ding argues that this deprived him of fair notice of the charges against him. But the reason this trial involved such a large volume of documents is that Ding took such a large volume of documents from Google. The government first identified the 105 documents (as well as certain combinations of these documents) it sought to hold Ding accountable for in August 2025. Prior to trial, the government provided a list of a subset of these documents that it expected to be the focus of its case-in-chief. At trial, the government ultimately focused on 18 of these documents. Unlike cases where the government's changing and non-exhaustive list of trade secrets created an "uncertain and shifting landscape" for the defense, here the government started with a larger list of trade secrets and whittled it down to a smaller subset to focus on during trial. *See USA v. Liang Chen*, 2020 WL 6342931, at *5 (N.D. Cal. Oct. 29, 2020). Moreover, the government disclosed detailed expert opinions about the trade secrets that it expected to elicit at trial. It is difficult to conclude from all this that Ding did not have fair notice of the charges against him.[4]

**Rulings Regarding Defense Experts.** Ding argues he should be afforded a new trial because the Court's rulings regarding his experts resulted in an unfair trial. Ding disclosed Isaac Pflaum as an expert on the non-public nature of the trade secrets and their value. The government moved to exclude Pflaum and the Court held a *Daubert* hearing at which Pflaum

---

[3] At the charging conference, Ding made a similar argument regarding the theft of trade secrets instruction. The same reasoning applies.

[4] Ding notes that he was constrained in his ability to prepare a defense given the financial limits imposed on counsel appointed pursuant to the Criminal Justice Act, which were exacerbated by the Fall 2025 government shutdown. The answer to these concerns would have been to seek a continuance of the trial, not to insist on going to trial in January 2026 and then complaining about an inability to properly absorb and understand the documents.

testified. Based on the hearing, the Court expressed doubts about the reliability of Pflaum's opinion and allowed supplemental briefing. Because the question of whether to exclude Pflaum was a close one and the Court had not heard from the government's expert on the relevant issues, the Court proposed an additional *Daubert* hearing during trial, to be held outside the presence of the jury. This additional *Daubert* hearing for Pflaum never took place because the evening before jury selection, Ding disclosed a new expert, Steve Novak, and later asked the Court to swap out Pflaum for Novak. The Court would have been well within its discretion to deny the request to allow Novak to testify (and to deny funding for Novak to serve as a defense expert). But the Court was concerned about Ding's ability to receive a fair trial given the real chance (very, very real chance) that Pflaum's testimony would be excluded. So Novak was permitted to testify after a *Daubert* hearing of his own.

When cross-examining Novak at trial, the government emphasized that he had only been reviewing the trade secret documents for approximately three weeks, in contrast with Sanchez, who had spent over a year reviewing the documents. Ding argues that this sequence of events resulted in the jury negatively assessing Novak's credibility. The main response to this is that Novak's trial testimony had much larger credibility problems—his trial testimony contradicted his *Daubert* testimony in a number of important ways, and the prosecutor subjected him to a devastating cross-examination about those contradictions. But regardless, as mentioned earlier, Ding was fortunate that he was able to present expert testimony at all. And if he were concerned that Novak didn't have adequate time with the documents, he could have sought a continuance rather than insisting on going to trial in January 2026.

Nor was there error in limiting the testimony of James Pooley, who opined on best practices and industry standards for protecting trade secrets. As discussed at the pretrial conference and in the pretrial ruling, Pooley likely did not have the knowledge an expert would have needed to testify reliably about Google's practices, and in any event, such testimony was excludable in the Court's discretion under Rules 702 and 403 because it would encroach upon the jury's domain and risk jury confusion. *See* Order Granting in Part and Denying in Part the

Government's Motion to Exclude the Testimony of James Pooley (Dkt. No. 148); *see also* Fed. R. Evid. 702, 403.

**Verdicts Against the Weight of the Evidence.** As an alternative to his motion for judgment of acquittal, Ding seeks a new trial on the grounds that the guilty verdicts returned by the jury go against the weight of the evidence. For the reasons stated here, that motion is denied.

**IT IS SO ORDERED.**

Dated: June 29, 2026

_____
VINCE CHHABRIA
United States District Judge