UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA,<br>Plaintiff,<br>v.<br>LINWEI DING,<br>Defendant. | Case No. 24-cr-00141-VC-1<br><br>**ORDER GRANTING MOTION FOR JUDGMENT OF ACQUITTAL FOR ECONOMIC ESPIONAGE COUNTS** |

Linwei Ding worked as a software engineer in Google's Artificial Intelligence program. From May 2022 to April 2023, he uploaded a large number of Google's AI-related trade secret documents to his personal cloud account, with an eye towards starting a private AI supercomputing company in China. Based on that conduct, a federal jury found Ding guilty of two crimes: theft of trade secrets and economic espionage.

As discussed in a separate ruling, a reasonable jury could easily have concluded beyond a reasonable doubt that Ding was guilty of theft of trade secrets. That's because, among other things, there was plenty of evidence that Ding intended to benefit himself and his nascent company when he uploaded the trade secret documents.

But the economic espionage counts require that Ding intended or knew that his conduct would benefit the Chinese government. The prosecution's theory at trial was that when Ding uploaded the trade secret documents at various points during the May 2022–April 2023 period, he did not merely intend to benefit himself; he also intended or knew that his conduct would benefit the Chinese government. The evidence presented at trial was insufficient to prove this

theory of intent. Ding's illegal uploads began well over a year before the earliest identified evidence that he was even contemplating engagement with government entities. In the months following his final theft of the trade secrets, Ding may have eventually developed the intent necessary to support the economic espionage charges. But the evidence was too thin to support a conclusion—at least under the reasonable doubt standard—that at the various times of the illegal uploads Ding already intended or knew that his conduct would benefit the Chinese government.[1]

## I

The following is a description of the key evidence presented at trial and the arguments the government made to the jury about the economic espionage counts.

Ding worked as a software engineer for Google from May 2019 through January 2024, when he was arrested for the conduct at issue here. In May 2022, he began transferring Google's AI-related documents to his personal cloud account. This involved a process of: (1) taking screenshots of Google's AI-related documents; (2) pasting them into the Apple Notes application on his Google-issued MacBook; (3) converting the Apple Notes into PDF files; and then (4) uploading the PDFs onto his personal Google Cloud account. The trade secrets that were the subject of the trial were uploaded at four different points during the May 2022–April 2023 period, with the last set of documents uploaded on April 17, 2023. Had Ding simply uploaded Google documents directly to his personal account, this would have been immediately flagged by Google's security systems, but because he was uploading PDFs from his Apple Notes app, Google's system had a harder time detecting this activity.

Ding's plan was to use the trade secrets to make money in China. In 2022, he began surreptitiously working for a private Chinese technology company called Rongshu. Then, starting in early 2023, Ding and Yuan Ye, Rongshu's CEO, made preparations to form a separate Chinese AI company that would eventually come to be Zhisuan. Yuan was slated to be the CEO;

[1] To be precise, the crime of economic espionage requires that the defendant know or intend that his conduct will benefit a foreign government or an "instrumentality" of a foreign government. 18 U.S.C. § 1831(a). In the interest of avoiding clunkiness, this ruling will use "the Chinese government" as shorthand.

Ding was slated to be the Chief Technology Officer—although at some point along the way, Zhisuan began touting Ding as the CEO.

By March 2023, Ding and Ye were working with a Chinese consulting firm called I&R Capital that helps startups raise funds. *See* Trial Ex. 1155 at 001. As discussed further below, Ding had not then started using the Google trade secret documents to build his own AI supercomputing technology—indeed, he never did, nor did he seem to know how to. But he pretended that he had already built his own technology, and I&R Capital appeared to be under the impression that he had done so. *See, e.g.*, *id.* at 028. The firm would interface with potential private investors in China, and then circle back with Ding to request additional detail about "his" technology. *See id.* at 027.

In May 2023, Ding applied to MiraclePlus, an early-stage startup accelerator based in China. *See* Trial Ex. 1010. MiraclePlus is a private entity. *See* Trial Tr. 64:24–65:2; Trial Tr. 944:10–11. Ding was accepted to the MiraclePlus program in August 2023. *See* Trial Ex. 1013; Trial Tr. 689:9–698:7. His participation came with $5 million Chinese Yuan (approximately $700,000) in private funding from the MiraclePlus venture arm in exchange for a seven percent stake in Zhisuan. *See* Trial Tr. 705:9–706:1. He also received the opportunity to pitch Zhisuan to additional private investors at a MiraclePlus conference in November 2023. *See* Trial Ex. 1158; Trial Tr. 721:15–723:6.

