CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

CASEY BOOME (NYBN 5101845)
MOLLY K. PRIEDEMAN (CABN 302096)
ROLAND CHANG (CABN 271511)
Assistant United States Attorneys

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6627
casey.boome@usdoj.gov
molly.priedeman@usdoj.gov
roland.chang@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LINWEI DING, aka Leon Ding,<br><br>Defendant. | CASE NO. 3:24-cr-00141-VC<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Hearing Date: September 1, 2026<br>Hearing Time: 2:00 p.m.<br>Courtroom: 3 – 17th Floor<br><br>Hon. Vince Chhabria |

**TABLE OF CONTENTS**


INTRODUCTION ....................................................................................................................1

OFFENSE CONDUCT ............................................................................................................1

I. Ding's Method of Exfiltration Concealed his Crimes and Preserved his Access ....................1

II. Ding Lied to Google, MiraclePlus, PRC-Based Investors, and Yuqing Ren ..........................2

III. By Stealing the Trade Secret Documents, Ding Stole the Time, Effort, Know-How, and Money Required to Create Them ....................................................................................4

RELEVANT PROCEDURAL HISTORY ................................................................................5

THE SENTENCING GUIDELINES CALCULATION ..........................................................6

I. The Evidence Shows that Ding Intended to Harm Google ....................................................6

II. Ding Intended to Cause Google Between $6.2 and $9.5 Million in Lost Profits Over Zhisuan's First Five Years in Business ..........................................................................12

A. Ding Planned to Copy Google's AI Infrastructure Technology ......................................12

B. Ding Planned to Operate Zhisuan in China and Globally ................................................13

C. The Company Ding Envisioned Would Compete with Google and Others for AI Infrastructure Services Customers Around the World ......................................................14

D. Ding's Projected Revenue Quantifies his Intended Impact on Google ............................15

E. This is a Conservative Estimate ........................................................................................17

F. The Court's Judgment of Acquittal Does Not Alter this Calculation ...............................18

SENTENCING RECOMMENDATION ................................................................................20

I. The Nature and Circumstances of Ding's Crimes, 18 U.S.C. § 3553(a)(1) .........................20

II. The History and Characteristics of Ding, 18 U.S.C. § 3553(a)(1) ......................................21

III. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense, 18 U.S.C. § 3553(a)(2)(A) ...................................21

IV. The Need to Afford Adequate Deterrence to Criminal Conduct, 18 U.S.C. § 3553(a)(2)(B) ..........................................................................................................................22

V. The Need to Protect the Public from Future Crimes by Ding, 18 U.S.C. § 3553(a)(2)(C) ..........................................................................................................................23

VI. The Same Sentence Is Warranted If the Court Rejects the Intended Loss Enhancement .............23

RESTITUTION AND FINE ....................................................................................................23
CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*United States v. Goffer*,
721 F.3d 113 (2d Cir. 2013) ..... 24
*United States v. Hackett*,
123 F.4th 1005 (9th Cir. 2024) ..... 8
*United States v. Howley*,
707 F.3d 575 (6th Cir. 2013) ..... 7
*United States v. Lucas*,
101 F.4th 1158 (9th Cir. 2024) ..... 20
*United States v. Musgrave*,
761 F.3d 602 (6th Cir. 2014) ..... 24
*United States v. Pu*,
814 F.3d 818 (7th Cir. 2016) ..... 8, 11
*United States v. Shan Shi*,
2019 WL 6879409 (D.D.C. 2019) ..... 10
*United States v. Thompson*,
130 F.4th 1158 (9th Cir. 2025) ..... 24
*United States v. Wilson,*
900 F.2d 1350 (9th Cir. 1990) ..... 7
*United States v. Xue*,
42 F.4th 355 (3rd Cir. 2022) ..... 11, 12
*United States v. You*,
74 F.4th 378 (6th Cir. 2023) ..... 8, 9, 17
*United States v. You,*
2024 WL 4158884 (E.D. Tenn. 2024) ..... 9
*United States v. Yu Xue*,
No. CR 16-22, 2021 WL 2433857 (E.D. Pa. June 15, 2021) ..... 26
*United States v. Zheng*,
113 F.4th 280 (2d Cir. 2024) ..... 9, 17
*United States v. Zolp*,
479 F.3d 715 (9th Cir. 2007) ..... 7, 19

**Statutes**

18 U.S.C. § 1831 ..... 20
18 U.S.C. § 1834 ..... 25
18 U.S.C. § 3553(a) ..... 2, 22, 23,24
18 U.S.C. § 3663A ..... 25

**Rules**

U.S.S.G. § 1B1.3(c) ..... 21
U.S.S.G. § 2B1.1 ..... 7, 19, 17, 20
U.S.S.G. § 4C1.1 ..... 20

## INTRODUCTION

Google trusted the defendant, Linwei Ding, with access to some of its most valuable artificial intelligence technology. Ding violated that trust when he carried out his scheme to steal Google's AI infrastructure trade secrets and use them as the technological foundation for his own AI company, Zhisuan Technology. Ding employed a multi-step exfiltration process designed to evade Google's security systems, stockpiled the stolen information in his personal cloud account, and repeatedly deceived his managers and colleagues to conceal his crimes and preserve his access to Google's technology as he secretly built Zhisuan in the People's Republic of China (PRC).

Armed with thousands of pages of documents containing Google's trade secrets, Ding told investors in China that Zhisuan could "replicate and upgrade" Google's AI computing platform. He secured a $700,000 investment from a PRC-based startup incubator, partnered with PRC government-controlled entities, sought government support through a PRC talent program, and planned to grow Zhisuan into a "unicorn" that would operate in China and around the world. All the while, Ding concealed Zhisuan from Google and continued collecting Google's confidential AI infrastructure information until Google terminated his network access.

After a twelve-day trial, the jury found Ding guilty on all fourteen counts: seven counts of theft of trade secrets and seven counts of economic espionage. The Court later set aside the verdict and entered a judgment of acquittal as to the economic espionage counts. An accurate Guidelines calculation, including the intended loss enhancement for the pecuniary harm Ding sought to cause Google, produces a Guidelines range of 63 to 78 months. The government respectfully submits that a sentence of 70 months, near the midpoint of that range, is sufficient but not greater than necessary. That sentence reflects the scale and sophistication of his theft, his sustained deception, and the need to deter other insiders who may view stealing American technology as a shortcut to personal profit.

## OFFENSE CONDUCT

### I. Ding's Method of Exfiltration Concealed his Crimes and Preserved his Access

Ding executed a deliberate strategy to maximize the confidential and trade secret information that he could steal while avoiding detection. Ding's multi-step exfiltration process included accessing confidential documents from Google's network, copying Google's trade secret information into the

Apple Notes application on his Google-issued computer, converting those Apple Notes files into PDFs, and uploading them to his personal cloud account. Ding's method stripped away much of the metadata and contextual information associated with Google's original source documents. For example, in numerous instances, Ding copied technical information from Google source documents but did not copy confidentiality markings, document identifiers, or the authors' names. These measures hid the trade secret documents from Google's automated threat detection system, making it more difficult for the system to identify the origin of the confidential information and detect Ding's unauthorized removal of trade secrets from Google's network.

The scope of Ding's theft demonstrates the importance of Google's confidential technology to his plans for Zhisuan. Between May 2022 and May 2023, Ding stole 1,255 documents, including all 105 documents charged as containing Google's trade secrets. The stolen documents included 14,721 pages and 4,374 embedded screenshots, illustrating the painstaking and intentional process that Ding undertook to steal the documents containing Google's trade secrets without authorization.

