GRANT P. FONDO (SBN 181530)
*GFondo@goodwinlaw.com*
FARZAD FEYZI (SBN 343538)
*FFeyzi@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 Marshall Street
Redwood City, CA 94063
Tel: +1 650 752 3100
Fax: +1 650 853 1038

DARRYL M. WOO (SBN 100513)
*DWoo@goodwinlaw.com*
RACHEL M. WALSH (SBN 250568)
*RWalsh@goodwinlaw.com*
JESSICA FUZELLIER HUANG (SBN 315208)
*JHFuzellier@goodwinlaw.com*
COLETTE A. LOWRY (SBN 359889)
*CLowry@goodwinlaw.com*
**GOODWIN PROCTER LLP**
525 Market Street, Floor 32
San Francisco, CA 94105
Tel.: +1 415 733 6000
Fax: +1 415 677 9041

Attorneys for Defendant:
LINWEI DING

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LINWEI DING,<br><br>Defendant. | Case No. 3:24-CR-00141-VC<br><br>**DEFENDANT LINWEI DING'S SENTENCING MEMORANDUM AND CONDITIONAL MOTION TO STAY SENTENCE PENDING APPEAL**<br><br>Date: September 1, 2026<br>Time: 2:00 pm<br>Courtroom: 4 (17th Floor)<br>Judge: Hon. Vince Chhabria |

**TABLE OF CONTENTS**


I. Introduction ........ 1

II. Probation Report And Mr. Ding's Objections ........ 3

III. Partial Stipulation As To Restitution ........ 4

IV. Background ........ 4

A. Mr. Ding's Life Before Google ........ 4

B. Professional Life ........ 5

C. The Offense ........ 6

D. Mr. Ding Since His Arrest ........ 6

V. The Final Offense Level Is 6 And The Advisory Range Is 0 To 6 Months Because Neither The Intended-Loss Nor The Economic-Espionage Enhancement Applies. ........ 8

A. No Loss Enhancement Applies Under § 2B1.1(b)(1). ........ 8

1. Intended Loss Requires Proof Of Purpose, Not Knowledge. ........ 9

2. The Record Contains No Evidence That Mr. Ding Intended To Harm Google. ........ 10

3. Courts Find Zero Intended Loss Where The Evidence Shows Only An Intent To Gain. ........ 13

a. *Xue* and *Pu* hold that evidence of intended gain does not prove intended loss. ........ 13

b. The government's own cases each involved proof of victim-directed intent that is missing here. ........ 15

4. Even On Its Own Terms, The Government's Calculation Fails. ........ 17

a. The Lohmeyer model is unreliable five times over. ........ 18

b. Any corrected loss calculation yields, at most, hundreds of thousands of dollars. ........ 21

B. No Economic-Espionage Enhancement Applies Under § 2B1.1(b)(14)(B) ........ 22

C. Mr. Ding Does Not Contest The Two-Level Enhancement Under § 2B1.1(b)(14)(A). ........ 24

D. Mr. Ding Is Entitled To A Two-Level Reduction As A Zero-Point Offender. ........ 24

VI. The Sentencing Criteria Of 18 U.S.C. § 3553(a) Also Demonstrates No Incarceration Is Appropriate. ........ 25

A. Section 3553(a)(1): Mr. Ding's History And Characteristics ........ 26

1. Mr. Ding Has No Criminal History. ........ 26

2. Mr. Ding Has Complied Fully With Pretrial Supervision. ........ 26

3. Mr. Ding Has Suffered Severe Collateral Consequences. ........ 27

B. Section 3553(a)(1): Nature And Circumstances Of Offense ........ 27

C. Section 3553(a)(3): Kinds Of Sentences Available .......... 27

D. Section 3553(a)(6): Avoiding Sentencing Disparities .......... 28

VII. No Restitution Should Be Ordered Because Google Suffered No Pecuniary Harm.......... 31

VIII. Conditional Motion To Stay Sentence Pending Appeal .......... 31

IX. Conclusion .......... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*McClinton v. United States*,
143 S. Ct. 2400 (2023) .......... 22, 23, 24

*United States v. Autery*,
555 F.3d 864 (9th Cir. 2009) .......... 8

*United States v. Avenatti*,
81 F.4th 171 (2d Cir. 2023) .......... 31

*United States v. Carty*,
520 F.3d 984 (9th Cir. 2008) .......... 25

*United States v. Emmenegger*,
329 F. Supp. 2d 416 (S.D.N.Y. 2004) .......... 25, 26

*United States v. Gamma Tech Indus., Inc.*,
265 F.3d 917 (9th Cir. 2001) .......... 31

*United States v. Manatau*,
647 F.3d 1048 (10th Cir. 2011) .......... 2, 9, 10

*United States v. Pham*,
545 F.3d 712 (9th Cir. 2008) .......... 9, 10

*United States v. Pu*,
814 F.3d 818 (7th Cir. 2016) .......... 10, 13, 14

*United States v. Shan Shi*,
No. 17-CR-110 (CRC), 2019 WL 6879409, at *2–3 (D.D.C. Dec. 17, 2019) .......... 13, 16, 17

*United States v. Showalter*,
569 F.3d 1150 (9th Cir. 2009) .......... 9

*United States v. Watts*,
519 U.S. 148 (1997) .......... 24

*United States v. Xue*,
No. 16-22, 2020 WL 5645765, at *19 (E.D. Pa. Sept. 22, 2020) .......... 13, 14,

*United States v. Xue*,
No. 16-22, 2021 WL 2433857, at *4–7 (E.D. Pa. June 15, 2021), *aff'd*, 42 F.4th 355 (3d Cir. 2022) .......... 31, 32

*United States v. You*,
No. 2:19-CR-00014-1-JRG-CRW, 2024 WL 4158884 (E.D. Tenn. Sept. 11, 2024) .......... 13, 15, 16

*United States v. Zheng*,
13 F.4th 280, 283 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1899 (2025) .......... 16, 17

**Statutes**

18 U.S.C. § 1831 .......... 2, 6

18 U.S.C. § 1832 .......... *passim*

18 U.S.C. § 1839(3) .......... 32

18 U.S.C. § 3142(b) .......... 32

18 U.S.C. § 3143(b) .......... 31

18 U.S.C. § 3553(a) .......... *passim*

18 U.S.C. § 3663A(a)(2) .......... 30

U.S.S.G. § 1B1.3 .......... 3, 8, 22, 24

U.S.S.G. § 2B1.1(b)(1) .......... *passim*

U.S.S.G. § 2B1.1(b)(14)(A) .......... 3, 8, 24

U.S.S.G. § 4C1.1 .......... 24

U.S.S.G. § 5B1.1(a)(1) .......... 3

U.S.S.G. § 5C1.1(c)(3), (d)(2) .......... 27

U.S.S.G. § 6A1.3(a) .......... 18

## I. Introduction

Since his highly public March 2024 arrest, Linwei Ding has lost his career, his marriage, and his mental health. He further faces likely removal from the United States, where he has lived for sixteen years, even though his eight-year-old son, whom he cares for daily, is a U.S. citizen. Mr. Ding has also fully complied with the conditions of his supervised release, including regularly attending mental health counseling, and Mr. Ding is not a further threat to the community. Mr. Ding does not offer these circumstances to minimize his actions or the jury's verdict.[1] Rather, they speak to the question 18 U.S.C. § 3553(a) asks: what punishment is necessary to "impose a sentence sufficient, but not greater than necessary" to serve the purposes of sentencing.

Much of the U.S. Sentencing Commission Guidelines ("U.S.S.G.") calculation turns on the parties' dispute as to intended loss. All agree that Google suffered no actual loss as defined under the Guidelines. Thus the issue is whether the government has proven that Mr. Ding intended loss as to Google and, if so, how much. After reviewing the trial record and the government's submissions, the Probation Office properly concluded that the government failed to prove that Mr. Ding "purposely sought to inflict" pecuniary harm on Google, as an intended-loss enhancement under U.S.S.G. § 2B1.1(b)(1) requires. Presentencing Report, dated July 21, 2026 ("PSR") ¶¶ 54–55. The government, the defense anticipates, will ask this Court to reject Probation's conclusion and instead add 18 offense levels for intended loss. The Court should reject this effort.

The government will likely rely on the same three documents it submitted to Probation, none of which show that Mr. Ding purposely sought to inflict a loss on Google. Two of the documents are slides from investor pitch decks for Zhisuan. Trial Exhs. 1143, 1160. These were attempts to raise investor funds for Zhisuan, not evidence of any intent to steal market share from Google. Indeed, the decks demonstrate that Zhisuan was targeting China, a market in which Google does not participate. The third document is a cryptic note on Mr. Ding's computer that appears to

[1] Mr. Ding recognizes actions and choices have consequences, and the impact they can have on others, and he apologizes for his actions. He accepts and respects the jury verdict for purposes of this sentencing. Mr. Ding intends to appeal his conviction, however, and nothing we say here is intended either to minimize the events that led to his conviction or to waive any of his appellate rights or arguments, or act as an admission of facts should there be a retrial.

be dated September 17, 2023, at a time shortly after Zhisuan joined an incubator and had no employees, and states that Mr. Ding hopes his company will generate $100 million in revenue. Trial Exh. 1149. All are speculative and none suggest, let alone establish, that Mr. Ding intended to harm Google.

Indeed, the Court's assessment of the trial record underscores the weakness of the government's intended-loss theory. The Court found that Mr. Ding never actually used Google's trade-secret documents to build AI supercomputing technology and "did [not] seem to know how to." Dkt. 447 ("Acquittal Order") at 3 . The evidence cast "serious doubt on whether he could get any sort of technology company off the ground at all, with or without the trade secret documents." *Id.* at 5. His efforts were "ad hoc, disorganized, and feeble"; he appeared to be "making things up as he went along"; and ultimately, "Ding had no product; he was just pretending he had one." *Id.* at 9. Those findings cannot be reconciled with the government's sentencing theory that Mr. Ding's venture, focused on the China market, would have inflicted millions of dollars in lost profits on one of the world's largest technology companies that was not even in that market.