In late September 2023, one of Ding's Zhisuan associates, Shasha Guo, sent him a document about the "Industrial Innovation Park," a Chinese government entity designed to promote technology investment. *See* Trial Ex. 1178 at 033–35; Dkt. No. 416 ("Gov't. Opp.") at 7 n.4; Trial Tr. 749:23–751:1; Trial Tr. 760:16–760:18. Ding and his team prepared a "pitch deck" for Zhisuan and presented it to the leaders of the Innovation Park on November 9, 2023. Trial Tr. 745:10–747:8. The pitch deck advertised that Zhisuan could provide significant AI supercomputing services. *See* Trial Ex. 1034 at 020, 033.

Around the same time, Ding and his colleagues in China were working to create a strategic cooperation agreement between Zhisuan and Tianfu Research Institute, a university that

was controlled by the Chinese government. Trial Tr. 756:16–757:16; Trial Ex. 1002; Gov't Opp. at 8. In his presentation to MiraclePlus investors in late November 2023, Ding touted Zhisuan's alleged relationship with both the Innovation Park and Tianfu Research Institute. Trial Ex. 1158 at 010; Trial Tr. 721:15–724:1, 756:10–756:15 (describing government entities listed on MiraclePlus slide page); Gov't Opp. at 6–7.

Toward the end of 2023, Ding applied to a government "talent program," *i.e.*, a government-run program that attracts technological talent to China with offers of funding and investment resources. *See* Trial Tr. 761:14–765:7. In his personal statement, Ding expressed that he would use this support to establish Zhisuan in Shanghai. Trial Ex. 1160 at 010. He also stated his desire to "help[] China to develop world-class compute infrastructure capabilities in the wave of AI Infra." *Id.* at 009; *see also* Gov't Opp. at 9.

Throughout this time, Ding took numerous ham-fisted steps to prevent Google from discovering that he was stealing its documents and using them to pretend that he had built his own AI supercomputing technology. For example, before traveling to China to promote Zhisuan in December 2023, Ding gave his security badge to his intern and instructed her to swipe it when entering company headquarters in Sunnyvale so that it would seem like he was still going into the office. Trial Tr. 302:13–305:7. Soon after, once he began fearing detection, Ding downloaded the earlier-uploaded trade secrets from his personal Google Cloud account to a personal laptop. Trial Tr. 768:6–768:8. And in late December 2023, after Google learned that Ding had been seeking investors for an AI firm in China, it cut off his access to the company's systems. Trial Tr. 768:9–12. In response, Ding rushed to the office at 7:00 a.m. to try to get back on the network. Trial Tr. 335:23–337:9. When that didn't work, he began deleting the trade secret documents that were still on his company-issued laptop (although he apparently didn't think to delete them from his personal Google Cloud account). *Id.*; Trial Tr. 768:9–12.

Speaking of ham-fisted, everyone involved at trial seemed to take the view that Ding lacked the talent, skill, knowledge, or business acumen to create an AI supercomputing company on a scale anything close to Google. Indeed, the evidence cast serious doubt on whether he could

get any sort of technology company off the ground at all, with or without the trade secret documents. The government itself described Ding as a mid-level software engineer who was not involved in most of the technology revealed by the documents he stole. The government also highlighted Ding's failure to understand the technology well enough to describe it to investors. For example, government counsel emphasized that after I&R Capital reported in April 2023 that potential private investors needed more details about the technology behind Zhisuan, Ding hurriedly uploaded more documents to enable himself to provide those details. Trial Tr. 2120; Trial Tr. 648:19–649:25; Trial Ex. 1155 at 027. And when Ding needed to produce a video demonstration of "his" technology as a proof of concept for MiraclePlus, he simply created a video of himself running a software test on Google's GPU (graphics processing unit) system to create the impression that the underlying GPUs for "his" product were working the way they should. Trial Tr. 845:11–845:21; Trial Tr. 1714:10–1716:14; Gov't Opp. at 13.

In the indictment and at trial, the government separated the documents stolen by Ding during the May 2022–April 2023 time frame into seven distinct categories. For example, one category of documents related to the design, performance, and operation of Google's custom-designed TPU chips, TPU machines, and TPU systems; another category related to the design, performance, and operation of Google's custom GPU machines and GPU systems. Each count of theft of trade secrets was based on a particular category of documents Ding had taken. The seven counts of economic espionage corresponded with the seven counts of theft of trade secrets—the category of documents implicated by the first theft of trade secrets count was the same as the category of documents implicated by the first economic espionage count, and so on. *See* Final Jury Instructions No. 12, *United States v. Ding*, 2026 WL 2365153 (N.D. Cal. Jan. 28, 2026).