Ding's efforts to steal yet more of Google's confidential information did not end with his last charged trade secret upload on April 17, 2023. Ding continued accessing Google's confidential technical information and copying it into Apple Notes on his Google-issued computer through the end of 2023. In fact, between April 18 and December 29, 2023, Ding created or modified approximately 1,349 new Apple Notes files containing additional confidential information. In December 2023 alone, after securing a $700,000 investment from MiraclePlus and pitching Zhisuan to investors at the MiraclePlus conference, Ding created about 250 new Apple Notes containing a broad range of confidential Google technology, ranging from low-level software design documents to higher-level AI and machine learning applications. Google terminated Ding's network access on December 29, 2023, before he had the chance to upload the newly created Apple Notes.

## II. Ding Lied to Google, MiraclePlus, PRC-Based Investors, and Yuqing Ren

Ding's theft was accompanied by a pattern of deception that permeated nearly every stage of the offense. As he sought to transform Zhisuan from a business concept into a funded AI infrastructure company, Ding repeatedly misrepresented his own qualifications and experience to PRC-based investors. For instance, during his MiraclePlus presentation, Ding claimed that he was one of only ten

people in the world capable of building an AI supercomputer on the scale of the supercomputer he claimed Zhisuan could build. He falsely asserted that he had led the development of Google's TPU- and GPU-based AI supercomputers and, because of that experience, Zhisuan could "replicate and upgrade" Google's AI infrastructure products. As Ravi Kavuri, one of Ding's managers, made clear at trial, Ding's claims about his experience and capabilities were false. But Ding never intended to rely solely on his own knowledge and experience to build Zhisuan; he intended to rely on Google's trade secrets. Indeed, while he was misrepresenting his experience to investors, Ding knew that he had already stolen the Google technical information that he intended to use to build Zhisuan. The stolen information enabled Ding to make inflated claims about his capabilities because it supplied the technical knowledge needed to bridge the gap between the engineer Ding was and the engineer he claimed to be.

Before misleading investors at the MiraclePlus conference, Ding devised a brazen and deceptive scheme to gain admission into the MiraclePlus entrepreneurship program. During the application process, MiraclePlus asked Ding for a product demonstration video and a professional reference, but he had neither. Ding solved these problems by fabricating both a product demonstration video and a professional reference. First, Ding recorded the "InfiniCompute" video (TX 1175S), which showed him running an internal Google system for testing GPU system functionality. Ding sent the video to MiraclePlus, claiming that it was a demonstration of a product that Zhisuan had developed. Second, Ding compounded that deception by impersonating a senior Google executive, Aamer Mahmood, whom Ding offered as his reference. Without Mahmood's knowledge or permission, Ding created and controlled the email account "aamermmood@gmail.com," corresponded with MiraclePlus while posing as Mahmood, and arranged a telephone call using that false identity. MiraclePlus requested a video call, but Ding, pretending to be Mahmood, suggested a phone call instead. The same day that Ding scheduled the call between "Mahmood" and MiraclePlus, he downloaded VoiceMod, an application capable of altering a user's voice, onto his Google-issued computer. This chain of events supports the inference that Ding modified his voice and pretended to be Aamer Mahmood during the call with MiraclePlus.

Ding employed lies and deception to conceal his misconduct from Google. After Google's security systems detected suspicious uploads of non-trade-secret documents to his personal Google Drive account in December 2023, investigator Brad Fuller interviewed Ding about those transfers. Ding

assured Fuller that he had no plans to leave Google and that he uploaded the documents as evidence of the work he had done at Google. Ding signed a Self-Deletion Affidavit falsely certifying that he had searched his personal devices and accounts for Google's confidential information and permanently deleted any copies in his possession. Six days later, on December 14, 2023, Ding downloaded all 1,255 exfiltrated files, including every charged trade secret document, from his personal Google Drive account onto his personal computer. On December 29, 2023, after Google cut off Ding's network access, Ding attempted to conceal his theft by deleting copies of the exfiltrated documents from his Google computer.

The impact of Ding's dishonesty was felt most acutely by his former intern, Yuqing Ren, who came to work for Google immediately after graduate school. As a Google student intern, Ren worked under Ding's supervision, and she later continued to work under him when she became a full-time employee. Before Ding traveled to China to pitch Zhisuan at the MiraclePlus conference, Ding gave Ren his Google access badge and instructed her to swipe it at the entrances to Google's Mountain View campus. Ding led Ren to believe that their manager was aware of the arrangement. Ren did as Ding asked, and, as she explained at trial, the incident resulted in her termination from Google:

> Q: Did anything happen to you at Google because you used Mr. Ding's badge for him? . . .
> A. I was let -- I was fired because of that.
> Q. After Google's investigations team reached out to you, did you try to reach out to Mr. Ding?
> A. Yes.
> Q. How did you reach out to him?
> A. I texted him and asked what happened and why.
> Q. Did he ever respond to you?
> A. No.

Tr. at 883:16-884:10.

## III. By Stealing the Trade Secret Documents, Ding Stole the Time, Effort, Know-How, and Money Required to Create Them

The jury found Ding guilty of stealing documents containing Google's trade secrets. Those documents were the work product of thousands of Google engineers, many of whom dedicated years of their careers to inventing and refining Google's AI supercomputer technology. Those documents represented the result of hundreds of millions of dollars of capital investment in materials, prototypes, testing through trial and error, and human resources. When Ding stole the trade secret documents, he

also stole the time, effort, know-how, and money required to create them.

The documents Ding stole described the core technologies that enable Google's AI supercomputing infrastructure to function at scale. The documents in Categories One through Three concerned Google's Tensor Processing Unit (TPU) accelerator chips. It took thousands of Google engineers, hundreds of millions of dollars in capital investment, and more than a decade of research and development to invent the TPU accelerator specifically designed for AI and machine learning workloads. Dr. Sanchez testified that the documents contained enough information for a competitor seeking to build a similar product to skip significant portions of the chip design process. Categories Four and Five contained Google's hardware and software designs for its GPU-based supercomputers, representing the work of thousands of engineers over several years. These documents were particularly relevant given Ding's stated goals for Zhisuan, including his promise to produce a supercomputer at "10,000 GPU scale." Finally, Categories Six and Seven detailed Google's customized SmartNIC called Diorite, which Dr. Chandra developed together with hundreds of additional Google engineers over a period of approximately four years. Diorite allows high-performance communication in Google's AI supercomputers, moving enormous amounts of data efficiently among thousands of accelerators. These documents would allow a competitor to save substantial development time when creating a similar hardware and software solution for high-speed networking.

The testimony of Dr. Sanchez, Dr. Chandra, and Mr. Lohmeyer made clear that the value of the stolen technology lay not only in the time and money Google invested in developing it, but also in the years of highly specialized work required to create it. Rather than devote the time and resources necessary to develop comparable technology independently, Ding copied Google's solutions and represented that Zhisuan could build AI infrastructure comparable to Google's. As a result, Ding's crime not only harmed Google, the owner of the trade secrets, but also devalued the work of the thousands of Google engineers who played by the rules and dedicated themselves to the painstaking process of inventing and refining Google AI infrastructure technology.