Hoping Zhisuan would succeed is not sufficient. "Intended loss" means pecuniary harm the defendant "purposely sought to inflict." U.S.S.G. § 2B1.1(b)(1)(C)(ii); *United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011) (Gorsuch, J.). Under *Manatau*, intended loss is not a loss the defendant "merely knew would result from his scheme or a loss he might have *possibly and potentially* contemplated"; rather, loss is "intended if it is done on purpose—not merely known, foreseen, or just possible or potentially contemplated." *Id.* at 1050 (emphasis in original) (citing The Oxford English Dictionary 1074 (J.A. Simpson & E.S.C. Weiner eds., 2d ed. 1989)). In other words, loss to Google "must have been an object of the defendant's purpose," which the evidence does not support.

The remaining enhancement dispute, under § 2B1.1(b)(14), is resolved by the Court's Acquittal Order. Mr. Ding concedes the two-level enhancement under subparagraph (A), but the four-level enhancement under subparagraph (B) cannot apply because it rests entirely on conduct of which Mr. Ding has been acquitted. Subparagraph (B) turns on the foreign-benefit element that distinguishes economic espionage under 18 U.S.C. § 1831 from the offenses of conviction under

§ 1832—the element the Court held unproven in granting the judgment of acquittal as to every espionage count. U.S.S.G. § 1B1.3(c) categorically excludes acquitted conduct from the Guidelines calculation.

The Court should reject the government's requested enhancements under U.S.S.G. § 2B1.1(b)(1) (18 levels) and § 2B1.1(b)(14)(B) (4 levels), and apply only the two-level enhancement under § 2B1.1(b)(14)(A). For the § 1832 convictions that remain, the correct Guidelines calculation yields a total offense level of 6 and advisory range of 0 to 6 months. That range falls within Zone A, where the Guidelines authorize a sentence of probation. U.S.S.G. § 5B1.1(a)(1). Mr. Ding respectfully requests a within-Guidelines disposition of three months' home confinement. That sentence accords with how courts nationwide have sentenced defendants that the Guidelines treat as similarly situated: of the 674 defendants sentenced under § 2B1.1 with a final offense level of 6 and a Criminal History Category of I in the last five years, 77 percent received no sentence of imprisonment, and among those who did, the median term was two months.[2] Mr. Ding's requested sentence is sufficient, but not greater than necessary, to serve every purpose of sentencing under 18 U.S.C. § 3553(a).

## II. Probation Report And Mr. Ding's Objections

Probation filed the PSR on July 21, 2026 (Dkt. 445), prior to the Court's August 20, 2026, Acquittal Order acquitting Mr. Ding of counts 8–14 (economic espionage) (Dkt. 447). Probation calculated a total offense level of 12 and an advisory range of 10 to 16 months. PSR ¶ 100. It also applied the § 2B1.1(b)(14) enhancement based on the convictions the Court has since vacated by judgment of acquittal. As a result of the Acquittal Order, Mr. Ding objects to the PSR's Guideline calculations; the § 2B1.1(b)(14) enhancement does not apply, and the total offense level is 6, with an advisory range of 0 to 6 months. To the extent Probation does not revise the PSR prior to sentencing as noted, the defense respectfully requests that the Court sustain its objections.

Mr. Ding further objects to the PSR's recommended upward variance (again, pre-Acquittal

---

[2] The defense obtained JSIN information from *Judiciary Sentencing Information*, U.S. Sent'g Comm'n, https://www.ussc.gov/guidelines/judiciary-sentencing-information (last visited Aug. 24, 2026). Because the JSIN data that Probation provided predated the Acquittal Order, it no longer applies.

Order), and asserts there is no proper basis for such a recommendation. *See* PSR, Sentencing Recommendation at 2. Mr. Ding also objects to the proposed fine of $5,500 (*id.* at 5), but only to the extent the Court finds restitution is required, on the grounds he has insufficient funds to pay for either, but certainly not both.

**III. Partial Stipulation As To Restitution**

Mr. Ding and the government met and conferred as to restitution, and have reached the following partial resolution:

1. Mr. Ding maintains that no restitution is permitted, the government disagrees, and the parties intend to litigate this issue;

2. If the Court agrees with the government that restitution is required, the parties stipulate that the proper amount is $189,098.01.

**IV. Background**

**A. Mr. Ding's Life Before Google**

Mr. Ding was born in 1986 in Dalian, China. His parents were factory workers who, after China's economic reforms, rented a stall in a shopping mall to sell clothing and eventually opened a garment factory. When Mr. Ding was eight, his parents divorced. His mother was primarily responsible for raising him, and she worked while caring for him. As she tells the Court, he was frightened she would leave him too: "Mom, now that you and Dad are divorced, can I stay with you? I promise I will behave." Declaration of Grant P. Fondo ("Fondo Decl.") Exh. A at 1.

His mother had little formal education and could not help him with school. Mr. Ding worked hard to advance his own education. When he transferred to a new middle school at thirteen and could not follow the lessons, he worked late every night until, within a few months, he ranked among the top students in his class. Fondo Decl. Exh. A at 1–2.

In 2003, when Mr. Ding was in middle school, the family's finances collapsed. A local court seized his father's factory. The family fell from comfort into hardship. Fondo Decl. Exh. B at 4. They lost their house, moved frequently, and cut expenses. *Id.* Exh. A at 2. A series of family crises forced Mr. Ding to drop out of high school after his second year. *Id.* Exh. B at 5. He watched his classmates take the national exam and go on to college without him. A year and a half later, with

six months to prepare, he resumed his studies, "studied constantly, without rest," and was admitted to Dalian University of Technology. He was nineteen. Fondo Decl. Exh. A at 2.

In 2010, after graduating from Dalian University, Mr. Ding came to the United States for a master's degree at the University of Southern California. Fondo Decl. Exh. C at 1. In December 2010, Mr. Ding married [redacted], his high-school classmate; she joined him in the United States six months later. As a graduate student, he got by living frugally. His mother taught him to cook simple soups by phone; he once joked to her that he had eaten oxtail soup for a week straight. *Id.* Exh. A at 2.

After graduate school, he remained in the United States and began working. With his earnings, Mr. Ding helped his mother purchase a small apartment in China. He also paid his father's social pension insurance and sent both parents health supplements and money for living expenses. Fondo Decl. Exh. A at 2; Exh. B at 5. Eventually, Mr. Ding bought a townhouse, in 2018. In that same year, Mr. Ding's son was born. In 2021, Mr. Ding became a lawful permanent resident of the United States.

By every account, Mr. Ding is a hands on, loving father. He read parenting books before the birth and lost ten pounds caring for the newborn in his first month. He has handled all of his son's daily routines—teeth, baths, bedtime stories—taught his son to ride a bicycle, swim, and play tennis, and attended every medical appointment in part because his ex-wife's English is limited. Fondo Decl. Exh. C at 3–4. The attachment runs in both directions: his son's mother and Mr. Ding's ex-wife describes a boy who loves his father and enjoys spending time with him. *Id.* at 3. Mr. Ding's mother writes that her grandson is now eight, the same age Mr. Ding was when his parents divorced, and that her son "has made up for everything he lacked, patiently guiding and caring for his child." *Id.* Exh. A at 3.

### B. Professional Life

After graduate school, Mr. Ding moved to Silicon Valley. In 2014, he started working on computer chips at Marvell Semiconductor in San Jose. He later worked at two other Silicon Valley companies. In 2019, Mr. Ding joined Google as a software engineer. He worked on a software platform for Google's supercomputing data centers—specifically, software that allowed GPUs to

run machine-learning workloads efficiently. PSR ¶ 21.

**C. The Offense**

On January 29, 2026, a jury returned guilty verdicts on seven counts of theft of trade secrets under 18 U.S.C. § 1832 and seven counts of economic espionage under 18 U.S.C. § 1831. On August 20, 2026, the Court granted Mr. Ding's motion for judgment of acquittal on all seven economic-espionage counts. Dkt. 447. Mr. Ding therefore comes before the Court for sentencing on the § 1832 trade secret theft convictions.

**D. Mr. Ding Since His Arrest**

FBI agents arrested Mr. Ding at his home in the early morning of March 6, 2024, and the Attorney General of the United States personally announced his arrest and indictment. Since that time, his conduct under supervision has been unblemished. Pretrial Services reports full compliance. PSR ¶ 5. He has complied with every condition of release, including obligations to report to Probation, location monitoring, travel restrictions, and mandatory participation in mental health treatment (which he appreciates and has been immensely helpful). *Id.*

He has done this while the rest of his life has unraveled. He lost his job at Google, and a subsequent job offer was rescinded after his arrest; he has not worked since. Fondo Decl. Exh. C at 2. His family's financial condition dramatically worsened since the arrest and this Court's appointment of the undersigned counsel, and he is getting by only through the support of his ex-wife. Under the strain of the indictment, his marriage ended, and he lost most of his assets. His ex-wife nonetheless continues to house and support him, "not out of obligation, but because we have shared over 20 years together." *Id.* at 3.

The case has broken something in Mr. Ding that the letters vividly describe. He has suffered through depression while taking ownership of his mental health issues, continuing to attend weekly therapy. His mother writes that her "once cheerful and upright child" has "lost his former brightness." Fondo Decl. Exh. A at 3. His childhood friend of thirty years, [redacted], describes watching "the brightest among us" lose his footing entirely. *Id.* Exh. D at 2. And his ex-wife, who sees him daily as they raise their son, reports that his mental and physical health have collapsed under the weight of prosecution:

> His physical and mental health also declined. He developed chronic tailbone pain and he is under tremendous pressure both mentally and physically. He used to rarely cry. I can only remember four times he cried in his sleep—twice about his late grandfather, and twice about the dog he grew up with. But since this case, he often loses control of his emotions even when awake and breaks down crying.

*Id.* Exh. C at 2. Mr. Ding attends weekly therapy to manage his depression.

What remains constant is his son. Mr. Ding spends his days caring for him, helping with his sports and homework assignments. He is his son's primary caretaker, and his ex-wife tells the Court, "I cannot imagine the emotional impact on our child if separated from him." Fondo Decl. Exh. C at 4.