The government's theory at trial was that Ding committed both theft of trade secrets and economic espionage when he uploaded the alleged trade secret documents to his personal cloud account between May 2022 and April 2023. It argued that when the uploads occurred, Ding did not merely have the intent to benefit himself and Zhisuan; he also intended to benefit the Chinese government. During its closing argument and throughout trial, the government asserted that from

"May 2022 to April 2023, the defendant stole over 2,000 pages of Google's cutting-edge AI trade secrets." Trial Tr. 2110:18–20. The "question you have to answer," the government explained on rebuttal, "is what he intended to do with them when he stole them, and the answer to that question has been proven beyond a reasonable doubt." Trial Tr. 2213:8–10. The answer, according to the government, was that Ding "intended to use them to build his company for his own benefit, to make himself rich, to make his company successful, and to help the entities controlled by the People's Republic of China." Trial Tr. 2213:11–13.

The jury found Ding guilty of all seven theft of trade secret counts and all seven economic espionage counts. This ruling addresses Ding's motion for judgment of acquittal on the economic espionage counts.[2]

## II

A court can set aside a jury's guilty verdict and enter a judgment of acquittal on a defendant's post-verdict motion. Fed R. Crim. P. 29(c). A judgment of acquittal is warranted if "the evidence is insufficient to sustain a conviction." *Id.* 29(a). The bar for setting aside a conviction on grounds of insufficiency of the evidence is high. Not only does a court have to view the evidence presented at trial "in the light most favorable to the prosecution," it must also ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The deference owed a jury's verdict is especially important when it comes to "elusive concepts such as motive and intent." *United States v. Mehanna*, 735 F.3d 32, 47 (1st Cir. 2013).

Although sufficiency-of-the-evidence review is deferential, it is "not a rubber-stamp of affirmance." *United States v. Vizcarra-Millan*, 15 F.4th 473, 506 (7th Cir. 2021). Deference does not mean losing sight of the Due Process Clause's mandate that the government prove all elements of the crime beyond a reasonable doubt. *See United States v. Ganji*, 880 F.3d 760, 767

[2] Ding has raised a number of other arguments in post-trial motions, but they are not particularly strong and are addressed in a separate ruling to avoid clutter in this one. *United States v. Ding*, 2026 WL 1865889 (N.D. Cal. June 29, 2026).

(5th Cir. 2018). Even evidence properly construed in favor of the government "may still be so supportive of innocence that no rational juror could conclude that the government proved its case beyond a reasonable doubt," such as where "mere speculation, rather than reasonable inference, supports the government's case." *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010). The reviewing court has the "obligation" to assess whether that's the case. *Id.*

## III

There was plenty of evidence to support a jury conclusion that Ding intended to benefit himself when he uploaded the trade secrets between May 2022 and April 2023. After all, when he began uploading the documents he was surreptitiously working for a private Chinese company, and towards the end of that period he was secretly taking steps to start his own company. With respect to the economic espionage counts, it's a close question given the "any rational trier of fact" standard. If the test were whether a rational juror could conclude merely by a preponderance of the evidence that Ding had the requisite intent when he uploaded the trade secrets, the Court would probably be compelled to uphold the verdict. But the evidence was insufficient for a rational juror to reach this conclusion about Ding's intent beyond a reasonable doubt.

### A

To be guilty of economic espionage, it's not enough for a defendant to take trade secrets with the intent to engage in business activity that would benefit a foreign economy. *See* Final Jury Instructions No. 16, *United States v. Ding*, 2026 WL 2365153 (N.D. Cal. Jan. 28, 2026); *see also United States v. Ding*, 2025 WL 1651936, at *2 (N.D. Cal. June 11, 2025). Thus, the jury was instructed that the government must do more than prove that Ding "intended or knew that his conduct would benefit the country of China or its economy in a way that might generally flow from engaging in economic activity there." Final Jury Instructions No. 16. Rather, the jury was told, "the government must prove beyond a reasonable doubt that the defendant either: (1) intended his actions to confer a benefit on a Chinese government instrumentality; or (2) knew that his actions would confer a benefit on a Chinese government instrumentality." *Id.* In short,

intent to start a private company in China is not enough.