## RELEVANT PROCEDURAL HISTORY

The Court empaneled the jury on January 7, 2026, and trial commenced on January 12, 2026. Over the course of twelve trial days, the jury heard testimony from seventeen witnesses, including five

expert witnesses, and considered more than 500 admitted exhibits. On January 29, 2026, the jury found Ding guilty of seven counts of theft of trade secrets and seven counts of economic espionage. With respect to each count, the jury found that the combinations of documents comprising Trade Secret Categories One, Two, Three, and Six were trade secrets. The jury further found that Trial Exhibits 402, 407, 408, and 410 (Category Four); Trial Exhibits 429, 431, and 434 (Category Five); and Trial Exhibits 448, 451, 461, and 462 (Category Seven) each contained Google's trade secrets. On August 20, 2026, the Court vacated the jury's verdict and entered a judgment of acquittal as to Counts Eight through Fourteen, the economic espionage counts. Dkt. 447.

## THE SENTENCING GUIDELINES CALCULATION

The Sentencing Guidelines calculation in the PSR[1] fails to include an enhancement for intended loss. The trial evidence showed that Ding intended to use Google's own AI infrastructure technology to build a competing AI infrastructure product that would capture customers, revenue, and market share in the same market in which Google Cloud competed. Ding's conduct and statements—including his business plans, marketing materials, and communications—revealed his explicit intention to sell a product "built through direct replication and upgrading" of "Google['s] computing power platform." TX 1156. Under these circumstances, the conclusion that Ding intended no financial harm to Google cannot be reconciled with the evidence.

### I. The Evidence Shows that Ding Intended to Harm Google

Section 2B1.1(a) of the Sentencing Guidelines establishes the base offense level for theft-related offenses, including theft of trade secrets. The loss table at U.S.S.G. § 2B1.1(b)(1), in turn, increases the offense level depending on the amount of loss. The Government bears the burden of proving the facts supporting a sentencing enhancement by a preponderance of the evidence. *United States v. Wilson,* 900 F.2d 1350, 1354 (9th Cir. 1990).

"Loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1), notes to table (A). Because the government disrupted Ding's plans for Zhisuan before he could accomplish his goals, Ding was never able to cause Google the competitive pecuniary harm he intended. Thus, the Court should

[1] The PSR issued before the Court's Order vacating the economic espionage convictions.

consider intended loss, which "means the pecuniary harm that the defendant purposely sought to inflict; and [] includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* notes to table (C)(ii). "Determining the value of a trade secret . . . is no easy task." *United States v. Howley*, 707 F.3d 575, 582 (6th Cir. 2013). A district court need not reach an exact figure for the harm that a defendant intended to cause; "a reasonable estimate" is sufficient. *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007); U.S.S.G. § 2B1.1 cmt. n.3(B). A court has significant discretion in making that estimate. It may accept a party's estimate in whole or in part, or it may develop its own calculation. *See Howley*, 707 F.3d at 582.

In cases like Ding's, where the government disrupts the defendant's criminal scheme before its completion, intended loss is the loss that would have resulted "had the [defendant's] venture been successful." *United States v. Hackett*, 123 F.4th 1005, 1009 (9th Cir. 2024). In trade secret theft cases, "[i]ntended loss is often used to capture the loss the victim would or could have suffered had the offender been able to complete his interrupted criminal scheme." *United States v. Pu*, 814 F.3d 818, 827 (7th Cir. 2016). Here, the PSR acknowledges that "had the defendant succeeded in achieving his revenue goals at Zhisuan (however unlikely), pecuniary harm to Google was a necessary consequence." PSR ¶ 55. At the same time, the PSR concludes that the government has not established that Ding purposefully sought to inflict pecuniary harm on Google. *Id.* In effect, the PSR concludes that Ding did not intend a necessary consequence of his conduct. That conclusion overlooks the direct and circumstantial evidence of Ding's business objectives for Zhisuan. Ding did not merely foresee that Zhisuan might affect Google. He planned to use Google's stolen technology to build and sell a replica product, he identified market-share and revenue goals for Zhisuan, and he targeted global operations in markets where Zhisuan would inevitably compete with Google. Those facts permit the Court to infer that diverting business from Google and other AI infrastructure providers was part of Ding's chosen means of enriching himself.

Courts considering intended loss in trade secret theft cases have relied on evidence of a defendant's plans to launch a competing business, including revenue projections, to conclude that the defendant intended to cause financial harm. The same type of evidence is present here. Thus, although

the PSR accurately sets forth the relevant facts, its conclusion that Ding did not intend to cause financial harm to Google is inconsistent with how courts have treated similarly situated defendants.

For example, in *United States v. You*, the defendant stole technology from seven U.S.-based companies concerning BPA-free coatings used to line aluminum cans. 74 F.4th 378, 383–85 (6th Cir. 2023). After stealing the victims' trade secrets, You founded a BPA-free coating company in China. Like Ding, she applied to a Talent Program and claimed in her application that her company could help China "break the international monopoly" in BPA-free coatings. *Id.* at 384. Her Talent Plan application, like Ding's, contained financial projections, which the sentencing court used to estimate the profits the victim companies would have lost had You accomplished her stated goals. *United States v. You*, No. 2:19-CR-00014-1-JRG-CRW, 2024 WL 4158884, at 6 (E.D. Tenn. 2024). On remand, after the Sixth Circuit directed the sentencing court to calculate intended loss based on the victims' expected lost profits, the sentencing court explained:

> The Court [] views Ms. You's [Talent Plan] application as undeniable evidence of her intent to harm the victim companies, and her financial projections in her [Talent Plan] application—those that the Court has found to be credible—are a translation of her intended harm into pecuniary values.

*Id.* at 10. The court found that You's conduct and statements in the Talent Plan application established her intent to cause the seven victim companies $30,450,000 in lost profits. *Id.* at 17.

Here, the Court should rely on similar evidence to find that Ding intended to cause financial harm to Google. Like You, Ding stole trade secrets, started a company in China, and marketed a product based on the stolen trade secrets. Specifically, Ding stole the AI infrastructure technology that Google used in its global network of data centers. He then marketed his company to investors and the PRC government through a Talent Plan application, claiming that he could "replicate" Google's AI infrastructure technology and "help[]China to develop world-class compute infrastructure." TX 1160. Ding planned to operate in China and to build "teams and data centers outside China." TX 1130 at 199–203. The evidence thus established that Ding intended to use Google's trade secrets to replicate Google's AI infrastructure and deploy that product in China and elsewhere around the world. As the PSR correctly recognized, financial harm to Google was a "necessary consequence" if Ding achieved his

stated revenue goals. PSR ¶ 55. Because this case is materially analogous to You, where the court used the defendant's financial projections to calculate intended loss, the Court should do the same here.

In *United States v. Zheng*, the defendant stole steam turbine technology from his employer, General Electric ("GE"). 113 F.4th 280, 281–82 (2d Cir. 2024). At the same time, Zheng founded two companies in the PRC that also developed turbine seals and created partnerships between those companies and the PRC government. *Id*. A jury convicted Zheng of conspiracy to commit economic espionage, and the Second Circuit affirmed the district court's determination "that the intended loss amount should be based on GE's 'potentially lost profits' had Zheng's conspiracy succeeded." *Id*. at 291. As in Ding's case, the evidence presented at Zheng's trial and sentencing included business plans for his PRC-based companies that contained revenue projections and goals to capture market share. *United States v. Zheng*, No. 19-cr-00156-MAD, Dkt. 311 at 10–12 (Gov't Sent'g Mem.); *see* TX 1149 (Ding's business-planning Apple Note, recovered from his personal computer, stating his goal of capturing "10% market share"). The government argued in *Zheng* that "the defendant sought to research, design, manufacture, and sell turbine parts based on the GE trade secrets that he unlawfully stole . . . [and] the defendant intended to take some of GE's existing sales and profits, thereby intending to cause GE to lose sales and profits." *Id.* at 5. The same is true here, where Ding sought to commercialize an AI infrastructure product based on Google's trade secrets that he unlawfully stole. Because Zheng's and Ding's offense conduct are closely analogous, the same reasoning supports a finding that Ding intended to cause financial harm to Google.