There is no realistic prospect that Mr. Ding will reoffend, and the purposes of specific deterrence and protection of the public under 18 U.S.C. § 3553(a)(2)(B) and (C) are already fully served. Mr. Ding understands the severe cost imposed on everyone, including this Court, for his actions, he understands his actions led to these results, and he will never do anything to risk a repeat of the past 30 months. Separately, Mr. Ding will never again hold a position of trust at a technology company; his convictions and the publicity surrounding them have foreclosed the career he went to school for, enjoyed, and at which he thrived. Zhisuan is defunct, and Mr. Ding faces possible removal from the United States. General deterrence, too, requires no greater sentence. Any similarly situated engineer or employee contemplating the charged conduct now has Mr. Ding's example before him: prosecution with widespread press coverage, conviction, and professional, personal and financial ruin. Any rational observer looking at this outcome would conclude the price too great.

Nor is Mr. Ding's accountability abstract. Although he preserves a legal question the federal courts of appeals have answered differently—whether restitution is available where the victim suffered no pecuniary loss—he has stipulated to the amount that would be imposed if the Court orders restitution ($189,098.01), eliminating any dispute over the amount of restitution. Should the Court order restitution, that obligation will follow him for years, a continuing and tangible consequence that Mr. Ding will be ill-equipped to afford, given his truncated future prospects.

Most importantly, Mr. Ding recognizes the wrongness of his actions, and the impact they

have had on his family, himself, and others. The Court can be confident he will not risk harm to others, his family or his freedom, ever again.

## V. The Final Offense Level Is 6 And The Advisory Range Is 0 To 6 Months Because Neither The Intended-Loss Nor The Economic-Espionage Enhancement Applies.

The Guidelines, though advisory, are the starting point for the sentencing analysis. *See United States v. Autery*, 555 F.3d 864, 871–72 (9th Cir. 2009). The trade secret counts group together under § 2B1.1, the guideline for economic crimes, and the government and Probation agree that the base offense level is 6, and Mr. Ding has no criminal history. From that starting point, this Section addresses three issues.

*First, no loss enhancement applies under § 2B1.1(b)(1)*. Google incurred no actual loss, and the government cannot carry its burden of establishing intended loss. Probation correctly and appropriately so found, concluding that the government had not proven that Mr. Ding "purposely sought to inflict" pecuniary harm on Google. PSR ¶¶ 54–55. The defense understands the government disagrees and will contend that a 18-level intended-loss enhancement applies under § 2B1.1(b)(1).

*Second, no economic-espionage enhancement applies under § 2B1.1(b)(14)(B)*. Mr. Ding was acquitted on those counts, and the Guidelines provide no basis to increase his offense level for conduct of which he was acquitted. U.S.S.G. § 1B1.3. However, Mr. Ding does not dispute that the Court may apply a two-point enhancement under § 2B1.1(b)(14)(A) for knowing or intending to transmit the trade secrets outside the United States.

*Third, Mr. Ding is entitled to a 2-level reduction under § 4C1.1(a)* because he has no criminal history and satisfies each of the provision's remaining criteria. The government and Probation agree that the 2-level reduction applies.

Together, these yield a total adjusted offense level of 6.[3]

### A. No Loss Enhancement Applies Under § 2B1.1(b)(1).

No loss enhancement applies under § 2B1.1(b)(1). The parties and Probation agree Google

[3] This is calculated as a 6 point base level, plus 2 for § 2B1.1(b)(14)(A), and a reduction of 2 for zero-point offender, for an adjusted offense level of 6 points.

suffered no actual loss, so the analysis turns on intended loss—the pecuniary harm Mr. Ding "purposely sought to inflict." U.S.S.G. § 2B1.1(b)(1)(C)(ii). For four reasons, the government cannot carry its burden of proving by preponderance of evidence that Mr. Ding intended to cause a loss to Google. *See* U.S.S.G. § 2B1.1(b)(1); *United States v. Showalter*, 569 F.3d 1150, 1159 (9th Cir. 2009) (citing *United States v. Burnett*, 16 F.3d 358, 361 (9th Cir. 1994)). This is true for at least four reasons. First, the law requires proof of purpose, not knowledge: an intent to profit is not an intent to make the victim suffer a loss. Second, the record contains no evidence of purpose. Thousands of pages of Mr. Ding's communications say nothing about taking market share or revenue from Google. Third, the case law, including the government's own authorities, permits an intended-loss finding only where the defendant tied his gain to the victim's loss, and no such evidence exists here. Fourth, even on its own terms, the government's intended-loss calculation is inflated many times over; corrected, it yields at most a figure in the hundreds of thousands of dollars, not millions.

Probation correctly found the intended loss is zero, PSR ¶¶ 54–55, and the Court should adopt that finding.

**1. Intended Loss Requires Proof Of Purpose, Not Knowledge.**

Intended loss means "(I) the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." U.S.S.G. § 2B1.1(b)(1)(C)(ii). Pecuniary harm does not include "emotional distress, harm to reputation, or non-economic harm." *Id.* § 2B1.1(b)(1)(C)(iii); *see United States v. Pham*, 545 F.3d 712, 722–23 (9th Cir. 2008) ( "actual loss in the form of pecuniary harm" counts for loss purposes).[4]

*United States v. Manatau* is the seminal case on intended loss, and it squarely distinguishes intent from knowledge. 647 F.3d at 1050–53. Intended loss does not extend to losses that were

[4] Nor does it include costs incurred by "victims primarily to aid the government in the prosecution and criminal investigation of an offense," which are compensable as restitution. U.S.S.G. § 2B1.1, Comment (3)(C)(ii).

merely known to the defendant or even losses that were virtually certain to occur as a byproduct of his conduct; the defendant must have intended harm to the victim. *See id. Manatau* grounded this holding in the ordinary meaning of "intent," which requires a conscious object or purpose, and it rejected the government's invitation to water intent down to knowledge: a defendant may know a consequence is practically certain to follow from his acts, yet not intend—that is, not aim at or desire—that consequence. *Id.* The Guidelines have codified *Manatau*'s rule. *See* U.S.S.G. § 2B1.1(b)(1)(C)(ii); *see also* U.S. Sent'g Comm'n, Amend. 792 (Reason for Amendment) (eff. Nov. 1, 2015) (adopting the approach taken by the Tenth Circuit by revising the commentary in Application Note 3(A)(ii)).

The jury's verdict supplies no shortcut around this standard. The jury found that Mr. Ding "intended ***or*** knew that [his] offense would injure Google." Dkt. 362 (Jury Instruction No. 15) (emphasis added). That finding cannot support the enhancement, for two reasons. Knowledge of a potential injury falls short of the purposeful *mens rea* that § 2B1.1(b)(1) requires. *See Manatau*, 647 F.3d at 1050–51. And the jury made no finding as to what type of injury Mr. Ding's offense could have caused—financial or otherwise—and, under the Guideline, only a pecuniary injury counts. *See Pham*, 545 F.3d at 722–23. Guilt of trade-secret theft and proof of intended loss are separate questions, because intent to inflict pecuniary harm to the victim is not an element of the offense; the government must prove intended loss independently. *United States v. Pu*, 814 F.3d 818, 828–29 (7th Cir. 2016) (holding that no finding of pecuniary loss is required under § 1832).

**2. The Record Contains No Evidence That Mr. Ding Intended To Harm Google.**

The government obtained an extensive record of Mr. Ding's private communications and personal notes, including thousands of pages of WeChat messages. The government has failed to identify any document where Mr. Ding asserts that he wants to take Google's customers, capture Google's market share, harm Google's business, or otherwise cause Google any harm, economic or otherwise, nor is the defense aware of any such documents. At most he wanted to replicate Google's success, not put it out of business or take share out of a geographic market in which Google does not participate. There is no discussion of any plan to make Google lose money, nor

does the evidence otherwise demonstrate any such plan, and certainly not a sophisticated plan that would compete with and take Google customers, in or outside of China. If causing Google financial harm were actually one of Mr. Ding's purposes, one would expect the government to have identified to Probation such discussions within the thousands of pages of his notes and messages. It failed to so.

What the record shows instead is that Mr. Ding tried to raise funds to start a company. Mr. Ding expects the government to rely on two investor pitch decks describing how much Mr. Ding hoped to raise from investors, and note that the government asserts shows Mr. Ding's wishful thinking that he hoped his company would "become a unicorn," with "annual revenue reaching $100 million." Trial Exhs. 1143, 1149, 1160; *see also* Fondo Decl. Exh. G (Boome Ltr. to Probation); *id.* Exh. H ("Lohmeyer Decl.") ¶ 5.[5] The pitch decks at best describe what Mr. Ding hoped to gain—investment, growth, a successful company—and the investment funds he was seeking (funds he never raised). His slide decks and his note say nothing about what Mr. Ding wanted Google to lose. And, importantly, the contemplated market for his venture was one Google AI does not serve: China.[6]

Nor were the revenue projections in the investor pitch decks reliable measures of what Mr. Ding actually expected Zhisuan to earn. A revenue projection made in a pitch deck to solicit funds while a company seeks its first round of investment and has no product is not a realistic forecast of future earnings, much less evidence of intent to harm Google. Every potential investor rejected the reliability of the projections that the defense now expects the government to rely on to support its intended-loss theory. Neither is a single note created months before the pitch decks evidence of intent. In fact, because the note was earlier in time, not shared with anyone, and created before Zhisuan even hired its two employees, the note is an even less credible source than the later

[5] The defense refers to the Lohmeyer declaration only because it this is the declaration the government submitted to Probation and represented it intended to submit to the Court.

[6] *See* "Cloud is a Global Market – Apart from China," Synergy Research Group (Aug. 21, 2024), https://www.srgresearch.com/articles/cloud-is-a-global-market-apart-from-China (recognizing that the top ten players in China are all Chinese firms.); *see also* July 26, 2025 Lohmeyer Disclosure (confirming that "Google does not have any data centers in mainland China").

slide-deck projections[7]; yet, Mr. Ding expects the government to attempt to use the note to multiply the lower projections used in the investor decks.

To the extent the government's sentencing position is consistent with the position it communicated to Probation, the government's intended-loss theory requires the Court to believe a version of Mr. Ding that the government itself refuted at trial. As the Court has recognized, the government went to great lengths to show the jury that Mr. Ding was not the highly experienced engineer he portrayed himself to be to potential investors, but rather a mid-level software engineer working on a small subcomponent of Google's AI supercomputing infrastructure. Trial Tr. 23:1–24:25. The government cannot claim at trial that Mr. Ding exaggerated his abilities and expertise to defraud investors, and then argue at sentencing that Mr. Ding was a highly skilled founder capable of and intending to build a company that would compete with Google, which had invested more than a decade and thousands of engineers to develop its AI infrastructure.