At trial, the government pointed to several pieces of evidence, all from the September–December 2023 period, in support of its argument that Ding had the intent to benefit the Chinese government when he uploaded the trade secrets. The earliest was the September 2023 WeChat conversation in which Ding discussed the Industrial Innovation Park with his colleagues (which culminated in Ding's pitch to the leadership of the Industrial Innovation Park leadership in November 2023). Next, the government pointed to a strategic cooperation agreement with Tianfu Research Institute that Ding and his colleagues worked on in November 2023. The government also highlighted the MiraclePlus presentation in November 2023, in which Ding, while seeking private investment, highlighted Zhisuan's partnerships with the Industrial Innovation Park and the Tianfu Research Institute. Finally, the government pointed to the fact that, in December 2023, Ding applied to a government talent program, emphasizing his desire to help China develop a world-class AI infrastructure. *See* Trial Tr. 2155:16–2156:19.

Ding began uploading the trade secrets around a year and a half earlier, in May 2022. At that time, he had not even begun laying the groundwork for Zhisuan; he was merely starting to work for another private Chinese company. And his final upload took place in April 2023—still roughly five months before the earliest piece of evidence the government used at trial to support its intent argument. This evidence is too removed in time to support a conclusion beyond a reasonable doubt that Ding intended or knew, at the various times he stole the trade secrets during that May 2022–April 2023 period, that his actions would benefit government entities in China. A conviction is valid only if "a defendant's mental state and act coincide." *United States v. Hernandez*, 859 F.3d 817, 824 (9th Cir. 2017).

To be clear, there's nothing categorically wrong with relying on subsequent conduct to prove what a defendant intended at an earlier time. In many cases, it will no doubt be sufficient to rely solely on subsequent conduct to prove earlier intent. For example, if Ding had stolen Google's trade secrets on a Monday and then transmitted them to a Chinese government official that Friday, nobody would question a finding that he stole the trade secrets with the intent to

benefit the government. But at some point—particularly when the reasonable doubt standard applies—it becomes too speculative to rely solely on conduct that occurred months later to prove a defendant's intent at the earlier point in time. Indeed, in other contexts, courts will outright exclude evidence of subsequent conduct for purposes of proving intent if it is too removed in time. *See, e.g.*, *United States v. Smith*, 735 F.2d 1196, 1199 (9th Cir. 1984).

On these facts, the subsequent conduct relied on by the government at trial is not sufficient. Indeed, one thing that's clear from the totality of the evidence presented by the government at trial is that Ding's efforts to put the stolen trade secrets to use in China were ad hoc, disorganized, and feeble. Far from acting in line with some "history of delivering information to China," *United States v. Chung*, 659 F.3d 815, 828 (9th Cir. 2011), Ding seemed to be making things up as he went along. As discussed in Section I, his exchanges with I&R Capital—the consulting firm Yuan brought on to help Zhisuan raise money—show that he was relying heavily on that firm to teach him how to pitch the company to private investors. Indeed, when I&R Capital told him that investors needed more technological detail, he did not simply provide it; he scrambled to steal more trade secrets. The government itself emphasized this, and made several comments throughout trial that seemed designed to highlight Ding's lack of sophistication and, indeed, lack of a real plan for his product and company. For example, the government highlighted how Ding pitched himself as the architect of Google's AI technology even though he was only a mid-level engineer. *See* Trial Tr. 23:22–24:3; Trial Tr. 1730:18–1731:13. And as described earlier, when Ding was asked to provide a proof of concept, he made a video of himself using Google technology that he passed off as his own. In short, Ding had no product; he was just pretending he had one. All of this is inconsistent with a person engaged in advanced planning to partner with particular government entities in connection with "his" AI technology.

It may be true, as the government's expert witness asserted at trial, that it's not possible to build a large, successful AI company in China without eventually needing to do business with the Chinese government. Trial Tr. 930:14–20. But no one has suggested that Ding is anything

like this "expert on the government and the technology industry in China." Trial Tr. 47:1–3. To the contrary, the government characterized Ding as someone who "didn't have real technical advantages," Trial Tr. 2125:12, and had received "rejection after rejection after rejection using a resume that actually reflected his experience," Trial Tr. at 2119:15–17. The picture the government painted for the jury—of someone who "wanted more from his career than his own knowledge and experience could earn for him," Trial Tr. at 56:15–18—is not of a person with the knowledge and sophistication to understand the Chinese technology industry in this nuanced way.