The facts of *United States v. Shan Shi* also closely resemble those presented here. No. 17-cr-110-CRC, 2019 WL 6879409 (D.D.C. 2019). There, the defendant stole technology related to foam used in oil drilling operations and started a company in China with the express goal—described in a business plan—of penetrating an existing market controlled by the victim and three other international companies and earning a profit of $3 million by its fifth year of operations. *Id.* at 2. The sentencing court found that "it naturally flows from Dr. Shi's stated goal of taking sales from the existing competitors in the market that CBMI's gain would come at their expense." *Id.* at 3. The court relied on Shi's business plan to establish his intent "[b]ecause a factfinder may infer a defendant's intent from the natural and probable consequences of his actions." *Id*. (citations omitted). The court calculated intended loss in the same

manner the government proposes here: by multiplying the defendant's expected profits by the victim company's market share to determine the "lost profits [the victim] would have suffered had [Shi's company] achieved its stated goals of penetrating the market." *Id.* Here, the trial evidence included Ding's business plans for Zhisuan, which, like Shi's, contained revenue and market-share projections that the Court should use to calculate intended loss.

The PSR states that Google would have been financially harmed if Ding had achieved his revenue goals for Zhisuan. PSR ¶ 55. It nonetheless concludes that Ding did not purposefully seek to inflict financial harm on Google because he "stole the trade secrets to enrich himself." *Id*. The government does not dispute that Ding intended to enrich himself. But that does not resolve the intended loss question. You, Zheng, and Shi likewise sought to enrich themselves by using stolen trade secrets to build businesses that would capture market share and profits from the victim companies and others in the same industry. The relevant question is how Ding intended to enrich himself. The evidence shows that Ding intended to do so by using Google's stolen AI infrastructure technology to build a competing AI infrastructure services product that would capture customers, revenue, and market share in the same market in which Google Cloud competed. On these facts, the government has established by a preponderance of the evidence that Ding intended to cause financial harm to Google.

Ding may rely on *United States v. Yihao Pu*, 814 F.3d 818 (7th Cir 2016) and *United States v. Xue*, 42 F.4th 355 (3rd Cir. 2022), as cases in which a circuit court affirmed the district court's decision not to apply an intended loss enhancement after a theft of trade secrets or economic espionage conviction. Both cases are distinguishable in fundamental ways.

In *Pu*, the defendant stole proprietary stock trading software from two former employers, both financial institutions. 814 F.3d at 821. There was no evidence that Pu tried to sell the software to a competitor, start his own financial institution using the software, or use the software for the benefit of a new employer. *Id.* Rather, Pu used the stolen software to make stock trades for himself and lost approximately $40,000. *Id*. The victims suffered no actual monetary loss. *Id*. At sentencing, the district court followed the government's recommendation and the PSR and found that the intended loss was equal to the cost of developing the stolen stock trading software. *Id.* Pu appealed and the Seventh Circuit vacated his sentence, finding, unlike Ding's case that "[t]here [was] no evidence from which we can

infer how much of a loss Pu intended the victims to suffer." *Id*. at 826. Highlighting another key distinction, the court explained:

> Intended loss is often used to capture the loss the victim would or could have suffered had the offender been able to complete his interrupted criminal scheme. Here, the district court found that the government did not prove that Pu was interrupted before completing a criminal act. His conduct was merely what was charged.

*Id*. at 827. In other words, unlike Ding, Pu accomplished everything he intended to do with the stolen trading software (other than trading profitably), and those plans did not show intent to cause financial harm to the victim companies. There was no evidence, for example, that Pu had founded his own hedge fund, circulated revenue projections for his new company, and sought to raise capital by claiming that he could replicate the trading patterns of the victim companies. Those facts, present in Ding's case but not in Pu's, fundamentally alter the intended loss analysis and illustrate why an intended loss enhancement is required for Ding but was not for Pu.

*United States v. Xue* is similarly distinguishable. There, the defendants, a former scientist at pharmaceutical firm GlaxoSmithKline ("GSK") and her co-conspirators, pled guilty to stealing research materials containing trade secrets with intent to benefit the defendants' PRC-based pharmaceutical startup company called Renopharma ("Reno"). 42 F.4th at 358-59. At sentencing, the government argued that the intended loss was equal to the value of the stolen trade secrets, more than $1 billion, but the district court found no intended loss. *Id.* at 360. The Third Circuit affirmed, holding that because "the defendants did not in fact use the trade secrets to compete with GSK [and] did not use the information to solicit investment, develop competing products, or develop the same products that GSK was developing," the defendants did not intend to cause financial harm to GSK. *Id.* at 364. For instance, one category of stolen trade secret was GSK's "platforms," which are standardized procedures used by GSK to develop monoclonal antibodies and other products. *Id.* at 359. The evidence showed that Reno sought to use GSK's procedures to streamline the development of its own drugs, but the evidence did not show that Reno planned to use GSK's platforms to develop products that would compete with GSK's products. *Id*. To the contrary, a Reno annual report showed that "[Reno] was developing products different from GSK's targets." *Id.* at 360. Ultimately, the Third Circuit found no clear error in the

district court's decision not to infer intended loss from the defendants' intended gain.

A key factual difference illustrates why this Court should find intended loss: Ding, unlike the *Xue* defendants, intended to develop a product explicitly modeled on Google's AI infrastructure products and to offer that product in China and globally. Reno, on the other hand, intended to use GSK's trade secrets to enhance its testing and development of drugs that were distinct from GSK's drugs and would not compete with them. Had Reno, with GSK's trade secrets, advertised a drug that could "replicate and upgrade" one of GSK's drugs, the intended-loss analysis would have been materially different. Thus, on the *Xue* facts, there was a reasonable basis to find that the defendants intended to use GSK's trade secrets without causing financial loss. Here, however, if Ding had achieved his growth and revenue goals for Zhisuan, Zhisuan's gain would necessarily have come in part at Google's expense.

**II. Ding Intended to Cause Google Between $6.2 and $9.5 Million in Lost Profits Over Zhisuan's First Five Years in Business**

The jury concluded beyond a reasonable doubt that Ding "intended or knew that the offense would injure Google." Dkt. 362, Jury Inst. No. 15. The government's evidence supporting that result included: (1) Ding's statements and documents he drafted explaining that Zhisuan's product would build an AI infrastructure platform modeled on Google's; (2) evidence demonstrating that Ding planned to operate Zhisuan in China and to establish teams and data centers outside of China; (3) Mark Lohmeyer's testimony explaining how an AI infrastructure company based in China and operating globally would compete with Google for customers; and (4) Zhisuan marketing materials and Ding's private notes documenting his revenue and market share projections for Zhisuan.

This same body of evidence establishes that Ding intended to cause financial harm to Google. The trial evidence proved that Ding's explicit goal was to launch an AI infrastructure product that would capture market share in the global cloud computing industry. If Ding had accomplished this goal, Zhisuan's success would have come at the expense of Zhisuan's competitors in the cloud computing industry, including Google. Therefore, the trial evidence, together with the Declaration of Mark Lohmeyer, submitted as Exhibit A to this memorandum, establishes by a preponderance of the evidence that Ding intended to cause between $6.2 and $9.5 million in lost profits over a five-year period.