The government's effort to compare Mr. Ding and Zhisuan to Crusoe and CoreWeave, two of the most successful AI start-up companies ever founded, also fails. *See* Lohmeyer Decl. ¶ 10. Those U.S. companies are the exception not the rule. Moreover, neither company was a startup when they pivoted to AI; both Crusoe and CoreWeave were established operating companies with years of revenue and hard assets.[8] Nor were their founders first-time entrepreneurs; they were seasoned finance professionals with capital networks: CoreWeave's CEO had spent fifteen years at Natsource Asset Management and co-founded and ran a natural gas hedge fund, and Crusoe's CEO was a general partner at Polychain Capital, a $1 billion fund, after years as a quantitative

---

[7] *See* Trial Tr. 978:11 – 979:8; 996:10 – 999:2.

[8] CoreWeave began in 2017 as Atlantic Crypto, an Ethereum mining operation, and renamed itself only in 2019, when it leveraged the large GPU inventory it already owned to begin selling cloud computing. *See* CoreWeave Form S-1; Kif Leswing, *CoreWeave's 7-year journey to IPO wound through crypto before AI*, CNBC (Mar. 30, 2025), https://www.cnbc.com/2025/03/30/coreweaves-7-year-journey-to-ipo-wound-through-crypto-before-ai.html. Crusoe was founded in 2018 around a patented flare-gas capture system deployed at wellheads. Each pivoted to AI from infrastructure it had already built and paid for.

trader.[9] Institutional venture capital backed both companies from the outset. Crusoe's seed round was co-led by Bain Capital Ventures and Founders Fund Pathfinder; by 2022 it had raised a $350 million Series C alongside credit facilities of up to $155 million.[10] These facts stand in stark contrast to the nascent and, in this Court's words, "ham-fisted" efforts of Mr. Ding and Zhisuan.

### 3. Courts Find Zero Intended Loss Where The Evidence Shows Only An Intent To Gain.

Where the evidence shows only that the defendant hoped to profit from stolen trade secrets, courts find the intended loss is zero: *Xue* and *Pu* each rejected loss figures built on the defendant's projected gains, because an intent to gain is not an intent to make the victim lose. *See infra* Section V.A.3.a. Where courts have found intended loss, by contrast, the defendant's words or conduct tied his anticipated gain to an identified victim's loss. In those cases, the defendant had a stated plan to "break" the victim's monopoly, enter its market, or replace its products, corroborated by real operations. The government's own authorities, *You*, *Zheng*, and *Shan Shi*, are all of this second kind, and each turned on victim-directed evidence that does not exist here. *See infra* Section V.A.3.b. The trial record contains only the first kind of evidence, and therefore, no intended loss enhancement should apply.

#### a. *Xue* and *Pu* hold that evidence of intended gain does not prove intended loss.

*United States v. Xue* is directly on point. There the defendant stole trade secrets from her employer, GSK, to benefit her own competing startup, Renopharma, and the government sought an intended-loss enhancement under § 2B1.1(b)(1) based on Renopharma's projected financials—its

---

[9] *See* CoreWeave, Inc., Registration Statement (Form S-1) (Feb. 2025) (describing CEO's background), https://www.sec.gov/Archives/edgar/data/1769628/000119312525044231/d899798ds1.htm.

[10] *Crusoe Energy Systems Closes $4.5 Million Seed Funding Round Co-Led by Bain Capital Ventures and Founders Fund Pathfinder* (May 7, 2019), https://irei.com/news/crusoe-energy-systems-closes-funding-round-co-led-bain-capital-founders-fund-pathfinder/; *Crusoe Energy Systems Announces $70 Million in Funding* (Dec. 6, 2019), https://www.prnewswire.com/news-releases/crusoe-energy-systems-announces-70-million-in-funding-for-expansion-of-digital-flare-mitigation-services-300970514.html; *Crusoe Energy Systems closes $505 million in new capital* (Apr. 2022), https://www.crusoe.ai/resources/newsroom/crusoe-closes-millions-in-new-capital.

self-described "best evidence of intended loss." *Xue*, No. 16-22, 2020 WL 5645765, at *19 (E.D. Pa. Sept. 22, 2020). The court rejected the government's theory. As to purpose, the projections "ha[d] little bearing on determining intended loss because they do not support an inference that Defendants intended to harm GSK; instead they merely show Defendants['] expectations from the theft." *Id.* As to credibility, the supposed "financial statements" were PowerPoint presentations—one for recruiting employees, one for soliciting investors—documents "meant to attract attention," whose "rosy outlook" was unsurprising given their purpose. *Id.* It was "unrealistic to assume that a young pharmaceutical venture with two PhDs and five total employees would be worth, at a minimum, $200 million dollars, and as much as $2.2 billion," and relying on "what is essentially advertising brochures" to fix a loss figure "is not an appropriate and practicable way to estimate loss." *Id.* The court found the intended loss to be $0 and imposed no enhancement. *Id.*, at *20.

*United States v. Pu* reached the same result on similar facts. The defendant copied and stole proprietary high-frequency-trading software from two financial institutions. *See Pu*, 814 F.3d at 821. The victims suffered no actual loss, but the district court found an intended loss of approximately $12.3 million—measured by the victims' combined cost of developing the stolen algorithms—producing a 20-level enhancement. *See id.* The Seventh Circuit reversed the calculation as clearly erroneous. *See id.* at 824–27. Intended loss, it held, "'turns upon how much loss the defendant actually intended to impose' on the victim," not on the value of the information he took. *Id.* at 824 (citing *United States v. Higgins*, 270 F.3d 1070, 1075 (7th Cir. 2001)). And on that question the record was blank: there was no direct evidence of how much loss Pu intended, and no evidence from which such an intent could be inferred. *See id.* at 826–27.

Two further holdings of *Pu* bear directly on this case. First, the Guidelines "do not require a loss calculation greater than zero": where the government fails to carry its burden on intended loss, zero is the legally correct figure, not an anomalous one. *Pu*, 814 F.3d at 827–28 (citing *United States v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991)). A conviction under 18 U.S.C. § 1832 supplies no shortcut, because economic loss to the victim is not an element of the offense—guilt of trade-secret theft and proof of intended loss *are separate questions*, and the government must prove the latter independently. *See id.* Second, the Seventh Circuit faulted the district court for internal

inconsistency: the $12.3 million figure could not be squared with the court's own finding that there was insufficient evidence of a grander scheme. *Id.* at 826–27. A court may not find an intent to inflict a massive loss while simultaneously finding no evidence of any scheme to deploy the stolen material against the victim. That is the inconsistency the government invites here: it asks the Court to fix a large intended loss as to Google while pointing to no scheme—no product, no operations, no capability—by which Mr. Ding could have inflicted any loss at all.

**b. The government's own cases each involved proof of victim-directed intent that is missing here.**

The cases cited in the government's July 14, 2026 letter to Probation each involved evidence that the defendant meant to take business from an identified victim, backed by conduct showing the plan was real.

In *United States v. You*, the defendant stole BPA-free can-coating formulas developed by seven companies for Coca-Cola, formed a company to commercialize the same technology, obtained Chinese government funding, and moved toward production. 74 F.4th 378, 383–85 (6th Cir. 2023). But more importantly, the district court found " 'clear' manifestations of [Ms. You's] intent to inflict pecuniary harm on the seven companies whom she victimized." *See United States v. You*, No. 2:19-CR-00014-1-JRG-CRW, 2024 WL 4158884, at *10 (E.D. Tenn. Sept. 11, 2024) (internal citation omitted). In her application for government funding, she described the existing can-coating industry as "an international monopoly" that she planned to "break," first by "fill[ing] the gap in Asia" and eventually by entering the "global market." *Id.* (internal citation omitted). Because the seven victims comprised the existing market, the district court drew the inference that "whatever existing market share [she] intended to gain, she intended to take it from a victim company." *Id.* (internal citation omitted).

*You*'s subsequent history helps Mr. Ding further. The Sixth Circuit initially vacated the loss calculation because the district court had been inconsistent about whether Ms. You's own promotional materials were reliable. *See You*, 74 F.4th at 398. On remand, the district court used a "conservative calculation method," examined You's statements one by one, and "dismiss[ed] as puffery" projections that lacked credibility. *You*, 2024 WL 4158884, at *8–10 (citing *United States*

*v. Xu*, 114 F.4th 829, 846 (6th Cir. 2024)). The court rejected, for example, Ms. You's projections about global market share because she had no basis for them, and credited narrower projections only where her company's actual operations corroborated them. *Id.*

Apply that approach here and the government's reliance on *You* fails. Mr. Ding made no statement about taking Google's customers, entering Google's market, replacing a Google product, or taking market share from Google, particularly given his target market was China, a market Google does not serve.[11] To the extent Mr. Lohmeyer asserts that "Ding planned to expand his business beyond mainland China and the Asia Pacific region," that statement is unsupported by any trial evidence and entirely speculative. Lohmeyer Decl. ¶ 17. Zhisuan had no operations or product that could corroborate the revenue figures in its fundraising decks. Under *You*, those figures are at best evidence of what Mr. Ding hoped investors would believe about Zhisuan's prospects, not evidence of a loss he purposely sought to inflict on Google.

*United States v. Zheng* is even further afield. There, the defendant's PRC-based companies had operated for years and developed turbine-sealing technology, later using stolen GE information. *Zheng*, 113 F.4th 280, 283 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1899 (2025). GE itself had operated in China for more than 40 years, competing in the same market as defendant's company.[12] *Zheng* concluded that the district court could infer the necessary intent from the defendant's years of actual operation in the PRC turbine-sealing industry, where GE also competed. *See id.* at 296. In contrast, there is no actual operation to credit here. While *Zheng* relied on a one-to-one match between the technology stolen and the defendant's ability to employ that technology in his own company and harm the victim company (*see id.*), this case involves no such credible threat.

The government's third case, *United States v. Shan Shi*, shows what evidence of intended

[11] *See supra* fn. 7.