In sum, given the way events unfolded, the evidence from the September–December 2023 time period was not sufficient to permit a rational juror to conclude beyond a reasonable doubt that Ding intended to assist those entities when he uploaded the trade secret documents during the May 2022–April 2023 period. The government's theory "extends an already broad statute too far." *United States v. Lazarenko*, 564 F.3d 1026, 1037 (9th Cir. 2009).[3]

**B**

Eventually, after several rounds of post-trial briefing, the government unearthed an additional document from the trial record that it contends could have contributed to a jury finding that Ding possessed the requisite intent at the time he stole the trade secrets. In April 2023, I&R Capital, Yuan, and Ding created the "Zhisuan Teaser," a promotional document that I&R would use to solicit private Chinese investors. *See* Dkt. No. 434 ("Gov't Supp. Opp.") at 14; Trial Ex. 1137 (Teaser); Trial Ex. 1155 at 022 (WeChat messages regarding Teaser); Trial Tr. 646:7–647:15 (testimony contextualizing Teaser). The document contained a section at the end titled "Potential Customers." Trial Ex. 1137 at 002. This section first identified "[s]erver manufacturers such as IEIT Systems, H3C, Nettrix, Enginetech and Huawei." *Id.* Then it

[3] On this record, the five-month gap between the final upload (in April 2023) and the first potential evidence of intent to benefit the government (in September 2023) is too long to prove intent at the time of upload beyond a reasonable doubt. But even if it were not, it wouldn't follow that *all* the economic espionage convictions would survive, because those counts were based on uploads that occurred as early as May 2022—well over a year before the first evidence of intent.

identified "national supercomputing centers in Beijing, Tianjin, Shenzhen, Chengdu, etc." *Id.* The government says in its supplemental brief that the national supercomputing centers referenced in this quote are government entities. *See* Gov't Supp. Opp. at 14. The government further notes that Ding, in his November 2023 MiraclePlus Presentation, listed "supercomputing centers" among the "Government agencies" that "will be our customers." *Id.*; Trial Ex. 1158 at 009.

One problem is that the government never argued that the Teaser was evidence of intent at trial. Rather, in support of its argument about Ding's intent during the May 2022–April 2023 period, the government focused solely on the evidence discussed above. *See* Trial Tr. 2127:21–2128:3 (discussing the intent to benefit a foreign government element "in three different ways": Ding's application to the talent plan, and the pitching of Zhisuan's services to two different Chinese government entities). Because the government "trained its fire" on the evidence from September–December 2023 throughout trial, it can't now perform a "bait-and-switch" to rely on a different piece of evidence that, while in the trial record, was never argued in this way to the jury. *See United States v. Didonna*, 866 F.3d 40, 49–50 (1st Cir. 2017).[4]

But even if it were appropriate to consider the Zhisuan Teaser as part of the total mix of evidence from which the jury could have assessed Ding's intent during the relevant period, this would not change the outcome. That document's probative value as to Ding's intent is negligible at best. The messages about the Teaser show that Yuan and I&R Capital were the primary creators and editors of the document; they merely solicited Ding's reaction to what they produced. *See* Trial Ex. 1155 at 003–027; Trial Tr. 646:7–647:15. Moreover, the document

[4] It's true that "argument is not evidence," and that the government may be allowed to frame how some pieces of evidence support an element at trial and then, on appeal, reframe how the jury may have found that they do that. *Lazarenko*, 564 F.3d at 1037–38 (upholding money laundering convictions where there was sufficient evidence that the money in question was the proceeds of extortion, though the government at trial focused more on the evidence supporting that the money was the proceeds of fraud); *see also United States v. Dann*, 652 F.3d 1160, 1170 n.3 (9th Cir. 2011) (allowing the government to argue on appeal that the defendant intended to threaten a third party with four types of harm that were supported by the evidence, though the government had focused at trial on only two of the harms). But that's not the same as relying on a separate piece of evidence that the government never pointed to at trial.

mentioned "national supercomputing centers" as potential clients without any indication that "national supercomputing centers" referred to government entities. As discussed in Section III.A, there was no indication in the trial record that Ding understood with any sophistication what starting an AI company in China would entail. Indeed, Ding's lack of experience and sophistication often seemed to be part of the government's theory of the case. *E.g.*, Trial Tr. 2212:16–20 ("He told lies to investors in China about what he could do, about the knowledge and capabilities that he had. He needed these documents to make himself valuable. He was going to use these documents to close the gap between the lies that he told to investors and what was true."). Finally, recall that Ding began stealing trade secrets in May 2022, meaning the Teaser document was created long after most of the trade secrets were stolen. So even if the Teaser document could be used to establish intent at the time of the final uploads, using it to show intent for uploads that occurred nearly a year earlier would run headfirst into the same temporal issues discussed in Section III.A.