**A. Ding Planned to Copy Google's AI Infrastructure Technology**

Ding intended to use Google's own AI infrastructure technology to build a competing AI infrastructure services platform that would capture customers, revenue, and market share in the same market where Google Cloud competed. Ding's statements during his MiraclePlus presentation and in Zhisuan's business pitch documents articulate this goal explicitly. The cover page of Ding's MiraclePlus presentation described Zhisuan's product as "China's earliest and only single-task, tens-of-thousands-of-cards compute platform for accelerating AI training and inference." TX 1158 at 1. The Innovation Park pitch deck similarly described Zhisuan's product as a "large model training acceleration platform of 10,000 GPU scale," which Dr. Sanchez interpreted to mean a GPU-based AI-supercomputer supporting roughly 10,000 GPUs to accelerate large-model training. *See* TX 1034; Tr. 1222:20–1223:12. This description could apply equally to Google's AI supercomputing infrastructure reflected in the stolen trade secret documents. Moreover, Ding clearly intended that similarity given his explicit and repeated references to replicating Google's technology. As the Court heard at trial, Ding advertised to investors at every opportunity his startup's value proposition: Zhisuan had the "R&D experience and technology of Google" and could build an AI supercomputer by replicating Google's technology. TX 1156, 1158.

### B. Ding Planned to Operate Zhisuan in China and Globally

Ding's plan for Zhisuan was expressly domestic *and* international from the beginning. His MiraclePlus materials, designed for PRC-based investors, emphasized a product based on Google's technology and designed to "suit China's national conditions." TX 1156. The evidence also proved that Ding planned to expand Zhisuan's operations globally. For instance, in Ding's February 13, 2023 WeChat conversation with Yuan Ye, Ding's initial business partner and co-founder of Zhisuan, Ye sent Ding a screenshot describing how TikTok structured its business by separating "their Chinese business from their oversea[s] business, and build[ing] teams and data centers outside of China." TX 1130 at 199. In his message containing the screenshot, Ye told Ding, "The final description from TikTok is what we just mentioned: How to do it both domestically and internationally." *Id*. Ding responded a few minutes later, asking "Where did you get this? *This is the same idea we had in mind at the beginning.*" *Id.* at 200 (emphasis added). Ding later commented that " *[t]he analysis in it seems to be in perfect agreement with ours*. . . . Is this from the internal analysis materials of TikTok." *Id.* at 201 (emphasis added).

Ye's message and Ding's reaction to it established that their business plan was to "completely

separate their Chinese business from their oversea[s] business and build teams and data centers outside of China." *Id*. at 199-200. The timing of this conversation shows that operating in China and abroad was foundational to Ding's plan for Zhisuan at the company's inception. Indeed, over the two months following their February 13 conversation, Ding and Ye would partner with I&R Capital to raise investment funds (*see* TX 1155), finalize the "Zhisuan Teaser" investor pitch document (TX 1137), and meet with IDG Capital and other potential investors (*see* TX 1127).

### C. The Company Ding Envisioned Would Compete with Google and Others for AI Infrastructure Services Customers Around the World

Ding claims that he intended no financial harm to Google because he planned for Zhisuan to operate within China exclusively. This conception of Zhisuan is incompatible with Ding's stated intention to establish Zhisuan teams and data centers around the world, as discussed above, and with Zhisuan's market position as reflected in Zhisuan's investment agreement with MiraclePlus. Specifically, that agreement lists Zhisuan's top competitors as Huawei Technologies and Alibaba Cloud. TX 1011 at 18. Both companies are PRC-based companies that offer cloud computing and AI infrastructure services and maintain operations and infrastructure around the world, competing for customers globally with Google and others. For instance, "Huawei Cloud provides services in many regions around the world,"[2] including Asia, Africa, Europe, the Middle East, South America, and North America.[3] Similarly, Alibaba Cloud offers services across regions, which the company describes as "a geographic area that contains Alibaba Cloud data centers," including Asia, Japan, Europe, the United States, Mexico, and the Middle East.[4] In other words, Huawei and Alibaba operate domestically (in China) and internationally, with teams and data centers around the world – the same model that Ding and Ye envisioned for Zhisuan from the beginning.

At trial, Mark Lohmeyer explained how Google Cloud competes with PRC-based companies like Huawei and Alibaba. Mr. Lohmeyer gave the example of Alibaba Cloud, which he described as a

---

[2] Huawei Cloud, Regions and Availability Zones, accessed August 7, 2026, https://support.huaweicloud.com/intl/en-us/productdesc live/live_03_0008.html

[3] Huawei Cloud, Global Products and Services, accessed August 7, 2026, https://www.huaweicloud.com/intl/en-us/global/

[4] Alibaba Cloud, Regions and Zones, accessed August 7, 2026, https://www.alibabacloud.com/help/en/cloud-migration-guide-for-beginners/latest/regions-and-zones

company headquartered in China with "data centers in other countries and regions around the world," including regions, such as Singapore, where Google also operates data centers and competes with Alibaba for customers. Tr. 110:24 – 111:5. Had Ding accomplished his stated goal to grow Zhisuan into a company like Huawei and Alibaba, with teams and data centers around the world, Zhisuan would have been positioned, like Huawei and Alibaba, in direct competition with Google and other global AI infrastructure providers like AWS and Microsoft Azure. Moreover, Zhisuan would have been particularly well-suited to capture market share from Google, because Ding planned to replicate Google's AI infrastructure platform. *See* Lohmeyer Decl. at ¶ 31.

### D. Ding's Projected Revenue Quantifies his Intended Impact on Google

The Court need not speculate about the financial harm Ding intended to cause Google. Ding's own contemporaneous business plans and projections set out the revenue he intended Zhisuan to generate, providing a concrete starting point for estimating the profits Google would have lost had Ding succeeded in building the competing AI infrastructure business he envisioned. *See You*, 74 F.4th 378; *Zheng*, 113 F.4th 280; and *Shan Shi*, WL 6879409 (all estimating intended loss by relying on financial projections in the defendant's business plans). Here, the calculation begins with Ding's own projections of Zhisuan's revenue during its first five years of operation. Mr. Lohmeyer then estimates the portion of that revenue that would have been diverted from Google based on Google's share of the relevant market and applies Google's cloud-services profit margin to that diverted revenue to estimate the profits Google would have lost. As detailed below, that methodology yields a conservative intended loss range of approximately $6.2 million to $9.5 million. Because the trial evidence and Mr. Lohmeyer's calculations establish by a preponderance of the evidence that Ding intended to cause financial loss to Google, the Court must apply an intended loss enhancement even if it "would have been impossible or unlikely" for Ding to achieve his intended result. *See* U.S.S.G. § 2B1.1(b)(1), notes to table (C)(ii).

Ding's revenue projections for the first three years of Zhisuan's operation are consistent across his Zhisuan marketing materials. Both Ding's Zhisuan investor pitch deck and his Shanghai Talent Plan application projected $3,525,000 in 2024, $7,050,000 in 2025, and $11,280,000 in 2026.[5] TX 1143 at

[5] Revenue figures are converted from Yuan to U.S. Dollars based on the currency conversion rate that existed in December 2023.

32; TX 1160 at 12. Additionally, an Apple Note recovered from the same folder as the trade secret documents in Ding's personal cloud storage account stated that Ding planned to "become a unicorn in about 5 years" with "annual revenue reaching US $100 million." TX 1149.[6] The Apple Note further indicates that "there is a clear, currently visible market path" to achieve these goals. *Id*.