[12] *China's Guangming Plant starts commercial operation, powered by GE Vernova's H-Class equipment,* GE VERNOVA (Jan. 9, 2025), https://www.gevernova.com/news/press-releases/chinas-guangming-plant-start-commercial-operation-powered-ge-vernovas-h-class; *see also* Alissa Espinoza, *The Coal-to-Gas Transition: GE Vernova Decarbonizing China with H-Class Technology,* TURBOMACHINERY MAG. (Jan. 17, 2025), https://www.turbomachinerymag.com/view/the-coal-to-gas-transition-ge-vernova-decarbonizing-china-with-h-class-technology.

loss looks like, and underscores that no such evidence exists here. Dr. Shi's company had received millions of dollars in funding, operated a facility, hired former employees of the victim who retained access to its information, and actually synthesized and tested the product at issue. *Shan Shi*, No. 17-CR-110 (CRC), 2019 WL 6879409, at *2–3 (D.D.C. Dec. 17, 2019). Like in *You*, the defendant in *Shan Shi* also promised to "break the monopoly" held by Trelleborg (the victim) and three named competitors and to "replace" the products those companies were selling into China. *Id.*, at *2. Those facts, missing here, showed that the defendant's anticipated gain flowed from his "stated goal of taking sales from the existing competitors." *Id.*, at *3. When Dr. Shi argued that he merely intended to expand the market rather than hurt Trelleborg, the court rejected the argument because his own documents said otherwise. *Id.*

There is nothing comparable here. Zhisuan's materials identify no Google customers it intends to take, no Google sales to replace, and that Zhisuan planned to target a market not accessed by Google—China. And the trial evidence confirmed the absence of any scheme that could have corroborated such an intent: Zhisuan never developed a product, let alone one incorporating any of the 115 trade secrets; it had only two employees beyond Mr. Ding, neither of them engineers but rather people focused on pitch decks; it had no revenue; it was rejected by every investor it approached other than Miracle Plus; and it targeted China, a market Google does not serve.

**4. Even On Its Own Terms, The Government's Calculation Fails.**

Given the above and based on the record and on the law, the intended loss in this case is zero. But, even if the Court disagrees, the government's proposed loss figure fails under its own methodology: the model's inputs are unreliable; any corrected calculation yields, at most, hundreds of thousands of dollars, a fraction of the $3.5 million the 18-level enhancement requires.[13]

---

[13] The Sentencing Commission has confirmed that the loss table the government relies upon overstates culpability. On April 16, 2026, the Commission unanimously adopted amendments—effective November 1, 2026, absent congressional action—raising the monetary thresholds throughout § 2B1.1's loss table to account for a decade of inflation, by an average of roughly 40 percent. U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, at 14 (Apr. 16, 2026) (eff. Nov. 1, 2026). Under the amended table, the threshold for an 18-level enhancement rises from $3.5 million to $5 million. Although the amendment is not yet in effect, the Court may consider it under § 3553(a) as the Commission's current judgment of the seriousness of economic offenses, and to avoid the unwarranted disparity of sentencing Mr. Ding several weeks before the

**a. The Lohmeyer model is unreliable five times over.**

The government's intended-loss calculation rests on the declaration of Mark Lohmeyer, which the government submitted to Probation with its July 14, 2026 letter regarding intended loss. The declaration purports to calculate the pecuniary loss Mr. Ding intended Google to suffer by multiplying Zhisuan's projected revenues by Google's asserted market share and profit margin. The defense understands the government will submit it with its sentencing memorandum as the basis for its intended-loss calculation. The declaration cannot bear that weight for at least five reasons.

First, the declaration's stated purpose is to measure "what monetary loss Ding intended for Google to suffer." Lohmeyer Decl. ¶ 3. But Mr. Lohmeyer concedes: "I do not have personal knowledge of Ding's intentions." *Id.* ¶ 28. That concession defeats the declaration's premise. Everything that follows is speculation presented as calculation: Mr. Lohmeyer "suspect[s]" Mr. Ding hoped to grow faster than projected, *id.*, assumes Mr. Ding "presumably" intended to operate "indefinitely" and at least 5 years, *id.* ¶ 29, and speculates about what "likely" would have occurred, *id.* ¶ 31. The government presented no witness at trial who spoke to Mr. Ding's intent as to loss, and presents none now. Sentencing facts must carry "sufficient indicia of reliability to support [their] probable accuracy." U.S.S.G. § 6A1.3(a). Conjecture about a defendant's hopes by an executive of the victim, based on documents he was not party to, is not reliable evidence of the defendant's purpose.

Second, Mr. Lohmeyer's model measures the wrong market. Mr. Lohmeyer applies Google's global market share (13% cloud; 20% AI infrastructure) to every dollar of Zhisuan's projected revenue. But he previously conceded that "Google does not have data centers in mainland China," Fondo Decl. Exh. I ("July 26, 2025 Lohmeyer Disclosure") at 4, does not claim Google has measurable market share in China, and now confirms that he is "not aware of any market share data that is specific to the Asia Pacific region," Lohmeyer Decl. ¶ 17. Mr. Lohmeyer's calculation uses Google's global market share (including the U.S. market) because Google does not sell in

---

amendments go into effect, under thresholds the Commission has voted to discard. *Cf.* 18 U.S.C. § 3553(a)(6).

Zhisuan's intended market. In contrast, Zhisuan targeted the Chinese domestic market; every prospective customer identified at trial was a Chinese entity; and Google has not identified any of them as its customers in China. Trial Exhs. 1003, 1143, 1158. Independent analysts confirm that the Chinese domestic cloud market is led entirely by Chinese firms, with Western providers "severely restricted" from competing.[14] Revenue earned from customers Google cannot serve diverts nothing from Google. The declaration's answer—that Chinese providers compete with Google "on a global basis," Lohmeyer Decl. ¶ 17—substitutes an industry generalization for evidence about Zhisuan.

Third, Mr. Lohmeyer's model mismatches its own inputs. The upper-bound figure that the government presented to Probation pairs Google's claimed 20% AI-infrastructure market share with Google's 30.08% cloud-services profit margin. Lohmeyer Decl. ¶¶ 15–16, 23–25. But Mr. Lohmeyer's own footnote concedes that no AI-infrastructure-specific margin data exists in the record because Google will not disclose it. *Id.* ¶ 22 n.5. Selecting the higher share from one market and the margin from another is not conservative, nor is it a sufficient evidentiary basis to support loss, it instead smacks of cherry-picking. The 20% share figure is itself an internal, undisclosed Google estimate attributed to unnamed employees (*id.* ¶ 15)—untestable by the defense and unverifiable by the Court. And the assumption is especially hard to defend for AI infrastructure, where GPUs, data centers, power, cooling, and depreciation consume enormous amounts of capital and make margins highly dependent on utilization, and lower than cloud-services margins.[15] Mr.

---

[14] *See Cloud is a Global Market - Apart from China*, SYNERGY (Aug. 21, 2024), https://www.srgresearch.com/articles/cloud-is-a-global-market-apart-from-china ("The market is currently led by Alibaba, Tencent, China Telecomm and Huawei. The top ten players are all Chinese firms."); *Omdia: Mainland China's cloud infrastructure market returns to over 20% growth in Q2 2025*, OMDIA (Nov. 28, 2025), https://omdia.tech.informa.com/pr/2025/nov/mainland-chinas-cloud-infrastructure-market-returns-to-over-20percent-growth-in-q2-2025 ("In Q2 2025, Alibaba Cloud, Huawei Cloud and Tencent Cloud held market shares of 34%, 17% and 10%, respectively.").

[15] *See* Massimo Mazza et al., *The evolution of neoclouds and their next moves*, MCKINSEY & CO. (Nov. 19, 2025), https://www.mckinsey.com/capabilities/tech-and-ai/our-insights/the-evolution-of-neoclouds-and-their-next-moves (explaining that GPU-focused cloud providers face significant capital costs and that profitability is highly sensitive to utilization and pricing); *see also* Tripp Mickle, *Google Plans to Double Spending Amid A.I. Race*, N.Y. TIMES (Feb. 4, 2026),

Lohmeyer offers no evidence that Google's AI-infrastructure business earns anything close to the 30.08% cloud-services profit margin.

Fourth, most of Mr. Lohmeyer's model's revenue base is invented. Of the $158.6 million of Zhisuan's "intended revenue" underlying Mr. Lohmeyer's loss range, $100 million comes from the unpublished note dated September 17, 2023 (Trial Exh. 1149), which predated the two investor slide decks that the government also relies upon and that show much lower forecasts that do not project anything close to $100 million in annual revenue in five years. Even taken at face value, the note says: "The premise is that we have the ability to success, but *we must find an investor* . . . ," which Zhisuan unequivocally failed to do. Trial Exh. 1149 (emphasis added). Another $36.7 million of Mr. Lohmeyer's model comes from a 2027 figure that appears in no document of Mr. Ding's at all; Mr. Lohmeyer generated it himself with the Google Sheets's "GROWTH" function based on the $100 million number – and working backwards from the $100 million. Lohmeyer Decl. ¶ 7. Strike those two figures, and the model's revenue base collapses from $158.6 million to $21.9 million. And, of course, the $21.9 million is based on the two investor pitch decks, which, for reasons already discussed, are not reliable financial forecasts but rather a failed tool to obtain investors.

Fifth, the model's comparables rely on survivorship bias. Not only does Mr. Lohmeyer's model assume Zhisuan would have raised a lot more funds than the government's trial presentation believed Mr. Ding capable of,[16] but to make Zhisuan's projections look "feasible," the declaration invokes Crusoe and CoreWeave. Lohmeyer Decl. ¶ 10. On the government's own account, Zhisuan was a three-person venture with minimal expertise, no product, no funding beyond an incubator, and a 100% investor rejection rate. For the reasons explained above, Crusoe and CoreWeave are not reliable comparators.

---

https://www.nytimes.com/2026/02/04/business/google-earnings-ai.html (suggesting that Google's profit margins in the future may not be "as lush" given capital expenditures on data centers).

[16] Trial Tr. 806:4–12, cross-examination of FBI Special Agent Andrea Valladao ("Q. He, in truth, did not have a ton of success with all these investors that he was meeting, the 21 that you mentioned; correct? A. We did not see any follow-up, no.").