**C**

At this point, it would be fair for a layperson to ask, "how can you say no rational juror could find Ding guilty of the economic espionage counts when 12 jurors did exactly that?" The short answer is that, on rare occasions, juries are too loose with the reasonable doubt standard, even when attempting to apply it in good faith. That's why the law confers upon judges the duty to review the record carefully and to guard against the rare case where a defendant is denied a fair trial because the jury strayed from the proper standard. *See Nevils*, 598 F.3d at 1167 ("[W]e acknowledge our obligation under *Jackson* to identify those rare occasions in which 'a properly instructed jury may . . . convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt[.]'" (quoting *Jackson*, 443 U.S. at 317)).

In this particular case, there are at least two potential explanations for why the jury convicted. One has to do with the government's expert on the Chinese technology industry. As discussed in Section III.A, this expert testified at length about the importance of the AI industry to the Chinese government and about how no large AI company could succeed without

eventually "attract[ing] the attention of the Chinese government." Trial Tr. 930:14–20. Based on this testimony, the jury might have jumped to the conclusion that anyone who seeks to start a large AI company in China inevitably knows they will, at least eventually, be doing business with the government. If so, this inference was insufficient to support a conviction. As explained by Judge Ware in an earlier prosecution of Chinese defendants based on attempts to set up a technology company in China using stolen trade secrets, it is not enough to show that a defendant intended to start a company in the country, even in an area of the economy that was a priority for the Chinese government. *See United States v. Lan Lee*, 2010 WL 8696087, at *6–8 (N.D. Cal. May 21, 2010) (granting motion for judgment of acquittal over the government's assertion that the defendants' intent to fund and develop a computer chip in China reflected an intent to benefit the Chinese government and noting that the economic espionage statute does not penalize "intent to personally benefit or an intent to bestow benefits on the economy of a country that might be realized from operating a company in a foreign country").

Another plausible reason for the jury's failure to focus on the timing issue is the defense's strategy at trial. Given the strength of the evidence against Ding for theft of trade secrets, Ding's team could have opted to give only lip service to those counts, and to instead argue primarily that even if the jury concluded that Ding intended to steal the trade secrets to benefit himself, the government could not prove beyond a reasonable doubt that he stole them with the Chinese government in mind. Instead, the defense made the tactical decision to focus almost all its energy on attacking the trade secret counts—arguing that Ding never intended to steal anything, and that the documents he uploaded did not meet the definition of trade secrets for a variety of reasons. As a result, the temporal disconnect between the uploads and Ding's engagement with the Chinese government was mentioned only in passing. This tactical decision was not unreasonable; indeed, one could imagine the defendant himself insisting on it. And if you're trying to convince the jury that your client didn't intend to steal the trade secrets in the first place, you may wish to downplay your alternative argument that even if he did intend to steal them, he didn't develop an intent to transact with the Chinese government until much later.

But the result was a trial that involved virtually no mention of a glaring weakness in the government's evidentiary presentation on a critical element of economic espionage. Indeed, the defense's reference to the timing issue was so fleeting that the government never bothered to respond. *See* Dkt. No. 430 ("Def. Supp. Brief") at 20; Trial Tr. 2202:4–24 (Defendant's Closing); Trial Tr. 2211:13–2222:23 (Government's Rebuttal).[5]

Of course, it ultimately does not matter why the jury didn't put the government to its burden on the intent element of the economic espionage counts. But the lack of focus on the timing issue, coupled with the potential distraction of the government's Chinese technology expert, could help explain why this was the rare criminal trial where the government managed to obtain a conviction despite lacking sufficient evidence to prove an element beyond a reasonable doubt.