Ding's revenue projections for years one through three and year five provide the Court with a sound basis to calculate Ding's anticipated five-year gross revenue for Zhisuan. Mark Lohmeyer's declaration calculates Zhisuan's expected revenue for the missing year (year four) by using the "growth" function in a spreadsheet to find the "exponential best fit curve." Lohmeyer Decl. at ¶¶ 7-8. This calculation determined that Ding's expected revenue for year four was $36,701,749, resulting in total expected revenue of $158,556,749 over Zhisuan's first five years of operation. *Id.* at ¶ 8. Based on the historical performance of similarly situated startup companies in the AI infrastructure and cloud computing industry, Ding's revenue projections are reasonable, particularly because Ding gave Zhisuan an unfair head start by stealing Google's AI infrastructure technology. *See id.* at ¶¶ 9-11.

To determine the financial loss that Ding intended to cause Google, the Court should follow the methodology detailed in the Lohmeyer Declaration to calculate the total lost profits that Google would have suffered had Ding accomplished the goals he articulated over Zhisuan's first five years of operation. *See id.* at ¶¶12-32. The government summarizes Mr. Lohmeyer's methodology below.

First, Google's market share in cloud computing and AI infrastructure services is a reliable indicator of what percentage of Zhisuan's expected revenue would have been diverted from Google. *Id.* at ¶ 13-15. This is true because Zhisuan would have competed not only against Google but also against Google's competitors. Google's market share in cloud computing, including but not limited to AI

[6] Ding gave this Apple Note the title "Qi," (TX 1149) a reference to Lu Qi, the founder of MircalePlus who signed Zhisuan's investment agreement on behalf of MircalePlus (*see* TX 1001 at 15). Ding created this Apple note on September 17, 2023, approximately two weeks after the conclusion of the MircalePlus Entrepreneurship Camp, held in Beijing on August 31st and September 1st. Tr. 689:20 – 690:5 (SA Valladao testimony about Camp dates); *see also* Tr. 1782:18-22 (confirming Ding's travel to China from August 27, 2023 until September 8, 2023). In context, therefore, Exhibit 1149 appears to be Ding's notes memorializing his business planning discussions with Lu Qi during the MiraclePlus Entrepreneurship Camp. The fact that Ding saved Exhibit 1149 in the "Comp" folder along with many of the trade secret documents links the business goals set forth in Exhibit 1149 to the stolen documents that Ding planned to use to achieve those goals.

infrastructure services, is 13%, and Google's estimated market share in AI infrastructure services is at least 20%. *Id*. at ¶ 14-15. Therefore, at the low end, Zhisuan would have diverted $20,612,377 (13% of Zhisuan's five-year revenue) in revenue from Google, and, at the high end, $31,711,350 (20% of Zhisuan's five-year revenue). *Id.* at ¶¶ 18-19.

Second, Google's profit margin for cloud services is a reliable indicator of Google's lost profits that would have resulted from Zhisuan's presence in the market. Google's profit margin for cloud services for Q4 of 2025 was 30.08%. *Id*. at ¶ 23.[7] Neither Google nor any of its competitors publish profit margin data for AI infrastructure services, the segment of the cloud computing market where Ding intended to compete with Google. *Id.* at ¶ 22. However, Google's profit margin in cloud services is a reasonable proxy for profit margin in AI infrastructure services because "AI infrastructure services are a significant component of Google Cloud's suite of products and an increasing portion of the computing infrastructure that public clouds . . . are deploying is for AI workloads." *Id*. at ¶¶ 14 and 22. This method of calculating Google's anticipated lost profits easily meets the "reasonable estimate" standard required for an intended loss analysis. *See United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007); U.S.S.G. § 2B1.1 cmt. n.3(B).

Finally, the Court should apply Google's 30.08% profit margin to the low- and high-end lost revenue estimates to determine Google's expected lost profits had Ding achieved his business and revenue goals for Zhisuan. Accordingly, at the low-end (13% market share), Zhisuan would have cost Google $6,200,203 in lost profits between 2024 and 2028. *Id*. at ¶ 24. At the high-end (20% market share), Zhisuan would have cost Google $9,538,744 in lost profits over the same period. *Id*. at ¶ 25.

**E. This is a Conservative Estimate**

The government recommends that the Court apply the low end of the government's intended loss calculation, $6,200,203, to increase Ding's offense level by 18 points. U.S.S.G. § 2B1.1(b)(1)(J). Aside from applying the low end of the range, this calculation of Ding's intended loss is conservative for three

[7] More recent results for Q2 2026 reported $24.768 billion in Google Cloud revenue and $8.814 billion in operating income, yielding an operating margin of approximately 35.6%. Alphabet Inc., *Alphabet Announces Second Quarter 2026 Results* (July 22, 2026), https://www.sec.gov/Archives/edgar/data/1652044/000165204426000066/googexhibit991q22026.htm.

additional reasons. First, the government's proposed intended loss calculation applies a 30.08% profit margin, which is lower than Google's more recently reported profit margin based on second quarter 2026 data. *Supra*, note 6. Second, the government's calculation considers only the first five years of Zhisuan's business operations, but there is no evidence indicating that Ding intended to shut down his business after year five. It is likely, therefore, that Zhisuan would have continued diverting revenue and profits from Google after that period and that Ding's theft could have impacted Google in other ways. *See* Lohmeyer Decl. at ¶ 29. For instance, had Ding been able to hire employees with the necessary technical expertise to use the stolen trade secrets in Categories One through Three to replicate a TPU-like accelerator chip, the damage to Google could have been incalculable. Third, the government's intended loss calculation does not account for the similarities between Google's products and Ding's. *Id*. at ¶ 31. As Mr. Lohmeyer points out:

> If Zhisuan built products similar to Google's, which would likely have occurred given Ding's theft of Google trade secrets and his stated goal to "replicate and upgrade" Google's technology, those products would likely be better substitutes for Google's products than for Google's competitors' products, leading to more revenue diversion from Google. *Id*.

Based on the foregoing, the government respectfully submits that the offense level calculation should include an 18-level intended-loss enhancement under U.S.S.G. § 2B1.1(b)(1)(J), reflecting an intended loss of more than $3.5 million but not more than $9.5 million. The base offense level is 6 and a 4-level enhancement applies because Ding intended to benefit a foreign government. PSR ¶¶ 61-62; U.S.S.G. §§ 2B1.1(a)(2) and 2B1.1(b)(14)(B). Therefore, the adjusted offense level is 28. A 2-level reduction applies because Ding is a zero-point offender. PSR ¶ 67; U.S.S.G. § 4C1.1. The total offense level is 26, resulting in an applicable Guidelines range of 63 to 78 months.

### F. The Court's Judgment of Acquittal Does Not Alter this Calculation

The Court's judgment of acquittal on the economic espionage counts does not preclude application of the four-level enhancement under U.S.S.G. § 2B1.1(b)(14)(B). The enhancement is applicable whenever a trade secret offense was committed with the knowledge or intent that the conduct would benefit a foreign government or foreign instrumentality; it does not require a conviction under 18 U.S.C. § 1831. In other words, the Court's Rule 29 ruling does not prevent the Court from finding the

facts supporting the enhancement by a preponderance of the evidence. *See United States v. Lucas*, 101 F.4th 1158, 1161–62 (9th Cir. 2024) (en banc).

Nor would application of the enhancement violate the prohibition against using acquitted conduct as relevant conduct. Section 1B1.3(c), added by Amendment 826 on November 1, 2024, excludes acquitted conduct "unless such conduct also establishes, in whole or in part, the instant offense of conviction." U.S.S.G. § 1B1.3(c). That exception applies here. The economic espionage and trade secret theft count rested on Ding's theft of the same Google trade secrets. Moreover, the evidence of Ding's intent to benefit PRC-controlled entities also helped establish an element of the surviving § 1832 convictions: that Ding intended to convert Google's trade secrets to the economic benefit of someone other than Google. Ding's plans for Zhisuan's economic success included partnerships with PRC government instrumentalities, which would also economically benefit from their respective partnerships with Zhisuan. Because that evidence established, at least in part, the offenses of conviction, § 1B1.3(c) expressly permits the Court to consider it when calculating the Guidelines range.