**b. Any corrected loss calculation yields, at most, hundreds of thousands of dollars.**

Mr. Ding maintains that the intended loss is $0. But even accepting the government's assertion of loss and methodology in full, a corrected calculation yields an intended loss of, at most, several hundred thousand dollars. Once the September note and the manufactured 2027 figure are rejected, the only evidence of any projected Zhisuan revenue is the investor pitch decks—inflated as they were—which project a total of $21,855,000 across 2024, 2025, and 2026.

The government's methodology multiplies projected revenue by Google's share of the relevant market, then Google's profit margin. On the question of the share of the relevant market, the market is China, and Google's share appears to be zero and, is at most, minimal. The Omdia article cited in footnote 14, for example, mentions that the top three companies in China have a combined market share of 61%; Google is not one of them. Indeed, the Synergy Research Group article confirms that Google is not even one of the top 10 AI companies operating in China, all of which are Chinese firms. Mr. Ding lacks access to the actual figure, which is the government's burden to supply, but even assuming Google were in the China market at all and captured a generous 5% of the Chinese market,[17] the revenue Mr. Ding would have diverted from Google in the Chinese market would be at most $1,092,750 (5% of $21,855,000). Applying Google's own claimed margins against this market share yields an intended loss figure of $328,699 (30.08% cloud-services margin) or $218,550 (20% AI-infrastructure margin)—corresponding to a 12-level or 10-level enhancement, respectively.

Extending the model to years four and five does not change the picture.[18] Zhisuan did not have any projections of any kind beyond 2026, and there is no basis to assume exponential growth (or survival) for a company with no product and no investor interest. A linear model yields projected revenue of $15,157,500 in year four and $19,035,000 in year five, for a total of $56,047,500. Any

---

[17] *See Cloud is a Global Market - Apart from China*, SYNERGY (Aug. 21, 2024), https://www.srgresearch.com/articles/cloud-is-a-global-market-apart-from-China (recognizing that the top ten players in China are all Chinese firms.); *see also* July 26, 2025 Lohmeyer Disclosure (confirming that "Google does not have any data centers in mainland China").

[18] Mr. Ding does not concede that any post-2026 projection is proper; he addresses years four and five only because the government's model reaches them.

fair model must also account for the substantial risk that the company would not survive long enough to generate those revenues. Founders Forum Group reports that 10% of startups fail in the first year and another 70% fail during years two through five.[19] Rather than assume a constant annual failure rate unsupported by that source, a conservative model can apply a cumulative 14% reduction for each year of the five-year period, reaching a 70% reduction in year five. At a 5% market share in China, that produces an intended loss figure of $405,784 using the government's 30.08% cloud margin, or $269,804 using a 20% AI-infrastructure margin. Given the cloud margin is inapplicable under any circumstance, the Court should reject it.

If there is any intended loss, every corrected path lands in the same place: an intended loss well below the more than $3.5 million the government asks this Court to find—no more than $405,784 on any path and no more than $269,804 once the inapplicable cloud margin is set aside. The distance between the government's number and a defensible one is not a dispute at the margins; it is a measure of how far the Lohmeyer model strayed from the record and reality.

**B. No Economic-Espionage Enhancement Applies Under § 2B1.1(b)(14)(B)**

Section 2B1.1(b)(14)(B) provides for an enhancement "[i]f the offense involved misappropriation of a trade secret and the defendant knew or intended . . . (B) that the offense would benefit a foreign government, foreign instrumentality, or foreign agent, increase by 4 levels." Although subparagraph (B) rests entirely on conduct of which Mr. Ding was acquitted, Mr. Ding understands that the government will argue that it nonetheless applies. The Court should reject that argument. Because the Guidelines no longer permit consideration of acquitted conduct, the enhancement does not apply. *See* U.S.S.G. § 1B1.3(c) ("**Acquitted Conduct.--**Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct establishes, in whole or in part, the instant offense of conviction.").

The Sentencing Commission adopted § 1B1.3(c) in 2024 after sustained criticism of acquitted-conduct sentencing from jurists, including current and former Justices of the Supreme Court. *See McClinton v. United States*, 143 S. Ct. 2400, 2401 & n.2 (2023) (Sotomayor, J.,

[19] *See* "The Ultimate Startup Guide with Statistics (2024–2025)," Founders Forum Group (May 9, 2025).

statement respecting the denial of certiorari) (collecting cases and statements); *id.* (noting that many states questioned the practice). Justice Sotomayor grounded her criticism in the constitutional protections of double jeopardy, explaining how acquitted-conduct sentencing effectively affords the government a second opportunity to prove under a lower standard what it failed to prove at trial. *Id.* at 2401–02. In its Reasons for Amendment, the Commission explained that the exclusion "seeks to promote respect for the law by addressing some of the concerns that numerous commentators have raised about acquitted conduct sentencing, including those involving the 'perceived fairness' of the criminal justice system." U.S. Sent'g Comm'n, Amend. 826 (Reason for Amendment) (eff. Nov. 1, 2024) (citing *McClinton*, 143 S. Ct. at 2401).

The Commission recognized one narrow qualification. Because "[t]he chief concern regarding administrability raised by commenters throughout the amendment cycle was whether courts would be able to parse acquitted conduct from convicted conduct in cases in which some conduct relates to both the acquitted and convicted counts," the Commission left it to the sentencing court "to determine which conduct can properly be considered as part of relevant conduct based on the individual facts in those cases." U.S. Sent'g Comm'n, Amend. 826. That qualification addresses cases of genuine factual overlap —where a single course of conduct simultaneously establishes elements of both the acquitted and convicted counts. It has no application where, as here, the acquitted conduct is defined by a discrete element that the offense of conviction does not contain—intent to benefit foreign instrumentalities. Intent to benefit a foreign instrumentality establishes no element of 18 U.S.C. § 1832; the trade secret charges are stand-alone charges that do not rely on the acquitted conduct, and the theft at issue, the downloads, occurred before the alleged economic espionage. No parsing difficulty exists in this case. The statutory carve-out is therefore unavailable by its own terms, and the categorical exclusion on acquitted conduct controls.

The amendment history of subparagraph (B) further confirms that it would be inappropriate to apply the enhancement here, given the trial record. U.S. Sent'g Comm'n, Amend. 771 (Reason for Amendment) (eff. Nov. 1, 2013). When the Commission raised the enhancement from 2 to 4 levels and imposed a minimum offense level of 14, it explained that the increase responded to the distinct dangers of offenses that benefit foreign government where "offenders backed by a foreign

government likely will have significant financial resources to combat civil remedies" and the foreign government's involvement "increases the threat to nation's economic and national security." *Id.* But, as the Court is aware, this case does not involve a state-backed offender with resources to deploy, no state-directed threat to national security, and no foreign agent controlling or funding the defendant's conduct.

Nor does it help the government that the Court, in ruling on the acquitted counts, observed that the evidence of foreign-benefit intent "may" have satisfied a preponderance standard. Prior to Amendment 826, a sentencing court could, under *United States v. Watts*, 519 U.S. 148 (1997) (per curiam), rely on acquitted conduct proved by a preponderance of the evidence. Amendment 826 was adopted precisely to displace that practice under the Guidelines. U.S. Sent'g Comm'n, Amend. 826 (Reason for Amendment) (eff. Nov. 1, 2024). Further, U.S.S.G. § 1B1.3(c) has one narrow exception to it—"unless such conduct also establishes . . . the instant offense of conviction." To assert that the government could still prove up this conduct by a preponderance of the evidence would make the amendment meaningless, as that was the standard for applying acquitted conduct before the amendment. The Commission's answer to the concerns catalogued in *McClinton* was to remove acquitted conduct from the Guidelines calculation notwithstanding what a lower standard of proof might permit. The Court should decline the government's invitation to reintroduce it.

### C. Mr. Ding Does Not Contest The Two-Level Enhancement Under § 2B1.1(b)(14)(A).

Section 2B1.1(b)(14)(A) provides, in the alternative, for a two-level enhancement "[i]f the offense involved misappropriation of a trade secret and the defendant knew or intended . . . (A) that the trade secret would be transported or transmitted out of the United States." U.S.S.G. § 2B1.1(b)(14)(A). Given the jury verdict, Mr. Ding does not contest that subparagraph (A) applies.

### D. Mr. Ding Is Entitled To A Two-Level Reduction As A Zero-Point Offender.

The parties agree that Mr. Ding qualifies for a two-level reduction under U.S.S.G. § 4C1.1. That provision reflects the Sentencing Commission's judgment that defendants with no criminal history points are markedly less likely to reoffend and warrant lower sentences. Mr. Ding has zero criminal history points, PSR ¶¶ 67, 73–74, and he satisfies each of § 4C1.1(a)(1)-(11)'s remaining

criteria.

## VI. The Sentencing Criteria Of 18 U.S.C. § 3553(a) Also Demonstrates No Incarceration Is Appropriate.

The Court should reject Probation's recommendation of an upward variance, as it predated the Court's recent Acquittal Order and is not warranted. An upward departure is unheard of in this context in this district. A review of the cases in the Northern District of California where defendants were convicted of theft of trade secrets and/or economic espionage,[20] based on publicly available information, reveals to the best of the Defense's knowledge that, in the last 25 years, ***there has been no case*** in which the court imposed an upward variance and a sentence above the Guideline range, much less one of the magnitude that the Probation Office previously recommended.

Probation's recommended upward variance inverts the direction in which the relevant considerations point: as demonstrated below, the § 3553(a) factors, including Mr. Ding's history and character, the thirty months of restrictions already imposed, and the two-month median sentence[21] imposed on the minority of similarly situated defendants who are sentenced to a period of incarceration, warrant a sentence below the advisory range, not a multiple of it. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (the sentence must be "sufficient, but not greater than necessary"); 18 U.S.C. § 3553(a).

The § 3553(a) factors become still more important if the Court were to sustain any part of the government's requested loss enhancement, because the resulting guideline range would rest almost entirely on a calculation for "losses" that Google did not actually suffer. Courts have long recognized that in this posture, loss "is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427

---

[20] In some instances, defendants were charged with attempted or conspiracy to commit theft of trade secrets and/or economic espionage, at times in addition to theft of trade secrets and/or economic espionage.