## IV

The government responds that even if the theory of economic espionage discussed in the preceding section is unsupported by the evidence, the jury could have convicted Ding on a different theory. Recall that Ding did not merely upload the trade secret documents to his personal Google Cloud account during the May 2022–April 2023 period. In December 2023, when he feared Google was onto him, Ding downloaded the documents from his Google Cloud account to his personal laptop. The economic espionage statute makes it a crime to do a whole variety of things with trade secrets with the intent to benefit a foreign government. Subsection (a)(1) makes it a crime to do things like steal, appropriate, obtain, or carry away a trade secret with the requisite intent. And subsection (a)(2) makes it a crime to do things like copy, duplicate, deliver, send, upload, or download a trade secret with the requisite intent. 18

[5] Even if one thought that Ding's team made a bad tactical decision, it would not affect the sufficiency-of-the-evidence analysis here. If the defense puts on a bad case and fails to highlight a hole in the government's evidentiary presentation, the burden remains with the government to fulfill its "principal purpose" of persuading the jury of guilt beyond a reasonable doubt. *See United States v. Velazquez*, 1 F.4th 1132, 1137 (9th Cir. 2021). The defense's tactics here are relevant simply to help understand why the jury may have failed to find reasonable doubt.

U.S.C. § 1831(a)(1), (a)(2).[6] Based on the word "download" in subsection (a)(2), the government now argues that even if Ding lacked the requisite intent when he uploaded Google trade secrets during the May 2022–April 2023 period, a jury could find that he had developed that intent by the time he downloaded the trade secrets to his laptop in December 2023. *See* Gov't Supp. Opp. at 1–13.

That's true. To be sure, Ding's conduct during the September–December 2023 period hardly puts him in the heartland of economic espionage cases. There was no indication at trial that any of Ding's colleagues in China were affiliated with the government. Nor was there indication that he intended to actually provide trade secrets to anyone in the Chinese government. The evidence merely suggested that, by that September–December 2023 period, he developed an intent to make money off the Chinese government. But the economic espionage statute is broadly worded, covering people who "know" that their theft of trade secrets would "will benefit" the foreign government. Therefore, one can imagine a reasonable jury concluding that Ding: (1) committed the crime of theft of trade secrets during the May 2022–April 2023 period by copying all those documents to his Apple Notes app and uploading them to his Google Cloud account; and then (2) committed the separate crime of economic espionage when he downloaded those same documents to his personal device in December 2023, because at that point there was evidence of knowledge or intent that his conduct (downloading the documents in an effort to keep them) would benefit the government entities he was seeking to do business with.

But the government never articulated this alternative theory of economic espionage to the

---

[6] Subsection (a)(3) makes it a crime to receive, buy, or possess a trade secret with the intent to benefit a foreign government knowing that the trade secret has been stolen. 18 U.S.C. § 1831(a)(3). The jury was not instructed on this theory of liability for economic espionage because it does not appear targeted at people who committed one of the acts described in subsections (a)(1) and (a)(2). Rather, this section appears to be modeled after the crime of receipt of stolen property. Ding obviously does not fit within that theory of liability. *But see United States v. Agrawal*, 726 F.3d 235, 256 (2d Cir. 2013) (interpreting parallel provision in the theft of trade secrets statute as criminalizing unauthorized possession, as opposed to receipt of property stolen by someone else).

jury. As discussed in Section I, the government emphasized that the key to both sets of counts was assessing Ding's intent at the time he stole the trade secrets, which the government consistently described as the May 2022–April 2023 period. *See* Trial Tr. 2110:18–20 ("From May 2022 to April 2023, the defendant stole over 2,000 pages of Google's cutting-edge AI trade secrets."); Trial Tr. 2213:8–13 ("The question you have to answer is what he intended to do with them when he stole them, and the answer to that question has been proven beyond a reasonable doubt. He intended to use them to build his company for his own benefit, to make himself rich, to make his company successful, and to help the entities controlled by the People's Republic of China."); Trial Tr. 2112:19–2113:4 ("So let's talk about how the defendant stole the trade secrets in this case. . . . [He] compiled information from multiple internal Google source documents and copied and pasted them into Apple Notes on his Google computer. The defendant then PDF'd the notes and uploaded them to his personal account."); Trial Tr. 2110:24–2111:2 ("In mid-December 2023, about two weeks before the defendant resigned from Google and was on his way out the door, he downloaded all of the *stolen* trade secrets to his personal computer." (emphasis added)). It's black-letter law that the government can't save a conviction on appeal by using a theory it didn't present to the jury. *See, e.g.*, *Ciminelli v. United States*, 598 U.S. 306, 316–17 (2023); *McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991); *United States v. Motley*, 168 F.4th 588, 602 n.3 (9th Cir. 2026); *United States v. Yates*, 16 F.4th 256, 270 (9th Cir. 2021) (declining to affirm a conviction on the basis of a "third theory" separate from the theories the government focused on at trial); *United States v. Mittelstaedt*, 31 F.3d 1208, 1220 (2d Cir. 1994) (refusing to "affirm a conviction based upon a theory that was never presented to the jury" even though that theory "theoretically could" support the conviction).[7]