*Shan Shi* provides a close analogy. There, the jury acquitted the defendant of conspiracy to commit economic espionage but convicted him of conspiracy to steal trade secrets. *Shan Shi*, No. 17-cr-110-CRC, Dkt. 260, *Verdict Form*. The sentencing court nevertheless found that the defendant knew or intended that the offense would benefit the PRC and applied the four-level foreign-benefit enhancement. *Id.* at Dkt. 338, Sent'g Hr'g Tr. 33:19-25. (Feb. 10, 2020). Although *Shi* predates Amendment 826, it illustrates that § 2B1.1(b)(14)(B) is not conditioned on a § 1831 conviction.

Alternatively, if the Court declines to apply the four-level enhancement, it should apply the two-level enhancement under § 2B1.1(b)(14)(A). That provision applies if Ding knew or intended that the stolen trade secrets "would be transported or transmitted out of the United States." The trial evidence established that Ding founded Zhisuan in the PRC, planned to use Google's technology as the foundation for Zhisuan's product, told PRC-based investors that Zhisuan could "replicate and upgrade" Google's AI computing platform, and planned to operate the company in China and abroad. He also stockpiled the stolen documents in his personal cloud account and later downloaded them to his personal computer. Together, those facts establish that Ding intended to take or transmit Google's trade secrets outside the United States for use in his PRC-based business.

## SENTENCING RECOMMENDATION

The Court must impose a sentence "sufficient, but not greater than necessary" after considering the factors listed in § 3553(a). Those factors support a 70-month sentence for Ding, near the middle of the correctly calculated 63- to 78-month range. That sentence accounts for Ding's prolonged and sophisticated theft of foundational AI technology, his intent to benefit foreign government instrumentalities, his sustained deception, and the substantial need to deter an offense that offers potentially enormous rewards and is difficult to detect, while acknowledging his lack of criminal history. If the Court declines to apply an intended loss enhancement, the same factors independently warrant a 70-month sentence as an upward variance.

### I. The Nature and Circumstances of Ding's Crimes, 18 U.S.C. § 3553(a)(1)

This was not a momentary lapse in judgment or the retention of a few documents by a meticulous note-taker. As detailed above, Ding carried out a deliberate exfiltration process over more than a year and targeted foundational AI infrastructure technology developed through hundreds of millions of dollars in investment and years of work by thousands of Google engineers. He took the fruits of that investment so that Zhisuan could avoid the cost, risk, and time required to develop comparable technology independently.

Ding's plans to use the stolen technology for the benefit of PRC government instrumentalities make the offense especially serious. His partnerships with the Mingyue Lake Industrial Innovation Park and the Sichuan Tianfu Research Institute show that he planned to turn technology developed by an American company into a commercial and strategic advantage for those instrumentalities. *See* TX 1034 at 34 (Mingyue Lake PowerPoint presentation noting Zhisuan's ability to "customize the research and development of underlying chips and network structures"); Tr. 748:7-22 (Valladao); TX 1002 at 3-4 (Tianfu Partnership Agreement touting cooperation "in AI large model training and inference . . . [and] chips and compute scheduling"). The offense therefore implicated not only Google's proprietary interests but also the national interest in protecting American AI innovation from foreign governments competing with the United States for technological and strategic advantage.

The fact that law enforcement disrupted the scheme before Zhisuan brought a product to market does not reduce Ding's culpability. By then, Ding had stolen and preserved a substantial cache of trade

secret information, secured a $700,000 investment (TX 1001), and marketed Zhisuan based on his asserted ability to replicate Google's technology. He continued stockpiling confidential information until Google terminated his network access. The Court therefore should reject Ding's characterization of Zhisuan as a hobby that "existed mostly on paper." Tr. 76:2-5 (Defense Opening Statement). Zhisuan's unfinished state shows that Ding's scheme was disrupted, not that it was imaginary or unserious.

Ding's repeated deception further aggravates the offense. As detailed above, he lied to Google, investors, and colleagues to obtain financing, preserve his access, and conceal his theft. His lies ranged from fabricating a product demonstration (TX 1175S; Tr. 1714-21 (Kavuri)) and impersonating a Google executive (TX 869; Tr. 1690-91 (Mahmood)) to inducing Yuqing Ren to help conceal his trip to China—ultimately costing her job (Tr. 881-84 (Ren)). When Google confronted him, he signed a false Self-Deletion Affidavit before downloading the trade secret documents onto his personal computer. *See* Tr. 509:13-511:5 (Fuller); TX 280; Tr. 451:5-452:5 (Crain). These were not incidental lies; they enabled Ding to advance, conceal, and prolong the scheme. Taken together, the theft's scope, Ding's objectives, and his sustained concealment place this offense well beyond the baseline of insider theft of trade secret cases.

**II. The History and Characteristics of Ding, 18 U.S.C. § 3553(a)(1)**

Ding's lack of criminal history merits consideration and is reflected in Ding's criminal history category. His background, however, provides little basis for a downward variance. Ding did not experience the childhood hardships or lack of educational opportunity that may mitigate culpability in some cases**.** PSR ¶¶ 79–85. He earned a master's degree in electrical engineering from the University of Southern California and worked at several prominent Silicon Valley companies before joining Google, where he earned approximately $360,197 in 2023. PSR ¶ 90; Tr. 2025:15-16. He also enjoyed stable family support and financial security. These circumstances show that Ding had legitimate alternatives and nevertheless chose to steal and deceive in pursuit of greater wealth and status. His background therefore does not justify a substantial variance below the Guidelines range.

**III. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense, 18 U.S.C. § 3553(a)(2)(A)**

The Court's sentence should make clear that intellectual property theft, like other white-collar

crime, is serious and warrants significant punishment. A 70-month sentence is substantial but measured. A materially lower sentence would undervalue the years of work, specialized knowledge, and hundreds of millions of dollars in investment embodied in the stolen information. *See e.g.*, Tr. 1562:8-17, 1578:1-4, 1617:1-10, 1620:6-1621:10, 1624:5-17 (Chandra discussing time, engineers, and investment required to develop the stolen technology). Such a sentence also promotes respect for obligations indispensable to technology companies, many of which are in this District. Those companies must entrust employees with sensitive information to enable research and innovation. That model depends on employees honoring access restrictions even when information can be copied with a few keystrokes. The Court's sentence should reinforce that trade secret laws impose serious obligations and carry serious consequences when violated.

**IV. The Need to Afford Adequate Deterrence to Criminal Conduct, 18 U.S.C. § 3553(a)(2)(B)**

The need for general deterrence carries unusual weight here. The Ninth Circuit recently emphasized that calculated computer and fraud offenses are particularly amenable to deterrence because potential offenders can weigh the expected reward against the likely punishment. *United States v. Thompson*, 130 F.4th 1158, 1171–73 (9th Cir. 2025). The court identified the scale and potential monetary return of such offenses as significant deterrence considerations, particularly when technically skilled offenders can operate remotely and without detection. *Id.* at 1172–73. *See also United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (affirming a sentence based in part on the need to alter the calculus of offenders who might view white collar crime as "a game worth playing"); *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (citation and internal quotation omitted).