[21] The PSR noted a median sentence of 3 months for offenses of a similar nature with a final offense level of 12 and criminal history category of I. It based this calculation on information that is no longer accurate, due to the partial acquittal, and thus the guideline range is lower, with a total offense level of 6, and a guideline range of 0 to 6 months.

(S.D.N.Y. 2004). The Guidelines' own commentary contemplates a downward departure where the loss determination substantially overstates the seriousness of the offense, U.S.S.G. § 2B1.1, app. n. 21(C) (2025), and the Sentencing Commission has now confirmed this point institutionally: its adopted amendments, expected to be effective this November, raise the threshold for the government's requested 18-level enhancement from $3.5 million to $5 million. This Court should not accept any recommendation to impose a sentence above the appropriate Guidelines range.

### A. Section 3553(a)(1): Mr. Ding's History And Characteristics

#### 1. Mr. Ding Has No Criminal History.

Until the underlying events, Mr. Ding has led a quiet life, and never been arrested, charged, or convicted of anything. PSR ¶¶ 71–77. His criminal history score is zero, and he qualifies for the Zero-Point Offender adjustment, which reflects the Sentencing Commission's determination that defendants with no prior contact with the criminal justice system are less likely to reoffend. Mr. Ding's history bears that out. As the letters to the Court describe, his life has been built on education, work, and family: a childhood of hardship, an academic record earned without advantage, thirteen years of lawful employment, and devotion to his parents and son. PSR ¶¶ 79–85, 91–95. He worked continuously since graduating from the University of Southern California and provided for the people who depended on him.

#### 2. Mr. Ding Has Complied Fully With Pretrial Supervision.

Mr. Ding has been on pretrial release since March 6, 2024, under a number of conditions, including: GPS and radio-frequency location monitoring, geographic confinement, supervision by Pretrial Services with ongoing reporting obligations, and mandatory mental health treatment. He has complied with each condition without a single violation, including through conviction. PSR ¶ 5. He has appeared at every hearing, on time, created no disturbances during any hearing or trial, and followed every directive of Pretrial Services and the Court. Mr. Ding recognizes that compliance is expected and should be the norm for all defendants, but nevertheless his compliance record supports three conclusions: that Mr. Ding has respect for this Court's orders, presents a low risk of noncompliance, and that supervision has been effective in his case.

**3. Mr. Ding Has Suffered Severe Collateral Consequences.**

Mr. Ding has already lost much of what he spent two decades of his life building. His career in technology is ruined; a pending job offer was rescinded after his arrest was publicized, and no comparable employment has been available since. Fondo Decl. Exh. C at 2. His marriage ended during the course of this case. PSR ¶ 81. He now relies on his former spouse for financial support and housing, cannot support his parents, and he has required continuous psychiatric treatment. PSR ¶ 87. As a lawful permanent resident, he faces likely removal and possible separation from his son. PSR ¶ 123.

**B. Section 3553(a)(1): Nature And Circumstances Of Offense**

Under § 3553(a)(1), the Court must also consider the nature and circumstances of the offense. Although he recognizes the government will and has argued that he intended to use the trade secrets once he got his company funded, at a minimum these facts do not demonstrate someone seeking to quickly and directly harm Google, or having some sophisticated, master plan. Moreover, to the extent government seeks to rely upon Mr. Ding's involvement with foreign instrumentalities the acquittal notwithstanding, the entities at issue never became customers, never paid Zhisuan a dollar, and never received anything from Mr. Ding—there was no tasking, no payment, and no handler. Nor has the government asserted that Mr. Ding took any actions resembling more traditional economic espionage.

**C. Section 3553(a)(3): Kinds Of Sentences Available**

Section 3553(a)(3) directs the Court to consider the kinds of sentences available, and at Zone A and offense level of 6 the Guidelines permit home confinement as a substitute for imprisonment. U.S.S.G. § 5C1.1(c)(3), (d)(2).[22] That option is appropriate here given Mr. Ding's lack of criminal history, behavior while on release, and no risk of recidivism, as well as because Mr. Ding is his son's primary caretaker. He manages the eight-year-old's daily routines, schooling, sports, and medical appointments, and his ex-wife—whose English is limited and who works to

[22] Given the Guideline range asserted by Mr. Ding, an adjusted offense level 6, and the fact that Probation's report predated the Acquittal Order and is therefore outdated, Mr. Ding is not seeking a downward departure or variance. However, if the court finds that the adjusted offense level is greater than 6, he of course reserves his right to seek one.

support the household—tells the Court she "cannot imagine the emotional impact on our child if separated from him." Fondo Decl. Exh. C at 4.

**D. Section 3553(a)(6): Avoiding Sentencing Disparities**

Under 18 U.S.C. § 3553(a)(6), an important factor in sentencing is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." A sentence of 3 months home confinement is well within other similarly situated defendants. And, if this Court holds that the adjusted offense level is significantly higher, a sentence below the Guidelines range will be needed to avoid gross disparities with defendants in other cases.

Over the last five fiscal years (FY2021–2025), approximately 674 defendants were sentenced under § 2B1.1 with a final offense level of 6 and a Criminal History Category I, excluding those receiving substantial assistance departures.[23] Seventy-seven percent of the defendants within this cohort were not sentenced to a term of imprisonment. Of those sentenced to a term of imprisonment, the median length of imprisonment was two months and the average was five. These findings strongly support Mr. Ding's requested sentence.

The government may respond that the JSIN cohort consists largely of ordinary fraud defendants rather than defendants convicted under § 1832, and that the comparison therefore understates the seriousness of this offense. The observation is accurate in that it consists of many defendants not convicted of the theft of trade secrets, but that is as far as it goes, and it is an argument with the Guidelines rather than with the comparison. The Commission determines the seriousness of an offense through the offense level, and the offense level here is 6. The enhancement for an offense involving a trade secret intended to be taken out of the United States is the mechanism the Commission selected to account for precisely the feature the government would invoke, and it is already reflected in the calculation that places Mr. Ding in this cohort. Section 3553(a)(6) directs the Court toward the sentences actually imposed on defendants the Guidelines treat as comparably situated, and this record supplies no basis for departing from them.

---

[23] The defense obtained JSIN information from https://www.ussc.gov/guidelines/judiciary-sentencing-information.

Counsel surveyed publicly available information about trade secret prosecutions in this district for the past 25 years. In every case obtained, the sentence imposed fell below the advisory range, and in many the defendant received no custody at all. For the benefit of the Court, a handful of cases are described in detail herein and the remainder are collected in Appendix A, with the conduct, counts of conviction, advisory range, and sentence for each.

**Instructive Cases in this District**

In *United States v. Zhang* (5:10cr827), while still employed at SiRF Technology, Defendant Zhiqiang Zhang downloaded over 100,000 files constituting millions of lines of code to external devices and his personal laptop. He then resigned from SiRF and formed a competing company called Anywhere Logic, replicating the stolen SiRF code to use to develop a product for the new company. He recruited SiRF employees to work for Anywhere Logic, and established several Anywhere Logic entities in the United States and China. Mr. Zhang was convicted of one count of theft of trade secrets under § 1832(a)(2). The advisory range was calculated as 12 to 18 months, and he was sentenced to **5 years of probation**.

In *United States v. Zhang* (5:18cr312), Defendant Xiaolang Zhang was on paternity leave from his job as an engineer at Apple when he met with his supervisor and resigned, explaining he wanted to move back to China to be closer to his mother; however, as the meeting progressed, he admitted he intended to work for a Chinese competitor of Apple on the same technologies he had been hired by Apple to develop. This launched an internal investigation that discovered Mr. Zhang had downloaded over 40 GB of data from Apple's confidential and secured databases to his personal devices, and improperly accessed Apple's laboratory spaces while he was on paternity leave. The documents were downloaded to Mr. Zhang's wife's laptop, and more Apple propriety materials were found in a separate laptop hidden at the bottom of a laundry hamper in Mr. Zhang's home. In its investigation, Apple also discovered confidential and proprietary material that Mr. Zhang had taken from his previous employer, Marvell. Mr. Zhang was convicted of one count of theft of trade secrets under Section 1832(a)(1). The advisory range was calculated as 18 to 24 months, and the Court imposed a sentence of **120 days (or 4 months) in custody**.

And in cases where the Guidelines advisory range was calculated to be closer to what it

would be here should the Court impose a 18 level loss enhancement, the sentences imposed were still well below the guidelines:

In *United States v. Ye* (5:02cr20145), Defendants Fei Ye and Ming Zhong were employed as engineers at Transmeta Corporation, which designed and produced computer microprocessors, when they started their own company, Supervision, with intent to design and manufacture computer microprocessors in China. Before ever manufacturing any products, Supervision obtained funding from the city government of Hangzhou and the provincial government of Zhejiang, in exchange for locating the design and manufacturing facilities in those regions. Defendants both took Transmeta trade secret materials including scripts to manage software applications to build and design chips, schematic layouts of a systems board that incorporated a Transmeta chip, and "Verilog" files that described the developmental designs. Defendant Ye also possessed schematics belonging to his former employer, Sun Microsystems, related to the design of their chips. Both defendants were convicted of two counts each of economic espionage under Section 1831(a)(3). The advisory range was calculated as 46 to 57 months for Mr. Ye, and 37 to 46 months for Mr. Zhong. Both defendants were sentenced to **12 months in custody** for each count, to run concurrently.

In *United States v. Chen* (5:17cr603), Defendant Donald Olgado, while employed at Applied Materials, downloaded about 16,000 files that comprised 98 percent of Applied Materials' trade secrets for its "NLighten" tool. He downloaded them for his own use in starting a competing company, which he planned to initiate with other Applied Materials colleagues. He was convicted of 11 counts of possession of stolen trade secrets and aiding and abetting under Section 1832(a)(3). The advisory range was calculated as 41 to 51 months, and he was sentenced to **3 years of probation**.

In short, sentencing Mr. Ding to even the low end of the final adjusted offense level would run counter to the sentences imposed on other, similarly situated defendants, and not serve the ends of justice. It would make Mr. Ding an outlier in a constellation of sentences in this district that have departed downward from the advisory range.