In response to all this, the government points to one isolated statement it made during

[7] An additional problem with the government's invocation of this new theory post-trial is that it is arguably inconsistent with the indictment, which focused on the document uploads that took place between May 2022 and April 2023. *See United States v. Davis*, 854 F.3d 601, 603 (9th Cir. 2017) ("The Fifth Amendment's grand jury requirement establishes the 'substantial right to be tried only on charges presented in an indictment returned by a grand jury.'" (quoting *United States v. Antonakeas*, 255 F.3d 714, 721 (9th Cir. 2001))).

closing argument about the December downloading:

> And finally, you have to find that the defendant knowingly took the trade secret information without authorization. This is not contested. You know that the defendant uploaded all of the stolen trade secrets to his personal e-mail account, which is against Google's policies. And then, as we talked about, he downloaded all of the trade secrets on December 14th, just six days after Mr. Fuller reminded him of the policies and after he had sworn that he would delete all Google information from his accounts and devices.

Trial Tr. 2154:20–2155:4. But it's clear in context that the government was not invoking the December downloads to articulate an alternative theory of guilt for the economic espionage counts. Rather, it invoked those downloads to bolster its argument that Ding's theft of the trade secrets during the May 2022–April 2023 period was intentional and "without authorization" rather than some innocent mistake. *See* Trial Tr. 2148:11-2149:13 (discussing how, instead of telling Google's investigator that he had taken the documents by mistake, Ding said "he permanently deleted or destroyed all copies of that information" but proceeded to "download[] all the information he had stolen and stored on his personal account to his personal computer"). Nowhere did the government suggest to the jury that it should convict Ding of economic espionage based on his state of mind during any period other than the one in which he originally uploaded the trade secrets.[8]

Thus, the fact that the evidence could have supported a conviction on this alternative

---

[8] For its part, the defense argues that the government's alternative theory does not work because the statute only criminalizes the initial theft of trade secrets, not subsequent handling of the same trade secrets. According to the defense, if the crime of theft of trade secrets was completed during the May 2022–April 2023 period, no additional crime pertaining to those same trade secrets could have been committed in December 2023. Perhaps that argument would make sense if the government was attempting to hold Ding liable for the same crime—theft of trade secrets—based on the earlier uploading and the subsequent downloading of the same documents. But theft of trade secrets and economic espionage are different crimes: The former requires intent to benefit someone other than the trade secret owner, and the latter requires the intent to benefit a foreign government. Both crimes can be committed by various means, such as stealing, taking away, photographing, or making copies of the trade secrets. You can obviously steal a trade secret in Year 1 for your own benefit and then decide to use that trade secret in Year 2 to benefit a foreign government. So long as you commit one of the acts identified in subsections (a)(1) or (a)(2) in furtherance of your intent to benefit a foreign government (say, copying, photographing, uploading, downloading, delivering, or sending the trade secret), you have now committed the crime of economic espionage in Year 2, in addition to the crime of theft of trade secrets that you committed in Year 1.

download theory does not matter. The government can't save a legally flawed conviction by identifying a new theory it failed to articulate at trial.

## V

In short, the evidence was insufficient for a rational jury to conclude beyond a reasonable doubt that Ding knew or intended during the May 2022–April 2023 timeframe that his actions would benefit the Chinese government. And the alternative theory of guilt now advanced by the government was not articulated to the jury. Although the government disagrees with these two conclusions, it has conceded that once they are made, they dictate a judgment of acquittal (as opposed to a new trial) on the economic espionage counts. That makes sense because giving the government a second crack at trial based on a new theory, following a finding of inadequate evidence to support the old theory, would seem to violate the Double Jeopardy Clause. *See United States v. Castillo-Basa*, 483 F.3d 890, 893 (9th Cir. 2007) ("The Double Jeopardy Clause requires the government to put on its strongest case the first time; it forbids it to conduct a series of prosecutions, involving the same fundamental issues, in which it presents additional arguments and evidence at each iteration."). Accordingly, the motion for judgment of acquittal on the economic espionage counts is granted.

**IT IS SO ORDERED.**

Dated: August 20, 2026

VINCE CHHABRIA
United States District Judge