The same reasoning applies to insider theft of trade secret cases. Employees with legitimate access can secretly exfiltrate immense amounts of information, and detection may be difficult, particularly when, as here, the employee disguises the exfiltration. The potential rewards include investment capital, company ownership, and substantial personal wealth. A meaningful prison term is necessary to alter the calculus of others tempted to turn trusted access into a commercial shortcut. A 70-month sentence would communicate that stealing technology from an employer is not an acceptable

startup strategy. A substantially lower sentence would risk conveying that an extensive, concealed theft carries modest consequences if detected before the successful launch of a competing product.

### V. The Need to Protect the Public from Future Crimes by Ding, 18 U.S.C. § 3553(a)(2)(C)

The need to protect the public from future crimes by Ding also supports the requested sentence. Ding's conduct was neither impulsive nor voluntarily abandoned. It continued for more than a year and persisted after Google confronted him. A 70-month sentence, followed by supervised release and appropriate conditions, is warranted to reduce the risk that Ding will again misuse specialized knowledge or trusted access.

### VI. The Same Sentence Is Warranted If the Court Rejects the Intended Loss Enhancement

If the Court declines to apply any intended loss enhancement, the resulting Guidelines range would substantially understate the seriousness of Ding's conduct. It would assign no incremental weight to the volume or strategic significance of the stolen technology, the investment it embodied, Ding's plan to commercialize it, or the financial harm his interrupted scheme threatened. Even absent proof of a particular intended loss amount, those facts remain relevant to the nature of the offense, just punishment, respect for the law, deterrence, and protection of the public. They provide a compelling, case-specific justification for an upward variance to 70 months based on the full seriousness of Ding's conduct.

## RESTITUTION AND FINE

The Mandatory Victims Restitution Act ("MVRA") requires that Ding "make restitution to the victim of the offense" because he was convicted of an offense against property "committed by fraud or deceit." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii); 18 U.S.C. §§ 1834 and 2322 (c) (trade secret theft convictions shall be subject to MVRA as "offense against property"). Specifically, and as applicable here, the law requires that Ding must "in any case, reimburse the victim for lost income [], transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4).

The parties agree that if the Court orders restitution in this case, the total amount of restitution owed is $189,098.01, which represents the losses Google incurred for participation and assistance with

the government's case.[8] *Id.* Here, the government provided Ding's counsel with information that supported this figure, including the approximate hours spent by Google employees assisting the government (totaling over 1350 hours), multiplied by the hourly salary compensation for each employee (based on average median base salary tied to seniority and location), excluding benefits and equity. In other words, the $189,098.01 figure is an agreed-upon conservative estimate of the costs that Google incurred to participate in the government's investigation and prosecution. 18 U.S.C. § 3663A(b)(4).

However, the parties disagree on whether the Court should impose restitution. Based on a narrow interpretation of the MVRA, Ding has reserved his right to argue that the Court should not award any restitution because he contends there was no pecuniary loss to Google in this case. *See* 18 U.S.C. § 3663A(c)(1) (MVRA "shall apply in all sentencing[s]" for offense against property convictions "in which an identifiable victim has suffered a [] pecuniary loss."). Only one unpublished out-of-circuit opinion from the Eastern District of Pennsylvania supports Ding's contention. *See United States v. Yu Xue*, No. CR 16-22, 2021 WL 2433857, at *3 (E.D. Pa. June 15, 2021) ("*Yu Xue*"), *aff'd on other grounds*, *Xue*, 42 F.4th 355 (3d Cir. 2022). In *Yu Xue,* the district court declined to award restitution comprised of attorneys' fees because GSK suffered no pecuniary loss, which it held was "a loss that is a prerequisite for ordering restitution under 18 U.S.C. § 3663A." *See id.* at *1 n. 3, *3. As explained above, the intended loss analysis in the 3rd Circuit opinion for *Xue* is inapposite. *See supra* at 10-12. In *Xue*, the defendant stole trade secrets but developed products that would not compete with the victim company, and thus the court concluded there was no loss or intended loss for the victim. *See id.* Here, unlike *Xue*, Ding founded a startup company intended to directly compete with Google using the stolen trade secrets. *See id.*

At least two other courts, including the Second Circuit, have declined to adopt *Yu Xue*'s interpretation of the MVRA. For example, in *United States v. Avenatti*, 81 F.4th 171, 209-10 (2d Cir. 2023), the Second Circuit rejected *Yu Xue*'s reasoning and upheld the district court's restitution award.[9]

---

[8] Without waiving any arguments and to avoid further litigation, the government is not currently seeking restitution for: (i) costs incurred by Google prior to referral of this case to the government; or (ii) outside counsel attorneys' fees that Google paid to support the government's investigation.

[9] The Second Circuit also cited *United States v. Kuruzovich*, No. 09-cr-824, 2012 WL 1319805 (S.D.N.Y. Apr. 13, 2012) *abated*, 541 F. App'x 124 (2d Cir. 2013) (abating restitution order in light of defendant's death and insolvency of estate). There, Second Circuit Judge Denny Chin, sitting by

The court specifically noted that *Yu Xue* misread the Supreme Court's guidance in *Lagos v. United States,* 584 U.S. 577 (2018), which narrowly focused on interpreting a specific phrase of 18 U.S.C. § 3663A(b)(4)—not the definition of "pecuniary loss" under 18 U.S.C. § 3663A(c)(1). The Second Circuit also noted that unlike *Yu Xue*, the victim company in *Avenatti* suffered pecuniary losses in attorneys' fees prior to any government involvement. *Id.* at 210. Likewise, in *United States v. Babichenko*, the court rejected *Yu Xue*'s reasoning and defendant's proposed narrow interpretation of "pecuniary loss" under 18 U.S.C. § 3663A(c)(1), in part because the defendants' criminal conduct caused the victim companies to "expend large sums of money participating in" the government's case. No. 1:18-cr-00258-BLW, 2024 WL3088912, at *3 (D. Idaho June 21, 2024). This Court should likewise reject Ding's argument, relying on *Yu Xue*, that there must be a "pecuniary loss" to Google before it can impose restitution. It is not consistent with the plain language and intent of the MVRA, nor with precedent on this issue. Moreover, Ding's argument is wrong as a factual matter. As the Court heard at trial, Google expended significant resources to investigate and remediate Ding's trade secret theft before Google referred the case to the government for further investigation. Tr. 292:1-294:18. That alone is sufficient to qualify as a pecuniary loss under the MVRA. 18 U.S.C. § 3663A(c)(1)(B); *see Avenatti*, 81 F.4th at 210-11. Accordingly, the Court should impose restitution for $189,098.01, *i.e.*, the agreed-upon amount between the parties to make Google whole for the losses it suffered.

Finally, "[a]s the defendant declined to provide" Probation "with any financial information, he has not established that he is unable to pay a fine. Therefore, it is presumed that he can pay a fine." PSR ¶ 97. The maximum fine per count is $250,000. 18 U.S.C. § 3571(b). The law also requires a special assessment of $100 per count. 18 U.S.C. § 3013. The fine range for this offense is from $5,500 to $55,000. U.S.S.G. § 5E1.2(c)(3). Accordingly, the government requests that the Court impose a statutory fine within the Guidelines range and the mandatory special assessment of $700.

## CONCLUSION

For the foregoing reasons, the government respectfully requests a sentence of 70 months' imprisonment, to be followed by three years of supervised release.

---

designation, ordered restitution despite defendant's argument that the victim company "sustained no injury as a result of his conduct." *Id.* at *4-5.

DATED: August 25, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Casey Boome*
CASEY BOOME
MOLLY K. PRIEDEMAN
ROLAND CHANG
Assistant United States Attorneys