## VII. No Restitution Should Be Ordered Because Google Suffered No Pecuniary Harm.

Restitution under the Mandatory Victims Restitution Act is compensatory, not punitive. It is available only to a person "directly and proximately harmed" by the offense, 18 U.S.C. § 3663A(a)(2), and only to the extent of actual pecuniary loss. *See United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 927–28 (9th Cir. 2001) (restitution may compensate only for actual losses caused by the defendant's conduct, and may not confer a windfall).

As discussed above, the government admits that Google suffered no pecuniary loss. On materially identical facts, the court in *United States v. Xue* held that where the misappropriation of trade secrets inflicted no pecuniary harm on the victim company, it was not entitled to restitution. *Xue*, No. 16-22, 2021 WL 2433857, at *4–7 (E.D. Pa. June 15, 2021), *aff'd*, 42 F.4th 355 (3d Cir. 2022). *Xue* grounded its reasoning in the language of the statute, concluding that "the MVRA in its entirety only applies if the victim 'has suffered a physical injury or pecuniary loss.'" *Id.*, at *4 (quoting § 3663A(c)(1)(B)). The Court reasoned, "because the Supreme Court held in *Lagos v. United States* that § 3663A(b)(4) should be interpreted narrowly," any contradiction within the MVRA "should be interpreted against the award of reimbursement for legal fees and costs." *Id.*

The defense acknowledges that the Second Circuit reached a different conclusion in *United States v. Avenatti*, 81 F.4th 171, 209 (2d Cir. 2023), which rejected *Xue* and held that Nike qualified as a victim despite incurring no actual losses from the extortion scheme itself. While neither case is binding on this court, Mr. Ding submits that *Avenatti*'s reasoning is less faithful to the MVRA's compensatory design and wrongly decided. *Xue* reflects the sounder reading of the statute and the one consistent with this Circuit's actual-loss requirement. Therefore Mr. Ding asserts no restitution is permissible.[24]

## VIII. Conditional Motion To Stay Sentence Pending Appeal

Because Mr. Ding requests a sentence of home confinement, he does not presently ask the Court to stay his sentence pending appeal. Should the Court instead impose a term of imprisonment, however, Mr. Ding respectfully moves under 18 U.S.C. § 3143(b) and Federal Rule of Criminal

---

[24] If restitution is awarded, the parties have agreed that the amount of restitution ordered to be paid to Google is $189,098.01.

Procedure 38(b) for a stay of that sentence pending appeal. Mr. Ding satisfies each requirement for release pending appeal. First, clear and convincing evidence establishes that he is not likely to flee and does not pose a danger to the safety of any other person or the community if released under the conditions set forth in 18 U.S.C. § 3142(b) or (c). Second, his appeal is not taken for the purpose of delay. Third, his appeal raises a substantial question of law or fact, including whether the government's exercise of peremptory strikes violated *Batson v. Kentucky* and whether the asserted combination trade secrets meet the definition of a trade secret under 18 U.S.C. § 1839(3). Fourth, resolution of those questions in his favor is likely to result in reversal or new trial. Should the Court grant the government's requested enhancements under §§ 2B1.1(b)(1) or 2B1.1(b)(14), the application of those enhancements presents a further substantial question, and a favorable ruling on that question is likely to result in a sentence that does not include a term of imprisonment, or in a reduced term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

## IX. Conclusion

The correct advisory calculation is an offense level of 6 and a range of 0 to 6 months, in Zone A. The enhancements the government seeks beyond it fail as a matter of law and of proof.

The § 3553(a) factors support Mr. Ding's recommended sentence. Moreover, every comparable defendant sentenced in this District for similar conduct—including defendants whose conduct was materially more aggravated—received a sentence below their Guideline range, and many received no custody at all. Sentencing Mr. Ding a term of imprisonment would not vindicate the Guidelines; it would make him an outlier among them.

Mr. Ding therefore respectfully requests that the Court adopt the Guidelines calculation set forth above, decline to order restitution, and impose a sentence of three months home confinement. That sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence. 18 U.S.C. § 3553(a).

Respectfully submitted,

Dated: August 25, 2026

By: **GOODWIN PROCTER LLP**

*/s/ Grant P. Fondo*

GRANT P. FONDO (SBN 181530)
*GFondo@goodwinlaw.com*
FARZAD FEYZI (SBN 343538)
*FFeyzi@goodwinlaw.com*
601 Marshall Street
Redwood City, CA 94063
Tel: +1 650 752 3100
Fax: +1 650 853 1038

LORA J. KRSULICH (SBN 315399)
*LKrsulich@goodwinlaw.com*
601 S. Figueroa Street, Suite 4100
Los Angeles, CA 90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

DARRYL M. WOO (SBN 100513)
*DWoo@goodwinlaw.com*
RACHEL M. WALSH (SBN 250568)
*RWalsh@goodwinlaw.com*
JESSICA FUZELLIER HUANG (SBN 315208)
*JHFuzellier@goodwinlaw.com*
COLETTE A. LOWRY (SBN 359889)
*CLowry@goodwinlaw.com*
525 Market Street, Floor 32
San Francisco, CA 94105
Tel.: +1 415 733 6000
Fax: +1 415 677 9041

Attorneys for Defendant
LINWEI DING

**Appendix A**

| **Case** | **Sentencing Date** | **Charges** | **Advisory Range** | **Sentence** |
|---|---|---|---|---|
| *USA v. Rashidi* (4:05cr744) | May 25, 2006 | 18 U.S.C. § 1832(a)(1), theft of trade secrets | 6 to 12 months | 4 years of probation and 10 months home confinement |
| *USA v. Ye* (5:02cr20145) (Defendant Fei Ye) | November 21, 2008 | 18 U.S.C. § 1831(a)(3), economic espionage | 46 to 57 months | 12 months in custody |
| *USA v. Ye* (5:02cr20145) (Defendant Ming Zhong) | November 21, 2008 | 18 U.S.C. § 1831(a)(3), economic espionage | 37 to 46 months | 12 months in custody |
| *USA v. West* (5:08cr709) | June 15, 2009 | 18 U.S.C. § 1832(a)(3), possession of stolen trade secrets | 10 to 16 months | 3 years of probation |
| *USA v. Zhang* (5:05cr812) | February 25, 2013 | 18 U.S.C. §§ 1832(a)(1), (2), (4), theft, misappropriation, and unauthorized downloading of trade secrets; 18 U.S.C. §§ 1832(a)(2), (4), unauthorized copying of trade secrets; 18 U.S.C. §§ 1832(a)(3), (4), unauthorized possession of stolen trade secrets | 21 to 27 months | 3 months in custody |
| *USA v. Zhang* (5:10cr827) | August 14, 2013 | 18 U.S.C. § 1832(a)(2), theft of trade secrets | 12 to 18 months | 5 years of probation |
| *USA v. Nosal* (3:08cr237) | January 8, 2014 | 18 U.S.C. §§ 1832(a)(3), (4), unauthorized receipt and possession of stolen trade secrets; aiding and abetting[25] | 27 to 33 months | 12 months in custody |
| *USA v. Liew* (4:11cr573) | July 10, 2014 | 18 U.S.C. § 1832(a)(3), possession of trade secrets; | 201 to 262 months | 120 months in custody |

[25] Defendant David Nosal was also convicted of charges under 18 U.S.C. § 371 (conspiracy to misappropriate, receive, possess, and transmit TS; gain unauthorized access to a protected computer; traffic in a password allowing unauthorized access to a protected computer) and 18 U.S.C. §§ 1030(a)(4), (c)(3)(A) (Unauthorized access to a protected computer with intent to defraud and obtaining something of value; aiding and abetting), and received sentences of 12 months in custody for each, all running concurrently.

| | | | | |
|---|---|---|---|---|
| (Defendant Walter Liew) | | 18 U.S.C. § 1832(a)(2), conveying trade secrets, aiding and abetting[26] | | |
| *USA v. Liew* (4:11cr573) (Defendant Robert Maegerle) | August 26, 2014 | 18 U.S.C. § 1832(a)(2), conveying trade secrets[27] | 78 to 97 months | 30 months in custody |
| *USA v. Levandowski* (3:19cr377) | August 4, 2020 | 18 U.S.C. §§ 1832(a)(1)–(4), theft and attempted theft of trade secrets | 24 to 30 months | 18 months in custody |
| *USA v. Pang* (5:15cr106) | August 31, 2020 | 18 U.S.C. §§ 1831(a)(1)–(3), economic espionage, aiding and abetting; 18 U.S.C. §§ 1832(a)(1)–(3), theft of trade secrets, aiding and abetting[28] | 33 to 41 months | 18 months in custody |
| *USA v. Chen* (5:17cr603) | November 8, 2022 | 18 U.S.C. § 1832(a)(3), possession of stolen trade secrets, aiding and abetting | 51 to 51 months | 3 years of probation |
| *USA v. Kim* (5:21cr438) | September 20, 2022 | 18 U.S.C. § 1832(a), theft of trade secrets | 18 to 24 months | 8 months in custody |
| *USA v. Zhang* (5:18cr312) | February 5, 2024 | 18 U.S.C. § 1832(a)(1), theft of trade secrets | 18 to 24 months | 4 months in custody |

[26] Defendant Walter Liew was also convicted of charges under 18 U.S.C. § 1831(a)(5) (conspiracy to commit economic espionage), § 1832(a)(5) (conspiracy to commit theft of trade secrets), and § 1831(a)(2) (attempted economic espionage), §§ 1832(a)(2) and (4) (attempted theft of trade secrets), and received sentences of 120 months in custody for each, all running concurrently.

[27] Defendant Robert Maegerle was also convicted of charges under 18 U.S.C. § 1832(a)(5) (conspiracy to commit theft of trade secrets), §§ 1832(a)(2) and (4) (attempted theft of trade secrets), and § 1512(k) (conspiracy to tamper with witness and evidence), and received sentences of 30 months in custody for each, all running concurrently.

[28] Defendant Hao Zhang was also convicted of charges under 18 U.S.C. § 1831(a)(5) (conspiracy to commit economic espionage) and § 1832(a)(5) (conspiracy to commit theft of trade secrets), and received sentences of 18 months for each, all running concurrently.

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on **August 25, 2026**. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on **August 25, 2026**.

*/s/ Grant P. Fondo*
GRANT P. FONDO